Mark J. Geragos, California State Bar #108325
GERAGOS & GERAGOS, APC
644 S. Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 625-3900
Facsimile: (213) 625-1600


Jon D. Williams (8318)
9 Exchange Place
Suite 600
Salt Lake City, UT 84111
Telephone: (801) 746-1460
Facsimile: (801) 998-8077

*Attorneys for Lev Dermen*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LEV ASLAN DERMEN,<br><br>Defendant. | **DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER OF DETENTION OF LEV DERMEN**<br><br>Case No. 2:18-cr-00365-JNP-BCW |

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

The matter of Mr. Dermen's detention came before Magistrate Judge Gail Standish on August 28, 2018. Evidence was presented through the testimony of Special Agent Tyler Hatcher ("SA Hatcher") and Government exhibis. Mr. Dermen proposed a

1

bail package which included a bond secured by real property, including property belong to sureties including his parents and brother, restricted travel, and home confinement with GPS monitoring, among other conditions.  At the conclusion of the proceedings Judge Standish ruled in favor of the Government citing findings of facts that Mr. Dermen posed a flight risk and that no set of conditions counsel ensure his appearance in further proceedings.

On September 24, 2018, Mr. Dermen filed a Motion for Review of Detention by District Judge (Doc 64) requesting a de novo consideration of detention, pursuant to 18 U.S.C. Section 3143 and DUCrimR 57-16(a)(1).

## I.    INTRODUCTION & PROPOSED CONDITIONS FOR RELEASE

Mr. Dermen is presumed to be innocent.  In deciding a bail issue pursuant to 18 USC Section 3142, the "court should bear in mind that it is only a limited group of offenders who should be denied bail pending trial." *United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987).*  Indeed the Bail Reform Act requires that the Court impose "the least restrictive...condition, or combination of conditions, that ... will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. Section 3142(c)(1)(B).

The Bail Reform act provides for a rebuttable presumption of detention for cases fitting only two categories - one where the defendant is charged with certain firearms or drug offenses; and a second where the defendant has certain prior convictions.  The facts of this case do not trigger either of the rebuttable presumptions of detention.

Therefore the Government bears the burden of establishing that there are no appropriate conditions of release based on the factors set forth in the bail reform act. With those legal principles in mind, the Defendant by and through counsel, is prepared to offer the following conditions that are more than sufficient to assure Mr. Dermen's appearance during the pendency of this action:

a)      A personal recognizance bond secured by real property or cash.

b)      Travel restricted to Los Angeles County, the county of Mr. Dermen's residence with the exception of travel to the charging district of Utah for Mr. Dermen's required court appearances with prior approval from Pretrial Services; or alternatively, a requirement that Mr. Dermen secure a temporary residence in the state of Utah and restrict any travel outside of Utah through the pendency of this matter;

c)      GPS monitoring and a designated curfew as Ordered by the Court;

c)      Surrender all passport and travel documents with no new applications;

d)      Strict pretrial supervision including once weekly required in person check in with Pretrial Services.

e)      Surrender any and all firearms to a designated law enforcement officer.

## II.     LEGAL STANDARDS & REVIEW
### A.     Review

The standard of review for the district court's review of a magistrate judge's detention or release order under § 3145(a) is de novo. *See, e.g., United States v. Rueben,* 974 F.2d 580, 585–86 (5th Cir.1992) ("When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts *de novo* and must

make an independent determination of the proper pretrial detention or conditions for release."); *Maull,* 773 F.2d at 1481 (stating that district court's review of magistrate judge's order setting bond was de novo).  *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003)

### B.    Legal Standards

Federal law has traditionally held that in determining the applicable standard of review, a person arrested for a noncapital offense shall be admitted to bail.  *United States v. Motamedi*, 767 F.2d. 1403, 1405 (9th Cir. 1985).  Only in rare circumstances should pretrial release be denied.  Id.  Doubts regarding the propriety should be resolved in favor of the defendant.  Id.

Release of a criminal defendant pending trial is governed by the Bail Reform Act of 1984 which mandates release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required.  Id.  The Fifth and Eighth Amendments' prohibitions of deprivation of liberty without due process and of excessive bail require careful review of pretrial detention orders to ensure that the statutory mandate has been respected.  Id.

The Bail Reform Act, codified in 18 United States Code Section 3142 provides in relevant part that:

> The judicial officer shall order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court, subject to the condition that the person not commit a Federal, State, or local crime during the period of release... unless the judicial officer determines that such release will not reasonably assure the appearance of

4

the person as required or will endanger the safety of any other person or the community.

18 U.S.C.A. § 3142 (b).

In determining issues of pre-trial detention and release, 18 United States Code Section 3142(g) directs courts to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the nature and seriousness of the danger to any person or to the community that would be posed by the person's release; and (4) the history and characteristics of the person including his family ties, employment record, community ties, history of drug or alcohol abuse, criminal history, and whether at the time of the offense or arrest he was on probation or parole. 18 U.S.C. Section 3142(g). Here, as explained below, the balance of factors weigh strongly in favor of granting Mr. Dermen bail pending trial. Any doubts regarding the propriety of bail should be resolved in favor of the defendant.

## III.    PROCEDURAL HISTORY AND RELEVANT FACTS

### A.    Background

Mr. Dermen is a 52-year old male. He is a widower and the father of two children. Mr. Dermen and his family reside in Los Angeles, California, where they have lived since he immigrated to the United States at age 14 and is a naturalized United States Citizen. Mr. Dermen operates a chain of family owned gas stations throughout California. He suffers from severe heart disease.

Mr. Dermen has sufficient financial means to post bond.   He is not a flight risk nor a danger to the community.

**B.     The Indictment**

Lev Derman is named as one of three defendants in a fifteen count Indictment alleging violations of false tax returns and money laundering.   Mr. Derman is only charged in four of the fifteen counts and on the face of the Indictment appears to be the least culpable of the three defendants.   For purposes of his application for bail, Mr. Derman concedes that the Indictment includes serious felony charges - a fact which, however, does not distinguish it from any other federal felony Indictment.   There are no allegations of violence or potential violence in the Indictment, and as noted, none of the charges create any presumptions of detention under the Bail Reform Act, see 18 U.S.C. 3142(f)(1), or is otherwise identified in the Act as the sort of crime for which bail should be denied, see 18 U.S.C. 3142(g)(1).

Co-defendant Jacob Kingston is charged in multiple tax fraud related counts with losses allegedly amounting to over $500 million as alleged in Counts 1 through 9 of the Indictment.   Mr. Dermen is named in Counts 10 through 12 in violation of 18 U.S.C. Section 1956(a)(1)(B), money laundering, with a loss amount of $210,000 in Count 10, and $70,000 in Counts 11 and 12.   These payments are alleged to be interest payments received by SBK Holdings USA, a corporation that Mr. Dermen was a director of, which was listed as the beneficiary of an $11 million loan that was sourced by Jacob Kingston allegedly with the proceeds of the underlying tax fraud scheme.  Lastly, Mr. Dermen is named in Count 13 a violation of 8 U.S.C. Section 1957(a)(1)(B)(i) where it is alleged

6

that Mr. Dermen essentially permitted co-defendants Jacob and Isaiah Kingston to use his name as a straw buyer in the purchase of real property at 2072 East Creek Road which was valued $3.1 million.

**C.     August 28, 2018 Detention Hearing**

Mr. Dermen was arrested on August 23, 2018, in Los Angeles, California where he resides.  A detention hearing was held on August 28, 2018 before the Honorable Judge Gail J. Standish, United States District Court Magistrate Judge in the United States District Court in the Central District of California.  The Government made a motion for detention on grounds that Mr. Dermen should be detained based on flight risk and a danger to the community.  The Court considered evidence regarding flight risk only.

The Magistrate Judge's conclusions and order for detention relied on information presented by the Government, including the testimony of Government witness Special Agent Tyler Hatcher (hereafter "SA Hatcher").   The evidence that the Government presented in support of pretrial detention was mischaracterized, misleading, unreliable, and often times blatantly false.   The Government cited Mr. Dermen's legal  name change, a supposed plan to "flee" to Turkey, allegations of continued efforts to evade law enforcement, among other misleading and factually incorrect assertions.

