IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Plaintiff,<br>v.<br><br>LEV ASLAN DERMEN,<br><br>　　　　　　　　　Defendant. | **ORDER DENYING DEFENDANT'S MOTION FOR REVIEW OF DETENTION**<br><br>Case No. 2:18-cr-365<br><br>District Judge Jill N. Parrish |

Defendant Lev Aslan Dermen was arrested in Los Angeles pursuant to a warrant on August 23, 2018. The government moved for Mr. Dermen to be detained pending trial, and on August 28, 2018 Magistrate Judge Standish of the Central District of California conducted a detention hearing at which she granted the government's motion. (*See* Federal Rule of Criminal Procedure 5 documents at ECF No. 45). At the conclusion of that hearing, Magistrate Judge Standish ruled that the government had met its burden of proving by a preponderance of the evidence that no condition or combination of conditions can reasonably assure Mr. Dermen's appearance at trial.

On September 24, 2018, Mr. Dermen moved this court to review that determination, and the court held a hearing on that motion on October 3, 2018. On the basis of evidence taken and arguments presented at that hearing and the hearing before Magistrate Judge Standish, the memoranda and exhibits submitted to this court, and a review of relevant law, the court finds that the government has met its burden to prove that there is no combination of conditions of release that will reasonably assure the appearance of the defendant.

## I. LEGAL STANDARD

### A. STANDARD OF REVIEW

The court considers defendant's motion for a review of the magistrate judge's detention order under 28 U.S.C. § 3145(b) and DUCrimR 57-16(a)(1).[1] Accordingly, the court conducts a de novo review of the government's request for detention without deference to the magistrate judge's findings or conclusions.[2]

### B. STANDARD FOR THE RELEASE OR DETENTION OF A DEFENDANT PENDING TRIAL

When, as here, a case involves a serious risk that a defendant will flee or "attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness[,]" a court should hold a hearing to determine whether there are conditions of release that will reasonably assure the defendant's appearance at trial. In making this determination, a court is to consider the following factors:

> (1) the nature and circumstances of the offense[s] charged . . . ;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
>     (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>     (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.[3]

---

[1] "Any party is entitled to seek review of a magistrate judge's order releasing or detaining a defendant. . . . ."

[2] DUCrimR 57-16(a)(1) (providing for de novo review of detention orders); *see also United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003) (holding that district court's review under subsection (a) of §3145 is de novo).

[3] 18 U.S.C. § 3142(g).

To obtain detention, the government must establish either (1) that the defendant poses a "serious risk of flight," which must be proved by a preponderance of the evidence; or (2) that the defendant presents a danger to the community, which must be proved by clear and convincing evidence.[4]

## II. ANALYSIS

First, the court considers the nature and circumstances of the offense charged. Mr. Dermen is charged with four counts of concealing proceeds of a scheme he is alleged to have known to be fraudulent, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The indictment alleges that the underlying scheme attempted to defraud the United States of $1.1 billion—of which $511 million was successfully obtained from the Treasury. These are very serious offenses. The government represents that, if convicted, Mr. Dermen's base offense level under the sentencing guidelines would suggest a life prison sentence. The court declines to rely on this calculation in the absence of a more fulsome analysis. But it notes that each violation of § 1956(a)(1)(B)(i) carries with it a statutory maximum of 20-years imprisonment.

Second, the court considers the weight of the evidence. Mr. Dermen points out that the law directs district courts to accord this factor minimal import because heavy reliance on the weight of the evidence could amount to an inappropriate preliminary determination of guilt. (ECF No. 79 at 45). The court agrees, and finds that this factor does not bear heavily on Mr. Dermen's detention. Nevertheless, the court finds that Mr. Dermen, despite being the putative purchaser of fuel from Washakie Renewable Energy, received a $1.3 million wire transfer from that entity. Perhaps the defendant will provide evidence of a straightforward business purpose for this payment at trial. To the limited extent the court considers the weight of the evidence in the

---

[4] *Cisneros*, 328 F.3d at 616.

detention analysis, however, it finds that this payment serves as relatively strong evidence that Mr. Dermen was being compensated for participating in—and therefore had knowledge of— the underlying fraud.

Third, the court considers the history and characteristics of Mr. Dermen. At an all-day hearing on this motion, the government—through evidentiary proffers and an hours-long examination of Special Agent Tyler Hatcher—established the following facts relevant to this factor.

