JOHN W. HUBER, United States Attorney (#7226)
ARTHUR J. EWENCZYK, Special Assistant United States Attorney (NY #5263785)
LESLIE A. GOEMAAT, Special Assistant United States Attorney (MA #676695)
RICHARD M. ROLWING, Special Assistant United States Attorney (OH #0062368)
JOHN E. SULLIVAN, Senior Litigation Counsel, Tax Division (WI #1018849)
Attorneys for the United States of America
111 South Main Street, #1800
Salt Lake City, Utah 84111
Telephone:  (801) 524-5682
Email: arthur.j.ewenczyk@usdoj.gov
       leslie.a.goemaat@usdoj.gov
       richard.m.rolwing@usdoj.gov
       john.e.sullivan@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:18-CR-365-JNP-BCW |
| Plaintiff, | : | |
| v. | : | GOVERNMENT'S SUPPLEMENTAL |
| | : | NOTICE OF INTENT TO INTRODUCE |
| LEV ASLAN DERMEN, | | RULE 404(B) EVIDENCE |
| a/k/a Levon Termendzhyan, | : | |
| Defendant. | : | District Judge Jill N. Parrish |
| | | Magistrate Judge Brooke C. Wells |

Now comes the United States of America, by and through its undersigned counsel, and respectfully notifies the Court of its intent to introduce at trial the evidence described herein.

I.    **Applicable Law**

A.    **All Relevant Evidence is Admissible**

Under the Federal Rules of Evidence, "[r]elevant evidence is admissible" unless the Constitution, a federal statute, the rules of evidence, or other Supreme Court rule provides

otherwise. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. However, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**B.      Evidence of Other Acts of the Defendant May be Used to Prove Facts Other Than the Defendant's Character**

Rule 404(b) provides that evidence of other crimes, wrongs, or acts may be used to prove facts of consequence to the litigation, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  The Tenth Circuit has adopted a four-part inquiry regarding the admission of evidence pursuant to Rule 404(b): "(1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) that the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) a limiting instruction is given if the defendant so requests." *United States v. Cardinas Garcia*, 596 F.3d 788, 797 (10th Cir. 2010) (cert. denied) (citations and quotations omitted); *see also United States v. Brooks*, 763 F.3d 921, 939 (10th Cir. 2013).  The Tenth Circuit has further stated that "[t]o determine relevance under Rule 404(b), we must examine factors such as the similarity of the uncharged act to the charged conduct and the temporal proximity of the two acts." *Cardinas Garcia*, 596 F.3d at 797-98.

This list of "proper purposes is illustrative, not exhaustive, and Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) (emphasis in original) (quotation and citation omitted). Further, although the text of Rule 404(b)

indicates that other act evidence "may" be admissible for purposes other than to show criminal propensity, the legislative history makes it clear that Congress intended for all such evidence to be admitted:

> [T]he use of the discretionary word "may" with respect to the admissibility of evidence of crimes, wrongs, or acts is not intended to confer any arbitrary discretion on the trial judge. Rather, it is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, i.e. prejudice, confusion or waste of time.

*Tan*, 254 F.3d at 1208 (citing S. REP. NO. 93-1277 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7071). "[I]f the other act evidence is relevant and tends to prove a material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403." *United States v. Davis*, 636 F.3d 1281, 1298 (10th Cir. 2011) (quoting *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009)).

### C. Rule 404(b) Does not Apply When Other Act Evidence and Evidence of the Crime Charged are Inextricably Intertwined

The Tenth Circuit has held that "[o]ther act evidence is intrinsic"—and thus not subject to Rule 404(b)—"when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993) (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)) (internal quotation marks omitted). "It is well settled that Rule 404(b) does not apply to other act evidence that is intrinsic to the crime charged[.]" *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997); *see also United States v. Arney*, 248 F.3d 984, 992 (10th Cir. 2001) (discussing Rule 404(b) as not applying to intrinsic evidence).

