IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


In re:                      )
                            )
UNITED STATES OF            )
AMERICA,                    )
                            )
        Plaintiff,          )
                            )
vs.                         )  Case No. 2:18-CR-365
                            )
LEV ASLAN DERMEN,           )
a/k/a Levon                 )
Termendzhyan,               )
                            )
        Defendant.          )
                            )
_____      )


BEFORE THE HONORABLE BROOKE WELLS

August 13, 2019

Deposition of Ms. Katirina Pattison pursuant to
Federal Rule of Criminal Procedure 15



Government
Exhibit

A

**Appearances of Counsel:**

For the Plaintiff:        Leslie A. Goemaat
                          Arthur J. Ewenczyk
                          John E. Sullivan
                          Attorneys at Law
                          US Department of Justice
                          Tax Division
                          Criminal Enforcement Section
                          601 D. Street NW 7th Floor
                          Washington, D.C. 20530

                          Richard M. Rolwing
                          Attorney at Law
                          US Attorney's Office
                          Tax Division
                          303 Marconi Blvd Suite 200
                          Columbus, Ohio  43215

For the Defendant:        Mark J. Geragos
                          Setara Qassim
                          Attorneys at Law
                          Geragos & Geragos APC
                          644 S. Figueroa Street
                          Los Angeles, California 90017

Court Reporters:

          Laura W. Robinson, RPR, FCRR, CSR, CP
                 Patti Walker, RPR, CP
                 351 South West Temple
                 8.430 U.S. Courthouse
              Salt Lake City, Utah 84101

I N D E X

Examinations                                              Page

**EVELYN KATIRINA PATTISON**                                 5
DIRECT EXAMINATION                                           5
BY MS. GOEMAAT
CROSS-EXAMINATION                                           89
BY MR. GERAGOS
REDIRECT EXAMINATION                                       153
BY MS. GOEMAAT
RECROSS-EXAMINATION                                        172
BY MR. GERAGOS
FURTHER DIRECT EXAMINATION                                 177
BY MS. GOEMAAT
FURTHER RECROSS-EXAMINATION                                178
BY MR. GERAGOS

E X H I B I T S

Description                                               Page

Government's Exhibit 4-1                                    40
Government's Exhibit 4-2                                    48
Government's Exhibit 4-3                                    62
Government's Exhibit 4-4                                    63
Government's Exhibit 4-5                                    70
Government's Exhibit 4-9                                    77
Government's Exhibit 4-7                                    79
Government's Exhibit 4-8                                    82
Government's Exhibit 4-10                                   85

```
  1                 Salt Lake City, Utah August 13, 2019

  2                              * * * * *

  3                THE COURT:  All right.  We're going to start

  4     over.  We have a court reporter present now.  I'm

  5     calling the United States of America versus Lev Aslan

  6     Dermen.  This is case number 2:18-CR-365 assigned to

  7     Judge Parrish and referred to me.

  8                We are here on an unopposed motion for the

  9     deposition of Ms. Katirina Pattison pursuant to

 10     Federal Rule of Criminal Procedure 15.  I would ask

 11     counsel to once again make their appearances.

 12                MS. GOEMAAT:  Thank you.  And good morning,

 13     Your Honor.  Leslie Goemaat on behalf of the United

 14     States.  Here with Richard Rolwing, Arthur Ewenczyk

 15     and John Sullivan.

 16                THE COURT:  Thank you.

 17                MR. GERAGOS:  Good morning, Your Honor.  Mark

 18     Geragos, G-E-R-A-G-O-S, with Setara Qassim and

 19     Mr. Dermen is present as well.

 20                THE COURT:  And he -- and I will note his

 21     presence.  All right.  Um, Ms. Goemaat, you may

 22     proceed.

 23                MS. GOEMAAT:  Thank you, Your Honor.  The

 24     United States calls Katirina Pattison.

 25                THE COURT:  Ms. Pattison, if you will please
```

00:00:-21 (line 5)
00:00:09 (line 10)
00:00:27 (line 15)
00:00:34 (line 20)
00:01:25 (line 25)

```
 1    step forward and be sworn in.

 2              THE CLERK:  If you could raise your right

 3    hand.

 4                  EVELYN KATIRINA PATTISON,

 5    called as a witness at the request of the Plaintiff,

 6          having been first duly sworn, was examined

 7                    and testified as follows:

 8              THE WITNESS:  Yes.

 9              THE CLERK:  Okay.  Have a seat right over

10    here.  And if you could pull the microphone as close

11    to you, that is the only way everyone can hear and

12    state your name and spell it for the record, please.

13              THE WITNESS:  Does that work?

14              THE COURT:  Little bit closer probably.

15              THE WITNESS:  How about now.  Okay.  My name

16    is Evelyn Katirina Pattison.

17                  DIRECT EXAMINATION

18    BY MS. GOEMAAT:

19    Q.   Can you please spell your name for the record,

20    Ms. Pattison.

21    A.   E-V-E-L-Y-N, Katirina, K-A-T-I-R-I-N-A, last name

22    Pattison, P-A-T-T-I-S-O-N.

23    Q.   Thank you, Ms. Pattison.  And as you know this is

24    being recorded so if you can talk as close to the

25    microphone as possible that will be helpful for the
```

00:01:32 (line 5)
00:01:51 (line 10)
00:02:02 (line 15)
00:02:13 (line 20)
00:02:28 (line 25)

```
 1    quality of the recording.

 2    A.    I will do my best.

 3    Q.    Ms. Pattison, what is your maiden name?

 4    A.    My maiden name is Tracy.

 5    Q.    And can you please give a little background on

 6    where you're living and what you're doing now?

 7    A.    Yes.  I currently live in Missouri.  I am

 8    self-employed and I work for my parents on their

 9    ranch and we raise cattle and goats.

10    Q.    How many goats do you have?

11    A.    A lot.

12    Q.    Estimate?

13    A.    Over 700.

14    Q.    Ms. Pattison, are you currently pregnant?

15    A.    I am.  I am 34 weeks pregnant today.

16    Q.    And when are you due?

17    A.    September 26th.

18    Q.    Ms. Pattison, what's your understanding of why

19    you are here doing videotaped testimony for the trial

20    of Lev Dermen?

21    A.    I am here today doing a videotape testimony

22    because I will not be able to be here during the

23    trial which starts September 9th.  My doctor has not

24    allowed me to travel past 36 weeks.

25    Q.    Thank you.  Ms. Pattison, is this your first time
```

00:02:41 (line 5)
00:02:55 (line 10)
00:03:04 (line 15)
00:03:16 (line 20)
00:03:28 (line 25)

```
 1   testifying?

 2   A.   No, it is not.

 3   Q.   Were you involved in your own criminal case?

 4   A.   I was.

 5   Q.   Were you in fact criminally charged?

 6   A.   I was.

 7   Q.   And can you generally tell the court the nature

 8   of the scheme that you were charged with?

 9   A.   I used to work for a company by the name of Cima

10   Green and Caravan Trading.  It was owned by a

11   gentleman by the name of Joseph Furando and his wife

12   and I was the chief operating officer for those

13   companies.

14   Q.   And was the case that you were charged with

15   essentially a biodiesel fraud case?

16   A.   Yes, it was.

17   Q.   Did it relate to RINs and tax credits?

18   A.   Yes, it did.

19   Q.   Did you plead guilty in that case?

20   A.   I did.

21   Q.   Did you plead guilty to the felony offense of

22   conspiracy to defraud the United States of America in

23   violation of 18 USC 371?

24   A.   Yes, I did.

25   Q.   Now, we're going to go over some of the details
```

00:03:37 (line 5)
00:03:51 (line 10)
00:04:03 (line 15)
00:04:11 (line 20)
00:04:23 (line 25)

1    of the case to which you pled guilty.  What was your

2    role at Cima Green and Caravan Trading?

3    A.    I was the chief operating officer for those

4    companies.

5    Q.    And what was the scheme that you pled guilty to

6    related to Cima Green and Caravan Trading?

7    A.    Cima Green worked with a company by the name of

8    E-Biofuels based out of Middletown, Indiana.  And

9    what our job was was to act as a middleman.  We

10   bought and sold B99 RINless biodiesel and sold it to

11   E-Biofuels so that they could in turn take it and

12   claim that they had produced it and sell it to their

13   customers.

14   Q.    Did they claim that they had produced B100?

15   A.    Yes, they did.

16   Q.    Now, you mentioned B99 and I just mentioned B100.

17   Can you explain your understanding of those two

18   terms?

19   A.    B99 is 99 percent biodiesel with one percent

20   diesel fuel added into it and that allows it to be

21   eligible for something that is called the dollar tax

22   credit.  And B100 is 100 percent biodiesel that has

23   had nothing added to it.

24   Q.    And what is your understanding of what biodiesel

25   is?

1    A.    Biodiesel is composed of three main elements.

2    You have your main raw material which is some form of

3    a vegetable oil or animal fat like soybean oil.

4    Sometimes you can use used cooking oil as well and

00:05:52    5    then you need to add methanol and I believe it is

6    also lye as well in order to create a chemical

7    reaction that turns it into fuel.

8    Q.    Did that resulting chemical reaction, if at all

9    goes according to plan, is that biodiesel?

00:06:07    10    A.    Yes, it is.

11    Q.    Do you know whether there is also a glycerin

12    byproduct that results from that process?

13    A.    Yes, there is.

14    Q.    Now you used the phrase raw material?

00:06:16    15    A.    Yes.

16    Q.    Is there another phrase in the industry that is

17    common for the building blocks of the biodiesel?

18    A.    It is also known as feedstock.

19    Q.    Now, you mentioned the $1 tax credit.  How do you

00:06:30    20    understand that a company can obtain this $1 tax

21    credit and what is it exactly?

22    A.    The $1 tax credit to my understanding is a

23    government incentive that is provided to producers in

24    order to make biodiesel.  The raw materials or

00:06:46    25    feedstocks are or I should say were very expensive.

1    I'm not sure where they stand now.  Um, and the

2    government would provide an incentive for producers

3    to make biodiesel but you had to require them to

4    blend in diesel fuel in order to be eligible for that

00:07:04    5    credit.

6    Q.    So that $1 tax credit, at what point in this

7    process do you understand a company becomes eligible

8    for the $1 tax credit?

9    A.    Can you repeat that?

00:07:15    10    Q.    Sure.  Is it for making B100 or was it when you

11    blend it into B99?

12    A.    It is for when you blend it into B99.

13    Q.    Now, is there another kind of government benefit

14    that's available related to the production of

00:07:27    15    biodiesel?

16    A.    Yes.  It is known as a RIN certificate.

17    Q.    Can you explain RINs to the court?

18    A.    A RIN is a Renewable Identification Number and I

19    am not positive as to whether it is 36 or 38 digits

00:07:44    20    long.  However, it is comprised of the date, the

21    producer code, and then a batch number and possibly

22    some other pieces that I'm not recalling.  But those

23    three components I do recall.  And it's similar to

24    like a stock certificate.  It has a monetary value

00:08:02    25    that fluctuates up and down with the market and there

1    is one and a half RIN credits per one gallon of

2    biodiesel fuel.

3    Q.    Who issues these RIN credits?

4    A.    The EPA does.

5    Q.    And you previously testified that the $1 tax

6    credit comes when you blend B100 down to at least

7    B99.  When do you get this RIN credit?

8    A.    Your RIN credit you receive as soon as you

9    produce the fuel.  So if you make one gallon of

10   biodiesel, you have a piece of paper that you then

11   submit to the EPA through the EMTS system and it says

12   I producer A made one gallon of biodiesel fuel.

13   Please assign me one and a half RIN credits.

14   Q.    And when you say biodiesel, would that also be

15   B100?

16   A.    It would be B100, yes.

17   Q.    And you testified that it fluctuated with the

18   market.  Can you remember from your time in the

19   industry approximately how high these market value --

20   the market value of RINs could go?

21   A.    From what I recall, we had seen them as high as a

22   dollar fifty per credit.  So for one gallon of

23   biodiesel fuel, it would have been roughly $2.25.

24   Q.    Okay.  So based on your understanding, if a

25   producer produced one gallon of B100, and then

00:08:14 (line 5)
00:08:30 (line 10)
00:08:47 (line 15)
00:08:58 (line 20)
00:09:13 (line 25)

1    blended it to 1.01 gallons of B99, what could they

2    get potentially from the United States?

3    A.    Approximately $3.25 worth of government

4    incentives.

00:09:30    5    Q.    And that could be the tax credit combined with

6    the market value of the RINs?

7    A.    That's correct.

8    Q.    Now, can just anyone claim these tax credits or

9    do you have to have some kind of authorization to do

00:09:40    10    that?

11    A.    You do have to have some sort of authorization.

12    For the dollar tax credit I believe you had to have a

13    blenders license.  And for the RINs, you had to be

14    certified as a producer.

00:09:53    15    Q.    Now, with that background, can you explain to the

16    court what it is that you did with Cima Green and

17    Caravan Trading that was the basis of your criminal

18    conviction?

19    A.    Yes.  So Cima Green and Caravan Trading acted as

00:10:07    20    the middleman.  What we had done was we had gone to

21    our supplier, which was Astra Oil up in Calgary,

22    Canada, they were a large trading company that held

23    very large positions in different parts of the United

24    States of biodiesel.  They had several what we called

00:10:25    25    in the industry tank farms, they're very large fuel

terminals that would contain millions of gallons of

biodiesel and other types of fuel.  So what we did is

we went to Astra Oil and contracted millions of

gallons worth of biodiesel, took it and sold it to

E-Biofuels.  And on our paperwork, instead of listing

it as biodiesel, we listed it as feedstock or raw

materials.

Q.  And more specifically, were you purchasing B99 or

B100 from Astra?

A.  We were purchasing B99 RINless biodiesel from

Astra.  Which meant that the dollar tax credit had

already been applied for and RIN credits had already

been removed from that fuel so they had been sold off

and that value had already been taken.  So it was

significantly cheaper than what B100 or any form of

raw material would cost.

Q.  And is there any way to take RINless B99 on which

the tax credit has already been claimed and the RIN

has already been submitted and stripped off and turn

it back into B100 that you can claim tax credits and

RINs for?

A.  To the best of my knowledge, no, there is not.

Q.  And you mentioned that RINless B99 was

significantly keeper than B100 with RINs?

A.  Yes.

1  Q.    Can you explain why?

2  A.    The reason being is once you take your dollar tax

3  credit and your RINs off of it, you've removed that

4  amount of money from the deal.  When you're

00:11:53  5  purchasing B100 with RINs, you have to factor in that

6  cost into the price of the gallon.  So, for example,

7  B100 might cost, I don't know, $4 and B99 would cost

8  $2 because you had your dollar tax credit and then

9  you have your one half RINs that were worth the other

00:12:13  10  dollar.

11  Q.    Now, you testified that you were purchasing

12  RINless B99 from Astra?

13  A.    Yes.

14  Q.    And what were you doing with that RINless B99?

00:12:21  15  A.    We were taking the RINless B99 and selling it to

16  E-Biofuels and instead of labeling it as fuel, we

17  labeled it as your feedstock or raw materials.

18  Q.    And what was the purpose of fraudulently labeling

19  that B99 as feedstock?

00:12:35  20  A.    The purpose of that was so that E-Biofuels could

21  take that material and in turn say that they had

22  produced it and it was eligible again for a dollar

23  tax credit and your RINs.

24  Q.    And to your knowledge, did E-Biofuels indeed

00:12:49  25  fraudulently claim RINs and tax credits on that

1    RINless B99 that you sourced for them?

2    A.    Yes, they did.

3    Q.    And was that part of the charges that you faced

4    in your own case?

00:12:58    5    A.    Yes, it was.

6    Q.    Can you tell the court the approximate loss in

7    the case to which you pled guilty?

8    A.    I believe the approximate amount was

9    $55,000,000.00.

00:13:09    10    Q.    Now, why was it E-Biofuels claiming the tax

11    credits and RINs and not Cima Green or Caravan

12    Trading?

13    A.    We were not eligible.  We did not have a blenders

14    license nor were we listed as a producer.  We did not

00:13:22    15    have a physical biodiesel plant so we were not able

16    to claim any of that through the EPA.

17    Q.    And E-Biofuels did have a plan that had been

18    registered to your knowledge?

19    A.    Yes, it had been registered and audited so they

00:13:36    20    were eligible to be listed as a producer.

21    Q.    So is it fair to say that you needed E-Biofuels

22    to do the front half --

23              MR. GERAGOS:  Objection, leading.

24              MS. GOEMAAT:  I'll rephrase.

00:13:46    25    Q.    (By Ms. Goemaat) Was E-Biofuels a necessary part?

15

```
 1    A.    Yes.  Without a functioning biodiesel facility,

 2    this would not be possible.

 3    Q.    Did you and your co-defendant Joseph Furando have

 4    a word for this fraud scheme?

 5    A.    Yes, we called it alchemy.

 6    Q.    What is alchemy?

 7    A.    Joe Furando described it as turning nothing into

 8    gold.

 9              MR. GERAGOS:  Objection, hearsay.

10              MS. GOEMAAT:  Your Honor, we will be

11    submitting that statement as a co-conspirator

12    statement pursuant to 801(d)(2)(E).

13              THE COURT:  Overruled.

14    Q.    (By Ms. Goemaat)  Is alchemy also magic?

15    A.    Yes.

16    Q.    Did you at some point do this with a company

17    other than E-Biofuels?

18    A.    Yes.  We did it with Washakie Renewable Energy.

19    Q.    Now, Ms. Pattison, you pleaded guilty to the 371

20    count conspiracy to defraud the United States that

21    you were charged with, correct?

22    A.    Yes, I did.

23    Q.    Did you also enter into a what is called a

24    cooperation agreement with the government?

25    A.    Yes, I did.
```

00:14:05 (line 5)
00:14:16 (line 10)
00:14:28 (line 15)
00:14:43 (line 20)
00:14:52 (line 25)

```
 1    Q.   Can you explain your understanding of the

 2    contours of your plea and cooperation agreement that

 3    you entered into?

 4    A.   My understanding was that I was facing a maximum

 5    sentence of five years in prison with the best

 6    outcome or the other side of the outcome possibly be

 7    three years worth of probation.  In exchange for that

 8    agreement, I had to cooperate in full with any and

 9    all questions from the United States Government

10    pursuant to the E-Biofuels case or any other cases

11    that I may have had knowledge of.

12    Q.   And so that would include cases other than the

13    one that brought your indictment to the floor,

14    correct?

15    A.   Yes, that is correct.

16    Q.   To your knowledge, did Joseph Furando cooperate

17    with the government?

18    A.   I don't believe he did.

19    Q.   Now, as part of your cooperation agreement that

20    you entered into, did you testify at a trial of a

21    co-defendant?

22    A.   I did.  I testified at the trial of Jeffrey

23    Wilson.

24    Q.   Did you also testify at the sentencing of Joseph

25    Furando?
```

00:15:03 (line 5)
00:15:19 (line 10)
00:15:31 (line 15)
00:15:44 (line 20)
00:15:55 (line 25)

1    A.    Yes, I did.

2    Q.    And were you then ultimately sentenced for the

3    felony that you pleaded guilty to?

4    A.    Yes.  I was sentenced after both of those were

00:16:03    5    completed in November -- or on November 16 of 2016.

6    Q.    And what sentence did you expect when you were

7    walking into the courtroom?

8    A.    I fully expected to walkout of that courtroom and

9    spend five years in prison and say goodbye to my

00:16:19    10    husband and my family.

11    Q.    What sentence did you receive?

12    A.    By the grace of God I received three years

13    probation.

14    Q.    Ms. Pattison, what promises were made to you for

00:16:32    15    your testimony here today?

16    A.    Absolutely none.

17    Q.    What benefit do you hope to receive for your

18    testimony here today?

19    A.    Absolutely none.

00:16:40    20    Q.    Why are you here?

21    A.    Because it is the right thing to do and I

22    received a subpoena.

23    Q.    We're going to turn to Washakie Renewable Energy

24    now.  Do you know Jacob Kingston?

00:16:53    25    A.    I do.

1    Q.    When did you first meet him?

2    A.    I first met Jacob Kingston at the National

3    Biodiesel Board Conference in Orlando, Florida in

4    February of 2012.

00:17:06    5    Q.    Do you remember who was there when you first met

6    him?

7    A.    It was myself, my co-defendant Joseph Furando,

8    Jacob Kingston, Justin Divis and a third-party who I

9    do not remember.  I believe he was affiliated with

00:17:19    10    United Fuel Supply but I'm not 100 percent sure.

11    Q.    Now Levon Termendzhyan was not there, correct?

12    A.    No, he was not.

13    Q.    And at some point previously did you mistakenly

14    think that he had been there?

00:17:32    15    A.    I did.

16    Q.    And how did you realize that he wasn't there?

17    A.    I had several photos and e-mails and

18    correspondences that had come back and forth when I

19    was originally interviewed by the EPA agents that I

00:17:46    20    had not had a chance to review.  The phone call came

21    a little bit out of the blue and I had already been

22    removed from the former companies that I worked for

23    for over a year and my memory was fuzzy at best.

24    Q.    After looking at some photos, for example, did

00:18:04    25    you then remember that Lev Termendzhyan was not

1    present at that February 2012 meeting when you first

2    met Jacob Kingston in Orlando?

3    A.   Yes.

4    Q.   Now, what was the point of talking to Jacob

5    Kingston at that meeting?

6    A.   So in February of 2012, our scheme that we had

7    going with E-Biofuels was collapsed for the most

8    part.  Um, E-Biofuels at this point rumors had

9    started to spread in the industry that they were

10   fraudulently producing biodiesel and so their

11   customers were no longer purchasing from them and we

12   were, by we I mean myself and Joseph Furando and our

13   companies, we were holding millions of gallons worth

14   of fuel in a fuel terminal that we were responsible

15   for.  We had put the money up in advance and prepaid

16   for it in order to be able to guarantee that we would

17   have this for our customer.

18       And so at this point we were looking for

19   another customer that might be able to do something

20   similar to what we were doing with E-Biofuels.  And

21   there had been some rumors that had gone around in

22   the industry that Washakie might be a possible match

23   for us.

24   Q.   What do you mean by Washakie being a possible

25   match for you?

1    A.    That they might be a good option for us to

2    re-start the scheme that we had been doing with

3    E-Biofuels, the alchemy scheme.

4    Q.    Did you think they might be a good option to

00:19:33    5    fraudulently file for the tax credits and the RINs?

6    A.    Yes.

7    Q.    And what was the exact type of fuel that you

8    prepaid for?

9    A.    We prepaid for B99 RINless biodiesel.

00:19:47    10    Q.    And that would be the fuel that tax credits and

11    RINs had already been claimed on?

12    A.    That is correct.

13    Q.    Now why didn't you just sell the fuel as a

14    commodity to somebody who wanted RINless B99?

00:20:00    15    A.    That would have been an option however you would

16    have only been looking at making a penny, maybe two

17    at best as far as profit is concerned.  And for Joe

18    Furando, that was not what he wanted to do.  There

19    was a certain lifestyle and a certain --

00:20:19    20              MR. GERAGOS:  Objection, nonresponsive.

21              MS. GOEMAAT:  Your Honor, the witness --

22              THE COURT:  Re-ask the question.

23    Q.    (By Ms. Goemaat)  Yes, Your Honor.  Was Joe

24    Furando, to your knowledge, willing to sell this

00:20:30    25    RINless B99 just as a commodity to a customer who

1  wanted to buy RINless B99?

2  A.    No, he was not.

3  Q.    Did he want to make a very large profit on it?

4  A.    Yes, he did.

00:20:41  5  Q.    And what was the one way to make a very large

6  profit on RINless B99?

7  A.    It was to recertify or do the alchemy scheme

8  which would be to send the B99 to a biodiesel plant

9  in order to allow them to claim that they had

00:20:56  10  produced it and take the tax credit and the RINs.

11  Q.    And when you first approached Jacob Kingston,

12  were you attempting to determine whether he and his

13  company would be willing to recertify this RINless

14  B99 that you had to sell?

00:21:10  15  A.    Yes.

16  Q.    Please describe your first conversations with

17  Jacob Kingston?

18  A.    The first conversations that we had with him were

19  is a hey, how are you, what are you doing, who are

00:21:23  20  your customers what type of needs do you have.  Um,

21  where would you like to supply, where can you take

22  supply from, just feeling him out to see what his

23  interest was.

24  Q.    Were you trying to just get a sense of whether or

00:21:40  25  not it was a possibility that he would be willing to

1    do this with you?

2    A.   Yes.  We were trying to confirm some of the

3    rumors that we had heard in the industry.

