IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>LEV ASLAN DERMEN,<br>　a/k/a Levon Termendzhyan,<br><br>　　　　　　　　Defendant. | **ORDER DENYING DEFENDANT'S<br>MOTION FOR MISTRIAL**<br><br>Case No. 2:18-cr-00365-JNP-BCW<br><br>District Judge Jill N. Parrish |

While the jury was deliberating, Defendant Lev Dermen (a.k.a. "Levon Termendzhyan") moved for a mistrial, arguing that the emerging Covid-19 ("coronavirus") pandemic would have a prejudicial effect on the jury's ability to continue deliberations. Docket No. 899. Hours later, the jury returned a verdict, finding Defendant guilty on all counts. Later that same day, the Government filed a memorandum opposing Defendant's motion for mistrial, Docket No. 902. Defendant thereafter filed two supplemental memoranda, Docket Nos. 903 and 915, and the Government replied. Docket No. 932. For the reasons articulated below, the court **DENIES** Defendant's motion for mistrial.

## I.　　FINDINGS OF FACT

Shortly before noon on Thursday, March 12, 2020, the jury retired to deliberate in the case of *United States of America v. Lev Aslan Dermen*, Case No. 2:18-cr-00365. At 2:15 p.m., the jury sent a note stating that it would be leaving at 4:00 p.m., would take Friday off and would plan on starting on Monday at 9:00 a.m. Docket No. 930 at 1. The jury deliberated until approximately 3:45 p.m. and then informed the court through another note that "[w]e have found a good stopping point for the weekend. We are ready to leave & return on Monday." Docket No. 930 at 2. On

Sunday, March 15, 2020, at approximately 6:33 p.m., Defendant filed a motion requesting that the court declare a mistrial in light of the continuing spread of the novel coronavirus, which results in a disease known as Covid-19. Docket No. 899. The next morning, March 16, the court ordered the Government to respond to Defendant's motion for mistrial by 5:00 p.m. that same day. Docket No. 900.

Earlier that same morning, the court had requested that counsel convene in the courtroom at 1:00 p.m. to discuss the civil forfeiture phase of the trial that would be necessary if the jury returned a guilty verdict. The court had raised this issue during the jury instruction conference that had taken place on March 10, 2020. Because Defendant's lead counsel, Mr. Mark Geragos, was not present at that conference, his co-counsel, Ms. Linda Moreno, had requested an opportunity to confer with Mr. Geragos regarding the issue during a break. Ms. Moreno later informed the court that Defendant Dermen had elected to proceed with the same jury for the forfeiture trial in the event that he was convicted.[1] Because the court had not addressed the contours or scheduling of the possible civil forfeiture trial with Mr. Geragos present, the court thought it prudent to discuss these issues with counsel before the jury returned a verdict. This would enable the court to inform jurors of their obligation to sit for the forfeiture trial if Defendant was found guilty.

At the scheduling conference, the court inquired of the parties as to their views on the timing of any civil forfeiture trial given the increasing uncertainty surrounding the coronavirus outbreak. Although the Government announced that it was ready to proceed immediately with the forfeiture phase of the trial if the jury returned a guilty verdict, the parties ultimately stipulated that any forfeiture trial should be postponed indefinitely until there was more clarity regarding the

---

[1] Although Rule 33.2(b)(5)(A) of the Federal Rules of Criminal Procedure gives either party the option to exercise this option, the Government deferred to Defendant Dermen.

scope of coronavirus outbreak and any impact it may have on court operations.[2] In the event of a guilty verdict, the parties also agreed that jurors should be informed that they would be recalled to serve in a future forfeiture trial and that they should continue to refrain from viewing any news reports or outside information regarding the case. During the scheduling conference, the court observed that there was no way to predict when the jury would reach a verdict[3] and emphasized that "it may be that we're just talking hypothetically [about a forfeiture trial] because if this jury returns a verdict of not guilty, this is something that would not come to pass."

Minutes after the conclusion of the scheduling conference, at approximately 1:30 p.m., the jury sent a note stating that it had reached a verdict. The jury found Defendant Dermen guilty of all ten counts in the indictment. Following the announcement of the verdict, the Government submitted its memorandum opposing Defendant's motion for a mistrial. Docket No. 902. Defendant replied later that evening. Docket No. 903. Supplemental briefing by both parties followed thereafter.

As the seven-week trial in this case neared its conclusion, the spread of the novel coronavirus was slowly beginning to affect events and institutions across the country. The day after the case was submitted to the jury, Utah officials announced that public schools would be dismissed for a two-week "soft closure" due to coronavirus concerns. *See* Utah K-12 schools dismissed for a two-week 'soft closure' due to coronavirus, https://www.sltrib.com/news/education/2020/03/13/utah-teachers-parents/. But the United States District Court for the District of Utah, which was still operating under Phase I of its Coronavirus Response Plan,

---

[2] The court was amenable to postponing any potential forfeiture trial because such a proceeding is a civil matter in which Defendant Dermen's liberty interests would not be at stake.