Mr. Dermen was ordered detained by the Magistrate Judge.  In a written order denying bail and ordering detention, Judge Standish states the following reasons for Mr. Dermen's pre-trial detention: that Mr. Dermen (1) is subject to lengthy period of incarceration if convicted; (2) has significant family or other ties outside the United States; and (3) prior failure to appear in court as ordered.   Judge Standish's written

decision goes on to state, "Defendant has significant assets abroad, travels frequently, and has previously declared, under penalty of perjury, that he 'resides' in Istanbul.  He has failed to comply with civil court orders to appear for depositions in unrelated cases.  He has absented himself from the United States when other investigative, state court, matters were pending."

Special Agent Tyler Hatcher testified at the August 28, 2018 detention hearing upon the Court's request for a proffer from the Government.  RT at 21.  SA Hatcher is an Internal Revenue Service (IRS) agent and has been assigned to this investigation for two years.  RT at 23.

The Government adopted two different conflicting positions in their attempt to establish flight risk.  On the one hand the Government and SA Hatcher portrayed that Mr. Dermen had zero knowledge that he was or may have been a subject of a criminal investigation over the last year.  RT at 24-25.  For instance, on direct examination, SA Hatcher explained that some time in June of 2018 he met Mr. Dermen and spoke with him after the agent "showed up" at Mr. Dermen's place of business with a grand jury subpoena for Mr. Dermen's business records and for the personal appearance of the president of his company. RT at 23-34.  SA Hatcher testified that he met Mr. Dermen at his business office and spoke with him and the president of his company at length.  RT at 23.  Hatcher even conceded that Mr. Dermen was cooperative and volunteered all of the information sought by Hatcher.  Many of SA Hatcher's questions had to do with Mr. Dermen's business affiliation, if any, with Washakie Renewable Energy, a company that

is controlled by co-defendant Jacob Kingston, the primary subject of this Indictment.  RT

at 24.

| | |
|---|---|
| Mr. Geragos: | You went on your own to Mr. Termendzhyan's office; is that right? |
| SA Hatcher: | I did. |
| Mr. Geragos: | A month ago or June? |
| SA Hatcher: | In June. Uh-huh. |
| Mr. Geragos: | Is that yes? |
| SA Hatcher: | Yes. In June. |
| Mr. Geragos: | When you went there, did he tell you, "Uh-oh, I've got to get out of here; the IRS CID is here"? |
| SA Hatcher: | No. |
| Mr. Geragos: | Did you identify yourself as the Criminal Investigation Division? |
| SA Hatcher: | I did. |
| Mr. Geragos: | Did you say that you're -- what did you tell him you were investigating? |
| SA Hatcher: | I didn't tell him what I was investigating. I said I was dropping off a subpoena for records, for the business records of NOIL. |
| Mr. Geragos: | Okay. Does it say on the subpoena "Criminal Investigation Division"? |
| SA Hatcher: | I don't believe so. |

| | |
|---|---|
| Mr. Geragos: | You don't think that your name has that CID next to it? |
| SA Hatcher: | My name's not on the subpoena. |
| Mr. Geragos: | Whose name was? |
| SA Hatcher: | It's the U.S. Attorney's office. |
| Mr. Geragos: | And does the U.S. Attorney's office say Criminal Investigation Division? |
| SA Hatcher: | I don't think there is a criminal investigation division of the U.S. Attorney's office. |
| Mr. Geragos: | No. How about the -- how about from Washington, DC? Is there a criminal investigation division of the IRS? |
| SA Hatcher: | Not to my knowledge. Not -- not from prosecutors. |
| Mr. Geragos: | Not from prosecutors. |
| SA Hatcher: | Correct. |
| Mr. Geragos: | How about from the agency? |
| SA Hatcher: | Sure. Absolutely. |
| Mr. Geragos: | And did you -- and did he flee after that? |
| SA Hatcher: | He was unaware that we -- we were looking for him. |
| Mr. Geragos: | Well, was it a grand jury subpoena? |
| SA Hatcher: | It was. |
| Mr. Geragos: | Okay. So, you've got a -- and did it say civil on it or did it say criminal? |
| SA Hatcher: | I am not that familiar with the subpoena. |
| Mr. Geragos: | Well, the subpoena says criminal on it, doesn't it? |

SA Hatcher:          I don't know.

Mr. Geragos:         It says grand jury on it, doesn't it?

SA Hatcher:          It says grand jury subpoena, correct.

Mr. Geragos:         Right. So, you've got a grand jury subpoena; you go to his
                     office; he's the one who -- he was cooperative, correct?

SA Hatcher:          Correct.

Mr. Geragos:         He answered all of your questions, correct?

SA Hatcher:          I wasn't questioning -- questioning him. I was trying to
                     question Mr. McDyre.

Mr. Geragos:             Okay. But he was volunteering the information.

SA Hatcher:          Correct.

Mr. Geragos:         He wanted to tell you whatever it was you wanted to know,
                     correct?

SA Hatcher:          I was trying to clarify for him which records I was
                     looking for, and that was the extent of the -- there wasn't
                     really questions; I was explaining what I was looking
                     for.

Mr. Geragos:         Did he tell you, "Go talk to my lawyer"?

SA Hatcher:          No.

Mr. Geragos:         Did he tell you, "I'm not going to talk to you; I'm
                     invoking the Fifth"?

SA Hatcher:          No.

Mr. Geragos:         Did he say, "I'm not" -- all you got is name, badge, and
                     serial number.

SA Hatcher:          I'm sorry; repeat that question?

RT 47-49.

Despite obvious evidence suggesting Mr. Dermen would have at the very least suspected a pending criminal investigation, SA Hatcher maintained that Mr. Dermen had no information or reason to believe that one existed simply because SA Hatcher did not explicitly tell him that he was under federal investigation:

| | |
|---|---|
| AUSA Rowling: | And did you reveal to him that he was under Federal investigation by you and your -- |
| SA Hatcher: | I did not. |
| AUSA Rowling: | Did you suspect that he knew this at that time? |
| SA Hatcher: | I did not. |

RT at 24.

On the other hand, the Government claimed that Mr. Dermen was aware of an imminent prosecution and had a plan to flee to Turkey "when things got hot." The fact is that Mr. Dermen has been well aware that he was a target of a pending criminal investigation with federal law enforcement involvement since the execution of a search warrant by Homeland Security Investigation agents and local law enforcement on August 10, 2017. While Mr. Dermen has indeed travelled over the last year, there has never been an intention to flee to avoid prosecution. Rather, Mr. Dermen subjected himself to state court jurisdiction by filing a motion for return of property inviting the prosecution to file charges to expedite the return of property; making himself available to federal law enforcement and even the United States Attorney's Office on many occasions; he has

been easy to locate, *i.g.* SA Hatcher locating him at his place of business as late as June of 2018.  Still when he was asked by the Government whether he had any evidence that Mr. Dermen was aware of this Indictment, SA Hatcher testified **"none whatsoever."**  RT at 40.  Hatcher testified that he took efforts during the course of this two year investigation to keep the circle close so that the Indictment would not be leaked.  He even said "That's why we kept it mostly in Utah."  RT at 40.

**D.      August 10, 2017 Search Warrant**

*Flight Risk*

On August 10, 2017, in a joint task force with Homeland Security Investigation and agents from the United States Customs and Border Patrol, and the Los Angeles Police Department executed a search warrant obtained from the Los Angeles Superior Court, on multiple gas stations owned by Mr. Dermen and two homes, one belonging his elderly parents.  While the search warrant affidavit remains sealed, the investigation was regarding allegations related to biodiesel fraud and grand theft by false pretenses with respect to biodiesel fuel.  As a result of the warrant, several vehicles, currency, business records, computers, point of service systems, and jewelry among other items were seized from Mr. Dermen's homes and businesses, as well as those of his family members.   Mr. Dermen immediately initiated proceedings before Judge Gary J. Ferrari in the Los Angeles Superior Court, Long Beach Courthouse, and filed a Motion for Return of Property.   After four court appearances, Judge Ferrari, who had initially signed the warrant, ordered the property returned subject to specific conditions. *See Def Exhibit 1, Judge Ferrari's Order re Motion for Return of Property.*  Part of that Order for return of

property was that all seized currency was to be held in an attorney client trust account subject to further order of the court. That money presently remains in an attorney client trust account.   After the order for return of property was issued, it was revealed that all of the property had been turned over from local law enforcement to the HSI and Customs and Border Patrol (CBP).   The return of property was facilitated by Matthew P. Benham, who was at the time the Assistant Chief Counsel for Homeland Security Investigations in Los Angeles, with the assistance of several federal law enforcement agents.     The physical return of property occurred over the course of four different occasions, two of which were at HSI field offices where much of the property was stored.