- In December of 2017, Mr. Dermen entered and exited the United States without creating any record of this travel with Customs and Border Protection.
- Mr. Dermen has ready access to and regularly travels via private aircraft.
- Mr. Dermen legally changed his name in 2017 from Levon Termendzhyan to Lev Aslan Dermen.[5]
- Turkey is not presently honoring its extradition agreement with the United States.
- Since 2013, Mr. Dermen has spent 85 weeks in Turkey.
- Mr. Dermen owns a yacht and a home in Istanbul.
- Mr. Dermen or entities under his control have sent upwards of $35 million to Turkish bank accounts.

Most alarming in this list is the uncontroverted fact that Mr. Dermen—during a trip to Turkey that extended from August 11, 2017[6] to January 31, 2018—temporarily returned to the United States to attend a deposition on December 8, 2017. His brief presence in the United States

---

[5] The government suggests that the defendant's name change was a conscious attempt to assume a more Turkish-sounding name pursuant to his plan to flee to Turkey in the event that "things got hot." Mr. Dermen responds that he merely wanted to shed his Armenian surname.

[6] Although Mr. Dermen used private aircraft to fly to Turkey one day after the execution of a state court search warrant stemming from an unrelated joint state-federal criminal investigation, the court does not believe that the evidence surrounding this flight is sufficient to support a finding that Mr. Dermen "fled" the country in response to that warrant, as the government suggests. Neither does the court believe Mr. Dermen eagerly returned to Los Angeles in January of 2018 in the face of what he believed were impending charges from the investigation that produced that warrant, as the defense suggests. The court finds that it is more likely than not that Mr. Dermen was unaware of the degree of criminal exposure he was facing from *this* investigation—which the court finds was, in fact, unrelated to the state-federal investigation—until his arrest following the return of this indictment.

apparently went entirely undetected by Customs and Border Protection. The defendant's demonstrated ability to enter and exit the United States without detection in combination with his access to private aircraft is a cause of serious concern. Further, aside from defense counsel's representation that the notion of Turkey declining to extradite Mr. Dermen was "laughable," Mr. Dermen made no attempt to proffer evidence that undermines the government's evidence that the President of Turkey has publicly committed not to honor the United States' extradition requests.[7] The court further found Special Agent Hatcher credible when he testified that multiple witnesses had informed the government that Mr. Dermen intends to flee to Turkey precisely because of the obstacles the government would face in extraditing him or his assets.

Defense counsel has repeatedly and vociferously argued that the government is woefully ignorant[8] of the troubled history of Turkish-Armenian relations when it urges the court to draw inferences from Mr. Dermen's recent name change. But in all of those arguments—most of which only tangentially referred to the defendant's motivation for the name change—the court did not hear a single reason why Mr. Derman's name change would serve his interests in the United States. Mr. Dermen apparently lived in Los Angeles (or Yakima, Washington) for over 35 years without experiencing anti-Armenian prejudice sufficient to precipitate a name change. While the court is far from certain that the name change was part of a concerted plot to flee to Turkey, the inference is inescapable that the only reason Mr. Dermen renounced his Armenian surname in 2017 was to improve his experience in Turkey. Mr. Dermen admits as much in his memorandum to the court, though he claims he expected to reap the social benefits of his non-

---

[7] Mr. Dermen also failed to rebut the government's assertion that he conspired with a corrupt Department of Homeland Security official to ensure that Mr. Dermen's business associate would be permitted entrance into the United States despite being barred from the country due to a criminal record and an outstanding arrest warrant.

[8] In the detention hearing before Magistrate Judge Standish, defense counsel decried the government's "cultural insensitivity" in making this argument.

Armenian name only in the context of his frequent Turkish travels, not as part of a plan to live there in perpetuity.

Mr. Dermen's prolific Turkish traveling is another source of the court's concern. The court need not conclude that Mr. Dermen has established residency in Istanbul to find that the considerable amount of time he has spent in that country is relevant to his risk of flight. From his production of a document that purports to prove that no immovable property is held in Turkey under the name Levon Termendzhyan, Mr. Dermen appears to suggest that he does not own real property in that country. But he has not affirmatively represented—either in his memorandum or during the detention hearing—that he is not the beneficial owner of real property in Turkey.

That omission is notable in light of other evidence proffered by the government. Special Agent Hatcher testified that since 2013, Mr. Dermen has spent a total of 85 weeks in Turkey. It is, of course, possible that Mr. Dermen stayed in hotels or with friends during these trips. Perhaps he stayed on his yacht in Istanbul. But given Special Agent Hatcher's credible testimony that his investigation has produced multiple witnesses who claim to have visited or stayed overnight at a palatial Turkish residence held out by Mr. Dermen as his own, the court does not credit his quasi-denial that he owns real property in that country.