Furthermore, the Tenth Circuit has held that, generally speaking, "'[i]ntrinsic evidence is

directly connected to the factual circumstances of the crime and provides contextual or background information to the jury. Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'" *Parker*, 553 F.3d at 1314 (citation omitted) (quoting Thomas M. DiBiagio, *Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other-Crimes Evidence Disconnected to the Fundamental Right to a Fair Trial*, 47 Syracuse L. Rev. 1229, 1231 (1997)). "Because Rule 404(b) only limits evidence of 'other' crimes – those extrinsic to the charged crime – evidence of acts or events that are part of the crime itself, or evidence essential to the context of the crime, does not fall under the other crimes limitations of Rule 404(b)." *Parker*, 553 F.3d at 1314; *see also United States v. Green*, 175 F.3d 822, 831 (10th Cir. 1999); *United States v. Lambert*, 995 F.2d 1006, 1007-08 (10th Cir. 1993).

### D. Use of Rule 403 to Exclude Relevant Evidence is An Extraordinary Remedy and Should be Used Sparingly

"[E]xclusion of evidence under Rule 403 that is otherwise admissible under the other rules 'is an extraordinary remedy and should be used sparingly.'" *Tan*, 254 F.3d at 1211 (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)). Evidence may be excluded under Rule 403 if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The term "unfair prejudice" as used in Rule 403, "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 Advisory Committee's note (1972). The Tenth Circuit in *Tan* identified some factors a court should consider in making a 403 determination. "First, we note that unfair prejudice does more than damage the Defendant's position at trial." *Tan,* 254 F.3d at 1211. Evidence is not precluded by

4

Rule 403 unless "it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Davis*, 636 F.3d 1281, 1298 (10th Cir. 2011) (quotation and citation omitted). "Even if this type of prejudice is found, it must substantially outweigh the probative value of the evidence in order to be excluded under Rule 403." *Tan*, 254 F.3d at 1212.

## II.   Lev Dermen's Conduct and Association with Current and Former Law Enforcement Agents and Government Officials

### A.   Evidence of Dermen's Corrupt Law Enforcement Contacts is Admissible as Intrinsic Evidence

The United States expects Jacob Kingston to testify at trial that in or about 2012, Defendant Dermen offered him the protection of a law enforcement "umbrella." This "umbrella" would protect Kingston, his family, and his companies, Washakie and UFS, from criminal prosecution and allow Kingston to file fraudulent claims for renewable fuel tax credits with impunity. In exchange, Dermen demanded an increasingly larger share of the proceeds, which he then claimed to use, in part, to pay the "umbrella."  In addition, Dermen used the "umbrella" as a sword as well as a shield, in effect threatening Kingston that the "umbrella" could have him arrested for fraud if they were not paid. Accordingly, evidence of Dermen's relationships with corrupt law enforcement officers is directly relevant, intrinsic, and inextricably intertwined with the charged crimes as it establishes the basis for Dermen's role in the conspiracy.

The evidence will show that since at least 2012, Dermen has surrounded himself with many current and former law enforcement officers. Further, he has bragged to Kingston that these law enforcement officers, and others, whom he referred to as the "boys," not only protected him but would hurt others on Dermen's orders.  Dermen described that he started building this

"umbrella" when he was charged and acquitted of tax crimes in the late 1990s. He claimed to

Kingston that he bribed the investigators and prosecutors on that matter with $10 million and that

they now shielded him from future criminal prosecution. Dermen has bragged that this has

allowed him to play "games" with the IRS for the past two decades. Kingston also witnessed

Dermen repeatedly interact with current and former law enforcement officers, and on some

occasions make cash payments to these officers.  Among the law enforcement officers who

surrounded Dermen was Glendale Police Department Detective John Balian, Sherriff Baca[1] of

Los Angeles County, Former Special Agent-in-Charge of the Los Angeles Secret Service office

Tony Chapa, former ICE Agent Felix Cisneros, as well as others. Kingston will also testify that

he witnessed Dermen make a cash payment to Sherriff Baca at a dinner in the presence of ICE

agent Cisneros. Of all these four law enforcement contacts, only Mr. Chapa is not a convicted

felon.

Kingston also witnessed Dermen speak on the phone, purportedly to "the boys."

Although Kingston could not hear who was on the line with Dermen, and in some cases could

not understand because the conversations were in Armenian, Dermen explained he was talking to

"the boys." On several occasions, Dermen explained he had to go to the federal building in Los

Angeles to meet with "the boys."