4    Q.   And so what happened next as part of your attempt

00:21:53    5    to get Washakie Renewable Energy into the scheme to

6    replace E-Biofuels?

7    A.   I can't recall specifically all of the details

8    between the time period, however I do know --

9            MR. GERAGOS:  Objection.  Nonresponsive after

00:22:06    10    I can't remember all of the details.

11            MS. GOEMAAT:  Your Honor, I believe she is

12    about to answer the question.

13            THE COURT:  Overruled.  Go ahead.

14            THE WITNESS:  Thank you, Your Honor.  As I

00:22:20    15    was saying, I can't recall the specific details of

16    how it came about.  However, there were conversations

17    that took place between Joseph Furando, Jacob

18    Kingston that ultimately led to us having a meeting

19    in March of 2012 with Levon.

00:22:36    20    Q.   (By Ms. Goemaat)  Is it your understanding or --

21    let me rephrase.  At some point did Jacob Kingston

22    tell you that you needed to talk to Levon

23    Termendzhyan?

24    A.   Yes, he did.

00:22:48    25    Q.   And ultimately was a meeting scheduled with Levon

23

1    Termendzhyan?

2    A.    Yes, it was.

3    Q.    Roughly when was that meeting?

4    A.    I believe it was approximately March 24th of

00:23:00    5    2012.

6    Q.    And have you at times remembered that it might be

7    April but later confirmed, based on photos, that it

8    was March 24th and 25th of 2012?

9    A.    Yes, that is correct.

00:23:12    10    Q.    Where did this meeting take place?

11    A.    It took place in Miami, Florida in South Beach.

12    Q.    Did you fly there?

13    A.    We did.

14    Q.    Who were you with?

00:23:22    15    A.    I was with Joseph Furando.

16    Q.    Where were you staying?

17    A.    We stayed at the Eden Roc Hotel.

18    Q.    Where was Levon Termendzhyan staying?

19    A.    The Fontainebleau which was right next door.

00:23:34    20    Q.    And did you ultimately meet Levon Termendzhyan at

21    the Fontainebleau?

22    A.    Yes.

23    Q.    Now, do you see Levon Termendzhyan in court

24    today?

00:23:41    25    A.    I do.

1    Q.   Can you please identify him?

2    A.   He is the gentleman sitting in the I believe it

3    is a yellow jumpsuit.

4         MS. GOEMAAT:   Let the record reflect that

00:23:50  5    Ms. Pattison has identified defendant Lev Dermen AKA

6    Levon Termendzhyan.

7         THE COURT:   It will.

8    Q.   (By Ms. Goemaat)   Please describe your first

9    encounter with Levon Termendzhyan in South Beach,

00:24:01  10   Florida?

11   A.   We met with Levon at the hotel.  He was at the

12   Fontainebleau and it was myself and Joseph Furando

13   and I cannot recall whether we were talking through

14   Jacob or who we were texting or having phone calls

00:24:16  15   with, but we ultimately wound up walking out into the

16   valet carport-type area where the vehicles pull up to

17   drop guests off.  And Levon and his family and

18   several other members pulled up in a few luxury

19   vehicles.

00:24:34  20   Q.   Now, what was the first thing that you did with

21   Levon Termendzhyan?

22   A.   We walked over to him and shook his hand,

23   introduced ourselves to him since we had never met

24   him, and then we went and proceeded inside into the

00:24:47  25   lobby to go and have a drink at the hotel bar.

```
 1   Q.   Now, this was your first encounter ever with
 2   Levon Termendzhyan?
 3   A.   Yes.
 4   Q.   Did he make a strong first impression on you?
 5   A.   He did.
 6   Q.   Can you describe why?
 7   A.   So we went and sat down at the bar and Joe I
 8   believe he ordered it was some form of a scotch and
 9   he was looking at the menu and Levon had told him
10   that that wasn't good enough and he ordered him a
11   50-year old glass of scotch.  And I don't know much
12   about alcohol, but I do know that that is quite
13   expensive.
14   Q.   Do you know how much --
15        MR. GERAGOS:  Objection, nonresponsive.  No
16   foundation.  Irrelevant.
17        MS. GOEMAAT:  I'll rephrase.
18        THE COURT:  Go ahead.
19   Q.   (By Ms. Goemaat) Based on sitting at the bar with
20   Mr. Furando and Mr. Levon Termendzhyan and the
21   ordering of this scotch, do you know roughly how much
22   it cost?
23   A.   I believe it was about $1,500.
24   Q.   Did anything else happen in that moment that made
25   a strong impression on you?
```

00:24:56 (line 5)
00:25:11 (line 10)
00:25:25 (line 15)
00:25:33 (line 20)
00:25:47 (line 25)

```
 1    A.    Well, the waitress who --

 2              MR. GERAGOS:   Objection, relevance.

 3              MS. GOEMAAT:   Yes, Your Honor.   This witness

 4    is going to testify to the relationship that she

 5    ultimately perceived between Jacob Kingston and Levon

 6    Termendzhyan which is very relevant to the pending

 7    conspiracy charges.   And much of the basis of her

 8    understanding is based on these experiences that she

 9    had with Mr. Termendzhyan when she first met him

10    where she saw for the first time an incredible amount

11    of wealth and confidence and essentially leadership.

12    That is what she is --

13              THE COURT:   Objection is overruled.

14    Q.    (By Ms. Goemaat)   What happened next,

15    Ms. Pattison?

16    A.    So the waitress who was serving us she had a bit

17    of an attitude.   She acted like she couldn't care to

18    be there and that made Levon very offended.   He made

19    a comment about how she should be treating him with

20    respect.   And so we went ahead and we finished our

21    drink and Levon pulled out a series of $100 bills and

22    called the waitress over, threw them down on the

23    table and looked at her and said next time you will

24    remember me and said let's go and we proceeded to

25    dinner.
```

00:25:55 (line 5)
00:26:10 (line 10)
00:26:22 (line 15)
00:26:38 (line 20)
00:26:54 (line 25)

1   Q.   And that was your first impression of

2   Mr. Termendzhyan?

3   A.   Yes.

4   Q.   And what was your -- what was your impression of

00:27:01    5   him at that point?

6               MR. GERAGOS:   Objection, relevance.

7               THE COURT:   Overruled.

8               THE WITNESS:   I had never seen that type of

9   behavior before.   I quite frankly was shocked and

00:27:14    10   impressed.   It was a very powerful move.

11   Q.   (By Ms. Goemaat)   Where did you go from the bar

12   with the $1,500 shot?

13   A.   We proceeded to a restaurant, I cannot recall

14   whether we had walked or driven.   It had been a long

00:27:30    15   day of travel and out in the heat but we wound up

16   ultimately at an Italian restaurant that was along

17   the South Beach stretch.

18   Q.   And who was present that you can recall at this

19   dinner?

00:27:41    20   A.   It was myself, Levon, Joseph Furando and several

21   other members of his family and his, I guess,

22   bodyguard team.

23   Q.   So he brought a team of bodyguards with him?

24   A.   Yes.

00:27:53    25   Q.   What did you guys talk about at the dinner?

A.   Levon was very insistent about not discussing

business.  He wanted to have conversations more about

who we were and get to know us a little bit better.

But Joseph Furando is the type to be very insistent.

00:28:12     And so after about, I don't know, maybe halfway

through the meal, two-thirds of the way through the

meal Joseph Furando was sitting next to Levon and

they finally -- he was finally able to get him to

start discussing some business.

00:28:28     Q.   What was the nature of the discussion about

business?

A.   The nature of that discussion was what Joseph

Furando had proposed to Jacob originally which was to

use Washakie in order to recertify fuel and have them

00:28:43     then sell it to Levon.

Q.   Was it an explicit discussion about taking the

B99 that your company had prepaid for and

recertifying it through Washakie?

A.   Yes.

00:28:56     Q.   And did you discuss what would happen to the fuel

once it was recertified through Washakie?

A.   Yes.

Q.   What was that?

A.   We had explained that Washakie would go ahead and

00:29:06     say that they had produced the fuel even though it

29

```
 1    was already B99 with the RINs removed from it and the

 2    dollar tax credit removed from it and that would then

 3    make it eligible for claiming the dollar tax credit

 4    and RINs again even though that is illegal.

 5    Q.   And then who would Washakie sell the fuel to?

 6    A.   They would then in turn sell it to Levon.

 7    Q.   Did Levon Termendzhyan have a specific price that

 8    he wanted to buy this fuel at?

 9    A.   I distinctly recall every time we discussed

10    pricing that it always had to be 60 cents under

11    heating oil.

12    Q.   What does it mean for something to be under

13    heating oil?

14    A.   So heating oil is the commodity that was used to

15    price biodiesel.  It's the closest commodity that

16    they could use at the time.  I am not sure if that

17    has changed since then.  And to be 60 cents under

18    heating oil, um, for example, if heating oil was $2

19    it would need to be 60 cents under that so it would

20    be a dollar forty delivered into California.

21    Q.   Now, based on your experience during your time in

22    the biodiesel industry, would it be possible to sell

23    biodiesel at HO minus 60 into California?

24         MR. GERAGOS:  Objection, nonresponsive.  I

25    mean sorry no foundation.  She hasn't been qualified
```

00:29:21
00:29:34
00:29:43
00:29:59
00:30:15

30

1    as an expert in any way, shape, or form to give an

2    opinion.

3            THE COURT:  Do you have additional foundation

4    you can lay?

00:30:24    5            MS. GOEMAAT:  Yes, Your Honor.

6    Q.   (By Ms. Goemaat)  As the chief operating officer

7    of Cima Green and Caravan Trading, did you sell B99?

8    A.   Yes, I did.

9    Q.   Did you sell B99 to a number of companies?

00:30:35    10   A.   Yes.

11   Q.   Were you responsible for negotiating the purchase

12   price of the B99 from other companies?

13   A.   Yes.

14   Q.   Were you responsible for negotiating the sale

00:30:43    15   price of B99 to companies?

16   A.   Yes.

17   Q.   And what would you use to negotiate these prices?

18   A.   We would use the Chicago Board of Trade Heating

19   Oil pricing.

00:30:53    20   Q.   So you would use this heating oil market index

21   and would you price it out in relation to the heating

22   oil index?

23   A.   Yes, we did.

24           MS. GOEMAAT:  Your Honor, I submit this

00:31:02    25   witness has a basis of knowledge to testify as to

31

1    general pricing of the commodity that she regularly

2    bought and sold during the course of her employment.

3              MR. GERAGOS:  It is not -- there is no

4    expertise.  The question was in California and not a

00:31:13    5    single thing that she just asked related to

6    California.

7              MS. GOEMAAT:  I'll lay additional foundation.

8    Q.   (By Ms. Goemaat)  When you sell biodiesel,

9    depending on the way in which you sell it, do you

00:31:22    10    also need to insure that the fuel gets to where

11    you're selling it?

12    A.   Yes.

13    Q.   So shipping essentially?

14    A.   Yes.

00:31:28    15    Q.   And there is a number of different ways to ship

16    fuel, correct?

17    A.   Yes.  You can ship it via truck, railcar, barge.

18    Q.   You were sometimes responsible for setting up and

19    paying for the transportation of the fuel?

00:31:40    20    A.   Yes.

21    Q.   So based on your experience at Cima Green and

22    Caravan Trading, do you know generally what it would

23    cost to say ship fuel to California from Texas versus

24    somewhere else in Texas?

00:31:53    25    A.   Yes.

1    Q.    And is it more expensive?

2    A.    Yes.

3    Q.    And would that figure into the price that you're

4    able to offer to a potential customer based on where

00:32:01    5    they need the fuel?

6    A.    Yes.  It's one of the reasons why we opted to

7    most of the time not include delivery because it was

8    fluctuating all of the time and we were not

9    comfortable with that.

00:32:13    10        MS. GOEMAAT:  Your Honor, I submit that this

11    is not even remotely expert testimony.  As away of

12    example, a cashier is not an expert in the cost of a

13    bag of chips.  And this witness is perfectly

14    competent to testify as to the day in and day out

00:32:28    15    work of pricing biodiesel and shipping biodiesel

16    which she did as part of her job.

17        THE COURT:  Mr. Geragos?

18        MR. GERAGOS:  There is no foundation for it,

19    none whatsoever.  She just said --

00:32:37    20        THE COURT:  I am going to overrule the

21    objection.

22        MR. GERAGOS:  Thank you, Your Honor.

23    Q.    (By Ms. Goemaat)  My question, Ms. Pattison, was,

24    based on your experience would you have been able to

00:32:46    25    sell B99, RINless B99 at HO minus 60, 60 under

33

```
 1   heating oil, all the way to California?

 2   A.   No.

 3   Q.   So based on the conversation what was the plan

 4   that was discussed in order to make sure that Levon

 5   Termendzhyan could get this fuel at HO minus 60?

 6   A.   The plan was to use Washakie as a front or a

 7   biodiesel facility that could take our B99 RINless

 8   that Cima Green would label as feedstock or raw

 9   materials, and then Washakie would in turn claim that

10   they had produced it and then go ahead and take the

11   dollar tax credit and the RINs and then allow Levon

12   to purchase it from him and it would be delivered to

13   California.

14   Q.   And so based on your previous testimony, Washakie

15   fraudulently claiming tax credits and RINs on this

16   fuel would give them up to as much as a $3.25 cent

17   extra profit?

18        MR. GERAGOS:   Objection, leading.

19        THE COURT:   Sustained.

20   Q.   (By Ms. Goemaat)   I'll rephrase.  Thank you, Your

21   Honor.  Based on this process, would there be an

22   extra profit?

23   A.   Yes, there would be.  They would be eligible for

24   the dollar tax credit which is a dollar and whatever

25   the value of the RINs were at the time which, for
```

00:33:05 (line 5)
00:33:27 (line 10)
00:33:41 (line 15)
00:33:53 (line 20)
00:34:06 (line 25)

1    example, if they were a dollar they would be eligible

2    for an extra dollar fifty so that would make $2.50

3    cents.

4    Q.    And how, if at all, would this figure into the

00:34:18    5    pricing from Washakie to Levon Termendzhyan?

6    A.    It would allow Washakie to be able to sell to

7    Levon at the heating oil price that he was looking

8    for, the 60 cents under heating oil, and for

9    everybody to still make a significant profit.

00:34:35    10    Q.    And is it your recollection that you were

11    explicitly discussing this fraudulent recertification

12    process at this dinner?

13    A.    Yes.

14    Q.    And did you observe Levon Termendzhyan object to

00:34:47    15    this proposal?

16    A.    No.

17    Q.    What did you observe?

18    A.    Honestly nothing.  He seemed perfectly fine in

19    just continuing to engage in conversation.  There

00:34:58    20    were not very many questions which ultimately

21    confirmed what we had suspected that Washakie was

22    involved in some sort of re-certifying scheme.

23            MR. GERAGOS:  Objection, motion to strike.

24    Speculation as to what she ultimately suspected in

00:35:12    25    not many questions.  It is complete speculation.

1    MS. GOEMAAT:  Your Honor, she is testifying I

2  believe to her own opinion which is relevant because

3  they were seeking out these specific parties with the

4  intent to do fraud.  We can ask the witness to

00:35:26    5  rephrase.  I don't believe the witness was testifying

6  that Washakie had committed fraud, but that they had

7  believed they might be and this meeting confirmed

8  that that was probably so in their minds.

9    THE COURT:  Re-ask the question.

00:35:38   10    MS. GOEMAAT:  Yes, Your Honor.

11  Q.  (By Ms. Goemaat)  I'm going to slightly rephrase

12  the question.  You previously testified that you

13  sought out Jacob Kingston at that first meeting

14  because you had heard rumors and you were looking for

00:35:49   15  someone who could take the place of E-Biofuels?

16  A.  Yes, that is correct.

17  Q.  And did your opinion change after this dinner at

18  the Italian restaurant with Levon Termendzhyan in

19  South Beach?

00:35:59   20  A.  No, it did not.

21  Q.  Why is that?

22  A.  Because there was no objection, no being upset,

23  no, oh my gosh that is illegal what are you doing

24  type of reaction.

00:36:10   25  Q.  Now, Ms. Pattison, where is Jacob Kingston in

```
 1   this conversation?  Is he at the end of the table?
 2   A.   No, he was not present.
 3   Q.   How can you sit there with Joseph Furando and
 4   Levon Termendzhyan and make a plan about Washakie
 5   fraudulently claiming these RINs and tax credits
 6   without Jacob Kingston the owner of Washakie present?
 7   A.   From our interactions with Jacob Kingston it
 8   seemed like Jacob Kingston and Levon --
 9            MR. GERAGOS:  Objection, no foundation.
10   Calls for speculation.
11            MS. GOEMAAT:  I'll rephrase.
12            THE COURT:  Go ahead.
13   Q.   (By Ms. Goemaat)  What was your belief about who
14   needed to authorize this transaction?
15            MR. GERAGOS:  Objection, no foundation.  Her
16   belief is irrelevant.
17            MS. GOEMAAT:  Your Honor, her belief is
18   absolutely relevant because she is in the midst of
19   entering into a fraudulent conspiracy with these
20   parties.
21            THE COURT:  Overruled.
22            MR. GERAGOS:  Judge Parrish has not ruled on
23   the co-conspirator statements so I would like this to
24   be noted at this point.
25            THE COURT:  It will be.
```

00:36:24 (line 5)
00:36:40 (line 10)
00:36:48 (line 15)
00:36:59 (line 20)
00:37:06 (line 25)

37

1          MS. GOEMAAT:  Yes, Your Honor.  But I will

2    submit that the witness's belief is not a statement

3    for the record.

4          MR. GERAGOS:  Right and that makes it even

00:37:15    5    more irrelevant but the court is --

6          THE COURT:  Go ahead.

7    Q.    (By Ms. Goemaat)  Ms. Pattison, why did you

8    believe that it was okay to sit at this table and

9    make a plan with Levon Termendzhyan as to what fraud

00:37:27    10    Jacob Kingston was going to commit with his company?

11    A.    We believed that Jacob Kingston and Levon were

12    working hand-in-hand, that they were partners and

13    that Levon was -- I'm not sure how to phrase this in

14    an appropriate way.

00:37:44    15          MR. GERAGOS:  Objection, as this started with

16    we believed which is improper.  And second of all,

17    she is not sure how to phrase it which goes back to

18    what the original objection was is that it is

19    speculation.

00:37:56    20          MS. GOEMAAT:  Your Honor, I understand that

21    Mr. Geragos does not want this testimony to come out.

22    We can ask the witness to please focus on her belief.

23    I believe she is referring to her co-conspirator and

24    partner in crime, Joseph Furando.  I'll ask her to

00:38:11    25    testify specifically to her belief.  I would ask the

```
 1   witness be allowed to answer the question.
 2            THE COURT:  Overruled.  Go ahead.
 3   Q.   (By Ms. Goemaat)  Ms. Pattison, what did you
 4   believe -- what was in your mind and your mind alone
 5   such that it was okay to sit at this table with Levon
 6   Termendzhyan to make a plan for Jacob Kingston to
 7   commit fraud?
 8   A.   I believed that Levon and Jacob were partners and
 9   I believed that Levon was in charge of all of the
10   decisions related to Washakie, his organization
11   United Fuel Supply and whatever organizations that
12   Levon had at the time.
13   Q.   And was that based on your interactions and
14   conversations with Jacob Kingston and Levon
15   Termendzhyan up to that point?
16   A.   Yes.
17   Q.   Now, do you recall what you did the next day in
18   South Beach?
19   A.   The next day we met Levon at I believe it was a
20   place called Nikki's Beach in South Beach.
21   Q.   Did you take a photo while you were there?
22   A.   I did.
23   Q.   I would like you to turn to the first tab in your
24   binder, Tab 1, this is marked as Government
25   Exhibit 4-1.  What is this?
```

00:38:20
00:38:37
00:38:52
00:39:03
00:39:16

1    A.    This is the photo that I took at Nikki's Beach in

2    Miami, Florida.

3    Q.    Is this an accurate depiction of what you

4    observed that day?

5    A.    Yes.

6    Q.    Nikki's Beach?

7    A.    Yes.

8    Q.    And on the far right hand side, who is that?

9    A.    That is Joseph Furando wearing the white and red

10   Ferrari shirt.

11   Q.    And is Mr. Termendzhyan in this photo?

12   A.    Yes, he is.  He is the gentleman not wearing a

13   shirt in the white shorts and black belt.

14   Q.    And what exactly were you doing at Nikki's Beach

15   the next day?

16   A.    It was a celebration of a new business

17   relationship.

18        MS. GOEMAAT:  Your Honor, I move to admit

19   Government Exhibit 4-1.

20        THE COURT:  Any objection?

21        MR. GERAGOS:  Yes.  I object that it's

22   irrelevant.

23        THE COURT:  Overruled.

24        (Whereupon, Government's Exhibit 4-1

25        was received into evidence.)

00:39:28 (line 5)
00:39:37 (line 10)
00:39:48 (line 15)
00:40:00 (line 20)
00:40:07 (line 25)

1    Q.    (By Ms. Goemaat)   Was that the end of your South

2    Beach trip?

3    A.    I believe we flew out the next day.

4    Q.    And where did you go?

00:40:13    5    A.    Back to New Jersey.

6    Q.    And then where did you go?

7    A.    To Calgary, Canada.

8    Q.    Why?

9    A.    So as I mentioned previously, our supplier Astra

00:40:23    10    Oil is located in Calgary, Canada.  And we, Joseph

11    Furando and I, were -- we had several million gallons

12    worth of biodiesel fuel that Astra Oil was holding in

13    their tanks.  And by this point it's late March and

14    we were supposed to be consistently taking fuel out

00:40:43    15    of those tanks and we had not been and we were

16    receiving significant pressure from Astra Oil to get

17    the product moving.

18    Q.    So what was the purpose of going all the way to

19    Calgary?

00:40:53    20    A.    We wanted to go there face-to-face and say don't

21    worry, we have a new business partner, we're going to

22    get the fuel out of there.  And basically just

23    reassure them that we were back in business.

24    Q.    Were you somewhat relieved to have entered into

00:41:07    25    this agreement so you could move that fuel?

1    A.    Very much so.

2    Q.    Now, where did you go from Calgary, Canada?

3    A.    We flew from Calgary to Los Angeles, California.

4    Q.    Was it you or was it you and Joseph Furando?

00:41:20    5    A.    Joseph Furando was not able to join myself and

6    three other business colleagues on that trip.  He had

7    a -- it was a medical procedure that prevented him

8    from traveling.

9    Q.    Why did you go to Los Angeles?

00:41:31    10    A.    To meet with Levon.

11    Q.    How many days after the South Beach trip was

12    this?

13    A.    It was three or four, I believe.

14    Q.    And do you remember who told you you needed to

00:41:43    15    come to LA to meet with Levon?

16    A.    I cannot recall specifically.  It was either

17    Jacob or Levon.

18    Q.    And what happened when you landed in Los Angeles?

19    A.    We were picked up at the airport by Levon's son

00:41:56    20    George and I believe it was his nephew also named

21    George.

22    Q.    Anything memorable happen?

23    A.    He had some very nice cars.  It was a Bentley and

24    a Rolls Royce.

00:42:06    25    Q.    Where did they take you in the Bentley and the

1  Rolls Royce?

2  A.   They took myself and my three colleagues to

3  Levon's offices.

4  Q.   Can you describe Levon Termendzhyan's offices?

00:42:16   5  A.   I was unimpressed.  They were -- it's a trailer

6  slash mobile home type building is what it looked

7  like to me.  It had a wooden ramp leading up to it as

8  well as yellow siding.

9  Q.   What happened when you went inside of the

00:42:36  10  trailer?

11  A.   Same thing, still just not very impressive.  I

12  expected something more.  There was a receptionist

13  sitting at the front, there were several other

14  gentlemen just standing around, and then we were

00:42:49  15  brought into another room that I believe to be

16  Levon's office and that's where I saw Levon and his

17  personality come to life.

18  Q.   How so?

19  A.   The furniture in the office was Lamborghini

00:43:04  20  furniture, it was emblazoned with the logos.  There

21  was a tremendous spread of food laid out on the

22  table, lots of fruit.  I believe there was also a

23  bottle of Tequila there and there was Levon's desk

24  and several other people.

00:43:19  25  Q.   And who was there in that meeting?