[3] The court stated, "I suppose it's also possible that we could get a note from the jury today that says, 'we have a verdict'—who knows—or that may not happen and it may not happen for a week. We just—we have no idea of knowing of course where this jury is in its deliberations."

remained open for regular operations. Exhibit A at 1-2. During Phase I, the court was operating "as usual while collaborating with other federal agencies to minimize exposure to [the] virus in the courthouse." *Id*. at 1. On March 12, 2020, consistent with the Phase I plan, Chief Judge Shelby had implemented mitigation protocols restricting courthouse access to individuals with symptoms of Covid-19 or those at high risk for infection.[4] General Order 20-008 at 1-2. The general order noted that the court would "continue to monitor directives from the World Health Organization, CDC, and local health departments and reevaluate our response to this virus as needed." *Id*. at 2. But no further directive was issued until *after* the jury had returned its verdict in this case. In fact, at the time the jury returned its verdict, the United States District Court for the District of Utah had neither canceled nor continued any hearing based on the coronavirus outbreak.

On the evening of March 16, 2020 at approximately 8:15 p.m., nearly seven hours *after* the jury had returned its verdict in this case, Chief Judge Shelby issued another general order addressing court proceedings and operations during the coronavirus outbreak. General Order 20-009. This order stated that the "courthouse shall remain open for mission-critical functions of the judiciary, but the public and members of the bar are encouraged to come to the courthouse only as necessary for official court-related activities, including . . . in-person criminal hearings. . . ." Order 20-009 at 5. The order specified additional protocols relating to motion deadlines, grand jury proceedings, and hearings. With respect to civil and criminal jury trials, the order stated:

> All civil and criminal jury trials scheduled to begin between today and May 1, 2020 are CONTINUED pending further order of the court. The court may issue further orders concerning future continuances, as necessary and appropriate. **Criminal jury trials already underway are not affected by this Order.** Questions concerning prospective scheduling of trial dates should be directed to the assigned judge.

---

[4]These restrictions applied to persons who had: (1) traveled to countries severely affected by the coronavirus; (2) been asked to self-quarantine by their physician, hospital or healthcare agency; (3) been diagnosed with or had close contact with anyone who had been diagnosed with coronavirus; or (4) experienced signs of a fever, cough, or shortness of breath. General Order 20-008 at 1-2.

*Id*. at 1 (emphasis added).

## I.     RELEVANT LAW

The Supreme Court has observed that courts may declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. 579, 580 (1824). "The decision to declare a mistrial is left to the 'sound discretion' of the judge, but 'the power ought to be used with the greatest caution, under urgent circumstances, and for plain and obvious cases.'" *Renico v. Lett*, 559 U.S. 766, 774 (2010) (quoting *Perez*, 22 U.S. 579 at 580). The Tenth Circuit has explained that while "the Supreme Court has refused to adopt a mechanistic formula for the presence of 'manifest necessity'. . . [the Court] has repeatedly reiterated that trial judges must be accorded broad discretion to declare a mistrial." *Walck v. Edmonson*, 472 F.3d 1227, 1236 (citations omitted).

## II.     DISCUSSION

### A.     Deliberations During the Coronavirus Outbreak

Defendant argues that jurors should not have been allowed to continue deliberating on March 16, 2020 because of concerns relating to the outbreak of the coronavirus. In his initial memorandum, Defendant asserted that jurors would become "scared, irritated, and/or angry" at having to commute to the trial and deliberate while the coronavirus outbreak had not been contained. Docket No. 899 at 6. Defendant further argued "[t]hat anger and fear will translate to an unfair trial for the Defendant." *Id*. at 7. In its reply memorandum filed after the jury had returned its verdict, Defendant argued that "[t]he verdict was clearly not based on any reasoned consideration of the evidence or discussion about the case; rather, it was unfairly influenced by passion or prejudice as a result of panic and fear." Docket No. 903 at 2. In response, the

Government maintains that the court properly adhered to the guidelines contained in the order issued by the Chief Judge of this court, and that there is no evidence to suggest that the coronavirus outbreak had any influence whatsoever on the jury's verdict.