At Mr. Dermen's August 28, 2018 detention hearing, the Government and SA Hatcher tried to distance this Indictment and the involvement of federal agencies from that August 2017 search warrant.  AUSA Rowling claimed: "When he left in August of 2017, when the local police department here executed State search warrants, he did not return as is reported in the Pretrial Services report until Mr. Geragos, who was well aware his client was in Turkey the entire time LAPD was dealing with the assets they seized from Mr. Termendzhyan's home and business, negotiated and got a court to order the release and return of all those seized assets because no prosecutor was involved as my understanding -- I wasn't involved in that search warrant, it wasn't part of our investigation." RT at 7.   The mischaracterization of the origination of the search warrant and attempts by the Government to hide the fact that it was a federal investigation was at best not accurate:

MR. GERAGOS:    You just testified this was a state court warrant,

correct?

SA Hatcher:              Which warrant are you referring to? I'm sorry.

MR. GERAGOS:    The one that the -- we talked about or that your -- your U.S.
                Attorney has been talking about; August, last year.

SA Hatcher:     The one last August was a state --

MR. GERAGOS:    Yeah.

SA Hatcher:     -- search warrant.

MR. GERAGOS:    Do you know where all the property was turned over to?

SA Hatcher:     I don't know.

MR. GERAGOS:    Homeland Security? Do you know who Matthew
                Denham (phonetic) is?

SA Hatcher:     I don't know who that is.

MR. GERAGOS:    General Counsel for ICE, who supervised all of the property,
                everything that was -- that was seized by LAPD? Are you
                aware of that?

SA Hatcher:     I'm not.

RT at 43.

   The Government continued to distance their investigation from the August 17, 2017 search warrant, for instance, at the detention hearing, AUSA Rowling argued: "All the talk Mr. Geragos makes of this so-called search warrant, the search warrant I mentioned is not the search warrant that relates to this investigation at all. It has nothing to do with this case. There's no allegation of this fraud in that search warrant affidavit,

and yet he fled the day it was executed." RT at 19-20. Yet, when SA Hatcher was asked whether he was aware that Mr. Dermen travelled to Turkey in August of 2017 following the execution of this August 2017 search warrant, he replied that he was aware, stating: "I spoke to another special agent associated with investigations in California who relayed to me that he received a phone call from Customs and Border Patrol saying that he was on his way out." RT at 27.

Mr. Dermen, is in a lawsuit with Zubair Kazi who is identified as Borrower X in the Indictment with regard to Counts 10 through 12, and within the proceedings of that lawsuit received a copy of an email from Special Agent Louis S. Skenderis, Homeland Security Investigations, located in San Pedro, California instructing Mr. Kazi not to pay any portion of the outstanding balance on the loan, because according to Agent Skenderis in the email, the $11 million to source the loan was stolen from a U.S. Government renewable energy subsidy program. Mr. Kazi is warned, that continued payments towards the loan would subject him to criminal liability under Title 18 U.S.C, Sections 1512, 1956, and 1957. Agent Louis Skenderis is a special agent with Homeland Security Investigations. Despite SA Hatcher's denial that HSI is involved in the investigation of this Indictment, and that the August 10, 2017 search warrant had nothing to do with this investigation, it is belied by the address in Agent Skenderis' signature box, which is where the property that was seized from the search warrant was held and picked up by Mr. Dermen's counsel on January 18, 2018. *See Def Exhibit 2, Email from HSI SA Louis S. Skenderis.*

Not surprisingly, Counts 10 through 12 of the Indictment charge Mr. Dermen with money laundering counts for receiving the interest payments from Zubair Kazi in relation to this $11 million loan that was sourced by Jacob Kingston, which clearly involved an investigation involving Homeland Security who specifically warned Kazi to stop paying this loan.

The Government's effort to conceal the agency's involvement in this search warrant was to apparently bolster their narrative that Mr. Dermen had no knowledge that he was the subject of a federal investigation for the last twelve months.

The Government also claimed that when the August 10, 2017 search warrant was executed, Mr. Dermen "fled" that same day to Turkey. They alleged that his return was somehow conditioned on his legal counsel securing a court order for return of his property, which was issued on November 3, 2017. According to AUSA Rowling, "He did not return to the United States until Mr. Geragos sufficiently acquired that court order. Then Mr. Termendzhyan returned." RT at 7. The fact that an Order for Return of Property was issued has no bearing on whether Mr. Dermen was cleared with respect to filing of formal charges. There was no representation during motion for return of property proceedings that the District Attorney's Office or any other prosecuting agency had abandoned its investigation against Mr. Dermen or his business as a consequence of the Order for Return of Property. In fact, the Order required that all currency seized be held in a client trust account by counsel subject to further court order.

Mr. Dermen voluntarily submitted himself to the jurisdiction of the Los Angeles Superior Court upon his decision to have his legal counsel file a motion for return of

property immediately after the August 10, 2017 search warrant was executed.   The motion was opposed by the Los Angeles District Attorney's Office which has maintained, since filing of the motion, that the office intended on filing multiple charges relating to alleged biodiesel fraud by way of grand theft by false pretenses.   The Los Angeles District Attorney's Office was in contact with Mr. Dermen's counsel on a monthly basis and they continued to maintain their intention of filing felony charges during those communications.   Counsel for Mr. Dermen kept Dermen apprised of the updates and impending felony charges regarding biodiesel sales.   Although there was not a formal criminal complaint or grand jury finding in the Los Angeles Superior Court as these factors appeared relevant in the magistrate judge's inquiry, there was always a consistent representation by the District Attorney's Office that these charges "were coming." RT at 16.

Finally, the Government claims that Mr. Dermen was "tipped off" to the search warrant because, according to them "the Borajet plane from which and on which he fled this country in August of 2017 was in the United States two days before the search warrant and left the day the search warrants were executed." RT at 8.   Again this is either a false allegation or yet another example of a lack of any meaningful investigation in this Indictment.   First, Mr. Dermen has no ownership interest or control over Borajet Airlines.   Borajet ceased operations on April 24, 2017, and Turkish Airlines assumed its flight reservations.   Borajet has not resumed operations since.   Secondly, Mr. Dermen was not "tipped off" and the Government has no evidence to demonstrate that he was.   Mr. Dermen's birthday is August 13, and his travel plans were for his birthday celebration.

The agents that were at the scene of the search warrant even witnessed several birthday gifts delivered to the NOIL station on Randolph St., while the search was being executed, at one point one of the agents even asked defense counsel who was also at the scene to store the birthday presents in her vehicle.

Additional evidence demonstrating Mr. Dermen's knowledge of this investigation prior to his arrest, and lack of any intention or plan to flee is that Mr. Dermen through counsel, sent a letter to the United States Attorney's Office, addressed to AUSA Thomas Stout, who was involved in conducting the grand jury proceedings, notifying the US Attorney's office that he had evidence that Edgar Sargsyan, who as detailed below is now a Government witness, and John Balian - presently awaiting sentencing in a separate federal criminal complaint - were interfering with the ongoing grand jury investigation by threatening witnesses and attempting to obstruct justice by offering to pay for the witnesses' attorney's fees.

*See Def Exhibit 3, Letter to AUSA T. Stout*.

*Flight to Turkey*

Even though the Government and SA Hatcher maintained that Mr. Dermen had no clue "whatsoever" that there was a pending criminal investigation, they also alleged that Mr. Dermen had a plot to flee to Turkey to avoid his arrest in this Indictment.  RT at 40. This alleged plot included a legal name change and travel reservations.   RT at 40.