Moreover, Mr. Dermen or entities under his control have directed millions of dollars to Turkey. And by his own admission, Mr. Dermen has at least once purchased real property in his name to obscure the identity of the beneficial owner. (ECF No. 79 at 6–7). The court does not impute any unlawful purpose to that transaction at this preliminary stage, but simply notes that it is an ownership structure with which the defendant is familiar. Indeed, Special Agent Hatcher credibly testified that much of Mr. Dermen's American portfolio is held by nominee owners. The

court has no reason to believe that Mr. Dermen deviated from this practice in the placement of his Turkish investments.

Finally, although evidentiary standards are relaxed in pretrial proceedings, the court will not make decisions on the basis of defense counsel's personal vouching for his client's appearance at trial. Even if the court considered counsel's arguments as evidence, his assertion that Mr. Dermen has always complied with court directives in the past is belied by his behavior in the present case. The evidence is uncontroverted that, despite a warrant for its seizure, Mr. Dermen has failed to surrender the Bugatti Veyron, a vehicle alleged to have been purchased for Mr. Dermen with $1.8 million in proceeds obtained from the United States by fraudulent means.

Mr. Dermen submits that a high-value bail package combined with around-the-clock supervision by a private security firm's armed personnel can reasonably assure his appearance at trial. The court agrees with other courts to have considered the matter, which have concluded that it is doubtful that the Bail Reform Act contemplates an elaborate and expensive replication of pretrial detention at a defendant's home as a "condition" of release. *See United States v. Tajideen*, No. 17-46, 2018 WL 1342475, *6 (D.D.C. Mar. 15, 2018); *United States v. Zarrab*, 15 CR 867, 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016); *United States v. Valerio*, 9 F. Supp. 3d 283, 293–94 (E.D.N.Y. 2014).

Beyond the questionable legal authority for such an arrangement, the logistics of private detention appear highly problematic. For example, Mr. Dermen submits that "Guidepost is agreeable to use of [sic] physical force if needed for any purpose[.]" (ECF No. 83 at 3). Far from providing the court with certainty, this proposal raises a slew of issues with which the court is not equipped to engage. The court declines defendant's invitation to deputize a private security firm and subsequently supervise its operations, up to and including the use of force by that firm's

personnel. If Mr. Dermen's risk of flight can be constrained only by constant supervision by private security personnel that are "agreeable to use of [sic] physical force[,]" the court finds that the appropriate means to accomplish that is pretrial detention. *See Valerio*, 9 F. Supp. 3d at 295 ("What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance?" (quoting *United States v. Colorado-Cebado*, No. A-13-CR-458, 2013 WL 5852621, at *6 (W.D. Tex. Oct. 30, 2013)).

Mr. Dermen submits that his family is willing to pledge as security "real property totaling upwards of 10 million" to assure his appearance at trial. (ECF No. 79 at 46). But this amount is dwarfed by the $35 million in wire transfers Mr. Dermen or entities under his control sent to Turkish bank accounts. Mr. Dermen responds that those wire transfers were merely transactions returning funds to a Turkish investor who had decided to exit the investment holding company, SBK Holdings USA. Without more information about the ownership of the various Turkish bank accounts, the court cannot rely on that representation. Those wire transfers originated from the same bank account that Mr. Dermen used to purchase a gas station for Noil Energy,[9] so the court has no way of discerning which wire transfers should be allocated to Mr. Dermen and which were initiated on behalf of his Turkish investor. (*See* Government Exs. 9, 10, 11).

The court finds that Mr. Dermen has both the motive and ability to exit the United States without detection and abscond to a country that presently refuses to extradite to the United States. The court further finds that the government has proved by a preponderance of the evidence that no condition or combination of conditions will reasonably assure Mr. Dermen's

---

[9] The court expresses skepticism regarding the $6 million valuation that Mr. Dermen's family assigned to the Cactus Road station as part of his bail proposal in light of the evidence suggesting that it was purchased with a $3 million transfer from the SBK Holdings account.

appearance at trial. Because of this finding, the court need not analyze whether Mr. Dermen poses a danger to the community.[10]

### III. ORDER

It is **ORDERED** that Mr. Dermen's Motion for Review of Detention by District Judge, (ECF No. 64), is **DENIED**. Defendant is ordered detained pending trial.

Signed October 9, 2018

             BY THE COURT

             */s/ Jill N. Parrish*

             ———————————————
             Jill N. Parrish
             United States District Court Judge

---

[10] The government's evidence that Mr. Dermen once screamed at, and arguably threatened a former business associate with whom he was engaged in civil litigation cannot, without more, satisfy the level of proof required to detain a defendant.