During the course of Kingston's criminal involvement with Dermen, former ICE Agent

Felix Cisneros was criminally charged after assisting in the entry of an inadmissible alien,

---

[1] Lee Baca was convicted of overseeing a scheme designed to obstruct a federal investigation into corruption and civil rights abuses at county jail facilities. *See* "Former L.A. County Sheriff Lee Baca Sentenced to 3 Years in Federal Prison for Leading Scheme to Obstruct Investigation into Jails," https://www.justice.gov/usao-cdca/pr/former-la-county-sheriff-lee-baca-sentence-3-years-federal-prison-leading-scheme.

Santiago Garcia, at the request of Defendant Dermen.[2] Santiago Garcia met Cisneros through Dermen. In July 2013, Garcia flew to Mexico from Los Angeles in pursuit of a deal he was negotiating on behalf of Dermen. When he returned through Los Angeles, Garcia's passport was seized due to an outstanding warrant. In August 2013, Dermen again asked Garcia to travel to Mexico. Garcia told Dermen that he would not be allowed to return because of his pending deportation matter and his seized passport. Dermen contacted then-ICE Agent Cisneros, who arranged, under false pretenses, for CBP to return Garcia's passport. Garcia then traveled to Mexico in September 2013 and upon his return to Los Angeles, Agent Cisneros arranged his fraudulent re-entry into the United States.

Cisneros was charged with conspiracy to aid or assist the entry of an alien convicted of an aggravated felony – Garcia – in the Central District of California. *See United States v. Felix Cisneros,* 17-CR-00229-CAS (CDCA).[3] The affidavit in support of the original complaint against Cisneros identified "Co-Conspirator 1" as the unindicted co-conspirator who directed Cisneros to aid and assist Garcia's illegal entry into the United States. *See United States v. Cisneros,* 17-CR-00229-CAS (CDCA) ECF 1 at p. 3. Court records and evidence at trial later revealed Dermen to be "Co-Conspirator 1," and the Central District of California later publicly identified Dermen, "a suspected crime figure," as the person facilitating the entry of Garcia, his

---

[2] By letter dated May 31, 2019, the United States provided in discovery substantial portions of the CI files relating to Santiago Garcia, obtained through counsel for DHS-OIG and HSI. This letter indicated that some materials relating solely to the investigation of Cisneros, including recordings between Garcia and Cisneros, were not produced in discovery, and that counsel for defendants should file a motion with the Court to expeditiously resolve any disagreement as to the scope of the government's discovery obligation relating to the Cisneros investigative files. To date, the United States has not received a request from the defense for additional materials relating to the Cisneros investigation.

[3] Cisneros was acquitted of Counts 6 and 7 of the First Superseding Indictment.

business associate, back into the United States in September 2013.[4]

In addition to retrieving Garcia's passport and "smuggling" Garcia across the border on behalf of Dermen, Cisneros also impermissibly queried TECS (Treasury Enforcement Communications Systems) regarding Dermen on at least thirteen occasions. TECS is a confidential law enforcement database that included Dermen's travel history and his encounters with law enforcement, and would reveal whether any law enforcement agency had an alert on Dermen. *See United States v. Cisneros,* 17-CR-00229-CAS (CDCA) ECF 124 at pp. 7-8, 10. Notably, one of those TECS inquiries revealed that Dermen had traveled with former Glendale Police Department Detective John Balian. Former Detective Balian was later charged with various federal offenses including making a false statement to a federal officer. *Id.* at p. 8. *See United States v. John Saro Balian*, 18-CR-00345-JFW ECF 1 (Complaint).

The United States expects Jacob Kingston to testify that Dermen first told Jacob Kingston that it was "the boys" – i.e., the "umbrella" – who assisted Garcia after he was stopped at the border. Later, Kingston was told that it was former Agent Cisneros who helped Garcia on behalf of Dermen. Dermen also bragged to Kingston that his "umbrella" had kept another one of Dermen's close associates out of criminal trouble.