43

```
     1    A.   It was myself, Levon, three of my business
     2    colleagues, I don't know if you want me to name them.
     3    Q.   If you can recall their names?
     4    A.   I believe it was Grace Conte, Casey Houser, and I
     5    want to say Lou Deery.  I'm not 100 percent sure if
     6    it was Lou Deery or Ryan Davis who was with me on
     7    that trip.
     8    Q.   Now at this morning meeting in the office
     9    trailer, do you remember whether Jacob Kingston was
    10    present.
    11    A.   I honestly do not recall whether he was present
    12    or not.
    13    Q.   And what was the point of this morning meeting
    14    with the spread of food and the bottle of Tequila?
    15    What did you discuss?
    16    A.   We were there to discuss the further details of
    17    sending the biodiesel to Washakie in order to have it
    18    be processed by them and in turn be shipped out to
    19    California.
    20    Q.   Were there any other further details about how
    21    that was going to work?  Did you hammer out dates yet
    22    or prices?
    23    A.   Not that I can recall.
    24    Q.   What did you do after the meeting in the trailer?
    25    A.   Levon took us on a tour of his holdings, his
```

00:43:35  (line 5)
00:43:46  (line 10)
00:43:56  (line 15)
00:44:10  (line 20)
00:44:21  (line 25)

1    properties that he had.  One place that we went was a

2    nonfunctioning biodiesel plant that Levon owned.  It

3    was a building and outside was some equipment and he

4    said to us that it was not working.  I don't recall

5    whether I asked him why it wasn't working or not and

6    then he, I believe, took us to a fuel terminal slash

7    truck stop where he pulled up to the fuel pumps and

8    he removed one of the fuel pumps and said, "this is

9    where your fuel will be delivered to my customers."

10         And at that point he began to explain how at

11   some times during the year he was up-blending which

12   means he is adding more biodiesel into the diesel

13   fuel in order to at some points be as high as

14   50 percent biodiesel and 50 percent diesel fuel.

15   Q.   Did he tell you why he was doing that?

16   A.   In order to make a better profit on the diesel

17   fuel.  Biodiesel when you purchased it correctly was

18   cheaper than diesel fuel at that time.

19   Q.   And so if you put more biodiesel into the fuel

20   that you're selling, then your cost of goods sold

21   would be lower?

22   A.   Yes.

23   Q.   Okay.  Did you go back to the trailer office

24   after the tour of Mr. Termendzhyan's holdings?

25   A.   Yes, we did.

00:44:40 (line 5)
00:44:59 (line 10)
00:45:15 (line 15)
00:45:31 (line 20)
00:45:43 (line 25)

1    Q.    What happened when you got to the trailer?

2    A.    Well, when we got back the spread of food had

3    been changed to like a lunch-type setting.  And there

4    was -- Levon was in and out meeting with a couple

5    other people.  We met with another gentleman by the

6    name of I believe it was Dan McDire and if I recall

7    correctly, he worked for United Fuel Supply, and just

8    had a general conversation with him about what else

9    we could supply.  And at one point, um, Levon had

10   gone outside and he had a, I believe it was a GT500,

11   and started doing doughnuts in the parking lot.

12   Q.    Do you know why?

13          MR. GERAGOS:  Relevance.

14          MS. GOEMAAT:  I'll establish the relevance,

15   Your Honor.

16          THE COURT:  Overruled.

17          MS. GOEMAAT:  Thank you.

18   Q.    (By Ms. Goemaat) Did you take a picture shortly

19   thereafter?

20   A.    I did.

21   Q.    I would like you to turn to the second tab in

22   your binder.  And for the record, this is government

23   -- marked for identification purposes as Government

24   Exhibit 4-2.  Is this a photo that you took right

25   after the doughnuts in the parking lot?

1   A.   Yes, it was.

2   Q.   And can you describe what is in this photo?

3   A.   In this photo is Levon Termendzhyan, his back is

4   to the camera, he is in all black.  The other two

00:46:58   5   gentlemen in all black are his bodyguards.  And then

6   the gentleman in the blue shirt with the black pants

7   looking to the right, that is Jacob Kingston.

8   Q.   How do you know, based on this photo, that you

9   took it shortly after he did the doughnuts in the

00:47:12   10   parking lot?

11   A.   Because you can see the tire tracks in the

12   parking lot.

13   Q.   Now, does this photo accurately depict what you

14   observed that day?

00:47:18   15   A.   Yes, it does.

16   Q.   And there is something new here, there is Jacob

17   Kingston?

18   A.   Yes.

19   Q.   And do you recall at what point Jacob Kingston

00:47:27   20   joined you because he is clearly in this photo?

21   A.   I honestly do not know and it wasn't until I

22   found this photo that I -- that I knew Jacob Kingston

23   had been in California.  To my memory, it just never

24   stuck out that he was there.

00:47:41   25   Q.   And so this photo reminded you that at some point

```
 1   during that day he was present?
 2   A.   Yes.  Because I took that picture so he had to be
 3   there because he is in the photo.
 4        MS. GOEMAAT:  Your Honor, I move to admit
 5   Government's Exhibit 4-2.
 6        THE COURT:  Any objection?
 7        MR. GERAGOS:  Objection, relevance.
 8        THE COURT:  Overruled.  It will be admitted.
 9        (Whereupon, Government's Exhibit 4-2 was
10        received into evidence.)
11   Q.   (By Ms. Goemaat)  Now after the doughnuts in the
12   parking lot, was anything happening with your
13   co-defendant and co-conspirator Joseph Furando?
14   A.   Yes.  Joseph Furando is the type of person that I
15   refer to as a micro-manager.  He needs to know
16   everything that is going on at every given point, no
17   matter what you're doing.  And if you don't answer
18   him, he is very unhappy.  So he had been texting and
19   calling my cell phone throughout the day asking where
20   are we, how many railcars, have you figured out
21   pricing, when are they going to start to pull the
22   fuel.  And I was tired, I was hot, I had been
23   traveling all over the country and I, in a very
24   non-polite way, told Mr. Furando "FU, talk to Levon
25   yourself."  And so he instructed me to go ahead and
```

00:47:50   5
00:47:59   10
00:48:11   15
00:48:27   20
00:48:47   25

1    get Levon and get him on the phone.

2         So I proceeded inside and I spoke to Levon

3    and I asked him if he would speak with Joseph

4    Furando.  He agreed and we walked outside.  There was

00:49:03    5    a -- I don't even know how to describe it, it was a

6    shed with a wooden bench just outside of his offices.

7    I don't even think there was a door.  And we sat in

8    there and had a conversation.  It was myself, Joseph

9    Furando and Levon.  Joseph Furando was on the phone

00:49:19   10    and it was on speaker phone.

11    Q.    What did you discuss?

12    A.    We discussed the specific details regarding

13    getting product to Washakie.  At that point Levon had

14    agreed to do a small test run with I believe it was

00:49:32   15    approximately six railcars of biodiesel that would be

16    taken from the facility where we had it in Illinois,

17    have it shipped to Utah to Washakie and then

18    ultimately Levon would purchase it and it would be

19    delivered into California.

00:49:46   20    Q.    Did you discuss terms of payment?

21    A.     We did.  Um, Joseph Furando insisted that every

22    single customer that we had prior to Levon pre-pay

23    for the material.  So if they wanted ten gallons of

24    fuel biodiesel they needed to pay for ten gallons of

00:50:04   25    biodiesel.  And if they only picked up nine, then we

49

```
 1    would adjust it at the end.
 2         He was not interested in giving credit terms
 3    to anybody.  However, at this point we were with our
 4    backs against a wall.  We had been sitting on this
 5    material for -- the biodiesel for almost four months
 6    and we were losing money every single day.  And so he
 7    agreed to give Levon credit terms of I believe it was
 8    20 days.
 9    Q.   Where is Jacob Kingston in this phone call?
10    A.   He was not present.
11    Q.   So you're discussing six railcars to go from
12    essentially your holding facility in Illinois to
13    Jacob Kingston's plant in Utah?
14    A.   Yes.
15    Q.   Where the railcars will be recertified?
16    A.   Yes.
17    Q.   Was there explicit discussion that Jacob Kingston
18    would fraudulently claim the tax credits in the RINs
19    and recertify this B99?
20    A.   Yes.
21    Q.   But Jacob Kingston was not present?
22    A.   No.
23    Q.   And then was there explicit discussion that this
24    RINless B99 that was always RINless B99 would be sent
25    from the Utah Washakie plant to Levon Termendzhyan?
```

00:50:20 (line 5)
00:50:37 (line 10)
00:50:49 (line 15)
00:51:01 (line 20)
00:51:12 (line 25)

1    A.    Yes.

2    Q.    Was it odd to you that Jacob Kingston wasn't

3    present?

4    A.    Again, no, because it was my belief that Jacob

00:51:26    5    and Levon were involved in this and it did not matter

6    what Jacob thought.  As long as Levon was okay with

7    it everything was fine.

8    Q.    In this phone call did you finally finalize the

9    specifics of this plan that you had been attempting

00:51:42    10    to finalize over the course of these various

11    meetings?

12    A.    Almost.  We did not -- we did not set a price and

13    we did not set a date.  So all we had at this point

14    was a quantity and an agreement that yes we would

00:51:56    15    start the process.

16    Q.    And at what point during that whole day and phone

17    call do you remember talking to Jacob Kingston about

18    the specific plan?

19    A.    I do not recall talking to him at all.

00:52:10    20    Q.    Approximately how long do you think this call

21    lasted?

22    A.    30 minutes or so.

23    Q.    What did you do afterwards?

24    A.    Afterwards we went to dinner.

00:52:19    25    Q.    Did you go straight from the trailer?

```
 1   A.   Yes.

 2   Q.   Did you go back to the hotel and change?

 3   A.   No.

 4   Q.   Were you tired at that point?

 5   A.   I was exhausted.

 6   Q.   Would you have liked to have gone back to the

 7   hotel and change your clothes?

 8   A.   Very much so.

 9            MR. GERAGOS:  Objection, relevance.

10            THE COURT:  I'm going to sustain that one.

11            MS. GOEMAAT:  Thank you, Your Honor.

12   Q.   (By Ms. Goemaat)  Did you go to dinner directly

13   from the trailer?

14   A.   Yes.

15   Q.   And can you recall any details of getting to the

16   dinner and the dinner?

17   A.   Um, myself and my other female colleague who was

18   with me we both changed at the trailer and we got

19   into vehicles.  Myself and Levon rode in his -- in

20   Levon's Maybach.  It was driven by his bodyguard.

21   And the other parties followed and I can't recall if

22   it was one or two vehicles.  I believe it was two

23   though.

24   Q.   Do you remember anything about the dinner itself?

25   A.   I do.  Um, Levon -- I was 26 years old at the
```

Timestamps (left margin):
- 00:52:27 (line 5)
- 00:52:34 (line 10)
- 00:52:41 (line 15)
- 00:52:58 (line 20)
- 00:53:11 (line 25)

|         |    |                                                           |
|---------|----|-----------------------------------------------------------|
|         | 1  | time.  I had never been to LA.  I wanted to go down       |
|         | 2  | Rodeo Drive in the worst way.  So he instructed his       |
|         | 3  | driver to go down Rodeo Drive which made me very          |
|         | 4  | happy.  And then we proceeded to a restaurant that        |
| 00:53:32| 5  | was I believe it was like an Italian sushi-type           |
|         | 6  | restaurant.  There was a large boat of sushi that was     |
|         | 7  | brought out to the table.  We all sat down and began      |
|         | 8  | to eat.  And we were looking at the menu and I love       |
|         | 9  | risotto and there was a truffle risotto --                |
| 00:53:47| 10 | MR. GERAGOS:  Objection, relevance.                       |
|         | 11 | MS. GOEMAAT:  Your Honor, if I may.                       |
|         | 12 | Ms. Pattison is about to testify, I proffer to you,       |
|         | 13 | Ms. Pattison is going to testify about another very       |
|         | 14 | expensive event that happened that was firmly             |
| 00:54:01| 15 | imprinted on her young mind and convinced her that        |
|         | 16 | Mr. Termendzhyan had power and wealth.  And this          |
|         | 17 | plays into her role and Mr. Termendzhyan's role in        |
|         | 18 | the conspiracy that they struck.                          |
|         | 19 | MR. GERAGOS:  I'm mystified and maybe I'm                 |
| 00:54:14| 20 | missing it as to how wealth or power is relevant.         |
|         | 21 | THE COURT:  I disagree.  Overruled.                       |
|         | 22 | Q.  (By Ms. Goemaat)  Tell the court about the            |
|         | 23 | risotto?                                                  |
|         | 24 | A.  So there was a truffle risotto on the menu and it     |
| 00:54:28| 25 | came out.  And one of the things that Levon noticed       |

```
 1    was that there was not enough truffle on this

 2    risotto.  And for those of you who do not know,

 3    truffle is a very expensive mushroom.  There is two

 4    different types, there is black and there is white,

 5    and they're rare.  And he called the waiter over and

 6    told him to bring the truffle out.

 7              MR. GERAGOS:  Objection, relevance.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  And he had the waiter bring the

10    truffle out and told the waiter to shave more on to

11    the risotto.  And he told him to continue going and

12    going and going until this truffle was gone.  And I

13    am not an expert about truffles in no way, shape or

14    form, I do know that they're expensive.

15              MR. GERAGOS:  Objection, nonresponsive.

16    Irrelevant.

17              THE COURT:  That -- I overruled for

18    relevance.  Objection nonresponsive is sustained.

19    Q.   (By Ms. Goemaat)  Did this seem to you like a

20    demonstration of Mr. Termendzhyan's wealth?

21    A.   Yes, it did.

22              MR. GERAGOS:  Objection, leading.

23              THE COURT:  Sustained.

24    Q.   (By Ms. Goemaat)  What impact did this truffle

25    incident have on you and why?
```

00:54:41
00:54:54
00:55:10
00:55:23
00:55:31

```
 1            MR. GERAGOS:  Objection, irrelevant.
 2            THE COURT:  Overruled.
 3            THE WITNESS:  In my mind, this was another
 4   example of Levon's wealth and his power and just the
 5   ability to be able to do whatever he wanted.
 6   Q.   (By Ms. Goemaat)  And you previously mentioned
 7   that the bodyguards drove you to the restaurant?
 8   A.   Yes.
 9   Q.   Were they at the dinner with you?
10   A.   Yes, they were.
11   Q.   Did you have any interaction with the bodyguards?
12   A.   I did.  At one point I needed to use the restroom
13   and Levon instructed one of the bodyguards to escort
14   me to the restroom for my own safety.
15   Q.   Did this make a powerful impression on you?
16   A.   I had never been escorted to the restroom by
17   anybody in my life.  It was odd.
18   Q.   Did it also feel kind of special?
19   A.   I kind of felt like a celebrity.
20   Q.   What exactly were you doing generally this entire
21   day?  You flew in early in the morning, you have all
22   of these events, the day just seems like it goes from
23   event to event.  What was your purpose in continuing
24   with these endless interactions not all of which seem
25   related to business?
```

00:55:46  (line 5)
00:55:57  (line 10)
00:56:09  (line 15)
00:56:26  (line 20)
00:56:41  (line 25)

55

1    A.    No, a lot of them --

2              MR. GERAGOS:   Objection, relevance.

3              THE COURT:   Overruled.

4              THE WITNESS:   A lot of them were not related

00:56:49    5    to business.   The way that I was trained in the

6    corporate world by Joseph Furando was do whatever is

7    necessary in order to make the client happy.   Do not

8    tell them no, do not upset them, do not question

9    them.   Give them what they want in order to close the

00:57:10    10    deal.   And that's what I was instructed to do was to

11    just comply and do what was ever asked of us and

12    that's what we did.

13              If Levon asked me to jump 15 feet in the air,

14    I certainly would try to jump 15 feet in the air in

00:57:25    15    order to make this deal happen.

16    Q.    (By Ms. Goemaat)   And what was the deal that you

17    were trying so hard to close?

18    A.    To get Washakie to purchase the fuel that we were

19    holding in Illinois and recertify it through Washakie

00:57:39    20    and then ultimately sell it to Levon and any other

21    customers that they had.

22    Q.    Was that the end of your LA trip?

23    A.    Yes.   After the dinner wrapped up, it was

24    approximately, I want to say, about 2:00 in the

00:57:53    25    morning and we were finally dropped off back at our

1    hotel.

2    Q.    What was your next encounter with Levon

3    Termendzhyan that you can recall?

4    A.    It was a brief encounter in April of 2012.  I

00:58:06    5    believe it was the end of April, approximately the

6    25th, I think, was the date.

7    Q.    Where was it?

8    A.    In Las Vegas.

9    Q.    Did you go there?

00:58:15    10    A.    Yes.

11    Q.    Why?

12    A.    We were asked to be there.  It was Levon who had

13    said either be here or there is no deal.

14    Q.    At this point had they pulled any fuel or sent

00:58:25    15    any railcars to pick up your fuel?

16    A.    They had not.

17    Q.    Were you getting kind of desperate?

18    A.    Very much so.

19    Q.    So you go to Vegas because it is go to Vegas deal

00:58:35    20    or no deal and what happens in Vegas?

21    A.    There was a less than five-minute meeting in the

22    parking lot of the Wynn.  Levon pulled up in a luxury

23    RV, stated that he was downstairs.  I went with -- it

24    was myself and just a female who I had brought along

00:58:53    25    on the trip, she was not affiliated with the company,

```
 1   and we went down, walked on the RV, said hello how
 2   are you, shook hands, exchanged a few pleasantries
 3   and that was it.
 4   Q.   Was Jacob Kingston there?
 5   A.   Not that I recall.
 6   Q.   Did you discuss any business?
 7   A.   No.
 8   Q.   What was the point of this trip?
 9   A.   In my mind it was again how far are you willing
10   to go to get this done.
11   Q.   Now, I want to take a moment to clarify because
12   you actually have met with Levon Termendzhyan two
13   different times in Las Vegas, correct?
14   A.   Yes, that is correct.
15   Q.   And after this event that you have been
16   testifying to, did you meet with Jacob Kingston and
17   Levon Termendzhyan in February of 2013 in Las Vegas
18   nearly a year later?
19   A.   Yes, that is correct.
20   Q.   Can you briefly describe the purpose of that
21   meeting?
22   A.   So in February of 2013 we had already completed
23   what deal we were doing with Washakie and we were out
24   in Las Vegas for the National Biodiesel Board
25   Convention.  And at this point convention, we had
```

00:59:07 (line 5)
00:59:16 (line 10)
00:59:29 (line 15)
00:59:42 (line 20)
00:59:58 (line 25)

1    already been raided by the federal government for our

2    scheme in the biofuels but we were not indicted at

3    that point.

4            So we went to Las Vegas, like I said, for the

01:00:14    5    National Biodiesel Board Conference.  I was sent to

6    go meet with Levon by Joseph Furando and just talk to

7    him and engage in a conversation with him and see

8    kind of where they were at.  And Jacob Kingston went

9    up to Mr. Furando's hotel room and had a conversation

01:00:32    10    with him.

11    Q.   Now we have fast forwarded a bit and we will go

12    back to where we were.  But this second February 2013

13    Las Vegas meeting, was that also a later attempt to

14    try to get Levon Termendzhyan and Jacob Kingston

01:00:44    15    involved in this fraud with you?

16    A.   Yes, it was.

17    Q.   Okay.  Dialling back to April 2012, you just

18    testified you had a five-minute meeting in a luxury

19    RV in the parking lot of the Wynn.  Did you

01:00:57    20    personally have any other meetings with Jacob

21    Kingston or Levon Termendzhyan before these six

22    railcars were finally sent out?

23    A.   No, I did not.

24    Q.   Are you aware of whether or not Jacob Kingston

01:01:09    25    and Joseph Furando had a meeting in New Jersey?

1  A.    Yes, I am aware of it.  However, I was not

2  present at that meeting.

3  Q.    Now, ultimately, you testified that you agreed to

4  do a test run of six railcars.  What happened with

01:01:22  5  these six railcars?

6  A.    So after the Las Vegas meeting, we finally were

7  able to have Washakie start sending their railcars to

8  Illinois.  I believe it was the first or second week

9  of May, I can't recall the specific date, but they

01:01:39  10  did go ahead and start sending the railcars towards

11  Illinois.

12  Q.    And that was to pick up your B99 RINless that you

13  had in Illinois?

14  A.    Yes, that is correct.

01:01:49  15  Q.    At that time in May who did you believe the

16  actual customer and end user would be?

17  A.    I believed it was Levon.

18  Q.    And where were these six railcars going to go

19  once they filled up with your B99?

01:01:59  20  A.    They were going to return back to Washakie's

21  plant in Utah.

22  Q.    And was that for the purpose of recertification?

23  A.    Yes, it was.

24  Q.    Now, this B99 that you were selling, where did

01:02:11  25  you source it from?

1    A.    The B99 that we were selling we sourced it from

2    Astra Oil and it was being held in two different

3    locations.  One was Kinder Morgan which is in Argo,

4    Illinois, and the other one, I believe, is referred

01:02:25    5    to -- I referred to it as Gilman but it is also known

6    as Incobrasa.  I think it is I-N-C-O-B-R-A-S-A.

7    Q.    We're going to look at a couple of the contracts.

8    If you can turn to the third tab in the binder this

9    is Government's Exhibit 4-3.  There is an e-mail with

01:02:44    10   no content attaching a contract.  Can you please

11   describe this contract?

12   A.    Yes.  So these are standard contracts that were

13   generated by Astra Oil who was the supplier that we

14   purchased the B99 RINless from.  And in this contract

01:03:01    15   it --

16   Q.    Let me stop you for a second.

17   A.    Yes.

18   Q.    Was this -- was this a record that you used to

19   memorialize the contract that you entered into with

01:03:07    20   Astra Oil relating to the purchase of the B99?

21   A.    Yes, that is correct.

22   Q.    Was this sent to you by this e-mail address for

23   your records?

24   A.    Yes.

01:03:15    25   Q.    That was your contract?

1    A.   Yes, that is correct.  It is my e-mail address

2    from Cima Green when I worked there.

3              MS. GOEMAAT:  Move to admit Exhibit 4-3 as a

4    business record.

01:03:25    5              THE COURT:  Any objection?

6              MR. GERAGOS:  Could I have one moment, Your

7    Honor.

8              THE COURT:  Yes.

9              THE WITNESS:  Is it okay if I get a drink of

01:03:39    10   water, please?

11             MS. GOEMAAT:  Yes.  Please let the court know

12   if you need a break.

13             THE WITNESS:  I will.  Thank you.

14             THE COURT:  We're going to break in about ten

01:03:46    15   minutes for lunch.

16             MS. GOEMAAT:  Thank you, Your Honor.

17             MR. GERAGOS:  No objection.

18             THE COURT:  It will be received.

19             (Whereupon, Government's Exhibit 4-3 was

01:04:00    20             received into evidence.)

21   Q.   (By Ms. Goemaat)  Now, according to this contract

22   what were you purchasing from Astra Oil on May 8th,

23   2012?

24   A.   According to this contract, we were purchasing

01:04:11    25   625,000 gallons of B99.9 SME which is soy methyl

62

1    ester or a soy biodiesel.

2    Q.    What price did you agree to pay?

3    A.    The price in here is $2.6834 cents per U.S.

4    gallon.

01:04:30    5    Q.    I would like you to turn to the fourth tab in

6    your binder this is Government Exhibit 4-4.  This is

7    also an e-mail attaching a contract.  Is this

8    contract also the type of contracts you entered into

9    as part of your business?

01:04:43    10    A.    Yes, that is correct.

11         MS. GOEMAAT:  Move to admit Government's

12    Exhibit 4-4 as a business record.

13         THE COURT:  Any objection?

14         MR. GERAGOS:  No objection.

01:04:59    15         THE COURT:  It will be received.

16         (Whereupon, Government's Exhibit 4-4

17         was received into evidence.)

18    Q.    (By Ms. Goemaat)  Is this also a contract for

19    B99?

01:05:03    20    A.    Yes, it is.

21    Q.    But Ms. Pattison, do you need to see the

22    contracts in this case to know what you had purchased

23    from Astra?

24    A.    No, I do not.

01:05:12    25    Q.    Do you have any question in your mind that you

1  never purchased B100 from Astra Oil?

2  A.   I do not have any question in my mind that we

3  only purchased B99.  That's all we ever purchased

4  from them.

01:05:24  5  Q.   And these prices, for example, on 4-4, it appears

6  that the price is $2.17 a gallon?

7  A.   Yes, that is correct.

8  Q.   Is that, in your experience, a RINless B99 price?

9  A.   Yes, it is.

01:05:38  10  Q.   Now, it appears that at least based on these you

11  never sent these contracts to Levon Termendzhyan or

12  Jacob Kingston?

13  A.   No, we would have never sent our contracts to

14  them.

01:05:53  15  Q.   Based on your discussions planning this delivery,

16  do you have any question that Levon Termendzhyan and

17  Jacob Kingston were told by you or Joe Furando in

18  your presence that this was RINless B99?

19        MR. GERAGOS:  Objection, leading.

01:06:08  20        MS. GOEMAAT:  I'll rephrase.