The court finds that Defendant has failed to establish a miscarriage of justice or the existence of a "manifest necessity" for a mistrial. Defendant has offered no evidence that the jury's decision was compromised in any way by the coronavirus outbreak. No member of the jury raised any concerns or made any attempt to communicate with the court or the jury coordinator regarding the coronavirus outbreak. And the two notes that the jury did send both suggest that jurors felt no time pressure to reach a verdict and were making good progress in their deliberations. In the first note sent on Thursday, March 12, 2020, the jury stated that it intended to take Friday off and planned to continue deliberating the following Monday. The second note, sent later that same afternoon, stated, "We have found a good stopping point for the weekend. We are ready to leave and return on Monday." Document No. 930 at 2. By this point, the World Health Organization ("WHO") had already classified the coronavirus spread as a pandemic. *See* WHO Characterizes Covid-19 as a Pandemic, https://www.who.int/emergencies/ diseases/novel-coronavirus-2019/events-as-they-happen. And the Governor of Utah had declared a state of emergency nearly a week earlier. *See* Gov. Herbert Declares State of Emergency in Preparation for Coronavirus Cases in Utah, https://governor. utah.gov/2020/03/06/gov-herbert-declares-state-of-emergency/.[5] Had jurors been frightened or felt the need to hasten their deliberations because of concerns over the coronavirus outbreak, it begs the question as to why they chose to delay their deliberations four days, rather than deliberating late on Thursday or returning on Friday.

---

[5] Although no one in Utah had tested positive for the coronavirus at that time, Utah's Lieutenant Governor Spencer Cox explained that "issuing the order now allows our state and communities to access additional funding and resources that will be instrumental in helping us prepare to slow the spread of coronavirus." *Id.*

Defendant argues that the court's decision to allow the jury to continue deliberations on March 16 was not in accord with social distancing practices recommended by public health officials and physicians. But that is not the standard for declaring a mistrial. The question is not whether the court adhered to best practices recommended by public health officials. Rather the question is whether Defendant received a fair trial. And that question turns on whether the jurors were able to continue deliberating under the circumstances. Defendant suggests that the jurors could not deliberate fairly because of their concerns over risks to their health. But there is absolutely no evidence this was the case. The jury did not raise the issue of the coronavirus in any of their communications to the court,[6] and each juror reported in a timely manner for deliberations on March 16, 2020.

In addition, although the Governor of Utah had declared an emergency in order to obtain the resources that would help prepare the state for the pandemic, Utah was well behind many areas of the country in its progression. The best evidence of this is the fact that Chief Judge Shelby had not yet entered an order curtailing court operations. When the jury returned its verdict, the United States District Court for the District of Utah was still operating as usual and had neither canceled nor continued any hearing based on the coronavirus outbreak. And while the order that Chief Judge Shelby entered *after* the jury had returned its verdict postponed *future* jury trials, it specifically provided that "criminal jury trials already underway are not affected."

---

[6] The Government correctly observes that "this jury repeatedly demonstrated that it knew how to communicate – a juror had previously sent a note, multiple members of the jury . . . communicated to court staff about a number of matters including health concerns, family commitments, and personal knowledge of companies discussed in the courtroom, and the jury routinely told the court throughout the course of the trial when the courtroom technology was malfunctioning." Docket No. 931 at 12-13. Given the jury's lack of hesitation in raising these issues, the court finds it implausible that jurors would not have communicated to the court any concerns they may have had in continuing their deliberations during the coronavirus outbreak.

When the jurors arrived at the courthouse to deliberate on the morning of March 16, there were a total of 28 confirmed cases of Covid-19 in the State of Utah and no deaths. *See* State of Utah Coronavirus Task Force Latest News Webpage, https://coronavirus.utah.gov/latest/. A number of these cases were visitor cases and the resident cases were almost exclusively travel-related. *See* Utah now has 29 cases of coronavirus: 'Take This Seriously," https://www.sltrib.com/news/2020/03/16/utah-now-has-cases/.[7] Many of the cases and the single instance of community spread were in Summit County, home of the Park City ski resort. *See* Ski resorts closing as Summit County sees community spread of coronavirus; state total at 19 cases, https://www.sltrib.com/news/2020/03/14/new-case-summit-county/. But none of the jurors resided in Park City or Summit County and bars and restaurants in Salt Lake City were still open for dine-in service. *See* Utah orders restaurants, bars to close all dining to curb coronavirus, https://www.sltrib.com/news/2020/03/18/utah-orders-restaurants/. Given this backdrop, there is no reason to conclude that jurors were angry, irritated, frightened, or rushed in their deliberations.

Defendant argues that the ultimate confirmation of the "sham" verdict in this case occurred when the jury returned to the courtroom with the verdict and the court inquired as to which juror had been selected as foreperson. Before identifying himself as the foreperson, Juror 11 pointed to the empty chair next to him that previously had been occupied by Juror 10 who had been excused for health reasons. The court disagrees with Defendant's characterization of the incident. The court finds that the incident was an awkward attempt by a layperson to diffuse the natural tension associated with the reading of the verdict. While pointing to the empty chair may have been inappropriate, it was clear to the court that it was done in jest. And there was certainly nothing about the incident or the demeanor of Juror 11 to support Defendant's suggestion that the verdict

---

[7] This figure was updated on the afternoon of March 16 to 29 cases, with no deaths reported.