The Government falsely claimed that Mr. Dermen had travel plans to Turkey and that this was proof that he intended to flee the United States to avoid prosecution. RT at 5. For instance AUSA Rowling stated to the Court: "And in fact as the Pretrial Services

report shows, he was flying to Turkey yesterday, not coincidentally the same time period his co-defendant Jacob Kingston was arrested on a flight to Turkey on Thursday last week." RT at 5. The Court accepted this stating, "And, you know, that he was essentially, you know, arrested on his way out of the country, his co-defendant was arrested on his way out of the country, --" RT at 14. Mr. Dermen concedes that he intended to travel, as he frequently does, overseas to Dubai on August 27th, 2018. Since the Government concedes throughout the proceedings that Mr. Dermen had no knowledge of this investigation "whatsoever," his August 27th travel plans have no bearing on Dermen's flight risk. Further, despite the Government's attempts to establish Mr. Dermen's unlimited access to private airplanes by trying to connect him to BoraJet, a Turkish Airline that ceased to exist as of April 24, 2017, Mr. Dermen's flight reservations were through commercial airline Emirate Airlines. *See Def Exhibit 4, Flight Confirmations.*

Mr. Dermen was not arrested on his way out of the country, but rather by IRS agents at the IRS Office in Los Angeles, California. SA Hatcher explained the circumstances of Mr. Dermen's arrest stating that Mr. Dermen voluntarily contacted the IRS Office days before his arrest requesting to meet with the agents. RT at 26. SA Hatcher directed the special agent that took the call to schedule an appointment with Mr. Dermen for Friday, August 25, 2018. The meeting was subsequently rescheduled to August 24, 2018, the date of Mr. Dermen's arrest. The purpose of the meeting according to Hatcher's testimony was to create a ruse to lure Mr. Dermen into coming into the IRS office to arrest him. RT at 25-26. Thus, despite the Government's allegations and the

Magistrate Judge's findings that Mr. Dermen was arrested as he was fleeing the country, this was simply not the case according to the agent's own testimony.

*Name Change*

The Government claimed at the hearing that Mr. Dermen, whose former legal name was Levon Termendzhyan, changed his name to its current form, as part of a plot to escape to Turkey because of this investigation  "if and when things got hot." RT at 5. The Government described the name change as a "recent" one and alleged that he selected "Lev Dermen" so that he "could be more accepted" in Turkey upon his escape. The fact is that the Government was wrong again, and Mr. Dermen petitioned to change his name on June 9, 2017 in the Los Angeles Superior Court, in case number BS169819. *See Def Exhibit 5, Petition for Name Change.* This was well over a year before his recent arrest in August of 2018, and two months before the execution of a search warrant by a local and federal joint task force involving the Department of Homeland Security and the Los Angeles Police Department on August 10, 2017.

Lev Dermen is a shortened more "Americanized' version of his birth-name Levon Termendzhyan.  Mr. Dermen concedes that he engages in overseas travel and that Turkey is a destination that he frequents.  Mr. Dermen is a Christian and of Armenian heritage as is his name Levon Termendzhyan.   Turkey has a long standing volatile history with Armenia and Armenians because of Turkey's ongoing denial of the atrocities of the 1915 Armenian Genocide during the Islamic Ottomon Empire.  Until this day, Armenians are subject to  persecution, violence, threats, harassment, and at times unjust arrests in Turkey, sometimes based solely on the origin of their names.  Mr. Dermen shortened his

name to a simpler form like countless other Armenians have and continue to do.  The fact of his name change, under these circumstances,  is irrelevant to an inquiry of pretrial flight risk.

*Weight of the Evidence*

The Government's allegations are that Washakie Energy received $500 million worth of renewable fuel tax credits from 2010 forward by means of fraud.  According to SA Hatcher's testimony, Washakie allegedly applied for 1 billion dollars worth of credits, and out of that received approximately $500 million.  It is unclear based on SA Hatcher's testimony what the annual revenue was. Hatcher stated that the target of his investigation was co-defendant, Jacob Kingston,  who owns and operates Washakie Energy and according to him is believed to be responsible for the $500 million fraud alleged in this Indictment.  RT at 30.  He described Kingston as the "main target" of his investigation. SA Hatcher testified that it was his  "understanding"  that Jacob Kingston shares some sort of partnership in a company called SBK Turkey AS, a holding company in the country of Turkey.  RT at 30.  Hatcher claimed that Mr. Dermen also has an ownership interest or control of the Turkey based company.  RT at 29.

SA Hatcher's testimony relied heavily on a press release of unclear origin taken off of the internet from the "Republic of Turkey Prime Ministry Investment Support and Promotion Agency" dated September 9, 2016 which was presented as a Government exhibit at the August 28th hearing.  A cursory glance of the Government's exhibit demonstrates that the press release is simply propaganda material meant to stimulate investments in Turkey.  The document's title is "$950M Cash Flow Slated to Arrive in

Total Future Investments" with a subheading that reads "Noil Energy Group Inc., US-Based Washakie Renewable Energy and SBK Holding LLC are Set to Start a $450M Equity Fund." The document contains many exaggerated descriptions of the entities, such as Noil Energy Group being in existence for 200 years - which Hatcher could confirm is simply not true.  It is unclear what the source of the information was for this document, and SA Tyler Hatcher admitted that he made no attempt to make an inquiry about it.

SA Hatcher relied on the press release and testified that according to the document $500 million was invested into Turkey in 2013 and another 450 million was poised to flow into the country as of the date of the September 9, 2016 release - totaling an investment of over $900 million.  RT at 33.

SA Hatcher's testimony claimed that he traced $130 million of the $500 million worth of Department of Treasury refunds paid to Washakie to Mr. Dermen.  RT at 33. He claimed that the treasury refunds went through Kingston controlled accounts to either SBK Holdings LLC,  SBK Turkey, "or other Turkish investments," as of 2013.  RT at 33. Then Hatcher was asked whether he had seen Mr. Dermen send money to Turkey, to which he responded that he has seen bank records show the transactions, particularly SBK Holdings, LLC sent money to SBK Holdings, AS.  RT at 33.  At this point, the Government showed SA Hatcher a photograph of Turkish President, Erdogan, standing with Baran Korkmaz who is believed to control SBK Holdings AS, co-defendant Jacob Kingston, and an unnamed fourth individual.  The purpose of the photo was to establish "some sort of relationship" with the President of Turkey.  RT at 34.  It is noteworthy that Mr. Dermen was not in the photograph.

On cross examination Hatcher testified that he did not know who translated the September 9, 2016 press release, nor could he provide the document's source from the internet.

Mr. Geragos:     And this press release. This press release, did you --what did you do to substantiate the monies that are mentioned in this press release?

SA Hatcher:      Well, we tried to reach out to Turkey to get a request for records, but as it's been discussed, they are not cooperative right now.

Mr. Geragos:     Well, when you say "discuss," did you translate this?

SA Hatcher:      I did not. I don't speak Turkish.

Mr. Geragos:     Okay. Do you know who did translate this?

SA Hatcher:      I don't.

Mr. Geragos:     Did you -- where did you get this from?

SA Hatcher:      It came from -- on line.

Mr. Geragos:     On line. And, so, you had an online document which you had somebody else translate; you have no records whatsoever that support it, correct?

SA Hatcher:      I have bank records that show money went to Turkey.

Mr. Geragos:     Nine hundred million dollars?

SA Hatcher:      Not that much.

Mr. Geragos:     Five hundred million dollars?

SA Hatcher:      No.

Mr. Geragos:     Three hundred million dollars?

| | |
|---|---|
| SA Hatcher: | A hundred and thirty. It's been stated. |
| Mr. Geragos: | A hundred and thirty is what you have. You've got a press release that you don't know who translated it, of unknown origin; it was on the internet. Correct? |
| SA Hatcher: | Correct. |
| Mr. Geragos: | You have Edgar Sargsyan's lawyer telling you stuff, correct? |
| SA Hatcher: | Correct. |

RT at 45-46.