In addition, the evidence will show that Dermen not only claimed to pay and did pay domestic law enforcement, but that Dermen and his associates also paid cash payments to foreign governmental officials.  Kingston will testify that Dermen admitted that he had previously committed illegal acts in foreign countries, such as operating illegal casinos in Russia, and that he had never been prosecuted.  Kingston will also testify that a government official from

---

[4] *See* , "Federal Law Enforcement Agent Sentenced to Federal Prison for Helping Mexican National with Criminal Record Re-Enter the U.S.," https://www.justice.gov/usao-cdca/pr/federal-law-enforcement-agent-sentenced-federal-prison-helping-mexican-national.

Belize was routinely paid $25,000 in cash a month by Dermen, and that when Dermen could not make the payments himself, he would ask Kingston to make the payments on his behalf. On at least one occasion, in or about February 2014, at Dermen's request, Kingston arranged for cash payments to the Belizean official through an associate. In addition, in or about June 2013, Kingston electronically sent funds to a different Belizean government official at Dermen's request. In addition, Kingston will testify that he witnessed Dermen's associate, in Turkey, carry a bag of cash into a judge's chambers in Turkey to affect his position at a judicial foreclosure auction the next day, which Kingston also attended.

While Dermen's association and conduct with corrupt law enforcement certainly constitutes "bad acts," it is inextricably intertwined with the charged crimes and the anticipated testimony by Jacob Kingston that Dermen's "umbrella" of law enforcement would protect Kingston from investigation and prosecution.  The government further expects Kingston to testify that Dermen also used the shield of the "umbrella" as a sword at times, threatening that failure to pay the "umbrella" would result in criminal charges, and causing Kingston and his family to continue the fraud in ever increasing amounts.

Kingston's testimony will be corroborated by the statement of other witnesses, including one who will testify that while he was awaiting sentencing in an unrelated matter, Dermen threatened to use his influence to increase the witness's prison sentence if the witness did not pay Dermen the money he was owed. This testimony will also be corroborated by Kingston's contemporaneous text messages with others, including the Belizean Minister, and Garcia wherein Jacob Kingston references Dermen's contacts with corrupt law enforcement officers. The United States expects to introduce these text messages through Jacob Kingston as co-conspirator statements pursuant to rule 801(d)(2)(E). For example, on March 11, 2017, Kingston

had the following text message exchange with Garcia, while Garcia was running a similar

protection racket on Kingston (the "Commissioner Gordon" scheme):

| Jacob Kingston: | What will be the charge? |
| Jacob Kingston: | **Mr L can't be in any docs** |
| Santiago Garcia: | He is all over the radar you know that all his friends so called friends |
| Jacob Kingston: | **I know. But I can't turn on him. He has people.** |
| Jacob Kingston: | Call me when your done. |
| Santiago Garcia: | Call you in a bit. You are like me but his other assholes are punks |
| Jacob Kingston: | **I know. But I know more than you on him.** |

Jacob Kingston and Garcia's text messages also reveal Dermen's involvement in the

scheme to smuggle Garcia over the border through corrupt ICE Agent Felix Cisneros. Seized text

messages from Garcia's phone reveal the following exchange on March 24, 2017 regarding news

reports of Felix Cisneros's arrest:

| Jacob Kingston: | URL: https://www.google.com/amp/amp.10news.com/2124386828/ice-agent-arrested-for-helpinginadmissible-mexican-national-into-us-at-lax.html |
| Jacob Kingston: | Levon just sent me this |
| Jacob Kingston: | https://mmi405.whatsapp.net/d/OilzHqaXlrcek1kA1sSJ jFjVh4k/AmAyTkWS8IYq0VaPQof0b5yrbaf_saa5j5qSoY-j6yQy.enc |



| Santiago Garcia: | What the FUCK!!!! |
|---|---|
| Jacob Kingston: | Was that you that he helped? |
| Santiago Garcia: | Not me |
| Jacob Kingston: | URL: https://mme.whatsapp.net/d/Hc9qOw9UB13fFMpTYZeUKFjViR0/Ar3gTPxCIJs09RrEr0QiivsFqfm63fAfE8aNCCANuzB.Enc |