21        THE COURT:  Go ahead.

22  Q.   (By Ms. Goemaat)  Did you ever tell Levon

23  Termendzhyan or Jacob Kingston that this was B100?

24  A.   No, we never did.

01:06:17  25  Q.   Did you ever tell them that it was feedstock?

1    A.    No.

2    Q.    Did you ever tell them that it was actually soy

3    blend oil or any other name for the raw materials

4    used to make feedstock?

01:06:26    5    A.    No.

6    Q.    What did you tell them that it was?

7    A.    We told them that it was B99 RINless biodiesel

8    that we would label on our paperwork as feedstock.

9    Q.    Now, these contracts relate to fuel that was held

01:06:40    10    at Kinder Morgan?

11    A.    Yes, that is correct.

12    Q.    You also provided some documents to the

13    government of fuel that was held at Incobrasa?

14    A.    Yes.

01:06:46    15    Q.    Incobrasa didn't sell you the fuel, correct?

16    A.    No, they did not.  It was just a terminal

17    facility.

18    Q.    And some of those documents indicated that it was

19    B100.  Was it B100?

01:06:57    20    A.    No, it was not.

21    Q.    Do you have an explanation as to why those

22    documents would say B100?

23    A.    I do not have an explanation.  The only thing

24    that I can understand is that it was a material

01:07:11    25    safety data sheet that was provided by Incobrasa and

1    B99 and B100 are so similar that for the MSDS

2    purposes it did not matter.

3    Q.   For the purposes of safety precautions relating

4    to the material?

01:07:25    5    A.   Yes.

6    Q.   Now, did it matter to your fraud scheme whether

7    the terminal tank company called it B100 or B99?

8    A.   They could have called it pixie dust and it

9    didn't matter.

01:07:36    10    Q.   Because what you did was you put the fake name on

11    your invoices; is that correct?

12          MR. GERAGOS:   Objection, leading.

13          THE COURT:   Sustained.

14    Q.   (By Ms. Goemaat)   What paperwork mattered for

01:07:44    15    purpose of your fraud scheme?

16          MR. GERAGOS:   Objection.   No foundation if

17    she is asking about the paperwork for the terminal.

18          MS. GOEMAAT:   I'm not, Your Honor.   I'm

19    asking what paperwork as generated by the company

01:07:53    20    controlled by Ms. Pattison and her co-defendant

21    Joseph Furando.

22          THE COURT:   Overruled.

23    Q.   (By Ms. Goemaat)   What paperwork that you created

24    was important for the fraud scheme?

01:08:02    25    A.   It was what the paperwork that was generated by

1    Cima Green and Caravan Trading and submitted to

2    Washakie.  That was the only paperwork that mattered.

3    Q.   I would like you to turn to Tab 5 in your binder.

4    This is Government's Exhibit 4-5.  You provided this

01:08:19    5    record to the United States.  Before you read off of

6    this record, is this a record that you created as

7    part of your business to provide to Jacob Kingston

8    relating to three of these railcars?

9    A.   Yes.

01:08:33   10        MS. GOEMAAT:  Move to admit 4-5 as a business

11   record and alternatively if the court finds it is not

12   a business record as a co-conspirator statement

13   pursuant to 801(d)(2)(E).

14        MR. GERAGOS:  It's not a business record,

01:08:46   15   there is an objection as to that, and it also hasn't

16   been ruled as to the second grounds purported.  So we

17   have objections on both grounds.

18        THE COURT:  Remind me of that rule.

19        MS. GOEMAAT:  Pardon?

01:08:57   20        THE COURT:  Remind me of the rule.

21        MS. GOEMAAT:  Well, the business record rule

22   allows generally written statements to be considered

23   non-hearsay if the record was made at or near the

24   time, by or from information transmitted by someone

01:09:12   25   with knowledge, it was kept in the course of

```
 1    regularly conducted activity, it was a regular
 2    practice.  All of these conditions are shown by the
 3    testimony of the custodian who is here on the stand,
 4    Ms. Pattison, and neither the opponent showed that
 5    the source of information shows a lack of
 6    trustworthiness.
 7            However, I will point out we're not
 8    introducing it for the truth of the matter as it
 9    wasn't actually soy blends, so I rephrase my request.
10    I would move to admit this not for the truth of the
11    matter asserted but merely for the fact that
12    Ms. Pattison created an invoice falsely claiming that
13    this material was soy blend.
14            MR. GERAGOS:  Well, that's the problem.  If
15    you're going to argue the business records rule
16    you're arguing that it is a legitimate record created
17    in the course and scope of business.  Obviously they
18    aren't arguing that, they're arguing that it is not.
19    And they're also arguing that the only reason you
20    invoke the business records rule is to avoid hearsay.
21    So I am perplexed as to is it a fraud or is it the
22    truth or what is the purpose of those.
23            THE COURT:  Ask that question.
24            MS. GOEMAAT:  Yes, Your Honor.  If we can
25    proceed with the witness and then re-address it.
```

01:09:26  (line 5)
01:09:38  (line 10)
01:09:50  (line 15)
01:10:04  (line 20)
01:10:18  (line 25)

1    Q.   (By Ms. Goemaat) This is an invoice that you

2    created; is that correct?

3    A.   Yes, it is.

4    Q.   And how did it describe the product?

01:10:26    5    A.   It describes it as soy blend.

6    Q.   Is that true or false?

7    A.   It is false.

8    Q.   How does it describe the payment terms?

9    A.   It describes the payment terms as net 20 days.

01:10:34    10   Q.   Now, does that truthfully summarize the agreement

11   that you came to with Levon Termendzhyan?

12   A.   Yes, it does.

13   Q.   And who is the buyer?  Who is actually receiving

14   the invoice on this?

01:10:46    15   A.   Washakie Renewable Energy.

16   Q.   And is that the company that you actually thought

17   that you were selling to?

18   A.   That is the company that we were selling the

19   material to, yes.

01:10:56    20   Q.   But here you have invoiced in pounds.  Now is

21   that legitimate based on what you know that you were

22   selling?

23   A.   No.

24   Q.   But this is -- this is a piece of paper that you

01:11:08    25   drafted for the purpose of securing payment from

```
 1  Jacob Kingston and Washakie Renewable Energy as part

 2  of this fraud scheme?

 3  A.   Yes.

 4          MS. GOEMAAT:  Now, Your Honor, if I may.

 5  First I'll note the business records exception says

 6  nothing about it being a legitimate document.  But in

 7  any event, I withdraw the request that we submit it

 8  for that purpose as the witness will testify that she

 9  was billing Washakie Renewable Energy which is the

10  truth.  And the purpose of this document is to show

11  they were fraudulently listing it as soy blend which

12  was part and parcel of the fraud.

13          THE COURT:  Mr. Geragos?

14          MR. GERAGOS:  I have no idea what they're

15  doing.  She has already established the facts that

16  she wants through the testimony so I don't -- I am

17  perplexed as to what it is that they want.

18          THE COURT:  Well that's not really an

19  objection, perplexion, but I think that you have laid

20  an adequate foundation under the rules and I'll allow

21  it.

22          MS. GOEMAAT:  Thank you, Your Honor.

23          (Whereupon, Government's Exhibit 4-5

24          was received into evidence.)

25  Q.   (By Ms. Goemaat)  So turning again to this
```

01:11:17  (line 5)
01:11:36  (line 10)
01:11:47  (line 15)
01:12:03  (line 20)
01:12:09  (line 25)

1  invoice, you have billed the material to Washakie as

2  soy blend.  Can you again tell the court why this

3  invoice says "soy blend" when you had testified that

4  you were selling RINless B99?

01:12:24  5  A.  The reason why this document states that it is

6  soy blend is so that Washakie could in turn use this

7  document to show that they had purchased raw

8  materials or feedstock from us in order to be able to

9  produce B100 biodiesel which was not the case.

01:12:42  10  Q.  So this name "soy blend" was part of the scheme?

11  A.  Yes.  We used the term soy blend.  It was -- it

12  was a way for us to have an out if anything ever

13  happened.  It was so that we could claim that we

14  didn't know what they were doing with the material

01:13:04  15  regardless of whether or not it was B99 or, sorry,

16  feedstock.

17  Q.  But would it also allow Washakie Renewable Energy

18  to use it in some way?

19  A.  Yes.  They would be able to use this document as

01:13:18  20  proof that they had purchased raw materials from our

21  organization.

22  Q.  One final question, why is this an invoice for

23  Sunbelt Ag Supply, a company we have not talked

24  about?

01:13:31  25  A.  Sunbelt Ag Supply was nothing more than another

1   shell company that Joseph Furando had created.

2   Q.   What was the point of yet another shell company?

3   A.   He wanted to keep the transactions with Washakie

4   completely separate from Cima Green and Caravan

5   Trading.

6   Q.   And returning to the invoice, as we previously

7   discussed, it is billed in pounds.  Does that have

8   any meaning to you?

9   A.   Yes.  So when you purchase your feedstock or your

10  raw materials, it is billed in pounds.  That is how

11  the industry standardized it.  When you purchased

12  your fuel, it was always build in gallons.

13  Q.   And finally, the payment terms are net 20 days.

14  And so based on the payment terms, when were you

15  expecting to be paid?

16  A.   We would be expecting payment within 20 days of

17  Washakie receiving this invoice.  I don't know what

18  that is on a calendar but --

19  Q.   Why did you agree to such unfavorable terms?

20  A.   Again, we were in a hard place.  We were

21  desperate, we needed this fuel to start moving and

22  were willing to do anything that needed to be done in

23  order to get the fuel out of the tanks.

24  Q.   Now this invoice is dated May 17, 2012.

25  A.   Yes.

1    Q.    Did anything happen a week later?

2    A.    Yes.  On May 24th of 2012, Caravan Trading

3    headquarters were raided by the FBI and the EPA and a

4    whole host of other agencies.

5    Q.    It sounds like you have no difficulty remembering

6    that day.

7    A.    It's not hard to forget something like that.  You

8    don't ever forget agents coming to you and asking

9    questions and it was a very scary day.

10            THE COURT:  Let's take our break now.

11            MS. GOEMAAT:  Thank you, Your Honor.

12            THE COURT:  All right.  And we will be in

13    recess until 1:15.

14            MS. GOEMAAT:  Thank you.

15            THE COURT:  Thank you.

16            THE WITNESS:  Thank you, Your Honor.

17            (Lunch recess taken at 12:03 p.m.)

18

19

20

21

22

23

24

25

```
 1                        (1:15 p.m.)

 2            THE COURT:  The record should reflect that all

 3   parties are back in the courtroom and the witness has

 4   retaken the witness stand.

 5            Ms. Goemaat, you may go ahead.

 6            MS. GOEMAAT:  Thank you, Your Honor.

 7   BY MS. GOEMAAT:

 8   Q    Before we took a break, Ms. Pattison, you had just

 9   looked at Exhibit 4-5, which is tab five in your binder, and

10   in this invoice, the material being sold to Washakie is

11   described as soy blend.  Now what was this material

12   actually?

13   A    The soy blend that we had listed in the invoice was

14   actually B99 soy based biodiesel.

15   Q    And was fraudulently labeling this as soy blend part of

16   the original plan?

17   A    Yes.  That is correct.

18   Q    And then remind the Court of the original plan here

19   calling this B99 soy blend.

20   A    The original plan was that we, being myself, Joseph

21   Furando, and our companies, Cima Green and Caravan Trading,

22   would take the B99 soy based biodiesel, sell it to Washakie.

23   They would take that material to their facility and claim

24   that it was raw materials or feedstock, which is how it's

25   labeled in the invoice, and say that they had then produced
```

1    that fuel and turned it into B100, and then claimed the

2    dollar tax credit and the RINs on that material.

3    Q    And then what was your understanding of what they would

4    then do with the B99 that you sent them?

5    A    It was my understanding that they would then take that

6    material and sell it to Levon, and he would then sell it at

7    his facility in California.

8    Q    But something happened in the middle of this plan,

9    correct?

10   A    Yes.  That is correct.

11   Q    Right before the break, you testified that there were

12   federal search warrants on your company on May 24th, 2012;

13   is that correct?

14   A    That is correct.

15   Q    And did that pose a problem for this ongoing plan that

16   you had?

17   A    A very large problem.

18   Q    And what was the problem?

19   A    All of our computers, and data, and cell phones, and

20   e-mails were seized by the federal government.  Documents

21   were taken from our offices, and we were obviously caught in

22   some way, shape, or form.  We were in trouble.

23   Q    So among other things, did you change this invoice to

24   Washakie so that it no longer said soy blend?

25   A    Yes.

1    Q    Now I'd like to turn your attention to Exhibit 4-9,

2    which is tab nine in your binder.  This is an e-mail that

3    you sent to Jacob Kingston copying Joe Furando, and it

4    attaches Union Pacific Railroad Company documents as well as

5    Sunbelt AG Supply records.

6                MS. GOEMAAT:  Your Honor, I'd move to --

7    BY MS. GOEMAAT:

8    Q    Is this, in fact, an e-mail you sent?

9    A    Yes, it is.

10   Q    And did you send these Union Pacific Railroad documents

11   and these new invoices as part of trying to essentially

12   cover up what you had done?

13   A    Yes.

14   Q    But it was also within --

15               MR. GERAGOS:  Objection, leading.

16               THE COURT:  Sustained.

17               MS. GOEMAAT:  I'll rephrase.

18   BY MS. GOEMAAT:

19   Q    What was the purpose of this e-mail?

20   A    The purpose of this e-mail was to provide the invoices

21   for the railcar freight that we had incurred having the

22   material be delivered to the Washakie facility as well as

23   the invoice that was generated under the Sunbelt Ag Supply

24   stating that this was actually biodiesel, not feedstock.

25               MS. GOEMAAT:  Move to admit this as a

```
 1   co-conspirator statement subject to 801(d)(2)(E).

 2             THE COURT:  Mr. Geragos.

 3             MR. GERAGOS:  I'm sorry, Your Honor.  I'm looking

 4   at one.  I don't think it's the same one.

 5             Do you have a Bates number stamp on it in the

 6   bottom right?

 7             THE COURT:  I think it's tab nine.

 8             MS. GOEMAAT:  It's Exhibit 4-9.

 9             MR. GERAGOS:  Yeah, that's fine.

10             MS. GOEMAAT:  Thank you, Your Honor.

11             (Plaintiff's Exhibit 4-9 was received into

12   evidence.)

13   BY MS. GOEMAAT:

14   Q    Now I'd like you to turn to page ten of this exhibit.

15   Now page 10 looks somewhat like previous Exhibit 4-5 where

16   your company, Sunbelt Ag Supply, billed Washakie Renewable

17   Energy for soy blend oil, but it no longer says soy blend.

18   Now it just has a railcar.  Can you explain why that change

19   was made?

20   A    So the reason for this change was because at this point

21   we were under investigation by the Federal Bureau of

22   Investigation as well as the EPA, and so in order to protect

23   ourselves and not seeing that we were engaged in any more

24   fraud, we decided to just list the railcars and the quantity

25   that was involved and just sell it as fuel, as biodiesel.
```

1    Q    Because you'd had this federal search warrant?

2    A    Yes.

3    Q    And was this federal search warrant, had it become

4    public?

5    A    Yes.  Within a matter of hours, it was on the news --

6    the local news in New Jersey, as well as it had been

7    published on a biodiesel newswire that's known as Opus.

8    Q    So it became known in the industry?

9    A    Very quickly.

10   Q    But you did send these six railcars of B99 to Utah?

11   A    Yes, we had.

12   Q    In fact, the other documents attached to this e-mail

13   that you sent to Jacob Kingston are Union Pacific Railroad

14   documents indicating that you sent methyl esters to Utah,

15   correct?

16   A    Yes.  That is correct.

17   Q    And if you turn to the very last page, page 12 of this

18   exhibit, the freight charges that you've included are to

19   Nucor, Utah?

20   A    Yes.  That is correct.

21   Q    So pursuant to the original plan, you have sent these

22   six railcars, correct?

23   A    Yes.

24   Q    But now you've redone the invoices after the very

25   public raid; is that correct?

```
 1  A     Yes.  That is correct.

 2  Q     Now if you turn to tab seven in your binder, this is

 3  Government's Exhibit 4-7, in response --

 4             THE COURT:  What tab is that again?

 5             MS. GOEMAAT:  It is tab seven, Your Honor.

 6             MR. GERAGOS:  Did you say seven?

 7             MS. GOEMAAT:  Seven.  It's Exhibit 4-7.

 8             MR. GERAGOS:  Is that different from the one you

 9  just gave us this morning?

10             MS. GOEMAAT:  No.

11             MR. GERAGOS:  This is the supplement to that.

12  Thank you.

13  BY MS. GOEMAAT:

14  Q     Is this an e-mail that Jacob Kingston sent to you in

15  response to your e-mail attaching these invoices?

16  A     Yes.  That is correct.

17             MS. GOEMAAT:  Move to admit Exhibit 4-7 as a

18  co-conspirator statement pursuant to 801(d)(2)(E).

19             MR. GERAGOS:  I don't have any objection on this

20  one.

21             THE COURT:  It will be admitted.

22             MS. GOEMAAT:  Thank you, Your Honor.

23             (Plaintiff's Exhibit 4-7 was received into

24  evidence.)

25  //
```

```
 1   BY MS. GOEMAAT:
 2   Q    What does Jacob Kingston tell you in response to your
 3   invoices that you sent?
 4   A    He states in the e-mail that an invoice revision is
 5   coming.
 6   Q    And he attaches something called cost calculation Cima?
 7   A    Yes.  That is correct.
 8   Q    And turning to the last page of the attachment, the
 9   attachment says price to pay Cima Green for product.  Can
10   you explain these numbers?
11   A    Yes.  So what he's stating is that the product cost
12   $2.25.  Then there's expenses involved.  Below the product,
13   he stated RINs, which he listed as nothing.  Then you go to
14   your expenses.  You have your freight from Argo, which is
15   the facility in Illinois, which is 42 cents per gallon.
16   Then there's freight to California, which is 46 cents per
17   gallon.  And a processing fee to WRE, which is Washakie
18   Renewable Energy, for 25 cents.  That totaled out to $1.13.
19        Then he says --
20   Q    I'm sorry.  Oh, yes.  Carry on.
21   A    Then he states that there's income, minus freight and
22   processing is $1.12.  He proposed to pay to Cima Green
23   $1.12, which leaves nothing in profit for Washakie.
24   Q    But didn't you previously bill him for $2.30 per
25   gallon?
```

```
 1   A    Yes.  That is what we had put on our invoice because
 2   that is what we had stated that the product should cost.
 3   Q    Is it common for the customer to be able to come back
 4   and just change the price of the product?
 5   A    No.
 6   Q    And why did you understand he was proposing a change to
 7   the price of product here?
 8   A    I understand that the reason for the change is because
 9   in there he states that there is a processing fee to
10   Washakie Renewable Energy.  He was trying to claim that
11   there was something wrong with the material.
12   Q    And here he says that he's not going to claim RINs?
13   A    Yes.
14   Q    And this is after your very public FBI raid, correct?
15   A    Yes.  That is correct.
16   Q    And ultimately did you agree to a much lower price?
17   A    I believe the end result was roughly a dollar per
18   gallon.
19   Q    Substantially less than the $2.30?
20   A    Yes.  That is correct.
21   Q    I'd like you to turn your attention to tab eight, which
22   is Government's Exhibit 4-8.  This is an e-mail from Jacob
23   Kingston just minutes after the e-mail we just looked at and
24   he is attaching a scan --
25   A    Yes.
```

1    Q    -- of an invoice.

2          MS. GOEMAAT:  Your Honor, I move to admit this

3    e-mail and attached invoice as a co-conspirator statement

4    pursuant to 801(d)(2)(E).

5          THE COURT:  Mr. Geragos.

6          MR. GERAGOS:  No objection.

7          THE COURT:  It will be received.

8          (Plaintiff's Exhibit 4-8 was received into

9    evidence.)

10   BY MS. GOEMAAT:

11   Q    Turning to the second page of this e-mail, what did you

12   receive from Jacob Kingston after he told you invoice

13   revision coming?

14   A    This is what we had received from Jacob Kingston.  He

15   had made several handwritten changes to the invoice that was

16   originally sent to him with the railcars listed.

17   Q    And what are the changes that he was requesting.

18   A    He had requested that we change Washakie Renewable

19   Energy to United Fuel Supply as well as list on there that

20   it was B99 SME biodiesel, which is soy methyl ester

21   biodiesel.  Soy methyl ester is another term for biodiesel.

22          And then there's a series of letters underneath it and

23   I believe some numbers, which I do not know what that is,

24   and below that he has written no assigned RINs transferred.

25   Q    And this was sent after the FBI raid?

```
 1   A    Yes.  That is correct.
 2   Q    And why do you understand these changes needed to be
 3   made?
 4   A    They needed to be made in order to show that the
 5   product we had sent to Washakie was, in fact, not soy blend
 6   or raw materials.  It was, in fact, that biodiesel.
 7   Q    Because you were caught, you were raided in the middle
 8   of this fraudulent plan?
 9   A    Yes.  That is correct.
10   Q    Would you say that this test of six railcars that was
11   agreed to in that outdoor shed with Joe Furando on the phone
12   and Levon Termendzhyan, would you say this was a successful
13   test of six railcars?
14   A    No.
15   Q    It kind of fell apart, didn't it?
16   A    It did.
17   Q    And it fell apart because of the FBI raid that happened
18   at the exact same time?
19   A    Yes.
20        MR. GERAGOS:  All of this is just pure
21   speculation.  There's no foundation for any of this.  And
22   it's leading on top of it.
23        THE COURT:  It is leading.  I'll sustain that
24   portion.
25        MR. GERAGOS:  Motion to strike.
```

```
 1              THE COURT:  No.

 2              Go ahead.

 3    BY MS. GOEMAAT:

 4    Q    Now in addition to the changes we've seen, did you also

 5    have e-mails with Jacob Kingston about the quality of the

 6    fuel?

 7    A    Yes, we did.

 8    Q    What do you recall happening there?

 9    A    I recall Jacob Kingston sending an e-mail to myself,

10    and I cannot recall if Joseph Furando is copied on it, in

11    the top of my head.  However, the issue was is that he

12    claimed that the material was high in moisture, from what I

13    recall.

14    Q    I'd like to turn your attention to tab ten in your

15    binder, which is Government's Exhibit 4-10.  Is this an

16    e-mail exchange between you and Jacob Kingston relating to

17    the quality of the product that you sold?

18    A    Yes.  That is correct.

19              MS. GOEMAAT:  Your Honor, I'd move to admit

20    Government's Exhibit 4-10 as a co-conspirator statement

21    pursuant to 801(d)(2)(E).

22              THE COURT:  Mr. Geragos.

23              MR. GERAGOS:  The two-page document, tab ten?

24              MS. GOEMAAT:  Yep.  Exhibit 4-10.

25              MR. GERAGOS:  No objection.
```

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 4-10 was received into

3    evidence.)

4    BY MS. GOEMAAT:

5    Q    Okay.  So what's the date of this e-mail?

6    A    This is now July 11th, 2012.

7    Q    So at this point you've had a number of meetings with

8    Jacob Kingston and Levon Termendzhyan; is that right?

9    A    That is correct.

10   Q    And in those meetings you developed some kind of a

11   plan?

12   A    Yes.  That is correct.

13   Q    And you were actually executing the plan in May; is

14   that right?

15   A    Yes, we were.  We had full intentions on supplying

16   Washakie with fuel that they could claim was raw material

17   and in turn claim government tax credits on.

18   Q    And you'd sent these six railcars?

19   A    Yes, we had.

20   Q    And then the raid happens?

21   A    Yes.

22   Q    At which point changes were made to the paperwork?

23   A    Yes.  That is correct.

24   Q    And was there a concern that you could be caught by the

25   FBI in the middle of this scheme if the paperwork wasn't

1    changed?

2    A    Yes.

3    Q    Now on top of that, did Jacob Kingston or anybody else

4    claim that the material you sold had quality issues?

5    A    Yes.  As per this e-mail here, there were quality

6    issues, supposedly, with the material.

7    Q    You say supposedly.  Do you think there were quality

8    issues?

9    A    I do not.  In my experience, when railcars are loaded

10   at the terminal, they are sealed and then shipped to their

11   location.  And if the seal is broken, there is a possibility

12   that the material could be tainted.  However, the seal was

13   maintained and intact, and I do not believe that there was

14   any quality issues with this fuel.  We had retained samples

15   from this material -- from the tanks and had it tested in

16   our own independent labs that we had sent it out to, and

17   those results came back within the ASTM specs.