was a sham, that the jurors were irritated, angry or fearful, or that they were in a rush to leave the courthouse.[8]

Moreover, the jury was aware that alternate jurors were available to step in if a juror became ill or could not continue to deliberate. Before the court excused the jury for deliberations, the court informed Jurors 15 and 16 that they had been designated as alternate jurors, and so would not be deliberating.[9] But the court explained that "deliberations can sometimes take a very long time, and if anyone were to become ill or unable to continue as a juror, then we would need to call you on the phone and have you come in to replace whoever did not sit and at that point, deliberations would have to commence again with one of the two alternates." This explanation was given to Jurors 15 and 16 in the presence of the other members of the jury. Thus, all jurors were aware that alternate jurors were available to be called if one of the deliberating jurors could not continue. If, as Defendant argues, a juror were ill or uneasy deliberating because of health concerns, that juror would almost certainly have informed the court and an alternate juror would have been called.

Finally, even assuming for argument's sake that jurors were motivated to rush their deliberations because of uneasiness over the coronavirus, there is nothing to suggest that rushed deliberations would have been prejudicial to Defendant. Indeed, a more persuasive argument could be made that a jury operating under time pressure would be more likely to return an acquittal,

---

[8] The Tenth Circuit has addressed the issue of comments made by jurors in jest in *United States v. Lawrence*, 405 F.3d 888, 895 (10th Cir. 2005). In *Lawrence*, court personnel overheard a juror state that he or she was going to be the holdout during deliberations. *Id*. Another juror responded, "You are going to look funny with a black eye." *Id*. Upon questioning, the jurors stated that these comments were made in jest. *Id*. at 895-96. The Tenth Circuit affirmed the district court's denial of a motion for a mistrial based on these statements. The Tenth Circuit noted that even if the juror's comments reflected some level of bias, the misconduct had not "prejudiced the defendant to the extent that he has not received a fair trial." *Id*. (citation omitted).

[9] The trial began with four alternate jurors. As discussed below, two were dismissed prior to deliberations due to health reasons. Thus, two alternate jurors remained when the case was submitted to the jury.

rather than a conviction, in light of the court's instructions emphasizing the presumption of innocence and the government's burden to prove the defendant guilty beyond a reasonable doubt.

**B.**     **Health of Jurors 1, 10, and 4**

Defendant argues that concerns regarding Jurors 1 and 10, who were excused from the jury due to illness, and the fact that Juror 4, an elderly gentleman, was staying in a hotel, caused the remaining jurors to fear infection from the coronavirus. Defendant further suggests that Jurors 1 and 10 had symptoms of Covid-19 and may have exposed the remaining jurors. But the facts do not support Defendant's suggestion. None of the remaining jurors reported any symptoms consistent with Covid-19 after Jurors 1 and 10 were excused. And there is absolutely no evidence to suggest that either Juror 1 or 10 was ill with Covid-19 or that other jurors believed the two excused jurors posed any risk to their health. There is similarly a lack of evidence that Juror 4 was concerned about staying in a hotel.

Juror 1 was excused a full two weeks prior to the March 16 deliberations after reporting flu-like symptoms. She had not been with fellow jurors for 18 days[10] by the time they returned to deliberate on the morning of March 16. Juror 10 had called the jury coordinator early in the morning on Monday, March 2, indicating she could not report to duty because of flu-like symptoms. The last day she had been present for jury duty was Thursday, February 27. At that time, there were only 60 confirmed cases of Covid-19 in the entire United States and no confirmed cases in Utah. *See* What Utah health officials want you to know about coronavirus, https://www.sltrib.com/news/2020/02/28/utah-health-officials/. In short, there is absolutely no evidence that Juror 1 had Covid-19 or that other jurors had even considered such a possibility.

---

[10] According to the Centers for Disease Control and Prevention ("CDC"), symptoms of Covid-19 generally appear within 14 days from exposure to the virus. *See* Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

Juror 10 was excused by the jury coordinator on Friday, March 6, after visiting his doctor on the day of the week on which trial was not held. Juror 10 had worn a mask to court beginning Monday, March 2. When the court inquired as to his health, he indicated he felt fine and was merely suffering from a cold. Although his physician later diagnosed him with pneumonia, Juror 10 was not hospitalized, and he made no mention to the jury coordinator of any concern over Covid-19. This is not surprising since the first confirmed Covid-19 case in Utah, which arose in an individual who contracted the virus while on a cruise, was not announced until after Juror 10 had already been excused. See Utah Health Officials Announce First Case of Covid-19, https://health.utah.gov/featured-news/utah-health-officials-announce-first-case-of-Covid-19. Again, there is absolutely no evidence to suggest that Juror 10 had coronavirus or that other jurors had even considered such a possibility.