As SA Hatcher's testimony developed, what initially began as $900 million dollars transferred to Turkey, decreased to hundreds of millions, to $130 million, to just $30 million being attributed to Mr. Dermen.

| | |
|---|---|
| Mr. Geragos: | But do you have -- the tracing that you've done involves 130 million; is that correct? |
| SA Hatcher: | Over 130 million went to Turkey, yes. |
| Mr. Geragos: | Right. And how much of that came from the gentleman -- or the two gentlemen who were the co-defendants in Utah? |
| SA Hatcher: | I -- without my spreadsheets in front of me it's hard to say, but I know that, you know, in -- in 2015 and '16, tens of millions of dollars came from SBK USA or a related company. |
| Mr. Geragos: | Tens; not a hundred and thirty. |
| SA Hatcher: | No. |
| Mr. Geragos: | Correct. So, a hundred and thirty, you're just taking the Utah monies and you're lumping it in with Mr. Termendzhyan's tens millions. Is that correct? Do I have that right? |

SA Hatcher:       When I look at it, it's money from Washakie; it's money
                  from SBK USA; or other money that we've uncovered that
                  goes to Turkey.

Mr. Geragos:      Right. What I am asking you, though, is, when you did the
                  tracing, all you've got coming from him going to Turkey is
                  roughly 10 million; isn't that correct?

SA Hatcher:       When you say "coming from him," that's difficult in the
                  sense that the fraud proceeds were all manufactured, if
                  you will, by joint ventures by both of them.

Mr. Geragos:      Well, where were the -- when you say the "fraud proceeds,"
                  the proceeds and the indictment -- you're aware of the
                  indictment, correct?

SA Hatcher:       I am.

Mr. Geragos:      Okay. The indictment doesn't allege a conspiracy between
                  the Utah two defendants and Mr. Termendzhyan, does it?

SA Hatcher:       No, but you asked me what money from Mr. Termendzhyan
                  went to Turkey.

Mr. Geragos:      Right. That's what I'm saying. It was roughly
                  $10 million, wasn't it?

SA Hatcher:       That's incorrect.

Mr. Geragos:      Well, it wasn't a hundred and thirty, was it?

SA Hatcher:       It's over $130 million.

Mr. Geragos:      From Mr. Termendzhyan?

SA Hatcher:       From all related parties.

Mr. Geragos:      I'm not asking that question.

RT at 54-55.

26

Later in his testimony SA Hatcher admitted that the amount of money transferred from SBK Holdings LLC to Turkey was much less than 130 million:

| | |
|---|---|
| Mr. Geragos: | But is Washa- -- is it pronounced Washakie? |
| SA Hatcher: | It's Washakie. That's correct. |
| Mr. Geragos: | Yes. Washakie -- is there -- do you have any evidence that that's owned or controlled by Levon Termendzhyan? |
| SA Hatcher: | I don't.  He's not -- he doesn't have -- |
| Mr. Geragos: | It is not, correct? |
| SA Hatcher: | Correct. |
| Mr. Geragos: | Okay. Out of the 130 million, how much is that -- how much of that is Washakie? |
| SA Hatcher: | I don't understand the question. |
| Mr. Geragos: | Well, you said there's 130 million that went out, right? |
| SA Hatcher: | Correct. |
| Mr. Geragos: | Okay. How much of that, of that 130, is Washakie? |
| SA Hatcher: | Maybe it will be -- maybe it will be better if I explain how it comes in. The U.S. Treasury pays money to Washakie; Washakie either sends it directly from Washakie to Turkey or they send it to SBK USA and then it goes to Turkey. |
| Mr. Geragos: | How much did Washakie send to SBK? |
| SA Hatcher: | I believe it's 35 million, roughly. |
| Mr. Geragos: | Okay. And how much did SBK send to Turkey? |
| SA Hatcher: | Like I said, I think it's 30 to 40 million. |

RT 57-58.

SA Hatcher also clarified in his testimony that Mr. Dermen does not have any control or ownership of Washakie Renewable Fuel.

| | |
|---|---|
| Mr. Geragos: | Okay. So, the only money that he's got that went to Turkey that came from Washakie, if I understand correctly, is roughly 35 million without your tracing charts in front of you. |
| SA Hatcher: | Correct. |
| Mr. Geragos: | Okay. So, is it a fair statement that the remainder of the 130 that you testified about to the U.S. Attorney came from Washakie to Turkey? |
| SA Hatcher: | Correct. |
| Mr. Geragos: | Okay. So, if we've got 35 million -- by the way, when Washakie sends it to SBK, then Washakie is the one who actually got the credits, correct? |
| SA Hatcher: | Are you talking about SBK Turkey or USA? |
| **Mr. Geragos:** | **Well, first, when Washakie gets the money, how much do you -- I've heard all these numbers bandied about. Washakie got how much money?** |
| **Mr. Geragos:** | **Five hundred -- a little over $500 million. Washakie has no connect -- we have no evidence that that's connected to Mr. Termendzhyan in terms of control, correct?** |
| **SA Hatcher:** | **Control over the funds?** |
| **Mr. Geragos:** | **Correct.** |

RT at 58. (emphasis added).

Although it was SA Hatcher's testimony that Washakie sent $35 million to SBK, Hatcher also admitted that Washakie pays tens of millions of dollars to various other vendors and entities in the United States.  RT at 59.

Mr. Geragos:     Washakie also sends other funds to other vendors in the
                 U.S., correct?

SA Hatcher:      In terms of --

Mr. Geragos:     They pay
                 other bills?

SA Hatcher:      Correct. Sure.

Mr. Geragos:     Okay. They pay millions of dollars in other bills to other
                 people in America, correct?

SA Hatcher:      Correct.

Mr. Geragos:     Okay. They -- when they pay those bills to the others in
                 America, they pay as much as 10 or 20 million to other
                 people in America, correct?

SA Hatcher:      Correct.

Mr. Geragos:     Because they're buying the component parts of what it
                 takes to either produce the 100 or the 99 fuel, correct?

SA Hatcher:      In many cases they didn't even purchase product, but they
                 did pay some bills, correct.

Mr. Geragos:     Correct. Tens of millions of dollars, correct?

SA Hatcher:      Correct.

RT at 59.

One of the Government's exhibits was a declaration that was submitted on Mr. Dermen's behalf in a civil lawsuit that is pending in the Los Angeles Superior Court where Mr. Dermen has sued government witness Edgar Sargsyan and several corporate entities owned and operated by Sargsyan for embezzling millions of dollars from Mr. Dermen's company SBK Holdings, USA.

SBK Holdings USA, Inc. was an investment company that invested in real property and personal property, including, but not limited to, aircrafts, and residential and commercial properties.  Mr. Dermen was a shareholder, the Chief Financial Officer and a Director of SBK.  Edgar Sargsyan was the President of and Legal Counsel to SBK from approximately December 2013 to July 2016.  In his capacity as such, Sargsyan was largely responsible for most day-to-day operations concerning SBK's investments, including, but not limited to, generating leads, buying and selling real and personal property, and securing new investments.

Sargsyan and his lawyer Henrik Mosesi at Pillar Law Group, a law firm which has since abandoned its clients and ceased operations served as legal counsel to SBK. Sargsyan in his capacity as legal counsel to SBK was responsible for the management of SBK's lending program, a program that was developed and managed by Sargsyan and PLG to locate potential viable borrowers, ensure the loans were properly memorialized and documented, ensure all necessary documents were prepared, signed and notarized, ensure the collateral was suitable and recorded, and which, in the time since Sargsyan's termination from SBK, and after investigation, has been discovered as a scheme to embezzle funds from SBK, including through the use of falsified and forged loan

documents.

Sargsyan acquired more than 17 real properties totaling more than $22,000,000, all of which were purchased with SBK's money and to be held in SBK's name, but instead were fraudulently titled in Sargsyan's name and the name of his companies (including Regdalin Properties).  Moreover, Sargsyan and his companies received loans using the properties purchased with SBK's funds as security, which loans may have been based in part on a fake driver's license and fake joint account statements created in Termendzhyan's name.

With respect to SBK's Lending Program, it is believed that Sargsyan mismanaged the lending program, did not properly vet borrowers or the purported collateral, prepared deficient or fabricated loan and security documents for the purpose of embezzling approximately $23,628,120 from SBK, failed to properly obtain deeds of trust and record such deeds, and misdirected and misplaced payments and records related to loans and investments in such a manner that has caused SBK to be unable to recover payments related to the loans and investments, or even properly determine the borrowers with whom SBK allegedly entered into loans and investments.