| | |
|---|---|
| Jacob Kingston: | The Mexican is now a CI |
| Santiago Garcia: | Nice he had all kind of Mexicans working for him |
| Jacob Kingston: | **Levon and Felix thinks it's you** |
| Santiago Garcia: | . . . . |
| Jacob Kingston: | Dude... this was you. Read the article. |
| Santiago Garcia: | I got arrested in July and was in The cruise foe 21 days how do you figure |
| Santiago Garcia: | That's when I got back from cleaning up the Viscon BS |
| Santiago Garcia: | Leader of an organized crime really! |
| Jacob Kingston: | Www.pe.com/articles/arrested-828090-lives-charged.html |
| Jacob Kingston: | **Lion is the crime leader** |
| Jacob Kingston: | This talks about our LNG and Viscon project |
| Santiago Garcia: | I sat in jail the first time never went back cause he did t want to ever pay? I am checking with CG |
| Jacob Kingston: | That's messed up |
| Jacob Kingston: | Can you talk? |
| Santiago Garcia: | 15 min talking CG |
| Jacob Kingston: | **This describes lion** |

| Santiago Garcia: | . . . |
|---|---|
| Jacob Kingston: | **This story describes our old crew** |
| Santiago Garcia: | We are not organized crime come on |
| Jacob Kingston: | **But seriously. Lou Skidaros, guy who raised me, told me he knew Felix was on Levons payroll** |
| Jacob Kingston: | Raided |

This evidence is also described on pages 156-157 of the United States' June 6, 2019 *James* Proffer. At the time of that filing, the United States indicated that it did not intend to elicit testimony regarding the specifics of his cooperation against Felix Cisneros on direct examination of Santiago Garcia. Now, however, this evidence, introduced through Jacob Kingston, is directly relevant and probative of Jacob Kingston's belief and expected testimony that Dermen's law enforcement "umbrella" was going to protect Kingston from prosecution, in return for the lion's share of the fraudulent refunds.

This evidence is intrinsic to the crime charged because it establishes Dermen's role in the conspiracy. It also explains why Kingston paid much of the fraud proceeds to Dermen. Dermen was the member of the conspiracy who would protect the conspiracy from law enforcement by extending his law enforcement "umbrella" over the Kingstons and their companies. Evidence that Dermen had, in fact, surrounded himself with corrupt law enforcement officials – to include, but not limited to testimony by Jacob Kingston of Dermen's association with Cisneros, Baca, Balian, and others – is therefore relevant, intrinsic, and inextricably intertwined with the charged offenses.

### B. Evidence of Termendzhyan's Conduct with Corrupt Law Enforcement Contacts is Also Admissible Pursuant to Rule 404(b)

If the Court finds that evidence of Dermen's corrupt law enforcement contacts is not admissible as intrinsic evidence, then it is properly admitted under Rule 404(b). This evidence is directly relevant to Dermen's intent, preparation, and plan, in conspiring with Jacob Kingston to

fraudulently obtain tax credits. This evidence is directly relevant to Dermen's role in the conspiracy, namely that he could provide an "umbrella" of federal law enforcement protection, and to Jacob Kingston's agreement to share fraudulent proceeds with Dermen, and through him with the "umbrella." The prejudicial effect of this evidence pales in comparison to the charged conduct – the theft of more than $500 million – and it does not substantially outweigh the direct probative value. Finally, the Court can give a limiting instruction regarding evidence of Termendzhyan's association with corrupt law enforcement officials should the Court admit this evidence pursuant only to Rule 404(b).

### III.    <u>Lev Dermen's Use of Violence During the Course of the Conspiracy</u>

In addition to the law enforcement "umbrella," Dermen also used physical violence, or the threat thereof, to protect Kingston or, if needed, to punish him for failing to follow Dermen's instructions. Kingston will testify that Dermen regularly slapped him and others as a show of dominance. Kingston will also testify that after a trip that he and his family took to Turkey, he was informed that while in Turkey, his family member had been assaulted by a hotel employee. Kingston advised Dermen, who was still in Turkey, of the incident. Shortly thereafter, in a video call over FaceTime, Dermen showed Kingston and his family member the hotel employee on a chair. After they confirmed his identity, Dermen proceeded to beat the employee severely. Dermen later implied the employee was dead by saying he was now "swimming one way" and "was not anymore."  In addition, in or about January 2014, Kingston will testify that Levon offered to have "his guys" "take care of" a journalist who wanted to reference polygamy.