18   Q    So what did you think was going on at this point?

19   A    They were looking to cheat us out of more money is what

20   I believed to be the case.

21           MR. GERAGOS:  Again, objection, speculation.

22   There's no foundation.  Argumentative.

23           MS. GOEMAAT:  If I may, she's in a criminal

24   conspiracy with these people.  She can testify as to what

25   she thinks is happening in their conspiracy from her

1    perspective.

2          MR. GERAGOS:  Once again, the Court hasn't ruled

3    on that.

4          THE COURT:  No.  That's overruled.

5    BY MS. GOEMAAT:

6    Q    In this e-mail, in Exhibit 4-10, you write to Jacob

7    anything, question mark.  We sent our result over to you and

8    would expect to see the same on your end.  This issue needs

9    to be resolved immediately.

10         Why did it need to be resolved?

11   A    At this time after the federal government had raided

12   our offices, they had seized several of our bank accounts,

13   and we had several million dollars that were being -- that

14   was frozen and we were unable to access it.  And in the

15   meantime, we still had bills to pay.  We had staff to pay.

16   We had expenses that needed to be kept up with.  And the

17   material that was sent to Washakie needed to be paid for,

18   and it had not at this point, and it was almost two months

19   after the material had been picked up.

20   Q    So you were trying to get paid?

21   A    Yes.

22   Q    In this e-mail Jacob Kingston replies and tells you

23   samples were sent to the lab and they could not do all the

24   tests because they were outside the specs for the California

25   standard.  Why did this fuel that you sold to Washakie in

1    Utah need to be tested for the specs for the California

2    standard?

3    A    Because the fuel itself ultimately wound up in

4    California and that's why it needed to fall within the

5    California standard.

6    Q    And where in California did you understand this fuel

7    was going to go?

8    A    I understood that it was going to go to Levon's

9    facilities.

10   Q    And, finally, Jacob Kingston writes this will be

11   resolved when Levon gets back into the country next week.

12   Is Levon Termendzhan on this e-mail?

13   A    He is not.

14   Q    Did you bill Levon Termendzhyan for these six railcars

15   of B99?

16   A    We did not.

17   Q    Did you send e-mails to and from Levon Termendzhyan to

18   fix the invoices when the FBI raided you and you had to

19   change them?

20   A    We did not.

21   Q    Why do you think Jacob Kingston is telling you that he

22   can't resolve a quality issue with fuel that you sold him

23   until Levon gets back into the country?

24   A    I believe it was because Levon controlled the accounts

25   for Washakie and he controlled whether or not we would be

1  paid.

2  Q    Was he controlling this plan?

3  A    I believe so.

4          MS. GOEMAAT:  I have no further questions for this

5  witness.

6          THE COURT:  Thank you.

7          Mr. Geragos.

8          MR. GERAGOS:  Thank you.

9                    CROSS-EXAMINATION

10 BY MR. GERAGOS:

11 Q    Good afternoon.

12 A    Good afternoon.

13 Q    You said you believed Levon Termendzhyan was

14 controlling the plan based on this e-mail that was 4-10.

15 That was your testimony?

16 A    Yes.

17 Q    Okay.  What if I gave you a different example.  What if

18 you sent it to Washakie and Washakie then sold it to Levon

19 Termendzhyan or his company?

20 A    I'm not understanding what you're trying to ask there.

21 Q    Right, because that would take apart the theory that

22 they were in cahoots?

23          THE COURT:  No.  I think she's saying she did not

24 understand your question, nor did I.

25 //

```
 1   BY MR. GERAGOS:

 2   Q    What if he was just the customer of Washakie?  Washakie

 3   buys it from you, right?

 4   A    Yes.

 5   Q    Washakie was the one that -- he's not listed on any of

 6   these e-mails, correct?

 7   A    That is correct.

 8   Q    He's not on the invoices, the SAS invoices until what

 9   looks like sometime after June 20th that there's a United

10   Fuel Supply, right?

11   A    The United Fuel Supply that is listed there was a

12   change that Jacob Kingston had sent to us.

13   Q    Correct.  But you hadn't sent anything to Levon

14   Termendzhyan regarding the six railcars?

15   A    Not that I can recall.

16   Q    Do you have any -- you don't have any documents, you

17   weren't shown anything by Ms. Goemaat that had to do with

18   these six railcars being billed to Levon Termendzhyan,

19   right?

20   A    That is correct.

21   Q    You knew at some point that the railcars were going to

22   Utah, right?

23   A    Yes.

24   Q    You knew that there was going to be an amount for

25   freight to Utah?
```

```
1    A     Yes.

2    Q     But I didn't see on any of the bills, except for that

3    last page, the one that Ms. Goemaat gave me this morning,

4    which looks like freight to California.  Is that the first

5    time you ever saw freight to California on something?

6    A     That is correct.

7    Q     You didn't know about or didn't care about the freight

8    to California, right?

9    A     That is correct.

10   Q     Now you've also testified today that you went to

11   California and went to the location that didn't impress you

12   all that much; is that right?

13   A     Yes.

14   Q     That place, was it near the terminal?

15   A     I can't recall the distance from his offices to the

16   terminal.

17   Q     Do you remember going to the terminal?

18   A     I do.

19   Q     He took you to the terminal, correct?

20   A     Yes.

21   Q     Do you know what the name of the terminal was?

22   A     I do not recall.

23   Q     Do you remember if it was Titan terminal?

24   A     I do not recall.

25   Q     Did you see other trucks going to the terminal?
```

```
 1   A    While we were there, I do not recall trucks arriving at
 2   that terminal.
 3   Q    Do you know who owns that terminal?
 4   A    From my understanding, it was Levon who owned the
 5   terminal that we visited.
 6   Q    Do you know the name of the terminal that you thought
 7   Levon owned?
 8   A    I do not recall.
 9   Q    How long did you spend at the terminal?
10   A    Maybe ten, 15 minutes.
11   Q    What is an LCFS?
12   A    I do not know.
13   Q    If I told you that it was a term for a California based
14   tax credit, would that help you at all?
15   A    No, it would not.
16   Q    You don't know anything about the California rules and
17   regulations, do you?
18   A    No, I do not.
19   Q    Do you know anything about California tax credits when
20   it comes to fuel?
21   A    No, I do not.
22   Q    Do you know what CARB is, C-A-R-B?
23   A    No.
24   Q    California Air Resources Board, have you ever heard of
25   that?
```

1    A    I have not.

2    Q    Do you know, by the way, whether or not -- or any of

3    the rules.  Is it a fair statement that you don't know what

4    the rules are back in 2012 and 2013 -- because that's the

5    time period you dealt with Levon, correct?

6    A    That is correct.

7    Q    So the earliest would have been March of 2012?

8    A    That was the first time I met Levon.

9    Q    And latest would have been sometime in July or August

10   of 2013?

11   A    No.

12   Q    What was the latest?

13   A    The last time I interacted with Levon was in February

14   of 2013.

15   Q    Okay.  So we have a complete time period of less than a

16   year between 2012 and 2013?

17   A    That is correct.

18   Q    Now during that time period, is it safe to say you know

19   absolutely nothing about California Air Resources Board's

20   requirements in California; is that fair?

21   A    Yes.

22   Q    Is it also fair that you don't know about any biodiesel

23   regulations in California in 2012 or 2013?

24   A    Yes.

25   Q    Do you know what -- do you know what B5 is?

1    A    B5 is five percent biodiesel and 95 percent diesel.

2    Q    Do you know what B10 is?

3    A    Ten percent biodiesel and 90 percent diesel.

4    Q    How about B20?

5    A    20 percent biodiesel, 80 percent diesel.

6    Q    If you take B99, can you blend it to B5?

7    A    You can, yes.

8    Q    Can you take B99 and blend it to B10?

9    A    You can.

10    Q    B20?

11    A    Yes.

12    Q    Do you know if that was done in this case with the six

13    railcars?

14    A    I do not have any knowledge as to what happened after

15    to six railcars after they left the Utah facility.

16    Q    Okay.  You don't know when they left, do you?

17    A    No, I do not.

18    Q    You don't know if they ever got to California, do you?

19    A    No, I do not.

20    Q    You don't know if, in fact, they got to California if

21    they were blended -- what would you call B99 to B5, for

22    instance?  Would you call that up-blending?

23    A    No.

24    Q    What would you call it?

25    A    I believe that it would be called just blending.  I'm

1   not quite sure what the specific term is.

2   Q    Do you know what a blending license is in California?

3   A    I do not know the specific regulations around it.

4   Q    Do you know whether or not Noil Energy, Levon

5   Termendzhyan, or any of his entities had blending licenses

6   in 2012 and 2013?

7   A    I never found out whether or not they did or did not.

8   Q    Did you ever talk to them about whether or not on all

9   of these transactions they would be able to get credits in

10  California?

11  A    No.

12  Q    Was that ever raised to you?

13  A    No, it was not.

14  Q    In any of the discussions?

15  A    No.

16  Q    During the collection portion of this -- by the way,

17  the six railcars represented how many gallons?  Because I've

18  seen pounds and I've seen gallons.

19       Your testimony today, if I understand it, is that it

20  was gallons, not pounds, right?

21  A    Yes, because that is how fuel is sold.

22  Q    Right.  You're saying that when you put pounds on

23  there, that was fraudulent?

24  A    It's meant to represent that the material is actually

25  feedstock or some type of vegetable oil.

```
 1  Q    Correct.  But what I'm asking you is on the invoices
 2  that you were shown that say pounds, anytime it says pounds,
 3  it's your testimony that that's phony or fraudulent?
 4  A    Yes, it is.
 5  Q    And are you also saying that soy blend is fraudulent?
 6  A    Yes.
 7  Q    Do you know whether or not, after the six railcars got
 8  to Utah, whether or not they were blended?
 9  A    I do not.
10  Q    Did you ever discuss that?
11  A    No.
12  Q    I believe you testified in front of a grand jury,
13  correct?
14  A    Yes.
15  Q    When you testified in front of a grand jury, you said
16  that it was your testimony that when the railcars left the
17  Illinois facility, that they were sealed?
18  A    Yes.
19  Q    Did you see that?
20  A    I did not.
21  Q    Did you talk to somebody to confirm they were sealed in
22  real time at the time when the railcars were picked up?
23  A    When we were -- or when the issue was raised to us that
24  there was moisture issues, we went back to our supplier,
25  which was Astra Oil, requested the samples that had been
```

```
 1   retained from this tank, and asked whether the railcars were
 2   sealed.  We were told by Astra that the railcars were
 3   sealed.
 4   Q    Was Astra one of your fraud partners when you were at
 5   Cima?
 6   A    No.
 7   Q    Astra didn't know what was happening?
 8   A    No, they did not.
 9   Q    Okay.  When you would buy from Astra, what would you
10   buy from them?
11   A    We would buy B99 RINless biodiesel.
12   Q    Okay.  And then would you have Astra say that it was
13   B100?
14   A    No.
15   Q    Did you tell Astra what you were doing?
16   A    No.
17   Q    How long after the raids did Astra cut you off?
18   A    They cut us off immediately.
19   Q    After the raids.  What's immediately, how long?
20   A    I cannot recall the specific amount of time, but we
21   were done with Astra Oil probably within a day or two.  We
22   never pulled any further material from Astra Oil after the
23   FBI raids.
24   Q    Did you tell them about the raid?
25   A    No.
```

1    Q    Did you have a conversation with them about the raid?

2    A    No.

3    Q    Did you ever attempt to pull more after the raid?

4    A    No.

5    Q    How many gallons did you have at the -- if I understand

6    correctly, you had -- was it millions of gallons?

7    A    Yes.

8    Q    You meaning you and Mr. -- what is his name, your

9    partner?

10   A    Furando.

11   Q    Furando.  How many people, by the way, worked at Cima

12   on the day of the raid?

13   A    I do not recall the specific number of employees that

14   we had that day.  If I had to estimate, somewhere between 15

15   and 20.

16   Q    Fifteen and 20.  How many quit after the raid?

17   A    Several.

18   Q    So you were trying to continue the fraudulent operation

19   after the raid to make sure you could pay either 15 or 20,

20   less whoever quit; is that right?

21   A    No.  We were not attempting to continue the fraud

22   scheme after the raid.  We were attempting to just get

23   payment for the material that we had sent to Washakie.

24   Q    So when you sent through interstate commerce bills

25   where you were covering -- what was the term that you used

1    with Ms. Goemaat?

2    A    I believe it was alchemy.

3    Q    No.  The term that you used for covering your tracks --

4    is that what you said?  Covering yourself, by changing the

5    invoices?

6    A    I'm not sure what you're trying to ask.

7    Q    I'm asking you, did you ever, after the raid, change

8    the invoices, any of the invoices to Washakie?

9    A    Yes.  We changed them from soy blend to state that it

10   was just the railcars.  We did not list on there what the

11   material was in the railcars.

12   Q    Wasn't that continuing the fraud scheme?

13   A    It's not continuing the fraud scheme.  It's stating the

14   truth, which was what was in the railcars.

15   Q    Well, you were still trying to bill for something that

16   you had claimed was soy blend before, but you didn't think

17   that was fraud?

18   A    We billed them for the fair price of what B99 biodiesel

19   without RINs should have been at the time.

20   Q    That wasn't my question.  My question is was that a

21   continuation, in your mind, of the fraud?

22   A    No.

23   Q    So you just changed it from soy blend to railcars

24   trying to collect the money that you admit was a fraud to

25   begin with between you and Jacob, right?

1    A    Can you --

2    Q    You knew that it was a fraud -- you were asked the

3    question earlier today that you thought Jacob knew what you

4    were doing was a fraud, right?

5    A    Yes.

6    Q    So up until the time that the FBI came in -- it was the

7    FBI or the EPA?

8    A    It was multiple agencies.

9    Q    Okay.  Up until the federal government comes knocking

10   at your door, you believed you were committing fraud, right?

11   A    Yes.

12   Q    And you believed Jacob knew he was committing fraud?

13   A    Yes.

14   Q    And you didn't think that after that trying to collect

15   the money from the fraud with Jacob was a continuation of

16   the fraud; is that correct?

17   A    I do not believe that it was a continuation of the

18   fraud.

19   Q    You think it was just trying to collect money to get

20   paid; is that right?

21   A    Yes.

22   Q    Now you also, I believe, when looking through the

23   documents here, it looks like you specifically had your

24   accounts frozen; is that right?

25   A    We had some of our accounts frozen.

1   Q    And you asked specifically that Washakie not wire the

2   money to you; isn't that correct?

3   A    I did not personally ask them that.

4   Q    Did you know about that?

5   A    I did.

6   Q    And did you know that the reason that you didn't want

7   the money wired or that -- you were the COO, right?

8   A    Yes.

9   Q    Your title didn't change after the government came

10  knocking, did it?

11  A    No.

12  Q    After the government came knocking as the -- COO stands

13  for chief operating officer?

14  A    Yes.

15  Q    It means the person who runs the company basically,

16  right?

17  A    The day-to-day operations, correct.

18  Q    The day-to-day operations, collecting, shipping, all

19  those things, right?

20  A    Yes.

21  Q    And so one of the ways you wanted to get around the

22  freezing by the government was to have a check sent to you

23  so that the government wouldn't see or wouldn't know that

24  you were getting money in; isn't that correct?

25  A    That is correct.

```
 1    Q    And you don't think that that's fraud?
 2    A    I don't know what the law states that that is.
 3    Q    How long after the government came knocking did you
 4    start to cooperate?
 5    A    I did not start to cooperate until June of 2014.
 6    Q    Of 2014.  And what precipitated your cooperation?  What
 7    caused you to cooperate two years later -- what was it, a
 8    year later?  You said you remember the date as if it was
 9    yesterday.  What's the date when they came knocking?
10    A    They came to our offices on May 24th of 2012.
11    Q    Okay.  And then you started cooperating what day?
12    A    We were indicted in September of 2013 and I began my
13    cooperation in June of 2014.
14    Q    Now one of the things that they found during their
15    search were pornographic tapes involving you; is that
16    correct?
17    A    That is correct.
18    Q    And they came to you and said --
19              MS. GOEMAAT:  Objection, Your Honor, as to
20    relevance.
21              THE COURT:  What is the relevance?
22              MR. GERAGOS:  It goes to her bias.  It would be
23    just as relevant as now she's a citizen goat farmer.
24              THE COURT:  No.  I think it's quite different from
25    citizen goat farmer.
```

```
 1              MR. GERAGOS:  I agree, and I think the jury should
 2  know exactly what we were dealing with at the time.  She
 3  obviously started cooperating after it was presented to her
 4  that they had pornographic tapes of her.
 5              THE COURT:  I'm going to sustain the objection.  I
 6  don't see how that goes to bias.
 7  BY MR. GERAGOS:
 8  Q    Did you cooperate after you were told about the tapes
 9  that had been seized?
10  A    No.
11  Q    When did you cooperate?
12  A    I was not told that the federal government had
13  pornographic tapes of myself.
14              MS. GOEMAAT:  Your Honor, I would object to this
15  entire line of testimony and move to strike it as Your Honor
16  sustained the relevance objection.
17              THE COURT:  I did, and I will strike that.
18              Go ahead, Mr. Geragos, but go to a different
19  subject.
20              MR. GERAGOS:  I don't understand why.  Because it
21  isn't relevant?
22              THE COURT:  I sustained the objection.
23              MR. GERAGOS:  On what grounds, so I know I'll stay
24  away from it?  I didn't hear the grounds.  I just heard
25  relevance.  Are you saying it's not relevant?
```

```
 1              THE COURT:  I'm saying it's not relevant.

 2              MR. GERAGOS:  Okay.

 3    BY MR. GERAGOS:

 4    Q    The FBI -- what else did the FBI seize from you?

 5    A    From me personally, they seized my phone, my computers.

 6    I believe I had a gaming system with me that day.  Records,

 7    journals, paper documents.  It was quite a few items.

 8    Q    The papers and the journals, were the journals like

 9    diaries?

10    A    No.  They were just notebooks for taking business

11    notes, I believe.

12    Q    For what?

13    A    For taking business notes.

14    Q    Okay.  And did you have business notes that you

15    prepared in conjunction with this deal with Washakie?

16    A    I cannot specifically recall what was in those

17    notebooks.

18    Q    Have you looked at them?

19    A    I have not.

20    Q    Has the government shown them to you and said are there

21    any notes in here that are contemporaneous with when you --

22    you know what contemporaneous means?

23    A    I'm not fully familiar with that.

24    Q    I assume when you were taking notes in diaries or

25    journals, that you did it relatively close in time to when
```

1    it happened?

2    A    Yes.  That is correct.

3    Q    Okay.  Now did anybody ever, after you started

4    cooperating in 2014, show you these journals?  Anybody from

5    the government.

6    A    No, they did not.

7    Q    Did you ever say, wait a second here, I could use the

8    journals to refresh my recollection as to who was at a place

9    or who wasn't?

10   A    No.

11   Q    You did say, however, today, to Ms. Goemaat, that you

12   went back to refresh your recollection based on Facebook

13   pictures, if I understood correctly?

14   A    It was not always Facebook pictures.  There was backups

15   from my iPhone that I had retained in relation to the

16   E-Biofuels case, and as a result of that, that is where I

17   found the photographs.

18   Q    Wait.  You found the photographs where, in what backup?

19   A    So when you plug in your iPhone, it backs it up to your

20   computer, and I had backups dating back to this time period

21   that contained those photos.

22   Q    Didn't I just hear you testify that they seized your

23   computer?

24   A    They seized it, made a copy of it, and then returned it

25   to us.

```
 1   Q    So when you say returned it to us, was that the
 2   computer at your work?
 3   A    Yes.
 4   Q    So your work computer is where you kept the notes of
 5   your business dealings?
 6   A    We used work computers.  We used e-mails.  We used
 7   journals.  We used text messages, photos.  It was a
 8   multitude of ways that we kept track of our business
 9   dealings.
10   Q    Did you keep track of all of those on the computer as
11   well?
12   A    Not all.
13   Q    Did you have e-mails?
14   A    Yes.
15   Q    We saw some of the e-mails today, correct?
16   A    Yes.
17   Q    Have they shown you other e-mails that you haven't been
18   shown today, as you're testifying, prior to your testimony
19   today?
20   A    Not that I'm aware of.
21   Q    Have they shown you any of your journals prior to you
22   testifying today?
23   A    No.
24   Q    Has anybody in the entire world -- it's been five years
25   since you started cooperating, right?
```

1    A    Yes.

2    Q    Now during that five years, you've met with what,

3    probably 12, 15 different U.S. Attorneys?

4    A    I don't believe it's that many.  I could be wrong.

5    Q    You met with ones in Illinois, correct?

6    A    Indiana.

7    Q    Indiana.  I'm sorry.  Right?

8    A    Yes.

9    Q    You met with one -- at least one in the Central

10   District of California, correct, Mark Williams?

11   A    I'm not sure if I met with somebody by the name of Mark

12   Williams.  He may have been on a phone call.  There's been

13   multiple names back and forth.

14   Q    Would you say that you've met with at least ten federal

15   agents and -- I mean you've met with the various lawyers who

16   are sitting here in the courtroom, haven't you?

17   A    Yes.

18   Q    There are four of them right here.  Have you met with

19   them?

20   A    Yes.

21   Q    And you didn't meet with them for the first time until

22   when?

23   A    I believe the first time I met with agents regarding

24   this case, I was interviewed in September of 2014 via phone.

25   I believe again October 2014 via phone.  And then physically

```
 1    I had a meeting with agents in May of last year.
 2    Q    Now the ones by phone in 2014 is when you were
 3    cooperating and entering into a plea agreement, correct?
 4    A    I had already entered into a plea agreement at that
 5    point.
 6              MR. GERAGOS:  The plea agreement I believe we're
 7    going to mark as 4-A, Your Honor, and I don't believe
 8    there's an objection to that.
 9              MS. GOEMAAT:  No objection, Your Honor.
10    BY MR. GERAGOS:
11    Q    My understanding is --
12              THE COURT:  Wait a minute.  It will be received.
13              MR. GERAGOS:  Thank you.
14              (Whereupon, Defendant's Exhibit 4-A was received
15    into evidence.)
16    BY MR. GERAGOS:
17    Q    Are you aware of the plea agreement being also accepted
18    by the U.S. Attorney's Office for the Central District of
19    California?
20    A    I believe so, yes.
21    Q    Are you aware the plea agreement was entered into in
22    the United States District Court, Southern District of
23    Indiana, Indianapolis Division?
24    A    Yes.
25    Q    And you had a lawyer at the time, correct?
```

```
 1   A     Yes, I did.

 2   Q     And you signed it, correct?

 3   A     I did.

 4   Q     And you understood that you were getting coverage by

 5   the Indiana authorities and the California authorities,

 6   correct?

 7   A     I'm not sure what you mean by coverage.

 8   Q     Well, it was a plea agreement that was signed on to by

 9   both the Central Distinct of California and the Indianapolis

10   Division of the Southern District of Indiana, right?

11   A     Yes.

12   Q     Now you also knew that they were asking, in 2014 when

13   you did the interview, about Levon Termendzhyan, correct?

14   A     Yes.

15   Q     And about biofuel, correct?

16   A     Yes.

17   Q     They asked you about Washakie back in 2014?

18   A     Yes.

19   Q     And at the time, was your memory better in 2014 or

20   worse than it is today?

21   A     At that point in time, I did not spend very much time

22   looking for documents.  I did the best that I could.  I had

23   a new job.  I was newly married, and I was just trying to

24   move on with my life, and I was focused on the E-Biofuels

25   case at that time.
```

1  Q    Is it fair to say that your memory was worse in 2014?

2  Is that what you're saying?

3  A    I wouldn't consider it worse.  I would consider it just

4  it was what it was.  I don't believe that it was worse.

5  Q    Well, you just said you weren't focused on it because

6  you had a new job.  You said you hadn't looked at your

7  notes, correct?

8  A    That is correct.

9  Q    You didn't have -- did you tell anybody in 2014, hey,

10  by the way, agent or U.S. Attorney, that there are

11  contemporaneous, meaning -- I call it contemporaneous.  If

12  you don't understand what it means, I would call it --

13  there's a term my kids use, which is real time.  We did it

14  in real time or at the time.  Do you know what that means?

15  A    Yes.

16  Q    Did you tell anybody I've got real-time notes of

17  journals, or diaries, or texts, or e-mails and it's in your

18  possession?

19  A    I did not.

20  Q    Do you know if at any point you were questioned about

21  that in 2014?

22  A    I believe during my proffer agreement they had asked if

23  I knew of any other parties that may be involved in fraud,

24  and that was when I had mentioned Washakie.

25  Q    When you mentioned Washakie in your proffer agreement

1    the first time, you didn't mention Levon Termendzhyan,

2    correct?