Defendant also suggests that Juror 4, a retired gentleman, may have been fearful of having to reside in a hotel during the coronavirus outbreak. Again, there is no evidence to support that suggestion. Juror 4 was in frequent communication with the Jury Coordinator regarding the hotel arrangements related to his jury service. But he never raised any concerns regarding the outbreak of coronavirus with the Jury Coordinator. Nor did he raise any concerns with the court regarding his hotel arrangements or the possibility that his continuing service on the jury might expose him to coronavirus. And like the other jurors, Juror 4 timely reported for duty on Monday, March 16, 2020. Based on these facts, the court finds that the prior illnesses of Jurors 1 and 10 were not related to coronavirus and did not cause any concern among the remaining jurors. The court further finds that Juror 4 was not fearful of staying in a hotel or deliberating with his fellow jurors on March 16, 2020. Thus, there is no "manifest necessity" for a mistrial.

### C.     Questioning Jurors about the Impact of Coronavirus

In his most recent memorandum, Defendant argues that "[g]iven the drastic developments that occurred over the weekend regarding COVID-19, at the very least the court should have inquired of the jurors whether and how they were being impacted and if they believed they could continue to deliberate without distraction or fear." Docket No. 915 at 2. Defendant suggests questions the court should have asked jurors, such as:

- Have you or anyone you know been diagnosed with COVID-19, or been in physical contact with someone who has been diagnosed with COVID-19?
- Are you feeling unwell? Do you have any symptoms consistent with viral infection, cough, fly, headache?
- Do any of your family members have any symptoms consistent with a viral infection?
- Was there any discussion about the virus in the jury room last week? What was said?
- How do you feel about the developments over the weekend regarding COVID-19? Are you directly impacted by the school closures, employment restrictions, employment lay-offs, or the like that have resulted from the pandemic?
- Are you concerned with, preoccupied by, or fearful of the COVID-19 pandemic in a way that will cause you to rush through deliberations in Mr. Dermen's case? Do you feel you can fully and fairly review the evidence and deliberate with your fellow jurors for as long as necessary to reach a verdict?
- Given the warnings regarding community spread and social distancing, are you comfortable deliberating in the jury room and interacting with your fellow jurors; and are you comfortable physically handling the same documents and exhibits?

*Id*. at 2-3.

Defendant's argument in this regard is not only unsupported by the law, it is wholly at odds with his prior stance on the issue. At no time before the jury returned with a verdict did Defendant request that jurors be questioned regarding potential concerns about coronavirus. In fact, Defendant's current argument is directly contrary to the position articulated in his initial memorandum in support of his motion for mistrial. In that memorandum, Defendant affirmatively stated that "[a] third individual voir dire of the jurors will not suffice[,]" and that "[a] third inquiry

of these jurors will cause the jurors to turn on this process all together and feel as if they are on the receiving end of an attack by this Court and the parties." Docket No. 899 at 3. Defendant further argued that "any individual inquiry is limited by HIPPA protections as to the status of [jurors'] physical and mental health" and that "an inquiry will not only invade the sacred province of juror deliberations as contemplated by FRE Rule 606[11] but also jeopardize Mr. Dermen's rights to a fair and impartial jury." *Id*. In essence, prior to the return of the verdict, Defendant affirmatively and explicitly urged the court not to question the jurors.[12] It was only after the jury returned with a guilty verdict that Defendant changed course, arguing for the first time that jurors should have been questioned. Having urged the court not to question jurors before the return of the verdict, Defendant cannot now credibly argue that the court erred in failing to do so.

Setting aside the complete reversal in Defendant's position, the Government argues that questioning the jurors regarding their possible concerns about the coronavirus was unwarranted

---

[11] The jury would have understood the extraordinary nature of such an intrusion. After the court had conducted two sessions of individual questioning of the jurors during the trial proceedings, the court had given stipulated interim instructions that explained the reason for the individual questioning. These instructions assured jurors that the court would not inquire into their confidential deliberations:

> I want to thank you again for your patience and understanding throughout this process. I also want to emphasize that last week's inquiry into your impartiality was permitted only because you have not yet begun your deliberations. Once your deliberations begin, it would be impermissible to inquire into those deliberations and they will remain completely confidential. After you return a verdict, there will be no inquiry into any statement made by any one of you during deliberations, no inquiry into the effect of anything on any juror's vote, and no inquiry into any juror's mental processes concerning the verdict. In short, the court will not ask you about any of those things.

> The only thing you could be asked about once you return a verdict is whether you learned of anything extraneous—meaning something you did not see or hear in this courtroom—or whether any other outside influence was brought to bear on you during deliberations. Otherwise, your deliberations are secret and will be kept that way.

Docket No. 897 at 26. Thus, jurors had been put on notice that any inquiry into their deliberative process would only occur under the most unusual of circumstances. Absent a communication from the jurors articulating a concern regarding their ability to deliberate, such an intrusion would not only have been improper, it would have provoked speculation, confusion, or panic that would have needlessly distracted jurors from the task at hand.