In February 2017, SBK filed an action in the Los Angeles County Superior Court captioned *SBK Holdings USA, Inc. v. Edgar Sargsyan, an individual, et al.* (Case No. BC649108).[1]  This underlying lawsuit is relevant to the 30 to 40 million dollars SA

---

[1] The first amended complaint, filed October 10, 2017, asserts claims for: (1) breach of fiduciary duty; (2) conversion; (3) intentional interference with prospective economic advantage; (4) fraud; (5) constructive fraud; (6) unfair competition; (7) accounting; (8) violation of California Penal Code § 496; and (9) legal malpractice.

Hatcher claims to have traced from SBK Holdings US to its sister company in Turkey. The fact is that SBK Holdings US was initially funded by a 50 million dollar investment from its Turkish counterpart. Upon discovering Mr. Sargsyan's theft of $23 million, SBK Holdings US was dissolved and the remaining portion of the investment, approximately 30 million was returned to its investor in Turkey. Mr. Dermen does not have any ownership interest or control of the SBK Holdings AS in Turkey. SBK's US endeavor was unsuccessful and has no active operations presently.

Mr. Dermen and the Government's witness, Edgar Sargsyan are involved in ongoing litigation regarding the $23 million theft. In the last two weeks, Mr. Sargsyan has filed for bankruptcy in two different Chapter 11 matters, one on behalf of an entity named 999 Private Jet which is accused of embezzling funds from SBK Holdings USA to purchase a private jet, and the second on behalf of Regdalin Properties, which has been accused fraudulently acquiring real property from funds embezzled by Sargsyan from SBK. *See Def Exhibit 6, Chapter 11 Petitions*. It is suspected that Mr. Sargsyan has concealed funds and is committing a fraud before the Bankruptcy Court There is a motion pending to appoint a trustee in both matters to examine Mr. Sargsyan's finances.

The reason for the declaration which was Government's Exhibit 6 at the detention hearings, was in response to scheduling Mr. Dermen's deposition in the lawsuit. In the declaration at issue, Mr. Dermen had stated that he was residing in Istanbul, Turkey at the time of the declaration and offered to sit for a video deposition rather than returning to Los Angeles, California for a live deposition. The reason for Mr. Dermen reluctance to attend a live deposition was because he feared an encounter with the man that acted as

Sargsyan's bodyguard, John Soros Balian, a local Glendale Police Office that was recently indicted for various charges related to his involvement with the Mexican Mafia. Balian has entered a guilty plea in the Criminal Complaint filed against him in United States District Court for the Central District of California Case Number 2:18-cr-00345-JFW-1, and is awaiting sentencing. Mr. Sargsyan was initially Mr. Balian's criminal defense counsel in connection with the criminal complaint entering his appearance on his behalf according to Pacer records. *See Def Exhibit 7, Pacer Docket Sheet re Case Number 2:18-cr-00345-JFW-1.*

Mr. Dermen's fear of Balian is documented. Mr. Balian paid a third party to attempt to "scare" Mr. Dermen by firing shots at him. This is corroborated in the Federal Criminal Complaint, where the complaint states based on information from a Confidential Human Source (CHS) that on or around July 14, 2016 in Los Angeles, California John Balian offered the CHS and another individual "J.M." $100,000 to scare Mr. Dermen (referred in the Complaint as L.T for Levon Termendzhyan). According to the Complaint, J.M. executed Balian's plot to "scare" Mr. Dermen believing that he had shot and killed Mr. Dermen on the July 14, 2016 date. The actual victim of the shooting, was an employee of Mr. Dermen, who was driving Mr. Dermen's young son on that day and was mistaken by the shooter to have been Mr. Dermen. According to the police report, Mr. Dermen's son and the employee had just left Mr. Dermen's NOIL office and were ambushed by Balian's hitman resulting in serious injury to Mr. Dermen's employee. This shooting is still pending investigation by Los Angeles Police Department, Robbery and Homicide Division.

SA Hatcher misrepresented the facts of this shooting in his testimony and instead testified that Mr. Dermen was responsible for trying to have a witness killed unsuccessfully because of a jammed gun.

| | |
|---|---|
| AUSA Rowling: | And did witnesses you interviewed at or around that time reveal that they thought Mr. Termendzhyan was trying to have one of those witnesses killed? |
| SA Hatcher: | Yes. |
| AUSA Rowling: | And were there shots fired at a witness? |
| SA Hatcher: | My understanding is yes. |
| AUSA Rowling: | Or did the gun -- or shots attempted to be fired? |
| SA Hatcher: | Yes. |

RT at 41.

Later on cross examination, SA Hatcher admitted that he had not reviewed the criminal complaint against John S. Balian and really had no first hand knowledge or familiarity with the actual circumstances of the shooting, that Mr. Dermen was in fact the intended victim, and consequently, did not know that it was likely a murder-for-hire that was funded by the Government's witness Edgar Sargsyan:

| | |
|---|---|
| Mr. Geragos: | Are you aware that the shots that were fired were at his son? |
| SA Hatcher: | I am not aware with the -- of the circumstances. Just -- |
| Mr. Geragos: | Well, have you looked at the indictment in this district of the -- and the plea agreement for the officer, you know, John Balunis (phonetic)? |

SA Hatcher:    I have not looked at that.

Mr. Geragos:   You haven't looked at that? Do you know that the
               allegation is the only shots fired were at Mr.
               Termendzhyan's son?

SA Hatcher:    I'm not familiar with that.

Mr. Geragos:   Have you seen published reports that Gevork
               Termendzhyan was the -- the victim, who's sitting in
               court here, that it wasn't shots fired by Mr.
               Termendzhyan, it was shots fired at his son?

SA Hatcher:    I am unaware of that.

Mr. Geragos:   Well, who was it that the shots were fired at?

SA Hatcher:    My understanding, it was a witness.

Mr. Geragos:   Well, is -- where did you get that understanding?

SA Hatcher:    From a witness.

Mr. Geragos:   From what witness?

SA Hatcher:    I'm not going to divulge that.

Mr. Geragos:   You're not at liberty to say?

SA Hatcher:    Nope.

Mr. Geragos:   Are you at liberty to review any of the federal matters
               or information surrounding the shots fired?

SA Hatcher:    It's not a part of my case, so I don't know anything
               about it.

Mr. Geragos:   You've never talked to John Ballion (phonetic) or any
               of the agents who prosecuted or investigated John

|                  |                                                                                                 |
|------------------|-------------------------------------------------------------------------------------------------|
|                  | Ballion?                                                                                        |
| SA Hatcher:      | I have not talked --                                                                            |
| Mr. Geragos:     | Is that your testimony?                                                                          |
| SA Hatcher:      | I have not talked to him, no.                                                                    |

RT at 42-43.

SA Hatcher testified that he spoke with Mr. Sargsyan's attorney in the civil lawsuit and was told that Mr. Dermen "ignored" court "orders" to appear for depositions.

|                  |                                                                                                                                          |
|------------------|------------------------------------------------------------------------------------------------------------------------------------------|
| AUSA Rowling:    | Have you spoken to the attorney representing Edgar Sargsyan in this lawsuit?                                                              |
| SA Hatcher:      | I have.                                                                                                                                   |
| AUSA Rowling:    | And has he complained that Mr. Dermen has ignored court orders to appear for depositions?                                                |
| SA Hatcher:      | My understanding is at least once.                                                                                                        |
| AUSA Rowling:    | And was he not ordered to appear by August 20th of this month to appear for a deposition in a civil case, which he did not appear?       |
| SA Hatcher:      | Correct.                                                                                                                                  |
| AUSA Rowling:    | And this declaration relates to a deposition that they were trying to schedule last -- 2017.                                             |
| SA Hatcher:      | In October.                                                                                                                               |

RT at 36.

SA Hatcher's testimony was false and the court relied on this portion the testimony in its written decision.

Mr. Geragos: Do you know that Edgar Sargsyan is under investigation for embezzling over $10 million from Mr. Termendzhyan?

SA Hatcher: I'm not aware of an investigation. I'm aware of the civil litigation, but that's all I'm aware of.

Mr. Geragos: What is the -- what's the allegation in the civil litigation as to Edgar Sargsyan?

SA Hatcher: I don't know the particulars. I just know there's something going on.