This evidence is inextricably intertwined with the charged crimes. Just as with the law enforcement "umbrella," this evidence shows Dermen provided Kingston with protection through extra-legal means. This protection was both a shield and sword as Jacob Kingston

realized he might be the victim of Dermen's violence if he failed to follow Dermen's instructions to continue the fraud, increase the size of the fraudulent claims, and pay Dermen his share of the proceeds.

To the extent the Court does not find this evidence is intrinsic, it is properly admissible under Rule 404(b). This evidence is directly relevant to Dermen's intent, preparation, and plan, in conspiring with Jacob Kingston to fraudulently obtain tax credits. Specifically, it is directly relevant to Dermen's role as an "enforcer" in the conspiracy, namely that in addition to providing Kingston with an "umbrella" of federal law enforcement protection, he was also willing to assist Kingston by harming or threatening to harm anyone who stood in their way.

## IV.   Lev Dermen's Efforts to Mix Various Products Into His Fuel and Alter Volume Measurements

Jacob Kingston will testify that in or about January 2012, Dermen explained to him that he illegally mixed a number of products into the fuel at his gas stations, including transmix and motor oil. Because these products are significantly cheaper than gasoline, Dermen could significantly increase the margins on his fuel sales by doing so. Dermen offered up this information in response to Kingston's statement that he had a shipment of biodiesel returning from India that might not meet specifications because of the product's long ocean journey from Florida to India and back to Los Angeles. Dermen responded he was willing, in fact eager, to take such product at a below-market price and mix it into the fuel at his gas stations.  In addition, Dermen explained that he had his fuel trucks outfitted with secret compartments, such that when he went to deliver a truck-load of fuel to the customer, about 10% of the fuel would remain in the truck. Dermen explained this allowed him to charge his customers for a full truckload but deliver only 90%. Finally, Dermen admitted to Kingston that early on in their relationship, he had stolen fuel delivered by Kingston by falsely claiming that the trucks contained less fuel than they

15

actually did. At the time, Dermen falsely suggested that Kingston's truck drivers were stealing from him.

This evidence is inextricably intertwined with the charged crimes as it establishes the basis for Dermen and Jacob's criminal relationship. Indeed, Dermen's willingness to illegally blend transmix and other products into his fuel was a significant basis for Kingston's belief and understanding that Dermen would be a willing partner in crime. This evidence also establishes why Dermen wanted to enter into a conspiracy with Jacob in 2012. Dermen was looking for fuel at below-market prices that he could blend in with the fuel at his gas stations in order to increase his profit margin. As Kingston's testimony, as well as the testimony of other witnesses, including Katirina Pattison will establish, Dermen and Kingston's "recertification" project in 2012 allowed Dermen and Kingston to claim false credits and RINs and allowed Dermen to purchase biodiesel at below-market prices, which then increased his profit margin at this gas stations.

To the extent the Court does not find this evidence is intrinsic, it is admissible under Rule 404(b). This evidence is directly relevant to Dermen's intent, preparation, and plan, in conspiring with Jacob Kingston to fraudulently obtain tax credits and RINs. Specifically, it is directly relevant to Dermen's role in 2012 as the end-buyer of the "recertified" biodiesel. By conspiring with Kingston to falsely claim fraudulent tax credits and RINs, Dermen could also ensure a supply of biodiesel for his gas stations at below-market prices.

V.      <u>**Conclusion**</u>

The Government hereby provides notice of its intent to admit the evidence described

herein as intrinsic to the crimes charged or alternatively as admissible pursuant to Rule 404(b).

The Government reserves the right to supplement this Rule 404(b) Notice as necessary.

Respectfully submitted this 19th of August, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Leslie A. Goemaat*
LESLIE A. GOEMAAT
RICHARD M. ROLWING
ARTHUR J. EWENCZYK
Special Assistant United States Attorneys
JOHN E. SULLIVAN
Senior Litigation Counsel

Certificate of Service

I certify that on the 19th day of August 2019, I caused a copy of the foregoing to be filed through the CM/ECF electronic filing system, thereby providing notice to all parties of record in this case.


/s/ Leslie A. Goemaat
Leslie A. Goemaat
Special Assistant United States Attorney