3    A    I did not.

4    Q    And that would have been how close in time after you

5    entered the plea agreement, do you remember?  The proffer

6    agreements can be right after.  They can be right before.

7    They could be simultaneous.  Do you remember what the time

8    line was?

9    A    The proffer agreement was before my plea agreement.

10   Q    Okay.  So you were proffering to the government -- and

11   you understood that's what you were doing, right?  That a

12   proffer is you're telling the government this is what I know

13   so I can get a plea.  Is that how you understood what was

14   happening?

15   A    Yes.

16   Q    So you want to tell them -- you understood that you

17   want them to know as much as possible about what you know so

18   that they'll give you, arguably, the best agreement,

19   correct?

20   A    I did not know what to expect out of the proffer.  I

21   was told to go in, tell the truth, explain to them what I

22   knew, answer their questions, and see what they came back

23   with.

24   Q    Okay.  And you were told specifically that if you

25   didn't tell the truth, that that could be a federal crime?

```
 1   A    Yes.

 2   Q    They told you there's a thing called false statements

 3   if you don't tell the truth?

 4   A    Yes.

 5   Q    And you met with them.  Do you remember the date you

 6   met with them

 7   A    I believe it was in June of 2014.  I'm not sure of the

 8   specific date.

 9   Q    June 20th?

10   A    If that's what the document states, then that was the

11   date.

12   Q    And do you remember a July 18th interview between you

13   and Brian Neary and a Will Stanley from the IRS, and

14   Victoria Madtson, M-a-d-t-s-o-n, special agent FBI, Lisa

15   Matovic, resident agent in charge of EPA?  And then by

16   phone, Lorna Eagle, Department of Justice, Jake Schmidt,

17   U.S. Attorney for the Southern District, Tom Ballantine,

18   U.S. Department of Justice, Steve Debrota, Assistant U.S.

19   Attorney, do you remember -- it looks like one, two, three,

20   four, five, six, seven, eight, nine, ten, 11 -- excluding

21   you, ten other people?

22   A    Yes.

23   Q    And you were told to tell the truth.  You understand

24   that you can't lie, correct?

25   A    Yes.
```

1    Q    And you told them everything you knew about fraud,

2    correct?

3    A    I answered the questions that were put forth to me.

4    Q    And the first person that you talked about, at least on

5    here -- by the way, how many counts of the indictment had

6    you been indicted on at that point?

7    A    I don't recall the specific number of counts.

8    Q    Over 25, right?

9    A    If that's what the document states, then that is

10   correct.

11   Q    You were cooperating against Mr. Furando; is that

12   correct?

13   A    As well as several other parties, yes.

14   Q    Besides Mr. Furando, is it fair to say you were also

15   talking about Caravan Trading?

16   A    Yes.

17   Q    And what about Christine Furando?

18   A    Yes.

19   Q    That would be Furando's wife?

20   A    Yes.

21   Q    How about John Johnson?

22   A    Yes.

23   Q    That would be Furando's father-in-law?

24   A    Yes.

25   Q    And what about the Caravan employee Veronica Dilzer,

1   D-i-l-z-e-r?

2   A    Yes.

3   Q    You were cooperating against her?

4   A    Yes.

5   Q    You gave incredible detail, is that fair to say, as to

6   what you considered the fraud to be involving them; is that

7   right?

8   A    Yes.

9   Q    You told them about transactions.  You told them about

10  grand pianos.  You told them about Honda CRVs, correct?

11  A    Yes.

12  Q    You told them about 950,000 wires to a Jurecky,

13  J-u-r-e-c-k-y, law group, correct.  Remember that?

14  A    I believe so.

15  Q    How about a Girabaldi & Girabaldi $2.397 million wire,

16  another law firm?

17  A    That would be a law firm, yes.

18  Q    You brought that to their attention, correct?

19  A    I'm not sure of the specific dollar amount.

20  Q    And I'm not holding you to that.  I'm just saying a

21  large wire transfer you mentioned, and provided, and

22  identified as part of what you thought was a fraud scheme,

23  correct?

24  A    I believe it was in relation to money that was obtained

25  via the fraud scheme.

1   Q    You talked about Furando's purchases of Dragon Jewelry

2   Group, correct?

3   A    Yes.

4   Q    You talked about an Asian female owner of the Dragon

5   Jewelry Group named Tanya, correct?

6   A    Yes.

7   Q    You specifically talked about $395,000 from Caravan to

8   Dragon Jewelry Group, right?

9   A    Yes.

10  Q    You gave a lot of detail about going to China Town with

11  Furando, correct?

12  A    Yes.

13  Q    Were you intimately involved at some point with Furando

14  before you cooperated?

15  A    I was.

16          MS. GOEMAAT:  Objection as to relevance,

17  Your Honor.

18          THE COURT:  What is the relevance, Mr. Geragos?

19          MR. GERAGOS:  The relevance, that she was involved

20  with him during the time period of this scheme.

21          THE COURT:  What's the relevance?

22          MR. GERAGOS:  It goes to bias or motive.  And

23  she's cooperating against the wife, the father-in-law, and

24  now anybody else that is in the crosshairs.

25          MS. GOEMAAT:  Your Honor, perhaps if this was the

```
 1    trial of Joseph Furando or his wife.  But it's not.  This is

 2    the trial of Lev Dermen.  We object as to the relevance.

 3              THE COURT:  I'm going to overrule the objection.

 4              Mr. Geragos, you're to limit your questions in

 5    this area.

 6              MR. GERAGOS:  Thank you.

 7    BY MR. GERAGOS:

 8    Q    Now you also talked about jewelry purchases for

 9    investment purposes; is that right?

10    A    Yes.

11    Q    And you talked about other wire transfers in great

12    detail involving Caravan and Furando, right?

13    A    Yes.

14    Q    You talked about motorcycle purchases, correct?

15    A    Yes.

16    Q    The OCC television show; is that correct?

17    A    Yes.

18    Q    In fact, one of the pieces of fraud that you talked

19    about involved a biodiesel engine motorcycle that was sent

20    to the National -- what did you call that show you went to

21    in 2012?

22    A    It's the National Biodiesel Board Convention.

23    Q    Is that in Orlando, Florida?

24    A    It's held in different parts of the United States every

25    single year.
```

```
 1   Q    Okay.  You talked to these ten people that I named

 2   earlier in this proffer session, you talked to them about

 3   that; isn't that correct?  The biodiesel motorcycle engine.

 4   A    Those were the questions that they were posing to me.

 5   Q    Well, you answered those questions, correct?

 6   A    Yes.

 7   Q    You also provided folders of documents -- did you

 8   provide them with folders or did they show you folders of

 9   documents?

10   A    I believe that I provided them with documents as well

11   as they provided me with documents.

12   Q    So some of the documents that you provided them, where

13   did those come from?

14   A    They came from backups that I had on various computers

15   that I had owned.

16   Q    Did you detail to them during this session -- there

17   were two sessions prior to entering the plea agreement?

18   A    I believe so, yes.

19   Q    Now during those two sessions, you told them everything

20   that you remembered at the time, correct?

21   A    Related to the Caravan and E-Biofuels case, correct.

22   Q    You also talked about Washakie, correct?

23   A    Just briefly.

24   Q    Okay.  And they asked you about it, correct?

25   A    I cannot recall specifically what they had asked.
```

```
 1   Q    Did they show you a -- it looks like -- correct me if
 2   I'm wrong -- they showed you a folder involving Furando's
 3   purchase of watches, $150,000 worth of watches going back
 4   and forth between him and Caravan; is that right?
 5   A    I believe so, yes.
 6   Q    Did they also show you activity -- or actually, you
 7   were talking about specifically wire transfers between
 8   Caravan payments to them and E-Bio's involvement; is that
 9   correct?
10   A    I believe so, yes.
11   Q    Then they also -- did you talk about what footballs
12   were?
13   A    Yes.
14   Q    What were footballs?
15   A    They were data backups that were made from our server
16   on -- I believe it was a daily basis.
17   Q    And did you have access to that, to the backup of the
18   server?
19   A    Not that I recall.
20   Q    Did you have -- what did you have after the search
21   warrant?  You said you had a backup, right?
22   A    After the search warrant, they returned our computers.
23   What they had done was they took them, made copies of them,
24   and returned our computers and our cell phones I believe
25   later that night, if not early the next morning.  The search
```

1    warrant continued until -- I don't know.  It was maybe one,

2    two o'clock in the morning.  And at the end of that, they

3    returned our computers to us.  So on leaving Caravan Trading

4    and Cima, I had made a backup of my own, and that is what I

5    had.

6    Q    Now when you showed them documents, you talked about

7    B99 with them, correct?

8    A    Yes.

9    Q    And you talked about Caravan purchasing B99, right?

10   A    Yes.

11   Q    And you also said that you labeled the B99 as soy

12   feedstock, correct?

13   A    Yes.

14   Q    And specifically you told them that Furando got very

15   mad at you because he wanted the labels -- or the invoices

16   to be labeled correctly before you sent it to E-Bio; isn't

17   that correct?

18   A    I believe so, yes.

19   Q    Why would he want them labeled correctly before it was

20   sent to E-Bio?

21   A    So that it would ensure that everything was stated as

22   it should be in order to maintain the fraud scheme.

23   Q    To maintain the fraud scheme?

24   A    Yes.

25   Q    Why would he want to accurately report it as opposed to

1    fraudulently if it was a fraud scheme?

2    A    When I'm stating that Mr. Furando wanted the invoices

3    labeled correctly, I'm referring to that Mr. Furando wanted

4    the invoices to state that it was feedstock, not biodiesel.

5    Q    So you're saying that when you say he wanted them

6    labeled correctly, he wanted them to be fraudulently

7    labeled?  Is that a better way to put it?

8    A    Yes.

9    Q    Because it would suggest if you said I want them

10   labeled correctly -- if I told you I want you to correctly

11   answer my question, it would imply telling the truth.

12   You're saying it's just the opposite.  When Furando told you

13   I want you to label it correctly, it means continue the

14   fraud, cover up the fraud?

15   A    That is correct.

16   Q    Did you also -- would you characterize the company that

17   you were doing -- or your company -- Cima is what you call

18   it?

19   A    Cima, that is correct.

20   Q    It's C-i-m-a, but pronounced Chima?

21   A    That is correct.

22   Q    No H, but it's got an H in it when you pronounce it?

23   A    It's the Italian version of pronouncing it, correct.

24   Q    Is that a broker -- I mean basically a brokerage?

25   A    We considered ourselves a brokerage or a trading

1    company.

2    Q    So if you're a brokerage, what you're doing is you're

3    buying for X amount of dollars and selling hopefully for

4    more, and the delta between the two is how you exist and pay

5    your bills?

6    A    Yes.

7    Q    Now how many -- at the time that the search warrant was

8    executed, you had been in negotiations with Jacob Kingston

9    prior to that, correct?

10   A    As well as Levon Termendzhyan, correct.

11   Q    And Levon Termendzhyan knew that you guys -- prior to

12   the search warrant, right?  You were negotiating prior to

13   the search warrant, right?

14   A    Yes.

15   Q    Months before?

16   A    We started as early as March of 2013.  So that would be

17   two months before.

18   Q    Great.  So two months before, he knew that you had --

19   how many gallons that you were kind of sitting on?  You had

20   described it earlier to Ms. Goemaat.  How much fuel had you

21   paid -- I think you had said money that we had outlaid to

22   have this stuff and it was being stored for, if I remember

23   correctly, about four months?

24   A    It had been stored for about four months at that point,

25   yes.

1   Q    At the time you were negotiating?

2   A    Yes.

3   Q    And how many gallons?

4   A    It was millions of gallons.  I don't recall the

5   specific amount we had contracted for.

6   Q    And millions of gallons, what would be your cost,

7   roughly?  I'm not going to hold you to the exact penny, but

8   well over $1.50 a gallon?

9   A    Yes.

10  Q    So if you've got three million gallons that you're

11  sitting on, you've got at least $5 million in inventory.

12  Fair statement -- rough figures?

13  A    Yes.

14  Q    Now you let him know that you had this, correct, in the

15  discussions?

16       Either you or -- is it Furando -- would have let both

17  Jacob and Levon know that you had $5 million worth of

18  inventory that you're trying to sell?

19  A    I cannot recall if we specifically told them a dollar

20  amount or if we told them how much we were sitting on.  I

21  believe we had said that we were able to provide material to

22  them.  I don't recall if we gave them a dollar amount or a

23  quantity.

24  Q    Is there any reason why, as a broker -- by the way,

25  prices aren't set in stone, correct?

1   A    That is correct.

2   Q    You negotiate, correct?

3   A    That is correct.

4   Q    And you were talking before about fluctuation of

5   prices.  You understand that when you've got a lot of money

6   out on the streets, so to speak, if that's a term I can

7   boldly use for having five million in a bunch of tanks

8   somewhere, you need to get rid of it, right?

9   A    Yes.

10  Q    Otherwise it's not doing you any good.

11       I assume you pay costs to store it, right?

12  A    We did not pay the cost to store it.  That was on Astra

13  Oil since they actually owned the fuel.

14  Q    But you're trying to broker it because you've got money

15  out, correct?

16  A    Yes.

17  Q    So every day that goes by costs you not just the money

18  that you're out, but the fact that you haven't put that

19  money to work, right?

20  A    That is correct.

21  Q    So part of what you do is you negotiate your best price

22  possible given what the situation is, right?

23  A    It's not always necessarily a negotiation.  Mr. Furando

24  had a set price that he would not go below.  He did not want

25  to take a loss on this material.

```
 1   Q     Let's talk about Mr. Furando in the first meeting that

 2   you say he had with Mr. Termendzhyan.  Do you remember that

 3   conversation that you were telling us about this morning?

 4   A     Yes.

 5   Q     Now do you remember, in that first conversation between

 6   the two of them, you were at an Italian restaurant; is that

 7   correct?

 8   A     I believe that's what it was.

 9   Q     And do you remember at that Italian restaurant that,

10   specifically, Furando wanted to talk business and

11   Mr. Termendzhyan did not?

12   A     Yes.

13   Q     In fact, Mr. Furando kept bugging Mr. Termendzhyan to

14   talk about this scheme, correct?

15   A     Yes.

16   Q     Mr. Termendzhyan kept saying no, I don't want to deal

17   with that.  We're here.  We're at a social gathering.  I

18   don't want to talk to you about whatever this is, correct?

19   A     Yes.

20   Q     In fact, it was not Mr. Termendzhyan saying I want to

21   talk, I want to buy, I want you to recertify it.  It

22   certainly was not that.  It was the opposite, correct?

23   A     Correct.

24   Q     And Mr. Furando was -- would you say relentless?  Do

25   you know what that word means?
```

1    A    I do.

2    Q    Was he relentless in his seeking to get

3    Mr. Termendzhyan involved?

4    A    I wouldn't say that Mr. Furando was being relentless.

5    I would say that he was insistent on talking to

6    Mr. Termendzhyan about doing business.

7    Q    Didn't you tell the officers and agents that

8    Termendzhyan kept putting him off, Furando?

9    A    I do recall that.

10   Q    You say Furando was persistent and finally Termendzhyan

11   eventually gave in and started discussing it, correct?

12   A    Yes.

13   Q    Didn't you tell them, quote, you remembered an exact

14   quote from Mr. Termendzhyan?

15         MS. GOEMAAT:  Objection, Your Honor.  Mr. Geragos

16   is eliciting hearsay in that these are prior statements of

17   the witness.  They are not inconsistent with anything that

18   Ms. Pattison has testified to and so they're not properly

19   admitted really in any way.  And we would object at this

20   point as he appears to be just reading from the prior

21   proffer statements.

22         THE COURT:  What would you have him do,

23   Ms. Goemaat?

24         MS. GOEMAAT:  We would object to him repeating in

25   court these statements, if they're consistent.  And if he

 1    wants to impeach the witness pursuant to the rules of prior

 2    inconsistent statements under oath, we have no objection to

 3    that.

 4            MR. GERAGOS:  I'm not impeaching.  I'm eliciting

 5    and I'm on cross.

 6            THE COURT:  Well, you're on cross and you're

 7    attempting to impeach --

 8            MR. GERAGOS:  Okay.

 9            THE COURT:  -- deal with that properly.

10            MR. GERAGOS:  Sure.  I am hewing to exactly what I

11    have always considered to be the classic form of cross.

12    BY MR. GERAGOS:

13    Q    Didn't you state to the officers that Levon

14    Termendzhyan said I don't care how you do it, but it has to

15    be 60 below heating oil and delivered to California?

16    A    Yes.

17    Q    Now did you -- and you've already testified you didn't

18    know, or don't know as you sit here, anything to do with the

19    statutory scheme of the California Air Resources Board,

20    correct?

21    A    Correct.

22    Q    You don't know if 60 below heating oil at the time for

23    California was appropriate or inappropriate because that

24    wasn't your world, right?

25    A    Correct.

```
 1   Q    You don't know whether or not he was buying for
 2   something in California that was 50 below the heating oil
 3   price, do you?
 4   A    No.
 5   Q    You had no knowledge at the time that Mr. Furando
 6   was -- you don't want to say -- is pestering too much of
 7   a -- a good word?  Furando wasn't relentless, he was what?
 8   Persistent?
 9   A    I can agree to persistent.
10   Q    Okay.  So did you know anything about what this
11   gentleman's pricing was at the time of that first meeting?
12   Did you know what he was paying in California?
13   A    No, I do not.
14   Q    All he says is I don't care how you do it, this is what
15   I need, right?
16   A    Yes.
17   Q    And the upshot of that was that you took that to mean
18   that the company would be a middleman.  Is that what you
19   explained to the agent?
20   A    I believe so.
21   Q    Okay.  Where did you -- what was said between Furando
22   and Termendzhyan, the words?  Not your belief or your
23   feelings.  What words were used that led you to believe the
24   company -- and I assume when you said the company, you were
25   referring to Washakie?
```

1    A    Yes.

2    Q    That's what you mean when you say the company?

3    A    Yes.

4    Q    Now when you say the middleman, what did you

5    understand -- what words were said that led you to believe

6    that?

7    A    I believed that Washakie was going to be the facility

8    that would take in the B99 biodiesel, and we would sell it

9    to them and label it as raw feedstock.  They would then, in

10   turn, take it, claim that they had produced it as B100, take

11   the RINs, take the dollar tax credit, and, in turn, ship it

12   to Levon.

13   Q    I understand all of that.  What I'm asking you is what

14   words were used.  You didn't hear that.  They didn't say

15   that, correct?

16   A    That is correct.

17   Q    Okay.  So you assumed that because that would have fit

18   exactly the fraud scheme that you had been doing with E-Bio,

19   correct?

20   A    And that was the scheme that Mr. Furando was looking to

21   continue with Washakie.

22   Q    Correct.  So your prism, so to speak, what you're

23   looking through is you have been engaged in, how long, with

24   Mr. Furando as of this Miami meeting, which was February or

25   March I think you said.

1   A    March.

2   Q    So March of 2012, how long at that point had you and

3   Mr. Furando been doing your fraud scheme?

4   A    We started the fraud scheme with E-Biofuels in late

5   2009, ramped up through 2010 and 2011, and ultimately it

6   ended in January of 2012.

7   Q    So you knew what your fraud scheme was and what

8   Mr. Furando was doing, correct?

9   A    Yes.

10  Q    You assumed that that's what Washakie would do and what

11  Mr. Termendzhyan would do, correct?  You assumed both that,

12  because I think we established the words were -- the exact

13  words weren't used, but this is what you thought was going

14  on.

15  A    Mr. Furando explained to Levon what Washakie needed to

16  do in order to make that pricing work.

17  Q    I'm sorry.  I didn't mean to interrupt.

18  A    That's okay.  That is what I recall.

19  Q    But you also recalled that Mr. Termendzhyan didn't want

20  to have this discussion, correct?

21  A    Yes.

22  Q    And Mr. Termendzhyan just kept telling him I don't care

23  how you do it, I need to be 60 below -- what did you call it

24  before?

25  A    Heating oil.

```
 1   Q    Was there a short term for that?
 2   A    HO.
 3   Q    HO?
 4   A    Yes.
 5   Q    The initials?
 6   A    Yes.
 7   Q    Sixty below.  And Termendzhyan was stop bugging me
 8   about this.  I'm eating my pasta.  I want to be 60 under HO
 9   is basically -- as I look at the report, it looks like
10   that's the quotations that were used, meaning that's the
11   words you recounted to the agents?
12   A    That is what I recall him saying.
13   Q    Okay.  Now you assume a lot of stuff and have a lot of
14   beliefs; is that correct?  I was objecting earlier when you
15   were on direct with Ms. Goemaat about what your beliefs
16   were, right?
17   A    Yes.
18   Q    And your beliefs -- is it fair to say that your beliefs
19   are based on the years of fraud that you'd been doing with
20   Mr. Furando?
21   A    Yes.
22   Q    And how many deals would you say you and -- how many
23   gallons -- I think you guys said 55 million in fraud is what
24   you admitted to?
25   A    Yes.
```

```
 1   Q    What does that represent in terms of gallons of
 2   fraudulent fuel that's been mislabeled?
 3   A    I honestly could not tell you.  I don't recall.
 4   Q    Tens of millions?
 5   A    I believe so.  I don't recall.
 6   Q    If the RINs credit is a dollar, that would be over
 7   $50 million -- or 50 million gallons, right?
 8   A    Yes.
 9   Q    So you're doing nothing -- would you say that your
10   entire operation, you and Furando, was nothing but fraud?
11   A    There were some portions that were legitimate.  The
12   rest of it was fraud.
13   Q    Give a rough estimate of how much fraud.  Was it
14   90 percent, 95 percent?
15   A    If not more.
16   Q    Maybe close to -- I don't want to be facetious, but
17   99 percent?
18   A    Possibly.
19   Q    And the entire time that year that you met with
20   Washakie, that you met with Mr. Termendzhyan and tried to
21   continue the fraud scheme -- by the way, there were two
22   months after -- or three months after the Miami meeting
23   before the raid, right?
24   A    Two months.
25   Q    Two months.
```

```
 1           When did the railcars get shipped?
 2   A     They were shipped, I believe, in the first or second
 3   week of May.
 4   Q     And the raid was shortly thereafter?
 5   A     Yes.
 6   Q     Now it still took at least two months from the first
 7   meeting to get six railcars shipped, right?
 8   A     That is correct.
 9   Q     And the total amount of gallons of fuel, looking at
10   these invoices, was $155,000?
11   A     I believe so.
12   Q     And how long does it take to ship the railcars to
13   California?
14           You don't know, right?
15   A     I do not know.
16   Q     You just know that they were shipped.  How long from
17   Illinois to Utah?
18   A     I do not know.
19   Q     So we don't even know whether or not the fuel had
20   gotten to Mr. Termendzhyan or to California.  We just don't
21   know, do we?
22   A     I do not know.
23   Q     We don't know if those railcars were still sitting in
24   Utah when the search warrant was executed, do we?
25   A     I do not know.
```

```
1    Q    Do you know how much Washakie applied for in terms of

2    RINs credits on those six railcars?

3    A    No.

4    Q    Do you know if they did?

5    A    No.

6    Q    Would you know whether -- by the way, do you know if

7    Mr. Termendzhyan ever had applied for RINs credits?

8    A    I do not know.

9    Q    Do you know if at any point he ever -- did he ever ask

10   you to see the RINs credit forms?

11   A    No.

12   Q    Did he ever say, by the way, now that you've explained

13   this scheme to me, this is great, let's start shipping

14   millions of gallons right now at 60 below?  Did he tell you

15   that?

16   A    No.

17   Q    Did you ever -- when he said 60 below, your boss,

18   Furando -- Furando?

19   A    Furando.

20   Q    Furando said no, correct?

21   A    That is correct.

22   Q    He wouldn't do it at that price, right?

23   A    That is correct.

24   Q    Did Mr. Termendzhyan come back and say, okay, 50 under?

25   A    I don't know if he came back and there was any
```

1    negotiation.  I don't recall.

2    Q    I believe you told Ms. Goemaat that there was -- that

3    Furando was blowing up your phone when you were in

4    California meeting at the -- apparently the large spread of

5    food and a bottle of Tequila; is that right?

6    A    Yes.

7    Q    Did you drink the Tequila?

8    A    I did.

9    Q    Did you eat the food?

10   A    I did.

11   Q    Was it good?

12   A    It was.

13   Q    Good.  So there's something inhospitable about serving

14   you food and giving you Tequila while talking business?

15   A    No.

16   Q    Didn't you say that Furando was blowing up your phone

17   at the time?

18   A    He was sending multiple messages and multiple phone

19   calls requesting updates as to whether or not we had agreed

20   on a price, gallons, ship date.  He wanted the information.