[12] Nor did the Defendant request that the jurors be questioned after the verdict was returned. After the verdict was read, the court polled each of the individual jurors as to the verdict, but the Defendant did not ask the court to voir dire the jurors regarding the coronavirus or any impact it may have had on their verdict.

and improper considering the lack of evidence that the coronavirus situation was affecting their deliberations. Controlling law supports the Government's position. The Tenth Circuit has explained that "[a]lthough the ordinary course is to require a hearing or inquiry into nonfrivolous allegations of juror misconduct, such an inquiry is not warranted when only 'thin allegations of jury misconduct are present.'" *United States v. Easter*, 981 F.2d 1549, 1553 (10th Cir. 1992) (citing *United States v. Ramsey*, 726 F.2d 601, 604 (10th Cir. 1984); citing and quoting *United States v. Cattle King Packing Co*., 73 F.2d 232, 243 (10th Cir. 1986), cert. denied, 479 U.S. 985, (1986). And the Defendant's allegations in this case are based on nothing more than rank speculation.

The Government further argues that an inquiry of jurors regarding their views on the coronavirus would have violated Rule 606(b)(1) of the Federal Rules of Evidence, which prohibits testimony from a juror relating to a juror's mental processes. *Id*. at 15. Although Rule 606(b)(2)(B) contemplates exceptions to this prohibition if "outside influence was improperly brought to bear on any juror[,]" Supreme Court precedent directly forecloses this option as it relates to the issues raised by Defendant. In *Tanner v. United States*, the Supreme Court held that questions surrounding a juror's health or mental state did not qualify as an "outside influence." 483 U.S. 107, 122 (1987). It reasoned:

> [P]etitioners argue that substance abuse constitutes an improper "outside influence" about which jurors may testify under Rule 606(b). In our view the language of the Rule cannot easily be stretched to cover this circumstance. **However severe their effect and improper their use, drugs or alcohol voluntarily ingested by a juror seems no more an "outside influence" than a <u>virus</u>, poorly prepared food, or a lack of sleep.**

*Id*. at 122 (emphasis added). The Supreme Court's recognition that circumstances such as a juror's poor health or lack of ability to concentrate do not constitute an "outside influence" barred the court from making inquiry into the effect of coronavirus on juror deliberations.

The court concludes that inquiring into jurors' views regarding the coronavirus outbreak when no concern had been raised by any member of the jury would have constituted an improper intrusion into their deliberations in violation of Rule 606(b)(1) of the Federal Rules of Evidence. Information concerning the outbreak of the coronavirus does not constitute "extraneous prejudicial information" or "an outside influence." Accordingly, any inquiry into the juror's thoughts regarding coronavirus would have been improper.

### D.    Practices of Other Courts

In urging the court to grant a mistrial, Defendant notes that the Byron White United States Courthouse, the seat of the Tenth Circuit Court of Appeals in Denver, Colorado, was closed in response to the coronavirus. *See* Docket No. 903 at 2. While cases decided by the Tenth Circuit constitute binding precedent that this court must follow, operational guidelines for the Tenth Circuit courthouse located in Denver, Colorado[13] do not apply to all courthouses in the six states comprising the Tenth Circuit.[14] Instead, operations of the various district courts are governed by orders issued by the chief judges of those courts. The Government has summarized the general orders relating to the outbreak of the coronavirus issued by each of the district courts in the Tenth

---

[13] The court notes that as of March 16, 2020, the state of Colorado had reported 160 cases of Coronavirus, approximately six times the 29 cases reported in the state of Utah at that time. *See* Colorado governor closes bars, restaurants, theaters and gyms in fight against coronavirus, https://www.denverpost.com/2020/03/16/coronavirus-colorado-bars-restaurants-dmv-closed/; Utah now has 29 cases of coronavirus: 'Take This Seriously," https://www.sltrib.com/news/2020/03/16/utah-now-has-cases/.

[14] The Byron White Courthouse Restrictions, which Defendant cites, provides that "Effective Friday, March 13, 2020 and until further notice, anyone, (e.g., members of the public, employees, service providers) who meets any of the following criteria shall be denied entrance to the *Byron White United States Courthouse*. . . ." *See*, March 13, 2020 Courthouse Access Restrictions, https://www.ca10.uscourts.gov/sites/default/files/clerk/Sign%2BInfoSheetForEntrancesUpdated03.16.2020.pdf (emphasis added). These restrictions are like those contained in General Order 20-008 issued by Judge Shelby on March 12, 2020. And the March 16 General Order of Chief Circuit Judge Timothy Tymkovich, which was not issued *after* the jury had returned its verdict in this case, is limited by its terms to the courthouse in Denver Colorado. It states: "Due to the Coronavirus/COVID-19 pandemic, *the Byron White United States Courthouse ("Courthouse")* is closed to the public effective March 17, 2020." *See* General Order 95-1, https://www.ca10.uscourts.gov/sites/default/files/clerk/RestrictionsOnPublicAccess_March162020%20%28002%29.pdf (emphasis added).