Mr. Geragos: Did you know -- well, you don't know the particulars. When you interview somebody who is a lawyer for somebody making accusations, don't you want to know if they have an ax to grind?

SA Hatcher: I look for the facts relevant to my case.

Mr. Geragos: Okay. What was the facts relevant to the case as to the dispute between Edgar Sargsyan or Mr. Termendzhyan?

SA Hatcher: I'm not sure I understand your question.

Mr. Geragos: Did you know that Edgar Sargsyan was Mr. Termendzhyan's lawyer and stole over $10 million from him?

SA Hatcher: I'm not aware that he acted as legal counsel, no.

Mr. Geragos: Did you know that Mr. Sargsyan is a lawyer?

SA Hatcher: I did.

Mr. Geragos: Did you know that Mr. Sargsyan was representing Mr. Termendzhyan?

SA Hatcher: I did not.

| | |
|---|---|
| Mr. Geragos: | Did you ask the lawyer, by the way, what was the relationship between Edgar Sargsyan and Mr. Termendzhyan? |
| SA Hatcher: | I did ask him. |
| Mr. Geragos: | And what did he tell you? |
| SA Hatcher: | He said he was the president or he ran SBK Holdings, USA; he did not act as legal counsel. |
| Mr. Geragos: | Oh. And, so, you accepted that at face value, didn't review any documents in connection with that; is that right? |
| SA Hatcher: | I did. |

RT at 43-45.

Mr. Dermen sat for his deposition twice. By the time of the declaration used as a Government exhibit, Mr. Dermen was aware that John Balian was behind the July 2016 shooting, and was aware that Mr. Sargsyan used Balian as "muscle" to intimidate Mr. Dermen. Mr. Dermen was also aware that if he sat for a deposition noticed by Sargsyan, that it was likely that Balian would be in attendance. Mr. Dermen did in fact return for his deposition which took place on December 17, 2017 in Los Angeles, California, and again on June 7, 2018. And as Mr. Dermen predicted, Balian indeed attended his deposition as Mr. Sargsyan's bodyguard, and Balian instigated a physical altercation with Mr. Dermen during the December 17, 2017 deposition. The deposition came to an abrupt end because the altercation triggered Mr. Dermen's high blood pressure causing him to fall ill. Mr. Balian is currently in federal custody awaiting sentencing related to his criminal matter. An accurate chronology of the events regarding Mr. Dermen's

deposition and Sargsyan using John Balian as an intimidation tactic is detailed in Ret. Judge Richard Stone's Report and Recommendations regarding Mr. Sargsyan's Motion to Compel Mr. Dermen's deposition which actually ordered sanctions against Sargsyan. *See Def Exhibit 8, Ret. Judge Richard Stone's Report and Recommendations.*

When the Government repeatedly brought up Mr. Dermen's use of security personnel, e.g., "...what is striking is that Mr. Termendzhyan, you would hear from Special Agent Hatcher, surrounds himself with armed bodyguards all the time. It is not just intimidating to those he's in business with, but he is in this case the evidence will show acted has an enforcer and has assumed that role. So he is surrounding himself with armed bodyguards, he parades around in multiple vehicles with armed bodyguards,..." the real reason for the bodyguards is the threat that Mr. Sargsyan has posed including an actual attempt at Mr. Dermen's life.

*Ties and Assets in Turkey*

Mr. Dermen does not have significant assets in Turkey that would be sufficient for him to live there for the rest of his life as alleged by the Government.  Like many of the other outlandish but unsubstantiated allegations made against Mr. Dermen in the detention proceedings, the Government alleged that Mr. Dermen has been involved in a long term scheme to steal hundreds of millions of dollars from the United States government, stashing it in Turkey with a plan to flee there, "if and when it got hot." RT at 6.  SA Hatcher testified that he believed Mr. Dermen had sufficient assets in Turkey to remain their for the rest of his life.  RT at 37.  According to this IRS agent, unnamed witnesses allegedly have told him that Mr. Dermen has a house in Turkey, "possibly"

more than one.  RT at 38.  When asked if he verified any of these alleged assets, Hatcher responded that he "tried to reach out to Turkey to get a request for records, but as it's been discussed, they are not cooperative right now." RT at 45.

It was unclear who or what agency in Turkey SA Hatcher "reached out to."  Since the August 28, 2018 proceedings, counsel for Mr. Dermen was able to obtain verification from the General Directorate of Land Registry and Cadaster which operates under Turkey's Ministry of Environment and Urbanization, confirming that Mr. Dermen does not have any immovable property in Turkey.  Similarly, Turkiye Garanti Bankasi A.S., has verified that Mr. Dermen has two bank accounts at the Garanti bank, with a combined balance of $22,811.93.  *See Def Exhibits 9 & 10.*

Mr. Dermen and his family own and operate a chain of gas stations and fuel loading docks throughout Southern California that operate under the name NOIL.  These gas stations are Mr. Dermen's primary business interest. SA Hatcher is specifically aware of this fact as he testified that he physically visited with Mr. Dermen at his NOIL office and personally delivered a grand jury subpoena for NOIL's business records.

The Government also claimed Mr. Dermen does not own real estate in Los Angeles, California.  Again, this is simply not true.  RT at 6.  Mr. Dermen does own real property in Southern California as reported to Pretrial Services Report.

## IV.   ARGUMENT

### A.   *The Nature and Circumstances of the Offenses Charged Warrant Bail Pending Trial*

The charges against Mr. Dermen in the Government's Indictment are of violation 18 U.S.C. Section 1356 and 1357, allegations of money laundering. Significantly, the Indictment contains no allegations of violence, threats, extortion, or physical injury. The allegations are entirely financial related. The non-violent offenses charged in the instance case, although serious as most federal prosecutions are by definition, are not serious enough to warrant the extreme remedy of detention without bail.

**B.      *The Weight of the Evidence Against Mr. Dermen Warrants Bail Pending Trial***

The Government has not provided any discovery thus far showing that detention is substantiated in any way. Mr. Dermen is the third of three total defendants charged in the Indictment which consists of 15 counts. Mr. Dermen is only charged in five of the 15 counts, specifically in Counts 10 through 15. There is no allegation that Mr. Dermen has tried or attempted influence or intimidate any victim or potential witness related to this investigation. For purposes of bail, the weight of the evidence at the current time strongly favors Mr. Dermen's release on bond.

**C.      *Mr. Dermen's Release Would Not Pose a Danger to Any Person or to the Community***

Courts have held that a finding that concludes a person presents a danger to the community must be supported by clear and convincing evidence rather than the preponderance of the evidence standard for a finding of risk of flight. See Motamedi, supra, 767 F. 2d 1406 (citing 18 U.S.C. Section 3142(f)). This higher burden of proof cannot be met in Mr. Dermen's case as there is no evidence that Mr. Dermen has tried or attempted annoy, influence, intimidate any victim or potential witness related to this

investigation.  Nor is there any allegation or charge of violence in the Indictment.  The Indictment exclusively alleges financial offenses.

**D.**     ***Mr. Dermen is Not a Flight Risk***

The Government must establish risk of flight by a clear preponderance of the evidence that no condition or combination of conditions will reasonably assure the defendant's appearance. *United States v. Motamedi*, 767 F.2d 1403, 1406-1407 (9th Cir. 1985).

In *U.S. v. Motamedi* 767 F.2d 1403 (9th Cir. 1985)  the defendant was arrested on charges of conspiracy to export items without a license, in violation of the Arms Export Control Act, 22 U.S.C. § 2778 (1982). The United States Magistrate conditioned his pretrial release upon the posting of a $400,000 secured appearance bond, with special conditions including intensive Pretrial Services supervision, travel restrictions, and surrender of both passport and greencard. Motamedi complied with these conditions and was released.  Id. at 1404.  The defendant was thereafter indicted on one count of conspiracy under 18 U.S.C. § 371, and fourteen counts of unlicensed exportation of items attended by false shipper's declarations, under 22 U.S.C. § 2778(c) (1982), 18 U.S.C. § 2(b) (1982).  Id.