21   Q    I don't want to mischaracterize it, but it sounded to

22   me like on direct that you said that you had reached your

23   boiling point or breaking point with Furando bugging you at

24   that point.  Is that a fair statement?

25   A    Yes.

1    Q    Basically told him FU?

2    A    Yes.

3    Q    And at that point put him on the phone --

4    A    Yes.

5    Q    -- with Mr. Termendzhyan?

6    A    Yes.

7    Q    And they spoke for -- you told the agents at least, 30

8    to 40 minutes.  Today you testified it could have been as

9    long as an hour.

10            MS. GOEMAAT:  Objection, Your Honor.  It misstates

11    the testimony.

12            MR. GERAGOS:  This is on cross.

13            THE COURT:  I think that's a misstatement.

14    BY MR. GERAGOS:

15    Q    Well, did you tell the agents 30 to 40 minutes?

16    A    I did.

17    Q    Did you say today it could have been as long as an

18    hour?

19            MS. GOEMAAT:  Objection, Your Honor.  It misstates

20    the testimony.

21            MR. GERAGOS:  That's what cross is.  I don't

22    understand the objection.

23            THE COURT:  The objection is you're misstating

24    something.

25            MR. GERAGOS:  I'm not --

 1              THE COURT:  I don't recall having heard that and

 2   so --

 3              MR. GERAGOS:  I'm asking her.  That's what cross

 4   is.  I get to --

 5              THE COURT:  I understand what cross is,

 6   Mr. Geragos.  All right?

 7   BY MR. GERAGOS:

 8   Q    What did you tell -- what did you say this morning how

 9   long that meeting could have lasted?

10   A    I believe I stated that it was approximately 30

11   minutes.

12   Q    Did you tell the agents it could have been longer?

13   A    I believe I told the agents between 30 and 40 minutes.

14   Q    Did you say it could have been longer?

15   A    I believe that's what I stated.  I'm not 100 percent

16   sure without looking at the notes.

17   Q    If I showed you notes, would that refresh your

18   recollection?

19   A    You are welcome to show them to me.

20   Q    Okay.  I'm asking would notes refresh your

21   recollection?

22   A    Sure.

23   Q    Before I refresh your recollection, you remember

24   testifying that you spoke for at least 30 to 40 minutes,

25   correct?

```
1    A    Correct.

2    Q    Now did you -- during that time, did

3    Mr. Termendzhyan -- and by the way, what was the date of

4    this meeting?  What was the date of this meeting?

5    A    Are you talking about the date where Levon and Furando

6    had a conversation or are you talking about the statement

7    that you had in your hand?

8    Q    Date of the conversation.

9    A    It was the end of March.  I don't recall a specific

10   date.

11   Q    And during this 30 or 40 minutes, they never cut a

12   deal, did they?

13   A    Not specifically.

14   Q    In fact, you specifically told the agents they didn't

15   come to a conclusion, right?

16   A    No.

17   Q    No, they didn't?

18   A    No, they did not come to a conclusion.

19   Q    So Furando was bugging Levon Termendzhyan to do a deal,

20   and at the end of the day they didn't get a deal.  Even

21   after you had been there, after you had enjoyed the

22   hospitality, after you had a conversation with Furando, who

23   was obviously anxious to get a deal done, they still didn't

24   do a deal, correct?

25   A    At the end of the day, the only thing that was agreed
```

```
 1   upon was a short test run between us and Washakie is what I
 2   recall.
 3   Q    When was the next time you talked to Mr. Termendzhyan
 4   after that phone call?  I mean you testified earlier that
 5   you and a girlfriend -- who was the girlfriend who was with
 6   you?
 7   A    She was just a female that came along with us to Las
 8   Vegas.
 9   Q    Who was that?
10   A    Somebody that I knew personally.
11   Q    What was the name?
12   A    Her name was Amanda.
13   Q    Amanda what?
14   A    I believe her last name was Brown.
15   Q    Brown?
16   A    Yes.
17   Q    Amanda Brown.  Did you tell that to the agents?
18   A    No.
19   Q    Did they ask you what the name of this other witness
20   was?
21   A    Not that I recall.
22   Q    Is there some reason that you didn't want to reveal the
23   name of Amanda Brown?
24   A    She was somebody who was involved with myself and
25   Mr. Furando.  That's it.
```

1   Q    What does that mean involved?

2          MS. GOEMAAT:  Objection, Your Honor, as to

3   relevance.

4          THE COURT:  What is the relevance, Mr. Geragos?

5          MR. GERAGOS:  Another witness.  Potentially

6   impeachment as to a witness.  It's a he said, she said.  I'd

7   like to know who else was present.

8          THE COURT:  She's already identified the person.

9   I don't know what the basis for your question is other than

10  to embarrass the witness.

11         MR. GERAGOS:  Well, okay.

12  BY MR. GERAGOS:

13  Q    When you say involved with, what does that mean?

14  A    It was a sexual --

15         THE COURT:  I think I've already ruled on that.

16         MS. GOEMAAT:  Your Honor, I would move to strike

17  the question and the beginning of the answer.

18         THE COURT:  That motion is granted.

19         MR. GERAGOS:  I don't know.  Maybe it's me.  I

20  didn't understand that when she says involved, for all I

21  know, involved meant she was involved in the fraud.

22  Involved in a sexual relationship, why is that off limits?

23  I'm trying to ask.  I've never been restricted in cross when

24  I'm asking a witness about another witness who was present

25  for a conversation that, as far as I can tell, only involves

```
 1  my client and this witness.
 2            THE COURT:  Mr. Geragos, I don't care how it's
 3  happened to you in other courts.  This is this one, and
 4  you'll operate within those rules.
 5            Ms. Goemaat, did you have something?
 6            MS. GOEMAAT:  No, Your Honor.  Thank you.
 7  BY MR. GERAGOS:
 8  Q    Who else was -- so it was you, Amanda brown, Furando,
 9  and Levon, and Furando was on the phone; is that correct?
10  A    I'm not sure which meeting now you're trying to refer
11  back to.
12  Q    Was there anybody else present on the day that you had
13  the conversation with Furando on the phone?
14  A    You mean Furando?
15  Q    Furando, correct.
16  A    The day that I had the conversation with Furando on the
17  phone and Levon was in California, there was nobody else
18  present for that conversation except for myself,
19  Mr. Furando, and Levon.
20  Q    And then the day -- the next time you saw
21  Mr. Termendzhyan was when he had the RV; is that correct?
22  A    That is correct.
23  Q    The only other person who's a witness to that would be
24  Amanda Brown?
25  A    That is correct.
```

1   Q    Didn't you testify at the grand jury that the

2   conversation -- and I'm talking about the one with

3   Furando -- went on probably a good 30, 40 minutes, maybe

4   even longer?

5   A    That is correct.

6   Q    Could it have been as long as an hour?

7   A    I don't recall.

8   Q    But you said a good 30 or 40 minutes, maybe even

9   longer.  That's when you were under oath in front of the

10  grand jury, right?

11  A    That is correct.

12  Q    Now you're saying that the reason they couldn't get to

13  60 under the heating oil price is because Furando needed to

14  make a profit; is that right?

15  A    Yes.

16  Q    And because of that, Mr. Termendzhyan didn't do a deal;

17  is that right?

18  A    At that time no deal had been made.

19  Q    What?

20  A    At the time of that phone conversation, no deal had

21  been made.

22  Q    Because Mr. Furando would not meet Mr. Termendzhyan's

23  price?

24  A    That was to directly sell to Mr. Termendzhyan, that is

25  correct.

1   Q    Okay.  So when they couldn't reach a deal selling

2   directly -- and that's what you understood the arrangement

3   to be.  You understood Furando, when he was negotiating with

4   Levon Termendzhyan, to be negotiating a sale directly to

5   Mr. Termendzhyan, right?

6   A    That is correct.

7   Q    Mr. Termendzhyan was sitting in California.  Did they

8   talk about, during this 30 or 40, or maybe even longer

9   meeting, did they talk about how the product was going to

10  get to California?

11  A    Yes.

12  Q    How was that going to be?

13  A    My recollection is that it was going to be via railcar.

14  Q    Through a railcar?

15  A    Yes.

16  Q    Okay.  And that would have been railcar'd directly from

17  Illinois to California?

18  A    No.  It would have been from Illinois to Utah, Utah to

19  California, because in order to make the pricing work, it

20  had to be recertified and had to have a dollar tax credit

21  and RINs claimed on it in order to be able to meet that

22  price.

23  Q    That was Furando's issue, correct?

24  A    Yes.

25  Q    That's not Termendzhyan's issue, correct?

1    A    Yes.

2    Q    Termendzhyan just cared about price.  He didn't care

3    about Furando's fraud scheme.  That was what Furando was

4    fixated on, right?

5    A    Yes.

6    Q    In fact, the reason it broke down is because

7    Termendzhyan didn't want to engage in the fraud scheme with

8    Furando, correct?

9    A    It did not break down.  There was an agreement to do a

10   small test run of six railcars.

11   Q    Right.  And that was because Furando finally said,

12   okay, I'll come down in price?

13   A    I don't recall whether or not he said he was going to

14   come down in price.

15   Q    Well, you said before and you testified under oath,

16   didn't you, at the grand jury, that at the end of that 30-

17   or 40-minute conversation, or even longer, that they didn't

18   have a deal, correct?

19   A    Correct.

20   Q    And the reason they didn't have a deal is because

21   Termendzhyan only cared about price.  He didn't care about

22   Mr. Furando's fraud, right?

23   A    Correct.

24   Q    Now the other thing that you've talked about, you've

25   had -- as I understand it, you do these, or you were

1   doing -- during your three or four years of the fraud deals,

2   you would do, you meaning Cima, would do deals with other

3   legitimate parties, correct?

4   A    Yes.

5   Q    And when I say legitimate parties -- what do you call

6   them?

7        They're not a vendor because they're not selling to

8   you.  You're selling to them.  When you brokerage, who's the

9   end buyer?  What's the term?

10  A    We would just call them a buyer.

11  Q    So you would do deals with buyers based on price,

12  correct?

13  A    Yes.

14  Q    In fact, that's the whole kind of baseline of what a

15  broker is, buy low, sell higher, correct?

16  A    Correct.

17  Q    So the buyer doesn't care what you're doing in the

18  interim as long as you're giving him the price, correct?

19  A    Yes.

20  Q    And you did that for years, and up until the time there

21  was a raid on your place, you hadn't cut any deal other than

22  a small test run when you reduced the price sufficiently,

23  correct?

24  A    Correct.

25  Q    Now what was the price that you and Furando reduced it

1  to?

2  A    I don't recall specifically.

3  Q    You don't remember?

4  A    No.

5         THE COURT:  I think we're going to take a

6  ten-minute recess now.

7         (Recess)

8         THE COURT:  You may continue, Mr. Geragos.

9         MR. GERAGOS:  Thank you, Your Honor.

10 BY MR. GERAGOS:

11 Q    So I understand, the fuel you were sitting on, you and

12 Mr. Furando, was B99, correct?

13 A    Yes.

14 Q    And that was -- you were told specifically that the B99

15 could be blended into other diesel, correct?

16 A    Told specifically by whom?

17 Q    Levon told you that.

18 A    He told us that he was up-blending, correct.

19 Q    Right.  And that he could sell when he up-blended,

20 right?

21 A    Yes.

22 Q    But you don't know what he was referring to in terms of

23 California statute, correct?

24 A    Correct.

25 Q    Now you were still -- so you've got the Miami, which is

1  February or March, correct?

2  A    March.

3  Q    Which we already established.  You had first thought it

4  was February, but then pinned the date down to March.  Then

5  there's an April date, correct?

6  A    There was two dates in March.

7  Q    Correct.

8  A    Then there was an April date.

9  Q    And then you do the cooperation -- wait a second.  Go

10 back to the -- the Vegas meeting was for five minutes?

11 A    That is what I recall.

12 Q    And that was in the parking lot?

13 A    Yes.

14 Q    And you did that agreement -- the proffer agreement, I

15 think we established, sometime in June, correct?

16 A    In June of 2014, correct.

17 Q    And do you remember talking to an Allison -- an Agent

18 Allison Baker, who's a special agent, on the phone, and she

19 interviewed you in September --

20 A    That is correct.

21 Q    -- of 2014?

22 A    That is correct.

23 Q    And isn't that the first time that you told her about

24 Levon Termendzhyan, that you told anybody during your

25 proffer sessions specifically about Mr. Levon Termendzhyan?

1   A    That is what they questioned me on, correct.

2   Q    That was Allison -- do you remember the agent's name is

3   Allison Baker?

4   A    I don't recall her name specific.

5           MR. GERAGOS:  May I approach and just show her a

6   report to see if that will refresh her recollection.

7   BY MR. GERAGOS:

8   Q    I've got a report which looks like US0007022-001.

9   First page, there's a name and date.  Just read that

10  silently to yourself and see if that refreshes your

11  recollection.

12  A    That was the agent who interviewed me, then.

13  Q    That refreshes your recollection?

14  A    Yes.

15  Q    And Allison Baker was the one who interviewed you, and

16  that was the first of three interviews that she did with

17  you, correct?

18  A    I believe it was only two.  I'm not sure if there was a

19  third one.  I know that there was a conversation in

20  September and a conversation in October.  I cannot recall if

21  I met with her a third time.

22  Q    Okay.  And you just said met.  Do you mean -- the first

23  one, it appears, was by phone?

24  A    Yes.  Sorry.  That's what I meant by met.  It was a

25  phone conversation.

1   Q    Correct.  And she was always asking about Levon

2   Termendzhyan and Noil Energy, correct?

3   A    She had asked questions about Washakie as well as Levon

4   Termendzhyan.

5   Q    So she was asking about Washakie and Levon?

6   A    I believe so, yes.

7   Q    And that was also in connection with -- you were doing

8   that in connection with your plea agreement, correct?

9   A    Yes.  That was part of my cooperation agreement.

10   Q    At that point -- I just showed you the September

11   date -- you have signed a proffer agreement before that,

12   correct?

13   A    Yes.

14   Q    Then you had entered into a plea agreement, correct, a

15   cooperation plea agreement?

16   A    Yes.

17   Q    And then this is after the cooperation plea agreement,

18   correct?

19   A    Yes.

20   Q    And then specifically the deal that you were trying to

21   make, that Mr. Furando was pushing you to make.  After that

22   30- to 40-minute call in California, then there was the next

23   meeting, which would have been the third meeting with Levon?

24   A    There was the meeting in Miami, the meeting in

25   California, and then, again, in Las Vegas.  So yes, that

1   would be three meetings.

2   Q    And the third meeting was approximately five minutes

3   with Amanda Brown?

4   A    Yes.

5   Q    And did you tell Mr. Termendzhyan that if he closed the

6   deal, he could get something special from Amanda Brown?

7   A    I don't recall telling him that.

8   Q    Do you know what I'm talking about?

9   A    I do not recall.

10  Q    Did you tell him if he closed the deal right there, he

11  could have sex with Amanda Brown?

12  A    I do not recall talking about that.

13  Q    Is that something that you've done in other deals?

14  A    No.

15  Q    So you've never offered up one of your friends for sex

16  to close a deal?

17  A    No.

18  Q    But you don't remember if you did it in this case?

19  A    I've never offered it to anybody.

20  Q    A minute ago you said you didn't remember.

21  A    I'm saying I have never offered it to any other clients

22  and I do not ever recall offering it to Levon.

23  Q    You were impressed with him, though, right?

24  A    I stated before that I was impressed and I thought that

25  he was a powerful man, yes.

1    Q    And you had told that to Amanda Brown, correct?

2    A    I don't recall telling her that.

3    Q    You don't recall.

4         Did you tell her who you were meeting?

5    A    No.

6    Q    Did you tell her just come with me to Vegas?

7    A    She was coming with us to Vegas because we asked her to

8    join us.

9    Q    Who's we?

10   A    Myself and Mr. Furando.

11   Q    And was there some conference in Vegas?

12   A    No.

13   Q    And the date in Vegas that you were going there, was

14   that preplanned?

15   A    No.

16   Q    And then the -- how did you get there?

17   A    Via plane.

18   Q    And then just now did you take a break and talk with

19   the prosecutors in this case?

20   A    I did not talk with anybody.

21   Q    So you haven't talked to anybody since I've been

22   talking with you; is that correct?

23   A    That is correct.

24   Q    Haven't talked about your testimony at all?

25   A    No.

1   Q    How long have you prepared with the prosecutors in this

2   case for your testimony?

3   A    For today?

4   Q    Before today, correct.

5   A    I met with the prosecutors yesterday.

6   Q    And how long was that?

7   A    We started at approximately nine o'clock in the

8   morning, we broke for lunch, and we wrapped up at

9   approximately four o'clock in the afternoon.

10  Q    When you say you broke for lunch, half hour, hour?

11  A    Half an hour.

12  Q    So three and a half hours in the afternoon, three hours

13  in the morning?

14  A    Approximately.

15  Q    Okay.  Who was present with you?

16  A    It was Ms. Goemaat from the morning.  I believe there

17  was another agent by the name of Jamie Hipwell who was

18  there.  Agent Matthew Bird.  At some point Mr. Rich Rolwing

19  joined us.  Mr. Sullivan -- do I have that correct? -- he

20  joined us.  And I don't recall the gentleman who's sitting

21  in the blue suit -- I don't remember his name.

22  Q    Did they show you your grand jury testimony?

23  A    I reviewed my statements.

24  Q    And your statements?

25  A    Yes.

```
 1   Q    And grand jury testimony is a transcript.  Were you
 2   shown that?
 3   A    Yes.
 4   Q    Did you do any rehearsal?
 5   A    We walked through the testimony and the questions that
 6   were going to be asked of me today.
 7   Q    Okay.  Did you -- for instance, did you say or suggest
 8   that in response to certain questions this would be the
 9   answer?
10   A    I'm not sure what you're trying to ask.
11   Q    Well, you spent six hours there.  The six hours was
12   just to reiterate what you already knew or did you go
13   through questions and answers?
14   A    It was to reiterate what I already knew.
15   Q    That wasn't really my question.  My question is did you
16   go through mock questions and answers?
17   A    We went through questions that would be posed during my
18   testimony, yes.
19   Q    And did you go through what a cross-examination would
20   look like?
21   A    We didn't spend very much time on cross-examination.
22   Q    Did you go through and was it suggested to you that
23   certain things you shouldn't talk about?
24   A    No.
25   Q    Certain things that you should say?
```

1   A    No.

2   Q    The six hours was just going over what you've testified

3   to today?

4   A    Yes.

5   Q    So it took you six hours to prepare for this?

6   A    I believe so, yes.

7   Q    Thank you.

8            MR. GERAGOS:  I have no further questions.

9            THE COURT:  Redirect.

10           MS. GOEMAAT:  Thank you, Your Honor.

11                     REDIRECT EXAMINATION

12  BY MS. GOEMAAT:

13  Q    Ms. Pattison, I'll try to be brief in my redirect.

14       Now Mr. Geragos asked you some questions about

15  up-blending and whether you knew yourself any of the rules

16  in California, which I believe you answered you do not,

17  correct?

18  A    That is correct.

19  Q    But you did talk about up-blending with

20  Mr. Termendzhyan?

21  A    Yes.

22  Q    Where were you when you talked about up-blending?

23  A    We were at the fuel terminal that I perceived to be

24  Mr. Termendzhyan's in California.

25  Q    You keep calling it a terminal which actually has a

```
 1   technical definition.  Can you just describe what you saw
 2   there?
 3   A    It was located near a rail yard.  There was fuel pumps
 4   and I believe some tanks as well.
 5   Q    When you say fuel pumps, is it the kind of pump you can
 6   actually put into a vehicle to put gasoline into a vehicle?
 7   A    Yes.
 8   Q    And what did Levon Termendzhyan tell you at those fuel
 9   pumps about up-blending?
10   A    He had said that this is where our fuel would be
11   delivered to his customers, and that at times he had blended
12   as much as 50 percent biodiesel into the diesel fuel that he
13   was selling out of that terminal.
14   Q    Up to 50 percent?
15   A    Yes.
16   Q    Did you ask any follow-up questions?
17   A    I did not.
18   Q    And what was your goal in this meeting?  Was it to find
19   out how much he was up-blending or to catch him in a fraud?
20   A    No.
21   Q    What was your goal?
22   A    To close the deal that we were working on in order to
23   sell fuel, in order to be recertified through Washakie, and
24   ultimately wind up at Levon's facility.
25   Q    Now you were questioned about these changed invoices
```

```
 1  that you also testified about on direct examination.  There

 2  seemed to be some confusion.  Are you denying that this plan

 3  with Levon Termendzhyan, and Jacob Kingston, and Furando was

 4  a fraud?

 5  A    No.

 6  Q    And if it was perceived that you were denying in some

 7  way that that was a fraud, you're not doing that, are you?

 8  A    No.

 9  Q    So after these FBI raids when you changed the

10  description on the invoices to railcars, you took what was

11  an absolutely false invoice that said soy blend, I believe,

12  and you just had it list the railcar number, correct?

13            MR. GERAGOS:  Objection, leading.

14            MS. GOEMAAT:  I'll rephrase.

15  BY MS. GOEMAAT:

16  Q    Did you change invoices after the raid?

17  A    Yes.

18  Q    And what was the change that you made?

19  A    We changed it from stating that it was soy blend to

20  state that it was just the railcars.

21  Q    And is that because the FBI had raided you and you'd --

22            MR. GERAGOS:  Objection, leading.

23            MS. GOEMAAT:  I'll rephrase.

24  BY MS. GOEMAAT:

25  Q    Why did you do that?
```

1    A    Because our companies had been raided by the FBI and

2    the EPA, and a host of other agencies, and we were not

3    willing to admit or show that we were engaged in any further

4    fraud.

5    Q    Now when you originally sent these six railcars out to

6    Washakie, was that intended to be part of a fraud?

7    A    Yes.

8    Q    And when you changed the invoice to reflect a railcar

9    being sold for $2.30, was that actually an accurate -- was

10   that accurate once you changed it?

11   A    Yes.

12   Q    And at that time was $2.30 the price that you had

13   agreed upon to sell the B99 to Washakie?

14   A    I can't recall if it was the specific price that was

15   agreed upon.  It was a fair price, to our minds, in order to

16   still make a profit on the material that we had purchased

17   from Astra Oil.

18   Q    And then once the FBI raid happened, did the pricing

19   change?

20   A    Yes.

21   Q    And before the FBI raid, what did you think Washakie

22   was going to do to increase their profit margin?

23   A    That they were going to take this material and we would

24   list it as raw materials or feedstock on the paperwork for

25   Washakie in order to then have them claim that they had

1    produced it as B100 and say that they then were eligible for

2    the dollar tax credit and the RINs.

3    Q    What, if anything, was Levon Termendzhyan's profit

4    going to be?

5    A    I don't know what his specific profit was going to be.

6    I just know that it needed to be --

7              MR. GERAGOS:  Again, objection, nonresponsive

8    after I don't know what his profit was going to be.

9              MS. GOEMAAT:  Your Honor, she sat in multiple

10   meetings with Levon Termendzhyan where they discussed how

11   they were going to price this fuel and what price Levon

12   Termendzhyan wanted it at.  She is qualified to testify

13   generally as to how it is that Levon Termendzhyan was going

14   to make a profit from the fraud scheme he agreed to.

15             THE COURT:  The objection is overruled.

16             MS. GOEMAAT:  Thank you.

17   BY MS. GOEMAAT:

18   Q    What generally was Levon Termendzhyan's profit going to

19   be made of?

20   A    It was going to be made of the difference between the

21   cost of the biodiesel, which he wanted delivered to

22   California at 60 cents under heating oil, and what he could

23   sell it for in his terminals.

24   Q    I'm glad you mentioned the 60 cents under heating oil.

25   On cross-examination Mr. Geragos asked you repeatedly

1    whether the only thing Levon Termendzhyan cared about was

2    the price of HO minus 60?

3    A    Yes.

4    Q    Yes, he did care about that.

5         When he was telling you that the price must be HO minus

6    60, were you discussing with Levon Termendzhyan and Joe

7    Furando what you could do in order to get him the fuel at HO

8    minus 60?

9    A    Yes.

10   Q    And what were you guys going to do so that Levon

11   Termendzhyan could get his fuel at HO minus 60, which he

12   then told you he was up-blending up to 50 percent?

13             MR. GERAGOS:  There's an objection.  It misstates

14   the evidence.  It conflates three different conversations at

15   three different times.  And it's leading.