Circuit. *See* Docket No. 932 at 7. As of the time the jury returned its verdict in this case, none of these orders provided for the suspension of on-going criminal jury trials or the closure of courthouses.

Notably, the order governing the operational activities for the United States District Court for the District of Utah did not suspend criminal jury trials. The Defense cites General Order 20-009 in support of its argument regarding the severity of the coronavirus pandemic. But this order was not published until nearly seven hours *after* the jury had reached a verdict in this case. More importantly, General Order 20-009 explicitly states that "[c]riminal jury trials already underway are not affected by this Order." *Id*. at 1.

Defendant has also cited to other courts that have declared mistrials in the wake of the coronavirus outbreak. Although this precedent is not binding, the court has reviewed the cases cited by Defendant to assess their persuasive value. But none of them present a situation analogous to the one that confronted this Utah court on March 16, 2020. Two of the cases cited by Defendant were interrupted during jury selection, and likely would have continued for weeks. *See* Triple murder trial delayed, civil case a mistrial due to coronavirus threat, https://www.theday.com/article/20200312/NWS04/200319786; Fresno judge declares mistrial in double homicide case, amid coronavirus concerns, https://www-1.fresnobee.com/news/local/article241305911.html#. Another case cited by Defendant involved a trial in which the attorneys had just made their opening statements on March 12, 2020, which was expected to last six weeks. *See* Belstadt attorneys: Virus too disruptive for trial to proceed, https://www.niagara-gazette.com/news/local_news/belstadt-attorneys-virus-too-disruptive-for-trial-to-proceed/image_90b90dd9-1ccc-501a-a940-3ac8f34b8c9a.html.

Defendant also cites to general administrative orders issued by other courts. But Defendant does not explain why these orders from distant courts should carry more weight than Judge Shelby's order that was tailored to the facts and circumstances present in this jurisdiction at the operative time. In fact, neither of these orders supports Defendant's argument. One of these general orders provides that criminal jury trials "scheduled between March 11th through March 30th are still expected to appear in court on the day of trial unless the court has entered an agreed order signed by everyone changing that date. . ." *See* Jury trials suspended in Whatcom County courts due to coronavirus outbreak, https://www.bellinghamherald.com/news/local/article241113626.html.[15] And the second general order makes no reference to its effect on ongoing criminal trials. *See* Trucilla suspends this week's trial term due to COVID-19 prevention, https://www.yourerie.com/news/local-news/trucilla-suspends-this-weeks-trial-term-due-to-Covid-19-prevention/.

Other materials cited by Defendant are similarly unhelpful. For example, Defendant cites to an article that reports a mistrial[16] declared in a civil patent case that was in its third day of what was expected to be a two-and-a-half-week trial. *See* Coronavirus Forces Mistrial In Finjan Patent Case, https://www.law360.com/articles/1253867/coronavirus-forces-mistrial-in-finjan-patent-case. He also cites a case from Australia where the judge excused the empaneled jury and proceeded with a bench trial. *See* Coronavirus leads to judge-only manslaughter trial in Brisbane, https://www.brisbanetimes.com.au/national/queensland/coronavirus-leads-to-judge-only-manslaughter-trial-in-brisbane-20200316-p54ami.html. But the court fails to see how either of these cases are relevant to this case.

---

[15] The Government notes that this order was entered in the state of Washington, one of the first states to report cases of the coronavirus. Docket No. 932 at 3.

[16] Notably, both parties in this case agreed to the mistrial.

None of the cases cited by Defendant involved circumstances comparable to those present here. None took place in the state of Utah at the relevant time, and none involved a seven-week criminal jury trial that had already been submitted to the jury. And many of the cases cited by Defendant present idiosyncratic circumstances distinct from those presented here.[17] For these reasons, the court finds they have little or no persuasive value.

###     E.    The Swift Verdict

The Defense has repeatedly suggested that the absence of questions from the jury and the relatively swift verdict in this case are indicative of prejudice towards Defendant Dermen. But these suggestions are without factual or legal basis. There is no obligation for jurors to send notes or ask questions. Indeed, the absence of questions could be explained by the clarity of the jury instructions or the weight of the evidence. Similarly, there is no requirement that jurors deliberate for a minimum length of time. And here, the jury deliberated for over eight hours. They began deliberations on Thursday, sent a note indicating they had "found a good stopping point for the weekend," and returned the following Monday. They then deliberated for another four and a half hours and returned their verdict just after lunch. Nothing about this scenario suggests that jurors were angry, panicked or in a rush to leave the deliberation room.[18] There are many possibilities as to why the jury voted to convict after eight hours of deliberation. Based on their note, they had

---

[17] For example, one case cited by Defendant involved a defense attorney who was 70 years old and suffered from a permanent lung condition that made him particularly vulnerable to the most severe effects of coronavirus. This trial was taking place in northern California, which had been particularly affected by the coronavirus. *See* Fresno judge declares mistrial in double homicide case, amid coronavirus concerns, https://www-1.fresnobee.com/news/local/article241305911.html#.