The Government requested a detention order on the ground that Motamedi posed a serious risk of flight. Based on the information presented, the magistrate found that Motamedi, an Iranian citizen, was acting as a *de facto* purchasing agent for the Iranian government and could return to Iran with impunity; that he maintained large foreign bank accounts with most, if not all, of the deposits being made by the Iranian government; that

he persisted in his allegedly illegal exporting activities despite warnings by agents of the United States Customs and Federal Bureau of Investigation that it was illegal to export the items in question; and that the nature and circumstances of the offenses charged are serious. Based on these allegations, the magistrate concluded that the Government had demonstrated by a preponderance of the evidence that no condition or combination of conditions would reasonably assure the appearance of Motamedi for further proceedings in the case, and ordered him detained. Id. at 1404.

Motamedi moved the district court, pursuant to section 3145(b) of the Bail Reform Act of 1984, 18 U.S.C. § 3145(b) (1984), to revoke the detention order and to set bail. A second hearing was held at which the parties presented the same information that was before the magistrate. The court concluded that the magistrate's factual findings were not clearly erroneous and that it would reach the conclusion that no condition or combination of conditions would reasonably assure Motamedi's appearance, regardless of whether the applicable burden of proof was preponderance of the evidence or clear and convincing evidence. The district court affirmed the detention order and the defendant appealed to the Ninth Circuit for review. Id. at 1404–1405.

The Ninth Circuit reversed and ordered release on the same financial terms and conditions as had been granted prior to revocation of bail - with authorization that the district court could increase the monetary amount of the bond, with the condition that it be an amount that Motamedi could post. Id. at 1405.

In making its decision to revoke the detention order, the Circuit Court determined that many factors in section 3142(g) pointed toward the conclusion that Motamedi should

be released.   Id. at 1407.   For instance, the Ninth Circuit considered the facts that Motamedi was a 27-year old Iranian citizen who had obtained permanent residence in the United States; he has been living in the Los Angeles area for many years and had applied for citizenship; he had approximately eighty-five relatives in the Los Angeles area, many of whom are citizens; his immediate family, including his wife, brothers, mother, and father, all reside in the area; his parents have posted their residence as security on the $750,000 bond; he had no prior criminal record, and no history of alcohol or drug abuse; and he had not violated any conditions of his release, and has made all court appearances. Id. at 1408.

The Circuit court explained that the district court's findings were drawn primarily from allegations contained in the Indictment.   Id. at 1408.   For instance, in denying Motamedi's motion for revocation of the detention order, the district court relied on the magistrate's findings that the charges against Motamedi are serious; that he exported military items after being warned that it was illegal to do so, and after telling the United States Attorney that he had ceased doing so; that he is an Iranian citizen who may return to Iran with impunity; and that he maintains large bank accounts in foreign countries.  Id. at 1408.

> "With all due respect for the district court's determinations, our independent review leads us to a contrary conclusion. It is apparent from the record below that the district court accorded great weight to the charges against Motamedi and the Government's assertions of his guilt. Our court has stated, however, that the weight of the evidence is the least important of the various factors...Although the statute permits the court to consider the nature of the offense and the evidence of guilt, the statute neither requires nor permits a pretrial determination that the person is guilty."

*United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) citing *United States v. Edson,* 487 F.2d 370, 372 (1st Cir.1973); *United States v. Alston,* 420 F.2d 176, 179 (D.C.Cir.1969).

The Circuit Court citing *United States v. Alston,* 420 F.2d 176, 179 (D.C.Cir.1969) warned that if the court impermissibly makes a preliminary determination of guilt, the refusal to grant release could become in substance a matter of punishment.  Id. at 1408. Rather, the relevant factors may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community.  The Court added that the factor of the defendant's alienage, "upon which the district court also placed much weight," can not point conclusively to a determination that the defendant poses a serious risk of flight. *Id. at 1408, citing Truong Dinh Hung,* 439 U.S. at 1329, 99 S.Ct. at 18.

Here, since the time of his August 23, 2018 arrest, Mr. Dermen has surrendered his United States passport to counsel.  He is willing and prepared to surrender any other travel documents to the Court or the Government upon the Court's Order.  See, e.g., United States v. Xulam, 84 F.3d 441,443 (D.C. Cir. 1996)(revoking pretrial detention order on basis of flight risk, noting, inter alia, that "the government has taken away all his passports and travel documents, so it is unlikely he could go far even if he wished to.").

While Mr. Dermen was physically arrested on August 23, 2018, he was first made aware of this investigation in August of 2017.  More specifically, a search warrant was executed on Mr. Dermen's homes and businesses on August 10, 2017.  It was revealed by the investigating officer and prosecuting attorney that the search was the result of an

ongoing investigation regarding biodiesel fuel related offenses.  While Mr. Dermen was overseas when the search warrant was executed, he voluntarily returned to the state of California and approximately one year after the search warrant was executed, he ultimately self-surrendered for his arrest to be effectuated as a result of this Indictment on August 23, 2018.

Similarly, Mr. Dermen's history in the criminal justice system is further evidence that Mr. Dermen is not a flight risk.  There is no instance in Mr. Dermen's history with the justice system where he failed to appear for scheduled court appearances.

The sole fact that Mr. Dermen has financial means or access to private planes is not sufficient to deem him a flight risk.  See United States v. Himler, 797 F.2d 156, 162 (3d Cir. 1986)(reversing district court's order of pretrial detention based on risk of flight because there was no direct evidence to suggest that defendant would flee even though defendant's past and present crimes in the production of false identities provided him with the opportunity to flee.)

Courts have required far more than allegations of the commission of a serious crime, the mere opportunity of flight, and the fact that the defendant is facing a potentially long sentence to support a finding of a serious risk of flight.

Furthermore, Mr. Dermen's bond can be secured by affidavits of surety, real property totaling upwards of 10 million.  The significant amount of equity Mr. Dermen's family and friends are willing to post as security to assure his appearance at court proceedings can guarantee that Mr. Dermen will not flee.

### E.    *Criminal History*

Mr. Dermen is a 52-year old widower, father of two children, and a United States Citizen. Mr. Dermen has no serious or violent criminal convictions. Indeed, Mr. Dermen has in his history a number of law enforcement interactions, arrests, and even charges. However, Mr. Dermen has no felony convictions, and has never been convicted of any serious or violent offenses.  His criminal history consists of misdemeanor offenses, the last conviction dating back to a 2012 arrest. Mr. Dermen was not out on bail or on probation or parole at the time of his August 23, 2018 arrest.

Accordingly, there is no basis on which this court could conclude by clear and convincing evidence that Mr. Dermen poses a danger to the community.

### F.    *Community & Family Ties*

Mr. Dermen has strong community ties.  He is a United States citizen and has resided in this country since immigrating from Armenia in 1980 at the age of 14.  Mr. Dermen has ties to his community in the state of California.  Importantly, Mr. Dermen's two children, elderly parents, and older brother reside in Los Angeles, California.  Mr. Dermen owns real property in the state of California.

He also owns and operates several businesses within the state.  Mr. Dermen's primary business is his ownership of multiple gas stations and loading docks in Southern California.  It would not be feasible or realistic for Mr. Dermen to leave California permanently given these business investments and real property interests.

If required to do so as a term of pretrial release, Mr. Dermen has the means to secure a temporary residence within Salt Lake City, Utah, which is only an hour and a half flight from Los Angeles where his family resides. Mr. Dermen's travel outside of the city can be restricted and monitored through a GPS system and any other conditions the Court would see fit.

### G.   *Medical Care*

Mr. Dermen is 52-years old. Approximately five years ago he suffered a heart attack. His severe heart condition and coronary heart disease resulted in coronary stent needing to be placed in Mr. Dermen's arteries. In addition to requiring the stent, Mr. Dermen is also required to take a combination of prescription medications daily to stabilize his heart function.

### V.   CONCLUSION

As Mr. Dermen is not charged with a violent crime, and is otherwise eligible for Bail, the defendant urges this Court not to detain him simply because of his wealth. Mr. Dermen intends and will demonstrate a good faith compliance with any set of conditions that would allow for his pretrial release. The bail proposal made on Mr. Dermen's behalf removes any possible concern of flight.

DATED this 1st day of October, 2018.

 /s/ Mark J. Geragos
Mark J. Geragos

/s/ Jon D. Williams
Jon D. Williams

48