16             THE COURT:  Overruled.  Go ahead.

17   BY THE WITNESS:

18   Q    Do you remember the question?

19   A    If you could please repeat it.

20   Q    Sure.  When you were in these meetings where Levon

21   Termendzhyan was demanding HO minus 60, what were you

22   discussing with Levon Termendzhyan and Joe Furando to ensure

23   that Mr. Termendzhyan could get the fuel at HO minus 60,

24   which he told you at the fuel pump he was going to up-blend

25   up to 50 percent?

1    A    We discussed that Cima Green would send the material

2    from the facility in Illinois via railcar to Washakie in

3    Utah and label it as feedstock so that then Washakie would

4    be able to claim that that material was used to produce B100

5    biodiesel so that Washakie could get the dollar tax credit

6    and the RINs, strip those off, and then sell it to Levon

7    delivered into California so it could meet his price of HO

8    minus 60.

9    Q    And in those meetings where you discussed this with

10   Levon Termendzhyan, did Levon Termendzhyan have any problem

11   with this mechanism of lowering his price?

12   A    Not that I can recall.

13   Q    Did he ever object to it and say we can't do that,

14   that's illegal?

15   A    Not that I recall.

16   Q    In fact, it actually got him, would you say --

17              MR. GERAGOS:  Objection, leading.

18              THE COURT:  Sustained.

19   BY MS. GOEMAAT:

20   Q    If this had worked as planned, what do you understand

21   that Levon Termendzhyan would have gotten?

22   A    I understand that if this scheme had worked, that Levon

23   would have gotten the price that he wanted, the material

24   that he wanted and needed, and would have been able to then

25   blend it into his fuel to sell to his customers.

1   Q    Now you were asked on cross-examination whether you

2   know whether or not Washakie ever claimed RINs on this

3   material?

4   A    Yes.

5   Q    And do you know?

6   A    No.

7   Q    If you turn back to Exhibit 4-7, which is the tab seven

8   in your binder --

9   A    Yes.

10  Q    -- the attachment to this e-mail from Jacob Kingston

11  has a blank where the RINs would be.

12  A    Yes.

13  Q    Did you believe that to mean anything?

14  A    I believed that that meant they were not claiming RINs

15  on it.

16  Q    Now I'd like you to look at tab 12 in your binder.

17  This has been marked as Government's Exhibit 4-12.

18          MS. GOEMAAT:  And, Your Honor, I would like to

19  move to provisionally admit this.  The United States will

20  later seek to introduce these records as business records

21  through a witness.  We'd like to provisionally admit

22  subject --

23          THE COURT:  Through this witness or another

24  witness?

25          MS. GOEMAAT:  We'll admit it later.  We'd like to

1    provisionally admit it subject to being admitted as a

2    business record through a custodian.

3              THE COURT:  Mr. Geragos.

4              MR. GERAGOS:  Which document?  4-12 what?

5              MS. GOEMAAT:  Exhibit 4.12.

6              MR. GERAGOS:  I've got 4-12.  None of this bears

7    any relationship to this witness that I can tell, which is I

8    assume why they want to provisionally admit something that

9    has no basis with this witness to ask this witness to

10   speculate to something.

11             MS. GOEMAAT:  Yes.  We'd like to provisionally

12   admit it, ask the witness questions about it, and later

13   admit it through a document custodian who can establish the

14   relevance as to Ms. Pattison's testimony, and we would not

15   object to striking her answers if the government later fails

16   to admit it as a business record.

17             THE COURT:  I'll allow it.

18             MS. GOEMAAT:  Thank you, Your Honor.

19   BY MS. GOEMAAT:

20   Q    Now you did not create the invoice marked as 4-12,

21   correct?

22   A    Correct.

23   Q    This is an invoice -- actually a series of invoices

24   from United Fuel Supply to Noil Energy Group.  And I'm going

25   to ask you, hypothetically, if this was an invoice for the

1    B99 -- some of the B99 that you sold to Washakie, that exact

2    fuel, if, hypothetically, this was an invoice selling some

3    of that fuel here, 5300 gallons --

4        MR. GERAGOS:  Wait.  Can I interpose an objection?

5    Hypothetical questions are for experts.  She's not qualified

6    as an expert.  This is why I objected in the first place.

7        THE COURT:  She said it's going to be admitted or

8    offered later through the custodian of the records.

9        Correct, Ms. Goemaat?

10        MS. GOEMAAT:  Yes.

11        THE COURT:  All right.  Assuming that they can lay

12    that foundation, then the witness can testify as to what she

13    said.  They would accept a motion to strike at a later time

14    if for some reason they couldn't lay the foundation.

15        MR. GERAGOS:  Mine is more on the asking of a

16    hypothetical question, not on the foundation.  I understand

17    the provisional nature of this.  I'm saying that this is not

18    an expert where we can ask hypothetical questions.

19        THE COURT:  All right.  Don't ask it

20    hypothetically.

21        MS. GOEMAAT:  Yes, Your Honor.  I'll rephrase.

22    I'd be happy to establish it as we expect it to come in.

23    BY MS. GOEMAAT:

24    Q    Now this United Fuel Supply invoice bills Noil Energy

25    Group for some of the B99 sold by your company, Cima Green.

1    Do you see the line that reads PTD RIN 12038030?

2    A    Yes.

3    Q    What does that mean to you?

4    A    In my mind, PTD standards for product transfer

5    document, which is what is used to transfer RINs from the

6    seller to the buyer, and the 12038030 is the identification

7    code for that product transfer document.

8    Q    So based on your experience buying and selling B99, is

9    this an invoice selling B99 with RINs?

10   A    Yes.

11   Q    Now you previously testified that RINless B99 is much

12   cheaper than B99 with RINs, or you might have said B100 with

13   RINs.  Can you explain again why that is?

14   A    B99 without RINs means that there has been a dollar tax

15   credit and the RINs, which have a monetary value, taken from

16   it.  So therefore it is much cheaper than either B100 or B99

17   that has RINs associated with it.  Whatever the dollar

18   amount of that RIN is is factored into your purchase price.

19   Q    And what is the price as indicated on this invoice?

20   A    It is $2.3573, or 2.3573.

21   Q    So basically $2.35?

22   A    Yes.

23   Q    Now best case scenario, how much can you get for a RIN,

24   a biodiesel RIN?  Just best case scenario, in your

25   experience.

1    A    I recall seeing them as high as $1.50 per RIN.

2    Q    And do you know whose company Noil Energy Group is?

3    A    It belongs to Levon.

4    Q    Levon Termendzhyan?

5    A    Yes.

6    Q    Now if you can get $1.50 per RIN -- and how many RINs

7    does each biodiesel gallon have?

8    A    One and a half.

9    Q    So if you can possibly get $2.25 from a RIN per gallon,

10   and if this fuel, this Cima Green fuel is being sold now

11   with RINs, what is it actually costing Noil Energy to buy

12   this fuel?

13   A    Approximately ten cents.

14   Q    Approximately ten cents?

15   A    Yes.

16   Q    That would be even less than HO minus 60, wouldn't it?

17   A    Yes.

18   Q    Substantially less than HO minus 60?

19   A    Substantially, yes.

20           THE COURT:  Don't lead, Ms. Goemaat.

21           MS. GOEMAAT:  Thank you, Your Honor.

22   BY MS. GOEMAAT:

23   Q    Now Mr. Geragos asked you on cross-examination whether

24   you were seeing through the prism of E-Biofuels and whether

25   you perhaps misunderstood all of these encounters that you

```
 1    had with Mr. Termendzhyan because you were seeing it through
 2    the fraud that you were committing with E-Biofuels.  So
 3    let's go over some of the encounters.
 4         Your first conversation with Mr. Termendzhyan, March of
 5    2012 in the Italian restaurant, Joe Furando, he wanted to
 6    talk business, correct?
 7    A    Yes.
 8    Q    You don't deny that he was trying to talk business?
 9    A    No.
10    Q    He was always trying to talk business?
11    A    Even at two o'clock in the morning, yes.
12    Q    And Levon Termendzhyan, he was reluctant to at first
13    discuss business?
14    A    Yes.
15    Q    And then did you discuss business?
16    A    Yes.
17    Q    And what was the discussion?
18    A    The discussion was --
19              MR. GERAGOS:  Asked and answered.
20              MS. GOEMAAT:  I don't think so, Your Honor, as on
21    cross-examination, Mr. Geragos suggested that it was all
22    confused misinterpretation based on the prism of E-Biofuels.
23              THE COURT:  I'm going to overrule the objection.
24              MR. GERAGOS:  Thank you, Your Honor.
25              THE COURT:  Go ahead.
```

1    BY MS. GOEMAAT:

2    Q    Please tell the Court what the conversation you

3    eventually had at that restaurant with Levon Termendzhyan

4    was.

5    A    The conversation between Levon Termendzhyan, myself and

6    Mr. Furando revolved around a fraud scheme utilizing

7    Washakie Renewable Energy, which consisted of Cima Green

8    taking B99 biodiesel, labeling it as feedstock or raw

9    materials, selling it to Washakie Renewable Energy to their

10   facility in Utah, and Washakie would then claim that they

11   had produced this material from the raw materials and say it

12   was B100 with RINs, and be able to be eligible for the RINs

13   and the dollar tax credit.  In turn, they would then sell

14   that to Levon in California.

15   Q    Was this a blatant discussion of fraud, from your

16   perspective?

17   A    Yes.

18   Q    Did Levon Termendzhyan participate in this discussion

19   of the fraud scheme?

20   A    Yes.

21   Q    And you were asked on cross-examination whether Levon

22   Termendzhyan said something to you to the effect of I don't

23   care what you do, just get it to --

24        MR. GERAGOS:  Objection, leading.  I understand

25   that this is redirect, but everything that's asked is

```
 1   leading.
 2              THE COURT:  Please proceed without leading,
 3   Ms. Goemaat.
 4   BY MS. GOEMAAT:
 5   Q    Did Mr. Termendzhyan want this fuel cheap?
 6   A    Yes.
 7   Q    Did he express that to you clearly?
 8   A    Yes.
 9   Q    And based on your experience in the biodiesel, was the
10   price that he wanted this fuel possible without doing fraud?
11   A    No.
12   Q    And so you had all this fuel, right?
13   A    Yes.
14   Q    And then Mr. Termendzhyan, did he seem like --
15              MR. GERAGOS:  Objection, leading.
16              MS. GOEMAAT:  I haven't asked the question yet,
17   Your Honor.
18              THE COURT:  Overruled.
19   BY MS. GOEMAAT:
20   Q    Did he seem like a possible customer?
21   A    He did.
22   Q    Would that have been a good thing for you?
23   A    Yes, it would have.  It would have gotten us out of our
24   position that we were in.
25   Q    So what possible way did you have to get him fuel at
```

1    his price of HO minus 60?

2    A    The only way that we could have done it was to

3    recertify the fuel through Washakie utilizing the scheme

4    that I have previously described.

5    Q    Did you discuss this clearly with Levon Termendzhyan?

6    A    Yes.

7    Q    Did he object to it in any way?

8    A    No.

9    Q    And after that meeting, at the very end of March 2012,

10   were you summonsed back to Los Angeles by Levon

11   Termendzhyan?

12   A    Yes.

13   Q    Did you have another conversation in that outbuilding

14   with Mr. Furando on speakerphone and Levon Termendzhyan?

15   A    Yes.

16            MR. GERAGOS:  Objection, leading.

17            THE COURT:  No.  That's not leading.  Overruled.

18   BY MS. GOEMAAT:

19   Q    Did you blatantly discuss fraud in that phone call?

20   A    Yes.

21            THE COURT:  That may be leading.

22   BY MS. GOEMAAT:

23   Q    Please tell the Court, briefly, what did you discuss in

24   that phone call in that outbuilding?

25   A    We had an open conversation regarding the fraud scheme

1    that I have previously described, which involved Cima Green,

2    Washakie, and ultimately selling to Levon.

3    Q    Did Levon Termendzhyan object to it?

4    A    Not that I recall.

5    Q    Was anybody -- were you trying to hide what you were

6    doing from anybody involved in this phone call?

7    A    No.  All parties needed to be aware of what was going

8    on in order for this scheme to work.

9    Q    And did you come to any kind of conclusion about this

10    scheme in that phone call?

11    A    By conclusion, I'm not sure what you're trying to ask

12    there.

13    Q    Did you agree to any parts of it yet?

14    A    We agreed to do a short test run of six railcars.  No

15    dates, no price, no other specifics were discussed.

16    Q    Could you start sending railcars until you had actually

17    decided that information?

18    A    No.

19    Q    All right.  Who was trying, in this phone call, to get

20    to an agreement?  Who wanted an agreement?

21    A    Mr. Furando.

22    Q    And whose agreement did he need?

23    A    He needed Levon's.

24    Q    And after you got this agreement for six railcars, were

25    you again briefly summonsed by Levon to Las Vegas?

```
 1   A     Yes.
 2   Q     And ultimately you did sell -- is it the case that you
 3   did sell these six railcars?
 4   A     Yes.
 5   Q     And as you testified to extensively on direct
 6   examination, there were problems with the invoices and
 7   supposed problems with the quality from the start --
 8   A     Yes.
 9   Q     -- is that correct?
10   A     That is correct.
11   Q     I'd like you to turn your attention to the tenth tab of
12   your binder, which was previously admitted, 4-10.
13         When you were trying to resolve the final issues with
14   these six railcars, who did Jacob Kingston tell you would
15   decide what to do and resolve the issue?
16   A     It states in the e-mail this will be resolved when
17   Levon gets back into the country --
18         MR. GERAGOS:  Objection, that's nonresponsive.
19   She said who did Jacob Kingston tell you, and Levon
20   Termendzhyan, and it's also asked and answered.
21         MS. GOEMAAT:  Your Honor, it's an e-mail from
22   Jacob Kingston.  It's previously admitted and it's directly
23   responsive to cross-examination.
24         THE COURT:  Overruled.  Go ahead.
25   //
```

```
 1   BY MS. GOEMAAT:

 2   Q    Let me ask the question again.  July of 2012, is that

 3   near the end of this entire episode?

 4   A    Yes.

 5   Q    Had you had problems, supposedly, with the quality of

 6   the material?

 7   A    Yes.

 8   Q    Did you write to Jacob Kingston and tell him it needed

 9   to be resolved?

10   A    Yes.  We needed payment.

11   Q    And who did Jacob Kingston tell you was going to

12   resolve this issue?

13   A    As per the e-mail, it states this will be resolved when

14   Levon gets back into the country next week.

15   Q    Is that consistent with your understanding of this

16   entire scheme that you entered into?

17   A    Yes.

18   Q    Why?

19   A    In my mind it is because Levon controlled every aspect

20   of this deal, that he was the person who was in charge of

21   making the decisions, and who would get paid and how much.

22             MS. GOEMAAT:  No further questions for this

23   witness.  Thank you, Your Honor.

24             THE COURT:  You may proceed.

25   //
```

1                    RECROSS-EXAMINATION

2   BY MR. GERAGOS:

3   Q    I've looked through the reports.  It looks like --

4   let's see if this refreshes your recollection.  I showed you

5   the one report and that refreshed your recollection that you

6   talked to Allison Baker on September 19th, 2014, correct?

7   A    Correct.

8   Q    Then you said you thought you had two other

9   conversations, but I found another one that looks like you

10  had a second conversation with Allison Baker on

11  October 10th, 2014.  Does that refresh your recollection?

12       Do you want me to show it to you?

13            MR. GERAGOS:  May I approach and show her?

14            MS. GOEMAAT:  Your Honor, this is outside the

15  scope of redirect, and it appears to be a continuation of

16  his original cross.

17            THE COURT:  It's outside the scope.

18            MR. GERAGOS:  No.  It's the conflation and I'm

19  going to show what they have done.

20            THE COURT:  Go ahead, for the moment.

21  BY MR. GERAGOS:

22  Q    I've shown you three different reports with three

23  different dates.  Did you take a look at those?

24            MS. GOEMAAT:  We would ask counsel to show those

25  reports with the government.

1   BY MR. GERAGOS:

2   Q    Does that refresh your recollection that you talked to

3   Allison Baker three times?

4   A    As per the reports, yes.

5   Q    Now didn't you tell Allison Baker that the first time

6   that those invoices were changed, it wasn't because of the

7   raid, it was because Jacob wanted you to change them?  Isn't

8   that what you told her?

9   A    I would need to see the statement.

10  Q    So you don't remember, as you sit here, whether you

11  told her that?

12  A    This statement took place five years ago, Mr. Geragos.

13  I do not recall what was specifically said in that

14  statement.

15  Q    But I'm asking you, five years ago you told Allison

16  Baker that Jacob was the one who sent the invoice back and

17  told you to change it?

18            MS. GOEMAAT:  Objection, Your Honor.  She's

19  answered the question.  She's asked to see the document.

20  Mr. Geragos showed her the document.

21            MR. GERAGOS:  I'm testing her memory.  That's what

22  cross is.

23            I'll leave it.  It's okay.  If we're not seeking

24  the truth and we're just playing games, that's fine.

25            MS. GOEMAAT:  Objection.  Move to strike that

1    commentary.

2    BY MR. GERAGOS:

3    Q    Does the fact that -- you were asked -- you had three

4    meetings --

5         THE COURT:  Excuse me, Mr. Geragos.  There was an

6    objection.

7         MS. GOEMAAT:  I would move to strike his

8    commentary that games are being played and truth is not

9    being sought.

10        THE COURT:  Granted.

11   BY MR. GERAGOS:

12   Q    You had three meetings, correct?

13   A    As per the documents, yes.

14   Q    The first meeting, Furando was the one who wanted to

15   talk about the fraud scheme, and you specifically told

16   Allison Baker and testified in the grand jury that the only

17   thing Levon Termendzhyan said was basically stop bugging me,

18   I don't care about this, I just want heating oil less 60,

19   correct?

20   A    Yes.

21   Q    The second meeting was where Furando was telling him on

22   a call -- Furando was bugging you, correct?

23   A    Mr. Furando was communicating with me throughout the

24   day asking for updates as to whether or not the deal had

25   been completed.

1  Q    And you never cut a deal that day either?

2  A    The only thing that we had agreed on was to do a short

3  test run, that is correct.

4  Q    You never cut a deal, correct?  You testified at the

5  grand jury and you said in your reports we had most, but we

6  didn't have a deal.  Wasn't that what we established before?

7  A    A deal cannot be completed without a date, railcars,

8  pickup, price, et cetera.  What we agreed upon was a short

9  test run, that is correct.

10 Q    So you didn't have a deal, correct?  You said there

11 were missing elements, you didn't have a deal.

12 A    It was leading up to a deal.  So no, we did not have a

13 deal at the end of that meeting.

14 Q    And you did not have a deal at the end of the five

15 minutes in the parking lot when he was in an RV, correct?

16 A    Correct.

17 Q    So your three first person meetings where you were

18 actually present, there was no deal with Levon Termendzhyan

19 that was consummated, correct?

20 A    That is correct.

21 Q    Thank you.

22         MR. GERAGOS:  I have no further questions.

23         Oh, wait.  I do have.

24 BY MR. GERAGOS:

25 Q    You were asked about PTD RIN.  Do you remember that?

```
 1   A     Yes.

 2   Q     What does PTD stand for?

 3   A     Product transfer documents.

 4   Q     Okay.  What's a product transfer document of a RIN?

 5   A     It is a piece of paper that shows the RIN going from

 6   one party to another.

 7   Q     So in the document that you were shown, it would have

 8   gone from United Fuel Supply to Noil, correct?

 9              THE COURT:  Ms. Goemaat.

10              MS. GOEMAAT:  I'm sorry, Your Honor.

11              THE COURT:  Go ahead.

12              MR. GERAGOS:  I'm sorry.

13              THE COURT:  I thought there was an objection.

14              MR. GERAGOS:  I heard movement, but I didn't hear

15   an objection.

16   BY MR. GERAGOS:

17   Q     The PTD would be -- you're looking at something.  You

18   haven't seen this before today when Ms. Goemaat just showed

19   it to you, have you?

20   A     The first time that I saw it was yesterday, that is

21   correct.

22   Q     So she showed it to you yesterday?

23   A     As part of our preparation, yes.

24   Q     And did you tell her what the PTD was yesterday?

25   A     Yes.
```

```
 1   Q    What did you tell her?
 2   A    I told her that it was a product transfer document.
 3   Q    That would go from United Fuel Supply to Noil?
 4   A    I believe that is what it represents, yes.
 5   Q    So United Fuel Supply wouldn't have the RIN at that
 6   point, correct?
 7   A    They would have had possession of the RIN in order to
 8   do the product transfer document.
 9   Q    And who would it have been transferred to?
10   A    To Noil.
11   Q    Correct.  Were you shown any document yesterday or
12   today that shows that Noil exercised the cashing in of the
13   RIN?
14   A    No.
15   Q    Thank you.
16                  FURTHER REDIRECT EXAMINATION
17   BY MS. GOEMAAT:
18   Q    I just have one question, Ms. Pattison.  In these
19   meetings that you have now testified to repeatedly with
20   Mr. Levon Termendzhyan, did you at that time or do you now
21   have any question in your mind about whether you were
22   blatantly discussing entering into a fraud scheme with
23   Mr. Termendzhyan?
24             MR. GERAGOS:  There's an objection.  It's
25   irrelevant and it exceeds the scope of cross.
```

```
 1              THE COURT:  Overruled.  You went beyond the scope
 2    last time.
 3              MS. GOEMAAT:  I'll ask it again.
 4    BY MS. GOEMAAT:
 5    Q    In these meetings that you've described having where
 6    you discussed this scheme with Levon Termendzhyan, did you
 7    have any doubt then that you were blatantly discussing fraud
 8    with Mr. Termendzhyan?
 9    A    No.
10    Q    As you reflect on them today, do you have any doubt
11    today that you were blatantly discussing a fraud scheme with
12    Mr. Termendzhyan?
13    A    I do not have any doubt.
14              MS. GOEMAAT:  No further questions for this
15    witness.
16              THE COURT:  All right.
17                   FURTHER RECROSS-EXAMINATION
18    BY MR. GERAGOS:
19    Q    I just want to make sure that you were discussing fraud
20    in your head, right?
21              THE COURT:  Stand up, sir.
22    BY MR. GERAGOS:
23    Q    You were discussing fraud?
24    A    It was myself, Mr. Furando, and Mr. Termendzhyan.
25    Q    Mr. Termendzhyan wasn't selling you anything, you were
```

```
 1   trying to sell him, correct?

 2   A     Correct.

 3   Q     Thank you.

 4              THE COURT:  Anything further of this witness?

 5              MS. GOEMAAT:  No further questions for this

 6   witness.

 7              Thank you so much, Your Honor.

 8              MR. GERAGOS:  No further questions, Your Honor.

 9              THE COURT:  All right.  You may step down,

10   Ms. Pattison.  Thank you for your testimony.

11              THE WITNESS:  Thank you, Your Honor.

12              THE COURT:  May the witness be excused?

13              MS. GOEMAAT:  Yes, Your Honor.  Thank you.

14              THE COURT:  Thank you.

15              Do we have anything further?

16              MS. GOEMAAT:  Not from the government, Your Honor.

17              THE COURT:  All right.  Let me ask about the

18   deposition scheduled for next week, but I understand the

19   witness to be in London.  What time are we going to begin?

20              MS. GOEMAAT:  This is a defense deposition,

21   Your Honor.

22              MR. GERAGOS:  My understanding -- but I'll be

23   filing something -- is that the government contacted the

24   lawyers for the witness and now the witness has declined to

25   testify after interacting with the government.  So I'm going
```

```
1    to make a formal demand today of the government as to what
2    they communicated to the witness, and then I'll take
3    appropriate action after I've seen what they communicated
4    with the lawyer for the witness.  As of now, the lawyer sent
5    a letter yesterday saying they're no longer going to comply
6    or participate.  And on information and belief, that was
7    after the lawyer had received a communication from the
8    government.
9              THE COURT:  All right.  Anything else?
10             MR. ROLWING:  Nothing from the government,
11   Your Honor.
12             THE COURT:  Then we'll be in recess.  Thank you.
13             Counsel, are you saying that it is off at this
14   time?
15             MR. GERAGOS:  Yes.  At this time it's off,
16   Your Honor.
17             THE COURT:  All right.  If there is any change in
18   that, if you will let the Court know -- apparently you're
19   going to file something -- so I'll know whether to come in.
20   Thank you.
21             MS. GOEMAAT:  Thank you, Your Honor.
22             MR. ROLWING:  Thank you, Your Honor.
23             THE COURT:  Thank you.
24             (Whereupon, the proceeding was concluded.)
25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4           I hereby certify that the foregoing matter is

 5   transcribed from the stenographic notes taken by me and is a

 6   true and accurate transcription of the same.

 7

 8

 9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 8-22-19
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25
```