[18] This jury had routinely been at the courthouse from approximately 9:00 a.m. to 5:00 p.m. for the duration of this two-month trial. All 12 members of the jury had been together in the jury room for the past seven weeks. Assuming arguendo that jurors were concerned regarding potential exposure to the coronavirus, there would have been little or no benefit in terminating the deliberations just after lunch-- several hours before their usual stopping time since spending just a few more hours with fellow jurors who had spent the last seven weeks together would have been unlikely to increase their risk of exposure. In short, the timing of the verdict (shortly after lunch) is inconsistent with Defendant's assertion that jurors felt rushed or failed to base their verdict on the evidence.

reached a "good stopping point" before adjourning for the weekend. Perhaps they had reached a tentative decision the prior Thursday and wanted to reflect on the evidence over the weekend before finalizing their verdict. Perhaps jurors were persuaded by the documentary evidence presented in this case. Perhaps they found the testimony of the Government's witnesses' convincing. Perhaps, as the Government argues, they were convinced by certain pieces of evidence that were entirely unrebutted by Defendant. Perhaps they were persuaded by a combination of these things. But there is no evidence to suggest that the jury's verdict was based on anything other than the evidence presented at trial. The court has observed these jurors and their demeanor over the course of a seven-week trial and finds absolutely no evidence to suggest that they were scared, irritated, and/or angry as a result of the coronavirus. The court similarly finds no basis to conclude that the jury verdict was rushed, that the jury failed to conscientiously fulfill their duties as jurors, that Defendant was denied his right to be tried before a fair and impartial jury, or that the jury's verdict constituted a miscarriage of justice.

Moreover, it would be improper for this court to question the integrity of the jurors or second-guess their verdict absent evidence that their verdict was compromised. The Tenth Circuit has noted that jurors are presumed to follow their oath and the instructions given to them by the court. *See Stouffer v. Duckworth*, 825 F.3d 1167, 1180 (10th Cir. 2016) ("Surmise and suspicion may not be used to assail the integrity of a jury; it is presumed that jurors will be true to their oath and will conscientiously observe the instructions and admonitions of the court."); *Banks v. Workman*, 692 F.3d 1133, 1150 (10th Cir. 2012) ("The law presumes juries follow instruction."). The court has no reason to doubt this jury's integrity. In fact, the court finds that the jury's conduct was beyond reproach during this two-month trial. Jurors were unfailingly punctual for trial

proceedings and never voiced any anger or frustration with delays attendant to trial work.[19] Jurors were uniformly alert; many took copious notes during the proceedings. Jurors also patiently endured two voir dire sessions to investigate reports of potential juror misconduct, both which were later found to be innocuous misunderstandings.[20] In sum, the jury's conduct during the course of this trial does not indicate that any of the jurors failed to honor their oath to fairly decide this case based solely on the evidence presented.

### F. Timing of Verdict

Defendant finally asserts that the verdict in this case was "rigged" because it was returned shortly after the court met with counsel to discuss the scheduling of a potential civil forfeiture trial in the event the jury returned a verdict of guilty. Docket No. 903 at 2. But Defendant offers no explanation or evidence to substantiate this claim beyond the mere coincidence that the verdict was returned shortly after the conclusion of the scheduling conference. As the court noted during that conference, it had no idea whether the jury would reach a verdict in the next day or the next week. But the court thought it prudent to address the logistical issues surrounding a potential forfeiture trial with Defendant Dermen's lead counsel and the Government so that it would be prepared to convey the schedule to the members of the jury in the event a guilty verdict was returned. And that is exactly what happened. Because the court had convened the scheduling conference, it was able to inform the jurors that they would be retained to serve in a civil forfeiture trial that would take place sometime in the future. The purpose of the March 16, 2020 hearing was

---

[19] The court praised the jury's commitment to their civic obligations after the verdict had been announced and before they were excused.

[20] These circumstances are discussed at length in the court's supplemental order regarding Defendant's previous motion for mistrial. *See* Docket No. 939.

not to presuppose Defendant's guilt—it was simply to determine whether all parties were in agreement as to the timing of the civil forfeiture trial in the event a guilty verdict was returned.

### III.    ORDER

For the foregoing reasons, the court **DENIES** Defendant's motion for a mistrial.

Entered this 6th day of April, 2020.

BY THE COURT

_Jill N. Parrish_
Jill N. Parrish
United States District Court Judge