```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  DISTRICT OF UTAH, CENTRAL DIVISION

 3

 4

 5   UNITED STATES OF AMERICA,     )

 6             Plaintiff,          )

 7      vs.                        )   Case No. 2:18-CR-365-JNP

 8   LEV ASLAN DERMEN,             )

 9   a/k/a Levon Termendzhyan,     )

10             Defendant.          )

11   _____)

12

13              BEFORE THE HONORABLE JILL N. PARRISH

14        ------------------------------------

15                    January 30, 2020

16                      Jury Trial

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP     801-364-5440

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101
```

```
1                    A P P E A R A N C E S

2

3
     For Plaintiff:              Leslie A. Goemaat
4                                John E. Sullivan
                                 Arthur J. Ewenczyk
5                                US DEPARTMENT OF JUSTICE
                                 TAX DIVISION
6                                601 D St. NW
                                 Washington, DC  20004
7
                                 Richard M. Rolwing
8                                US ATTORNEY'S OFFICE
                                 TAX DIVISION
9                                303 Marconi Blvd. #200
                                 Columbus, Ohio 43215
10

11   For Defendant:             Mark J. Geragos
                                 Setara Qassim
12                               Linda Moreno
                                 Arthur Karagezian
13                               GERAGOS & GERAGOS APC
                                 644 S. Figueroa Street
14                               Los Angeles, CA  90017

15                               Jon D. Williams
                                 JON D WILLIAMS PC
16                               9 Exchange Place, #600
                                 Salt Lake City, Utah  84111
17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2    Witness                Examination By              PAGE

3    Evelyn Katirina Pattison

4                    Ms. Goemaat   (Direct)              95

5                    Mr. Geragos   (Cross)              138

6                    Ms. Goemaat   (Redirect)           176

7                    Mr. Geragos   (Recross)            177

8                    Ms. Goemaat   (Further Redirect)   178

9                    Mr. Geragos   (Further Recross)    179

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    SALT LAKE CITY, UTAH; THURSDAY, JANUARY 30, 2020; 8:30 A.M.
 2                              PROCEEDINGS
 3              THE COURT:  Welcome back, members of the jury.  I
 4    believe that we are ready to proceed with the opening
 5    statements at this point, so I am going to turn the time
 6    over to Ms. Leslie Goemaat on behalf of the prosecution.
 7              MS. GOEMAAT:  Thank you, Your Honor.
 8              Good morning, everybody.  Can everybody hear me?
 9              THE COURT:  We should also, I guess, make sure
10    that everyone can see and that their screens are working.
11    We tried to plug the one in last night.  It's still not
12    working.  And we have another one not working.
13              We tried to fix that one last night after you left
14    but -- is it working now?  Okay, we have all the screens
15    working.  All right, then.
16              You may proceed.
17              MS. GOEMAAT:  Good morning.  It seems like
18    everybody can hear me.  We've got microphones.  Ms. Walker
19    will be sure to let me know if they're not working, and give
20    a shout-out if you can't hear.
21              Before we given, I want to introduce myself one
22    more time.  My name is Leslie Goemaat.  I'm a prosecutor
23    with the Department of Justice in Washington, D.C., here
24    with my colleague from the Department of Justice, and we are
25    prosecuting this case on behalf of the United States and the
```

1    U.S. Attorney for the District of Utah.  I want to thank you

2    for your time, and now I want to tell you what this trial is

3    going to be about.

4              Let's take one minute and start at the end of the

5    story.  You will hear at this trial that on February 12,

6    2016, this defendant, Lev Aslan Dermen, also known as Levon

7    Termendzhyan, met with Jacob Kingston in Las Vegas, where he

8    ordered Jacob Kingston to strip down to his underwear to

9    prove that he wasn't wearing a wire.  This is a photo of

10   Jacob Kingston on the right, the defendant, Levon

11   Termendzhyan, on the left.  These are earlier times, and

12   you'll see behind them two cars that you will learn at trial

13   they gave to each other.  I'm going to tell you a little bit

14   more about these cars later.

15             Now two days prior to this meeting in Las Vegas,

16   you will learn that special agents from the IRS and the EPA,

17   and other agencies, had executed search warrants on Jacob

18   Kingston's home, on his company, Washakie Renewable Energy,

19   a biodiesel company, with offices in Salt Lake City, and on

20   his off-site backup server.  The search warrants were

21   executed as part of an investigation into fraudulent claims

22   for more than a billion dollars in biodiesel tax credits

23   from the United States Treasury.

24             After the raids, Jacob Kingston flew straight to

25   see this defendant, and at trial you will hear why.  He will

1   tell you that he flew straight to see this defendant because

2   for the past four years and a little bit of change, he had

3   been scheming with this defendant to try to steal this

4   billion dollars in biodiesel tax credits, and that they had

5   successfully stolen $470 million from the United States

6   Treasury.  That is why he flew to see Levon Termendzhyan two

7   days after the search warrants.  Now after he stripped down

8   and he proved that he wasn't wearing a wire, the defendant

9   told him stay strong, my people will take care of

10  everything.

11          So here in a nutshell is what this case is about.

12  This trial that you will see is about Levon Termendzhyan

13  partnering up with Jacob Kingston and other people to use

14  Jacob Kingston and his company, Washakie Renewable Energy,

15  to try to steal a billion dollars.  It's about how they

16  successfully stole $470 million.  It's about the ways that

17  this defendant had Jacob Kingston send him his share of this

18  money in all manner of ever increasingly complicated ways to

19  his companies, then overseas to Turkey and Luxembourg, then

20  millions of dollars to his friend, and the purchase of

21  millions of dollars of very lavish gifts.

22          You know, the Judge has told you that this is

23  likely to be a somewhat lengthy trial, and that's because

24  this was a long conspiracy.  It was a billion dollar

25  conspiracy over more than four years, and at trial we have

1   to present it to you one witness and one exhibit at a time,

2   and that's what we are going to do.

3          Right now, during opening statement, what I'm

4   going to do is I'm going to do my best to give you an

5   overview, or what we sometimes call a road map of what

6   you're going to hear the government's evidence in the weeks

7   ahead.  I can't tell you everything you are going to hear,

8   but I'm going to give an overview.

9          You're going to hear two kinds of evidence, as the

10  judge told you, testimony of witnesses and exhibits.  You

11  will hear the testimony of the people who committed this

12  fraud with the defendant.  You will hear testimony of people

13  who committed this fraud at the direction of the defendant.

14  And you're going to see different kinds of exhibits.  Let me

15  tell you about a few.

16         You will learn that through the course of this

17  conspiracy, Jacob Kingston and Levon Termendzhyan were very

18  careful to use burner phones.  If you're not familiar with

19  that phrase, a burner phone, you will learn at trial, is

20  basically a cheap, prepaid, maybe a flip phone.  It's not

21  registered in anyone's name.  You can just throw it away.

22  You can burn it.  So they were careful most of the time to

23  use burner phones, but not always.  And while you will see

24  the United States did not seize the burner phones, the

25  United States did seize two of Jacob Kingston's phones, and

1    you will see some of the text messages between Jacob

2    Kingston and Levon Termendzhyan when they weren't careful

3    enough to use burner phones.

4            You will see photos seized from Jacob Kingston.

5    You will see e-mails seized from that offsite backup server

6    that I told you was raided on February 10th, 2016.  You will

7    see invoices and paperwork from Washakie Renewable Energy,

8    you will see physical documents that were seized during the

9    search warrant, and you will see bank records because, as

10   the Judge told you, Counts 2 through 10 charge money

11   laundering.  So you are going to see bank records in this

12   case.  You will hear the testimony of an IRS special agent

13   who will show you these bank records, and the summaries of

14   these bank records that have been made so you can see where

15   some of this money went.

16           All right.  Let's get started.  The evidence at

17   trial will show that the defendant controlled many

18   companies, including Noil Energy Group, Viscon

19   International, GT Energy, SBK Holdings USA, Lion Tank

20   Lines -- that's a trucking company.  We're going to talk

21   about that -- Speedy Lion Renewable Fuel Investments.  A

22   little asterisk on SBK Holdings USA because you'll learn

23   that for roughly eight months Jacob Kingston was a partner

24   in this company before he was kicked out.

25           You are going to learn about Jacob Kingston and

1    Isaiah Kingston.  You will learn that they were brothers.

2    You will learn that they are members of a polygamist group,

3    sometimes called the Davis County Cooperative Society,

4    sometimes called The Order, sometimes just called the

5    Kingstons.  You will learn that Jacob and Isaiah co-owned

6    Washakie Renewable Energy, the biodiesel company, and its

7    sister company United Fuel Supply.

8         The evidence will also show that starting in 2010,

9    Jacob and Isaiah Kingston were engaged in a scheme to steal

10   these biodiesel tax credits that I'm going to tell you about

11   shortly.  Before they even met the defendant, you will learn

12   they already claimed almost $42 million fraudulently in

13   these credits.

14        In December of 2011, Jacob Kingston meets Levon

15   Termendzhyan, and the evidence will show that Levon

16   Termendzhyan joins the conspiracy.  And once Levon

17   Termendzhyan joins this conspiracy, it goes from a

18   $42 million fraud to over $1.1 billion.

19        Now I've put on your screens a graphical

20   representation of the claims that you will see.  On the left

21   is the fraud committed by Jacob Kingston before he met Levon

22   Termendzhyan and Levon Termendzhyan joined his fraud.  You

23   will see that after Levon Termendzhyan joins this

24   conspiracy, the total claims get to over one billion

25   dollars.  And why after Levon Termendzhyan joined, did this

1   fraud grow like this?

2          You will learn at this trial that when Levon

3   Termendzhyan joined this conspiracy, he promised Jacob

4   Kingston something that no other co-conspirator from his

5   past could give him.  Levon Termendzhyan promised him the

6   protection of his umbrella of law enforcement, who Levon

7   Termendzhyan said had been protecting him from prosecution

8   for his whole life.  And Levon Termendzhyan said that this

9   umbrella would protect Jacob Kingston and his family not

10  just for the fraud that they were about to commit together,

11  as I've shown on your screen, but for the fraud that Jacob

12  had already committed before he even met Levon Termendzhyan.

13         Now you will hear and you will see, when you see

14  the claims, Levon Termendzhyan did not put his name or his

15  company on any of these claims that add up to a billion

16  dollars.  He didn't.  But you will see the evidence, you

17  will hear the testimony of the co-conspirators that Levon

18  Termendzhyan recruited into this scheme.  You will hear

19  testimony of how he organized this scheme.  You will hear

20  how he kept the co-conspirators in line.  And there is one

21  place that you will see his name and his companies, and

22  that's on the money, because you will see that the IRS has

23  traced $72 million for the benefit of Levon Termendzhyan in

24  this country.

25         You will see how Levon Termendzhyan and Jacob

1    Kingston agreed to send $134 million to Turkey and

2    Luxembourg, and you will watch this money carefully because

3    you will also see that money does come back from Turkey and

4    Luxembourg, but it doesn't go to Jacob Kingston.  It goes to

5    Levon Termendzhyan's companies, $33 million, from Turkey and

6    Luxembourg to Levon Termendzhyan's companies.

7             Now you may wonder why Turkey.  Here we are in

8    Utah.  Why Turkey?  Well, you will learn that Levon

9    Termendzhyan has a number of contacts in Turkey.  He likes

10   Turkey.  He spends a lot of time in Turkey.  He speaks

11   Turkish.  In fact, when he changed his him in late 2017 from

12   Levon Termendzhyan to Lev Aslan Dermen, he shows, in part, a

13   Turkish name.  Aslan, which is what he goes by in Turkey, in

14   Turkish means lion.  You're actually going to hear a lot

15   about lions, because if you think back to these companies

16   that the defendant controls, his big company Noil Energy

17   Group, that's lion spelled backwards.  He has Lion Tank

18   Lines, Speedy Lion Renewable Energy Investments.  And you

19   will hear most of the witnesses call him Levon Termendzhyan

20   because that is what they knew him as prior to his change of

21   name.

22             Now you're also going to see evidence of how Levon

23   Termendzhyan and Jacob Kingston spent this money.  You will

24   see that they bought a $1.8 million car for the defendant.

25   That's this car here.  You will see that they bought a

1   $3.5 million mansion in Huntington Beach for Levon

2   Termendzhyan.  You will see the purchase of a $3.1 million,

3   15,000-square-foot mansion in Sandy, Utah for Jacob

4   Kingston, and more.

5           Okay.  Now I'm going to tell you what the

6   defendant has been charged with.  I'm going to turn this

7   chart around.  This chart is meant to be a handy reference.

8   If it's not a handy reference, don't look at it.

9           So number one, Levon Termendzhyan is charged with

10  conspiring with Jacob Kingston and others to commit mail

11  fraud.  This is the mail fraud conspiracy and this is the

12  scheme to steal a billion dollars from the government, the

13  scheme that resulted in $470 million.  That's Count 1.

14          In Count 2, he's charged with conspiracy to commit

15  money laundering.  This is the agreement with Jacob Kingston

16  and his brother, Isaiah Kingston, to commit international

17  money laundering, which I'll tell you about, concealment

18  money laundering, which I'll tell you about, and expenditure

19  money laundering, which we're also going to talk about.  So

20  the first one is the agreement to steal the money and the

21  second one is the agreement to do a lot of illegal stuff

22  with the money.

23          Counts 3 through 8 charge concealment money

24  laundering for specific financial transactions designed to

25  conceal and disguise the source, ownership, control of the

1    money.

2            Counts 9 and 10 charge expenditure money

3    laundering, for causing financial transactions with this

4    stolen money in Count 1 in excess of $10,000.

5            I'm going to walk you through each of these

6    counts.  These are the counts that you're going to be asked

7    to decide when you deliberate, and I'm going to give you an

8    overview of how we expect to prove each of these counts.

9    We're going to start with Count 1.

10           Count 1 charges this conspiracy to devise a scheme

11   to defraud the United States, Levon Termendzhyan conspiring

12   with Jacob Kingston, Isaiah Kingston, their mother Rachel

13   Kingston, Jacob Kingston's wife Sally Kingston, and others.

14   Jacob and Isaiah Kingston have pleaded guilty to this

15   conspiracy and they are going to testify.

16           You will hear from them that they are testifying

17   pursuant to what is sometimes called a cooperation

18   agreement.  And what that means, what they will tell you is

19   that in return for truthful information given to the

20   government in return for meeting with the government as many

21   times as the government might want to and for their truthful

22   testimony at trial, they are hoping for a sentence

23   reduction.  And the Court will tell you you should take that

24   into account when you consider their testimony, and you

25   should look for corroborating text messages, travel, e-mail,

1    photos, the kinds of things that you can look at to help

2    judge the credibility of these witnesses.  When they

3    testify, they will tell you that yes, they agreed with this

4    defendant to try to steal a billion dollars, and yes, they

5    succeeded in stealing $470 million.

6          Before I tell you more about how this fairly long

7    scheme unfolded, I need to give you some background.  So

8    right now, we are going to talk about biodiesel tax credits,

9    because you need to know.

10         So, first of all, biodiesel is a type of renewable

11   fuel which basically means that it's made from renewable

12   sources.  It could be a lot of different things.  The

13   general word for the raw material used to make biodiesel is

14   feedstock.  You can see on the far left of your screen.  But

15   feedstock can be soybean oil, canola oil, animal fat, used

16   cooking oil.  It can be a variety of things.

17         To make biodiesel, the feedstock goes through a

18   complex chemical reaction, including the chemical methanol,

19   resulting in a by-product of glycerin, and if all goes

20   well -- which you'll hear it usually doesn't go well -- but

21   if all goes well, you will get biodiesel.  Biodiesel in the

22   industry is known as B, for biodiesel, 100, because it's

23   100 percent biodiesel.

24         All right.  So once there's B100, you will learn

25   that Congress passed laws to encourage the production of

1    renewable fuel, and they did this in two main ways, and both

2    matter for this trial.  They did it with a tax credit and

3    they did it with a subsidy called RINs.  I'm going to tell

4    you about both.

5            If you take this B100 and you blend it with at

6    least point one percent diesel, you will get what is known

7    as B99.9, because it's 99.9 percent biodiesel.  You'll also

8    hear it called just B99 for short.  And if you do that, you

9    can apply, using a form, to the IRS, a form you do sign

10   under penalty of perjury, and you can ask for $1 per gallon

11   and they will send you a check.

12           So this credit is not the kind of credit you might

13   be familiar with.  It doesn't come off of your taxes.  So

14   this is just a check.  It's basically cash.  So let's say,

15   for example, you tell the IRS that you have blended

16   38,000,000 gallons of B100 into B99, they will send you a

17   $38 million check, and that is the tax credit.

18           Now you'll learn that B99 has use.  It can be

19   blended in small amounts into gas stations.  In fact, you

20   will learn that early on in this scheme, one of the ways in

21   which the defendant financially benefited was that he got

22   some cheap B99, because he also has gas stations in southern

23   California.  So that was a financial benefit that you will

24   see Levon Termendzhyan got at the beginning of the scheme.

25           So there's a couple weird quirks here.  As you can

1    tell, the tax credit comes at the blending stage, so you

2    don't have to make the B100 to get the tax credit.  You

3    merely have to have B100.  You can make it.  You can buy it

4    from someone else.

5            Now there's RINs.  RINs are issued by the EPA.

6    They're a little more complicated.  But basically, if you

7    make B100, you can apply to the EPA for a renewable

8    identification number.  It's like a serial number for a

9    gallon of fuel.  And it has a value on the open market

10   because large oil producers are required under these laws

11   that Congress passed to either make renewable fuel or buy

12   these RINs from other companies who have.  So they're kind

13   of like energy credits that get traded, and they have a

14   value on the open market that really fluctuates.  But at

15   some point during this scheme, you could get as much as

16   $2.25 per gallon of B100 that you make.

17           And to add to it, you get them at different

18   stages.  So as you can see in front of you, you get the RIN

19   when you turn feedstock into B100.  You get the tax credit

20   when you take B100 and you blend it to B99.  But here's the

21   important point.  There is no government money in B99,

22   because the RIN was already claimed at production and the

23   tax credit was already claimed at blending.  So once you get

24   to B99, there's no more government money.  You can't un-ring

25   the bell and go backwards.  You can't turn the B99 into

1    B100.  It's over.

2           So this is how the fraud -- the billion dollar

3    fraud was committed.  The billion dollar fraud was

4    committed, in a nutshell, by pretending that B99 that other

5    companies had produced, so no longer eligible for the

6    credits, pretending with fake paperwork that it was

7    feedstock, and pretending to produce the B100 and then blend

8    it to B99 with fake paperwork.  That is one of the ways this

9    fraud was committed.  Later, the fraud was committed by

10   pretending that this B99 was B100, and blending it.  And

11   then later it was committed by just basically making fake

12   paperwork saying that there was B100 that had been turned

13   into B99.  But in all cases, you have to keep your eye out

14   for the description of this product changing, for the fake

15   paperwork saying this product is one thing when it is not,

16   saying that it qualifies for a credit when it does not.

17   That is the basic way that you will see, over the course of

18   many years and many different schemes, that these credits

19   and RINs were fraudulently claimed.

20           Now as I've told you, before meeting Levon

21   Termendzhyan, Jacob and Isaiah Kingston had already filed

22   fraudulent claims.  What I have in front of you is

23   Government's Exhibit 1-1.  You are going to see this at

24   trial and you're going to have it when you deliberate.  It's

25   page one.  These are the claims that were filed in the name

1    of Washakie Renewable Energy, Jacob and Isaiah Kingston's

2    company, before they met the defendant, and you can see the

3    numbers.  It gets as high as 5.5 million, and that's the

4    largest one you will see.

5              They meet the defendant.  This is page two of that

6    exhibit, and you will see the claims that were filed after

7    the defendant joined the conspiracy and took this scheme to

8    a billion dollars.  These are the claims in green that were

9    filed for 2012.  Right here is the claim period.  These are

10   the returns in the name of Washakie Renewable Energy for

11   2013.  I'll tell you that these total $286 million.  You

12   will see one claim for 2014 in the amount of $170 million.

13   And then for tax year '15, you will see two claims, and for

14   the first time we've got a claim in the name of United Fuel

15   Supply, and you will see that these two claims total more

16   than 644 million gallons.

17             Now these claims were not paid out by the IRS, the

18   644 million, and that is what accounts for the difference

19   between the attempted fraud of a billion dollars and the

20   successful fraud of $470 million.  It's these last two

21   claims.

22             Now you will hear evidence at trial that the

23   reason the numbers went from one million, two million, five

24   million to what you see on your screen here, 11 million,

25   25 million, 35 million, 38 million, 170 million,

1    $322 million is because of the umbrella, because Levon

2    Termendzhyan promised Jacob Kingston that this umbrella

3    would protect him, that this umbrella had authorized these

4    filings.  And having obtained the protection of the

5    umbrella, you will see that Levon Termendzhyan pushed Jacob

6    Kingston to file more, which he did.  And Jacob Kingston and

7    Isaiah Kingston, seeing these huge claims paid out, they'd

8    come to believe more in this umbrella.  And you will hear

9    the other reasons that Jacob Kingston came to believe in

10   this umbrella.  Because you will learn at trial that Levon

11   Termendzhyan travels with bodyguards, that he has an armored

12   car with bulletproof glass windows, that he flies by private

13   plane, that he appears to have close contacts with

14   government officials and law enforcement who appear to be

15   doing his bidding.  And as Jacob Kingston came to believe in

16   this umbrella, these claims got bigger and bigger and bigger

17   until by the end they claimed $1,125,000,000.

18           Now you will learn that through the course of this

19   fraud, the defendant and Jacob Kingston employed a number of

20   different schemes to make it look like their fuel was being

21   produced and blended, to make it look legitimate, to make it

22   look good, and I'm going to tell you about some of these

23   schemes.

24           The story of Levon Termendzhyan and Jacob Kingston

25   starts with containers of biodiesel in India.  You're going

1    to learn at trial that just before meeting Levon

2    Termendzhyan, Jacob Kingston had bought B99, he had

3    relabeled it as used cooking oil, and he exported it all the

4    way to India.  So he'd already committed fraud with these

5    containers.  And for a variety of reasons that you're going

6    to hear about at trial, these containers were coming back,

7    which was not part of the plan.

8         So Jacob Kingston has a headache because now these

9    containers of biodiesel have been sitting on these hot ships

10   and it's degraded.  It's not really good fuel anymore.  And

11   Levon Termendzhyan, you'll hear, tells him I can help you

12   with this.  I will buy this biodiesel.  And then they hatch

13   a plan to fraudulently claim credits on this biodiesel,

14   which is and always was B99.

15        So here's the plan that they hatch that you will

16   see at trial.  The vegetable oil, the B99 fraudulently

17   labeled as vegetable oil, is going to come into LA to a

18   place called Titan Terminal into tank six.  It's going to be

19   imported.  It's going to be called vegetable oil.  So this

20   is what the paperwork is going to look like.  It's going to

21   look like used vegetable oil coming in, and then Levon

22   Termendzhyan and Jacob Kingston agree that they will have

23   fake paperwork claiming that this used vegetable oil was

24   trucked all the way to Washakie in Utah using, in part,

25   Levon Termendzhyan's drivers and Lion Tank Lines.

1          Once this used cooking oil, which has always been

2     B99, gets there, Washakie will pretend to turn it into B100.

3     They will pretend to blend it to B99, and they will truck

4     the B99 back to the defendant's company, Noil Energy.  That

5     is the paperwork that they plan to make to make it look like

6     Washakie produced this fuel so that Washakie can claim the

7     credit.

8          Now this is what really happened with this fuel.

9     What really happened is B99 came in from India, it went into

10    tank six, and it went all of roughly three and a half miles

11    to the defendant's company Noil.  That's what really

12    happened.  But at the end of this scheme, they had enough

13    paperwork to fraudulently claim these government subsidies

14    on this fuel that was always B99 to begin with.

15         So once they hatch this plan with India

16    containers, you'll learn Levon Termendzhyan says this is

17    great.  Can we do it again?  And Jacob explains to him India

18    is very far away.  It was very expensive to ship these

19    containers here, had no intention of bringing them back, but

20    let me get with my logistics guy, Deryl Leon, who you will

21    learn is also part of this fraud and always willing to make

22    fake paperwork, let me get with Deryl Leon and see what we

23    can do.  So he does that.

24         And then they come up with another plan.  The next

25    plan is that they are going to ship it through Panama.  This

1   is going to be a shorter route than to India and back, and

2   here's what you will see at trial.  You will see at trial

3   that they bought B99 from two companies.  So remember, B99,

4   there's no more government money in B99.  They send it

5   through Deryl Leon's company, Skinny Crow Music.  They label

6   it as used vegetable oil.  And so there's that moment where

7   it's gone from B99 to used vegetable oil, one of the raw

8   component parts of B99.

9        They get it to Panama.  They offload it from the

10  ship.  They put it on trucks.  They truck it across Panama.

11  They take it from the truck.  They put it back on a ship.

12  They ship it up to Los Angeles, back to good old tank six at

13  Titan Terminal, as used vegetable oil.  And then it's the

14  exact same plan as the India containers, but this time the

15  paperwork is going to have the India and the Panama B99

16  falsely, pretend shipped, pretend processed, pretend

17  returned.  But it didn't happen.

18       What really happened is the B99 from India and

19  Panama came into Titan Terminal.  It was dropped into tank

20  six, and it went three and a half miles to Noil.  That was

21  the plan and that's what happened.

22       Now how will you know, how will you know that

23  Levon Termendzhyan was involved in this plan aside from his

24  company buying this B99?  You're going to hear the testimony

25  of his own assistant, Anne Avagyan, and she is going to look

1    at some of this fake paperwork and she's going to tell you

2    Levon Termendzhyan knew this wasn't used vegetable oil.  He

3    knew this was biodiesel.

4           You're even going to hear from one of the

5    defendant's truck drivers from Lion Tank Lines.  Remember

6    that trucking service that supposedly was shipping

7    everything here, there and everywhere?  And he's going to

8    tell you, even though his name is all over this paperwork

9    going to Utah and even some coming back, he's going to tell

10   you that he knows the paperwork is fake, and that's because

11   he's never been to Utah in his life, except until he

12   testifies for you.

13          So after the Panama and India plans are hatched,

14   you will learn that Levon Termendzhyan and Jacob Kingston

15   were presented with another opportunity, to recertify B99.

16   Now that's a word I haven't used before.  Recertify is just

17   a catch word for taking B99 and pretending it's B100 to

18   claim the credits on it, recertifying it.

19          So you're going to hear from several witnesses

20   about how Levon Termendzhyan recruited other co-conspirators

21   into this scheme to help and make it look like Washakie was

22   legitimately making this biodiesel, or blending the

23   biodiesel.  One of the people, probably the first person you

24   will hear from, is Katirina Pattison.  She's an insider on

25   this scheme.

1              Katirina Pattison is going to tell you she has

2    pleaded guilty to her own biodiesel fraud that she committed

3    with Cima Green.  This was some years ago.  She pled guilty.

4    She also cooperated with the government, but her sentence is

5    done.  It's done.  And she will tell you she has nothing to

6    gain from her testimony here.  Unlike some witnesses who may

7    be hoping for a sentencing benefit, she is not.

8              Katirina Pattison will tell you that she and her

9    co-defendant, Joseph Furando, had prepaid for a whole load

10   of B99.  They had been recertifying it through a different

11   plant, but they couldn't do that anymore.  So they were

12   looking for another plant to do fraud with.  They had heard

13   rumors of Washakie Renewable Energy.  So they approached

14   Jacob Kingston to try to feel him out to see whether he

15   would do fraud with them, whether he would buy this B99 that

16   they had and recertify it through his plant.  And you will

17   learn that Jacob Kingston told Kat Pattison you need to talk

18   to Levon.  So that's what she did.

19             She will testify that she had not one but two

20   meetings with Levon Termendzhyan where they discussed a

21   fraud plan.  What they were going to do is they were going

22   to take this B99, they were going to do a test run of six

23   railcars, they were going to label it as feedstock -- they

24   happened to label it as soy blend -- send it to Washakie in

25   Plymouth so that Plymouth could recertify it and

1   fraudulently claim all these credits and sell it cheap to

2   Levon Termendzhyan and Noil.  So that's the plan.

3          And she's going to tell you that she discussed

4   this not once but twice with Levon Termendzhyan, and both

5   times that they discussed this plan to have Washakie

6   recertify the fuel, she will tell you Jacob Kingston, he

7   wasn't at the first meeting.  He wasn't at the second phone

8   call.  But she will tell you that that didn't bother her

9   because she believed that it was the defendant who

10  controlled the fraud scheme and controlled Washakie

11  Renewable Energy.  And, in fact, other witnesses at this

12  trial are going to tell you that Levon Termendzhyan would

13  brag that Washakie Renewable Energy was his company, even

14  though his name was not on it.

15         So this fraud actually fell apart because in the

16  middle of this six railcar test plan -- which they did

17  start, they sent six railcars of B99 with soy blend on the

18  invoices -- Cima Green is raided by the EPA and FBI, and

19  others.  So the fraud fell apart but, meanwhile, they had

20  sent these six railcars of B99, and Katirina Pattison was

21  trying to get paid for it.  So Jacob Kingston tells her, you

22  know, no, there's problems with this fuel.  I don't know, I

23  can't pay you as much.

24         In the middle of an argument about getting paid

25  and the quality of this fuel, you're going to see something

1    important.  You will see that Jacob Kingston tells Katirina

2    Pattison this will be resolved when Levon gets back into the

3    country.  But you won't see Levon Termendzhyan on this

4    e-mail and you won't see him on the contract between Cima

5    Green and Washakie Renewable Energy, but you will see Jacob

6    Kingston tell her this will get resolved when Levon gets

7    back into the country.

8              So the Cima Green plan is a total bust, courtesy

9    of the EPA and the FBI.  So the defendant and Jacob Kingston

10   are in the market for another source of B99, and eventually

11   they find a company in Ireland called Morrissey Oil.  You

12   are going to hear from Brendan Morrissey, who is the owner

13   of Morrissey Oil.  He's going to tell you how his employee,

14   Philip Cahill, got his company involved with Levon

15   Termendzhyan, and you will see that what was happening is

16   that Morrissey Oil was sourcing B99 from other companies and

17   selling it to Washakie fraudulently labeled as feedstock and

18   then as B100.

19             Now Brendan Morrissey lives in Ireland, so he's

20   not going to be here.  You're going to see a video of his

21   testimony.

22             But they didn't just get this B99 from other fuel

23   companies.  You're going to learn there was another person

24   involved in this, and his name is Josh Wallace.  Now Josh

25   Wallace is another one of those insiders, and he has pleaded

1    guilty to lying to federal agents during the course of this
2    investigation.  But he is now cooperating and he is going to
3    testify, and he's going to tell you that he was recruited by
4    Levon Termendzhyan to source B99 and sell it to Morrissey
5    Oil as B100 so that Morrissey Oil could then sell it as B100
6    to Washakie.  So why?  So that Washakie can take the B100
7    that's actually B99, falsely claim credits on it, and
8    everybody can get rich.

9          So this also kind of fell apart because here's
10   what you're going to learn.  In the middle of this scheme,
11   Josh Wallace, he defaulted on his contract.  So this meant
12   that Morrissey Oil defaulted on their contract with
13   Washakie.  And here's the important point.  When all of
14   these people defaulted, listen for who came to collect on
15   the debt, because even though Levon Termendzhyan's name and
16   company was not on any of these contracts, you will hear
17   that it was Levon Termendzhyan who came to collect on the
18   debt of these contracts.

19         All right.  So the Morrissey Oil project also
20   somewhat fell apart.  So in early 2013, you're going to
21   learn that the co-conspirators came up with another plan to
22   make it look like a lot of this B100 was being blended into
23   B99, and here's who they did it with:  Deryl Leon.  Deryl
24   Leon has two principal companies that were used in this
25   fraud, Skinny Crow Music and Catan Trading.

1           Now Deryl Leon is another insider.  He has pleaded

2    guilty for conspiring to defraud the United States for his

3    role in this conspiracy, and he too has promised to testify

4    truthfully and he too is hoping for a benefit at sentencing,

5    and here is what he will tell you.

6           He will tell you that in early 2013, he was

7    principally in charge of executing a scheme, a big, big

8    scheme to make it look like a lot of B100 was being sold to

9    Washakie Renewable Energy and a lot of B99 was being sold

10   from Washakie Renewable Energy to his company, Skinny Crow

11   Music, and this is how they did it.

12          They took the scheme to Houston.  He rented these

13   enormous shore tanks.  Imagine, like millions of gallons of

14   fuel can fit in these shore tanks.  They started buying B99

15   and other stuff, used cooking oil, from all these other

16   companies, and they filled these tanks.  And then they

17   rented barges.  And then they got some more tanks from

18   Louisiana.  And then for months, they literally took this

19   mix, put it on the barges, took it to a new tank, put it in

20   the tank, took it out of the tank, put it back on the barge,

21   took it to a new tank.  Maybe sent it from one tank to

22   another tank, maybe then another tank, maybe then a barge.

23   For months, this same fuel going around and around and

24   around.

25          But what you'll learn is every time fuel is moved

 1    like that, it generates paperwork.  So they collected just

 2    reams of this fake paperwork where they fraudulently labeled

 3    this fuel to make it look like Washakie Renewable Energy was

 4    selling hundreds of millions of gallons.  But they weren't

 5    doing any of that.  They were just sending it around in a

 6    circle.

 7           So you're not going to see evidence of Levon

 8    Termendzhyan loading a barge.  You're not going to see that.

 9    But you will see his role in this fraud that was responsible

10    for making these claims look good.  Highlighted in yellow on

11    your screen, these are the claims that were supposed to be

12    supported by this crazy Houston, Louisiana rotation of fuel.

13           Here's what you're going to learn about Levon

14    Termendzhyan and this scheme.  You will hear evidence that

15    Levon Termendzhyan was worried about Deryl Leon and what

16    Deryl Leon knew.  And so in March of 2014, Deryl Leon is

17    instructed to go to Houston, Texas -- it just happens to be

18    where this was also happening -- and to meet with Levon

19    Termendzhyan and Jacob Kingston.  And on your screen is a

20    photo of Jacob Kingston on the right, here, Levon

21    Termendzhyan on the left.  Here's this gold Ferrari that

22    Levon Termendzhyan later gifts to Jacob Kingston, and

23    they're about to board this private plane, and they are

24    going to fly to Houston where they are going to meet with

25    Deryl Leon, and here's what happened when they get there.

1          Everybody goes to a restaurant, takes a cigarette

2    break, Deryl Leon, Levon Termendzhyan, Jacob Kingston, and

3    Levon Termendzhyan confronts Deryl Leon and he says you are

4    too flashy with your Rolex, not one but two Lamborghinis.

5    Then he asks him -- Levon Termendzhyan asks Deryl Leon are

6    you willing to leave the country.  And Deryl Leon will tell

7    you that this defendant was worried that Deryl Leon was weak

8    and that he would talk.

9          Now as it happens, he was right, because you'll

10   learn that very quickly, after the federal search warrants

11   on Washakie Renewable Energy, Deryl Leon turned himself in

12   to the feds.  He did talk, and he's going to come to trial

13   and he's going to tell you everything he knows about this.

14         Next, Deryl Leon is ordered into an Escalade with

15   Levon Termendzhyan and the bodyguards.  At this point he's

16   worried.  Has he become a liability?  He doesn't know.  One

17   month later he sees Levon Termendzhyan again, this time at

18   Jacob Kingston's birthday party, and Levon Termendzhyan once

19   again confronts Deryl Leon and he says someone is talking to

20   the government, could it be your wife.  And he says no, it's

21   not my wife.  He vouches for the wife.  My wife doesn't know

22   anything about this.

23         And he'll tell you that Levon Termendzhyan seemed

24   satisfied with this, because then Deryl Leon is invited onto

25   Levon Termendzhyan's private plane and they fly to Los

1    Angeles.  And in Los Angeles, Levon Termendzhyan directs his

2    son, George Termendzhyan, to give Deryl Leon one of those

3    burner phones, one of those phones that's not registered to

4    anyone, a disposal little flip phone.  Orders his son to

5    give Deryl Leon a burner phone, which George does.  And

6    Deryl Leon will tell you he had precisely two numbers

7    programmed into that burner phone, Jacob Kingston and Levon

8    Termendzhyan.

9         Now by 2014, Washakie files one claim for

10   $170 million.  The reason some years it's many claims and

11   some years it's one is just the shifting regulations on how

12   you file.  One claim for tax year 2014, $170 million.  And

13   how do they make this look legitimate?

14        Well, you'll learn that by this point they had

15   really largely given up on this whole buying B99 and sending

16   it all over the place and making an enormous amount of fake

17   paperwork because it was really expensive.  It cost so much

18   money to do that.  In fact, over the course of this fraud,

19   you will learn they spent nearly $100 million of the

20   fraudulent proceeds on making the scheme look good, paying

21   off co-conspirators, buying B99, getting the tanks, getting

22   the barges, all this stuff.  So Levon Termendzhyan, you'll

23   learn, tells Jacob Kingston stop doing that.  You don't need

24   to do all that.

25        So for this year, 2014, the only thing that the

co-conspirators did to make it look like they were making
this fuel was some massive financial cycling, and you will
see that in April of 2015, in just one month, Washakie
Renewable Energy sent $588 million to Deryl Leon's company,
Catan Trading.  This was to pretend purchase B100.  They
made some fake invoices.  Catan backdoors every dollar to
Skinny Crow, and then Skinny Crow sends almost all of that
money right back to Washakie in return for fake invoices for
B99 so that they can have these bank records and these
invoices that make it look like, hey, we sold $588 million
worth of B99.  They didn't.  This is entirely a circle of
money between three companies.

There is one more thing that you will learn they

We get to 2015 when the two biggest claims are
made.  A total of $644 million.  And you'll hear they did --
they had a plan.  They were going to do some financial
cycling to back this up, because Levon Termendzhyan told
Jacob Kingston, you know, all you need is a little bit of
Hollywood.  So they had actually grabbed a couple more shell
companies through Deryl Leon, and they were about
$13 million into a big cycling plan that they had.  They
were going to cycle $1.2 billion.  They never finished.

There is one more thing that you will learn they
faked up for this year.  This is what they put their energy
into it.  They made a bunch of fake invoices to justify what
they expected to be the transfers of millions of dollars

1    from United Fuel Supply, whose name the last claim was in,

2    to the defendant's company, Viscon.  I will show you how.

3            The one thing they really bothered to do, other

4    than this $13 million of cycling for 2015, was a bunch of

5    inflated invoices from the defendant's company, Viscon

6    International, to United Fuel Supply claiming that Viscon

7    had sold this fuel additive.

8            Now Viscon -- there is a fuel additive called

9    Viscon.  You will hear about it.  It's commonly sold mostly

10   in Texas, a little bit in California.  But it doesn't sell

11   for $625 a gallon.  You will learn that this is dramatically

12   in excess of the market value, and there certainly were not

13   tens of millions of gallons of Viscon fuel additive sold

14   from Viscon International to United Fuel Supply.  Jacob

15   Kingston and Isaiah Kingston will explain to you that this

16   was their new scheme to justify the millions of dollars from

17   these $644 million claims that they were going to send to

18   Levon Termendzhyan.  Nothing but another fake paper scheme.

19           Now the $644 million was not paid.  For the first

20   time, basically, they reject the claim, and that's the end

21   of these false claims.  But you will hear at trial, as I've

22   sketched out for you, for 2012, '13, '14, and '15, you will

23   hear Levon Termendzhyan's role in these schemes.  You'll

24   hear about this plan to recertify the Panama and the India

25   B99.  You'll hear how he recruited Kat Pattison and Josh

1    Wallace into this scheme.  You'll will hear about his

2    confrontations with Deryl Leon to try to keep Deryl Leon's

3    mouth shut while they had Deryl Leon running hundreds of

4    millions of dollars in a circle.  But like I told you, you

5    are not going to see a lot of paperwork with Levon

6    Termendzhyan's company on it except in one place, the money.

7            So let me turn to Counts 2 through 10.  Counts 2

8    through 10 all charge money laundering relating to the

9    proceeds of the Count 1 mail fraud scheme, the scheme to

10   steal the billion dollars resulting in $470 million.  And

11   you will learn that it is a crime to engage in certain kinds

12   of financial transactions with that type of stolen money if

13   you know that the money is from crime.

14           So we're going to start with Counts 3 through 7.

15   Counts 3 through 7 charge concealment money laundering, and

16   this concealment money laundering is related to the

17   defendant's attempts to get some of his share of this money

18   through his friend, Zabair Kazi, and this is how it

19   happened.

20           Zabair Kazi is a good friend of Levon

21   Termendzhyan.  They travel together.  You're going to hear

22   from Zabair Kazi at trial.  He will tell you that he was in

23   some desperate straits because he needed $11 million for a

24   creditor right away.  So he goes to his good friend, Levon

25   Termendzhyan, and he says I need $11 million.  Levon

1   Termendzhyan tells him don't worry, Jacob Kingston will send

2   it to you.  And Levon Termendzhyan calls Jacob Kingston and

3   he says you need to send Kazi's creditor $11 million, and he

4   does.  And Jacob and Isaiah Kingston will tell you why they

5   did it.  They'll tell you, well, it was his share of the

6   money.  So when he called us and said send $11 million to

7   this creditor, Zabair Kazi, that's what we did.

8            So you'll see that's what happened, and you will

9   see the tracing of this money that funded the $11 million

10  straight from the Internal Revenue Service and those

11  fraudulently claimed refunds.

12           So what happens once the $11 million goes to

13  Zabair Kazi's creditor?  You'll hear Zabair Kazi is told by

14  Levon Termendzhyan don't pay that money back to Washakie

15  Renewable Energy.  You are going to pay that money back to

16  me, to my companies, and he does.  And you will see that

17  Kazi Management St. Croix, one of Kazi's companies, a

18  million dollars to Noil Energy.  And then you will see

19  multiple transactions sending money to SBK Holdings USA,

20  another one of the defendant's companies.  So pay attention

21  to what this looks like.

22           After this $11 million, which are the fraudulently

23  claimed refunds, goes to Kazi's creditor, then Kazi pays

24  money to Levon Termendzhyan's companies.  So it doesn't look

25  like a transfer from Washakie Renewable Energy.  It doesn't

1   look like this.  That's not what it looks like.  It looks

2   like money from his good friend Kazi.  And for that reason,

3   he has been charged with conceal and disguise money

4   laundering for causing these financial transactions that

5   were designed to conceal the source of the money, which was

6   the fraudulently claimed biodiesel tax credits.  Because the

7   way this was structured hides where the money came from.

8         So Counts 3 through 7 charge those transactions I

9   just showed you.  A million dollars to his company, Noil

10  Energy Group, and four more payments on this loan to SBK

11  Holdings USA, another one of the defendant's companies.  Now

12  remember, early on Jacob Kingston was associated with SBK

13  Holdings USA, but he had been kicked out long before this

14  money comes in.

15        There's one more count of concealment money

16  laundering that the defendant has been charged with and that

17  you will be asked to decide, and that's Count 8.  Now

18  Count 8 is kind of different because Counts 3 through 7, as

19  you saw, charged the defendant with concealment money

20  laundering for concealing his share of the proceeds.  But

21  Count 8 charges him with concealment money laundering for a

22  transaction designed to conceal Jacob Kingston's share of

23  the proceeds.  This is what it is, a $3.16 million wire

24  transfer from the defendant's company, Noil Energy, for the

25  purchase of a house in Sandy, Utah.  So let me tell you how

1   this house gets purchased.

2           Jacob Kingston wants to buy a house.  Levon

3   Termendzhyan wants him to have a house.  So Jacob Kingston

4   takes $3 million of these many millions of fraudulently

5   claimed credits and he sends this $3 million to Levon

6   Termendzhyan, to Noil Energy, and he says hold on to this.

7   So now Levon Termendzhyan is holding on to $3 million of

8   this stolen money for Jacob Kingston.  And Jacob Kingston

9   starts house hunting, and eventually he finds a house that

10  he wants for his family to live in.

11          Levon Termendzhyan blesses the deal.  And when it

12  comes time to buy this house -- first of all, the contract

13  is not in the name of Jacob Kingston.  The first contract is

14  in the name of Noil Energy, but Noil Energy is not going to

15  live in this house.  Jacob Kingston and his family are going

16  to live in this house.  That's the first contract.  And then

17  you will see when it came time to pay the title company, the

18  money didn't come from Washakie Renewable Energy, no wire

19  from Washakie that could be easily traced to these bad

20  Treasury checks.  No, the wire came from Noil Energy,

21  $3.16 million from Noil Energy, because Levon Termendzhyan

22  had been holding on to this money for Jacob Kingston,

23  straight to the title company for the purchase of this

24  lovely home for Jacob Kingston.

25          Now in front of the home you see a chrome

1   Lamborghini and a gold Ferrari, both of which are gifts from

2   the defendant.  We're going to talk a little bit more about

3   that chrome Lamborghini in a minute.

4           And this wire has been charged as Count 8,

5   concealment money laundering, because the defendant

6   conducted a financial transaction, in this case the

7   $3.1 million wire, made up of fraudulent proceeds, for the

8   purpose of concealing its source, because it looked like it

9   was coming from Noil.

10          The next charge is Count 9, expenditure money

11  laundering.  Now expenditure money laundering is a little

12  different.  It's a little simpler.  To commit expenditure

13  money laundering, all you need to do is cause a financial

14  transaction of these stolen proceeds in amounts more than

15  $10,000, knowing the money to be derived from crime.  That's

16  how you commit expenditure money laundering, and the

17  defendant is charged with two counts.  The first charges him

18  with causing a $483,000 wire from Washakie Renewable Energy

19  to an account in Turkey in his name, and I'm going to show

20  you exactly how this happened.

21          First of all, the Internal Revenue Service sends

22  out one of those many Treasury checks, fraudulently obtained

23  credits.  It's deposited into Washakie Renewable Energy.

24  Washakie Renewable Energy sends $483,000 to Levon

25  Termendzhyan's account at Garanti Bank in Turkey.  Why?

1   Well, I'll show you why.

2           You will see text messages.  Now, like I told you

3   earlier, they were pretty careful to use burner phones.  But

4   this was a long conspiracy, more than four years, and things

5   got sloppy, and some text messages were on the regular

6   phones.  So you will see a few, and this is one of them.

7           You will see Levon Termendzhyan texting Jacob

8   Kingston telling him wiring instructions to Garanti Bank in

9   the name of Levon Termendzhyan, $423,000, this IBAN.  That

10  means international bank account number.  TR is the Turkey

11  country code.  And he even tells him, hey, I would like you

12  to add a memo to the wire.  Please add a specific note this

13  payment is for the VAT of the waterside tax.

14          Now here's what you won't see.  You won't see

15  Jacob Kingston say why, no, what are you talking about,

16  that's not your money, why would I do that.  You're not

17  going to see that.  You'll see him forward those exact

18  messages to his brother, Isaiah Kingston, who was generally

19  in charge of wires, and the money is sent, and you will see

20  Levon Termendzhyan ask did you transfer the money.  And you

21  won't even see Jacob Kingston saying anything.  All he'll do

22  is send the wire confirmation, $483,000, to Levon

23  Termendzhyan and Levon Termendzhyan will say thanks, bro.

24  And nowhere in here will you see Jacob Kingston do anything

25  other than exactly what Levon Termendzhyan told him to do

1   with this money.

2           So Levon Termendzhyan has been charged with one

3   count of expenditure money laundering for causing a

4   financial transaction in excess of $10,000 of this stolen

5   money, in this case $483,000.

6           Levon Termendzhyan is charged with one more count

7   of expenditure money laundering, this one for using

8   $3.5 million to wire to title company for the purchase of a

9   house for himself, and here's how this happened.

10          So in early March of 2015 -- remember, for 2014,

11  they claimed that $170 million credit.  And the IRS actually

12  paid out $164 million of it.  And let me tell you, the IRS

13  cannot cut a check more than $100,000.  So they had to break

14  it in two.  So there was two $82 million checks that came

15  in.  So these checks come into Washakie in early March, and

16  they deposit them into their bank account.  And it is so

17  much money that it skews the bank account's ledgers and the

18  bank doesn't even want the money.

19          So you will see text messages between Jacob

20  Kingston and Isaiah Kingston about what are they going to do

21  with this money that they just got.  And you will see Jacob

22  Kingston tells Isaiah Kingston, on the day they deposit

23  these checks, I talked to Levon.  I'm going down tomorrow to

24  discuss the plan.

25          And what was the plan?  Well, you're going to hear

1    the whole plan at trial, but part of the plan included

2    taking some of this $164 million that was deposited on March

3    16th, and four days later sending 8.5 million to the

4    defendant's company, SBK Holdings USA.  You'll see he sends

5    3.5 million of it to another bank account and uses it to

6    send $3,520,000 of this stolen money to a title company for

7    the purchase of his own house in Huntington Beach,

8    California.  This is the house.  That is the subject of

9    Count 10.  And because he caused this $3.5 million wire to

10   the title company for the purchase of this house, made up of

11   these fraudulent proceeds, he has been charged with one

12   count of expenditure money laundering.

13          Last charge, Count 2.  Count 2 charges a

14   conspiracy between Levon Termendzhyan, Jacob Kingston and

15   Isaiah Kingston to commit three kinds of money laundering,

16   international, concealment, which we've talked about, and

17   expenditure, which we've talked about.

18          Two important things.  The crime of conspiracy for

19   Count 1 and Count 2 is the agreement to do the illegal

20   thing.  That's the crime.  Counts 3 through 10 charge actual

21   transactions, but Counts 1 and 2 is the agreement to do the

22   illegal thing.

23          The second important point.  The Judge will

24   instruct you at the end of this case that you need only find

25   that the defendant agreed to do one of these kinds of money

1    laundering.  We will, however, present evidence of all

2    three, and I'm going to tell you about some of the evidence

3    you will see at this trial proving that Levon Termendzhyan

4    agreed with Jacob and Isaiah Kingston to launder this money.

5            You will see that $72 million of these proceeds

6    were traced for the defendant's benefit in the United

7    States.  This is Government's Exhibit 2-1.  You will see it

8    at trial.  You will have it when you deliberate.  You will

9    see the $72 million.  You will hear from an IRS agent, who

10   will show you how the money was traced through these

11   increasingly complex ways.  But at the end of the day,

12   $72 million to Levon Termendzhyan.

13           Some of these transactions we've talked about.

14   What I've just highlighted is the $11 million loan to Zubair

15   Kazi's creditor to be repaid to Levon Termendzhyan's

16   companies.  The next two transactions are the purchase of

17   that Bugatti Veyron, more than $1.8 million for Levon

18   Termendzhyan's car.  And over on the right side of the

19   screen, you see that $8.5 million wire that I showed you.

20   That was used to buy that Huntington Beach house that's the

21   subject of Count 10.

22           Now, of course, Levon Termendzhyan is not the only

23   person who got money from this scheme.  This is why

24   co-conspirators commit fraud.  Everybody got money.  There

25   was maybe, as I told you, $100 million on scheme expenses,

1    and that includes Deryl Leon's roughly $10 million.

2           You will hear they spent almost $50 million trying

3    to build out the Washakie plant, which I haven't told you

4    much about, but there actually was a biodiesel plant in

5    Plymouth, Utah.  They really couldn't make that much

6    biodiesel.  One of the reasons is it's quite difficult to

7    make biodiesel when it's cold because animal fat will gel.

8    Cooking oil will gel.  But they built it out with

9    $50 million of fraud proceeds, in part, to make it look

10   good.  So if anybody went up to that plant, they'd say this

11   is a really big plant.  It's enormous.  Maybe they were

12   making this fuel.

13          You'll hear 45-ish million dollars went to

14   entities associated with The Order, Jacob and Isaiah

15   Kingston's family.  You're going to hear money was spent all

16   over the place.  They spent $4 million for the Utah Jazz.

17   They were one of their biggest advertisers.  They bought

18   property in Texas, property in Utah.  They built out a truck

19   stop.  They bought property in Belize.  You'll hear the

20   money went this way and every way.  But you will also hear

21   that $72 million was traced for the benefit of Levon

22   Termendzhyan in the United States.

23          On the outside of the United States, you will see

24   the IRS's tracing of this money, and that $134 million of

25   these stolen proceeds went to Turkey and to Luxembourg.

1          Now I'm going to introduce somebody else to you.

2    You will learn that a lot of the money that went to Turkey

3    was invested through somebody named Sezgin Baran Korkman,

4    who the evidence will show was an associate of Levon

5    Termendzhyan.  Sezgin Baran Korkman owned and controlled a

6    company called SBK Holding Turkey, or AS.  Levon

7    Termendzhyan owned and controlled a company called SBK

8    Holdings USA.  Both of these companies got proceeds of this

9    fraud.  SBK Holdings USA got it in the United States.  SBK

10   Holding Turkey got it in Turkey.  And you will see the

11   tracing of this money.

12          What I've put on the screen is the summary of

13   Government's Exhibit 2-3.  This is another exhibit that you

14   will see at trial.  You will see this tracing.  But there's

15   a very important part of this tracing, and that's after

16   $134 million goes to Turkey and Luxembourg, you will see

17   33 million came back from the companies, the entities that

18   got the money, in Turkey and Luxembourg.  And you need to

19   watch for where that money went to because it wasn't Jacob

20   Kingston, even though at some point Jacob Kingston demanded

21   that they send money back from Turkey and Luxembourg.  But

22   you will see who did.  Levon Termendzhyan got $33 million

23   back from Turkey and Luxembourg.  I'm going to show you how.

24          On September 9th of 2013, Washakie sent $9 million

25   to Turkey to a company called Komak.  Three days later, this

$9 million starts coming back.  But it doesn't go to Washakie.  It goes to Speedy Lion Renewable Fuel Investments.  And what is that?  You will learn it is one of the defendant's companies.  And you may wonder about this bank account, and I will show you, because as it turns out, Levon Termendzhyan was in Turkey when these transfers started.

So to get a bank account to get this $9 million of fraud proceeds from Komak, he had his brother open a bank account.  Grigor Termendzhyan opens Speedy Lion Renewable Fuel Investments one day after Washakie sends $9 million of their fraud proceeds to Komak.  So it didn't stay there long.

And this may be a good time to tell you what international money laundering is, because international money laundering is sending fraud proceeds, such as this, either out of the country or back in the country in a manner designed to disguise or conceal the source, the ownership, or control of the money, just as they did here, $9 million that spent just over a week in Komak before it appears to have come right back to Speedy Lion Renewable Investments.

There's something else that you should know, because all of these bank records, these come from United States banks, not Turkey.  Because as of the day of this trial, the United States still has not received bank records

1  from the Republic of Turkey.  So all of this tracing you

2  will see is only from bank records from the United States,

3  or perhaps a bank record here, a bank record there that came

4  from a witness, but not from the Turkish banks.

5           This wasn't the end of it, because you'll see on

6  December 31st, 2013, Washakie sent another $13 million of

7  these fraud proceeds.  And less than a month later, nine

8  million goes right back to Speedy Lion Renewable Fuel

9  Investments.  And then you will see in May of 2015, Washakie

10 sends a staggering $56.3 million of frauds proceeds to a

11 Luxembourg company called Isanne SARL.  And just over a

12 month later, Isanne SARL sends the defendant's company, SBK

13 Holdings USA, $15 million.  In total, $33 million coming

14 back from these entities to Levon Termendzhyan's companies.

15 Now you'll also learn that after the search warrants on

16 Washakie Renewable Energy, he starts sending some of this

17 money back.

18           To prove the defendant's involvement in money

19 going to Turkey, you will see, among other things, his own

20 text messages.  You will see Levon Termendzhyan telling

21 Jacob Kingston to send $100,000 to a bank account called

22 Doga Dogan.  It may be properly pronounced as Doga Dogan.

23 Once again, you're not going to see Jacob Kingston say no,

24 why, that's not your money, that's my money.  You're just

25 going to see him say done.  And Levon Termendzhyan will say

thanks.  And you will see that that is what happens, that

Washakie Renewable Energy sends $100,000 to Doga Dogan.

Now, like I told you, you're not going to see Doga

Dogan bank records because the United States was not able to

get Doga Dogan bank records from Turkey.  So we don't have

any records to show you who the legal owner of Doga Dogan

is.  But you will hear testimony that Levon Termendzhyan

uses this Doga Dogan account for spending money when he

travels to Turkey.  You'll hear that every time money goes

to Doga Dogan, that Levon Termendzhyan is either in Turkey

or about to go to Turkey.

You will also see how Levon Termendzhyan himself

talks about this account Doga Dogan.  You will see his own

words.  You will see him saying can you send me -- me 100

more.  That's not a hundred dollars.  That's $100,000, to

Doga Dogan, and pay attention to how he didn't do this.  He

didn't ask for Washakie Renewable Energy to send him this

money in the States so that he could send it to Doga Dogan.

He asked them to send it to Doga Dogan, and that is part of

the international money laundering, because, remember,

international money laundering requires it to be for the

purpose of concealing and disguising.  This conceals and

disguises, the evidence will show, the ownership and control

of this money.

Now as you can see, they are also charged with

1   conspiracy to commit expenditure money laundering.  That's

2   that type of money laundering where you basically cause a

3   transaction in excess of $10,000.  It doesn't really matter

4   what you do with it, if you buy something, if you just go

5   from account to account.  So long as it's made up of these

6   fraudulent proceeds and you know that it's money from crime,

7   that's expenditure money laundering.  And one of the things

8   that you will see they did was buy a $1.8 million Bugatti

9   Veyron -- I understand that's a French sports car, a very

10  nice one -- as a gift for Levon Termendzhyan.  This is the

11  car.

12           Let me tell you how it is that this car gets

13  purchased.  You will learn that in the summer of 2013, Levon

14  Termendzhyan sets his eyes on a particular Bugatti Veyron.

15  He goes, he test drives it, he likes it, he wants it.  So

16  this is what he does.  He tells Jacob Kingston you are going

17  to buy me this car for my birthday.  And Jacob Kingston

18  calls up the car broker and he makes an offer on this

19  Bugatti for Levon Termendzhyan, just as he was instructed.

20           You'll learn the very next day -- the very next

21  day, at Jacob Kingston's family's Pioneer Day picnic, Levon

22  Termendzhyan tosses Jacob Kingston the keys to his chrome

23  Lamborghini as a gift, the day after Jacob Kingston makes an

24  offer on this $1.8 million car.  And here's the chrome

25  Lamborghini parked outside of Jacob Kingston's mansion,

1    charged in Count 8, and you can see that the license plate

2    still bears the vanity plate Viscon, which is the

3    defendant's company.

4            Now this is actually one of the few times that

5    Levon Termendzhyan came to Jacob Kingston in Utah, this

6    Pioneer Day picnic, but you will learn that Jacob Kingston

7    traveled over and over and over again to see Levon

8    Termendzhyan during the course of this fraud.  In excess of

9    50 times he traveled to go see Levon Termendzhyan while he

10   committed this fraud.  And you'll hear that they traveled

11   internationally together.  They went to Turkey nine times.

12   They went to Belize five times.  But here Levon Termendzhyan

13   is in Utah.  And you will learn after he tosses the keys of

14   the chrome Lamborghini to Jacob Kingston, in August of 2013,

15   Washakie indeed wires that $1.8 million in two separate

16   wires for the purchase of this Bugatti for Levon

17   Termendzhyan.

18           So how did it all end?  As you now know, for 2015,

19   Jacob Kingston files the two biggest claims with Levon

20   Termendzhyan's input.  He says we're going to do this.

21   We're going to file these really big claims.  So they agree

22   to do it.  $644 million, it seems like a lot of money, even

23   to Jacob Kingston, who's deposited hundreds of millions of

24   dollars into his bank account so far, this seems like a lot

25   of money even to him.  Levon Termendzhyan says don't worry

1    about it.  We're protected by the umbrella.

2            So they file these claims for $644 million, and

3    for the very first time, they are rejected by the IRS.  And

4    three weeks later, EPA, IRS, a whole bunch of other people

5    execute search warrants on Washakie Renewable Energy, United

6    Fuel Supply, the backup server where all the e-mails are

7    stored at Jacob Kingston's house, and Jacob Kingston goes

8    straight to Levon Termendzhyan where he's stripped down to

9    make sure he's not wearing a wire, and Levon Termendzhyan

10   says stay strong, my people will take care of this.  And

11   then he tells him go tell Deryl Leon to stay strong.  And

12   you'll hear, a couple weeks later, Jacob Kingston goes to

13   Miami to meet with Deryl Leon where he says stay strong.  We

14   have outs.

15           Now you are not going to see Levon Termendzhyan's

16   name or his company on a single one of these false claims,

17   because the evidence at trial will show that the defendant

18   took great care to conceal his involvement in this fraud.

19   He did that by using burner phones, by using other people,

20   other companies, Kat Pattison and Cima Green, Josh Wallace,

21   Morrissey Oil.  He did it by using Jacob Kingston and

22   Washakie Renewable Energy to file these claims.  They

23   couldn't hide his involvement entirely and that's what this

24   trial is going to be about.

25           This trial is going to be about the $72 million in

1    fraud proceeds that were traced for the defendant's benefit

2    in the United States.  This trial is going to be about the

3    defendant's direct involvement in the transfer of

4    $134 million in stolen Treasury money to Turkey and to

5    Luxembourg, and it's going to be about the fact that the

6    only person who ever got money back from that is Levon

7    Termendzhyan.

8            This trial is going to be about those few text

9    messages that they were sloppy enough to let get through.

10   All their effort with these burner phones, they weren't

11   careful enough, and this trial is going to be about those

12   text messages.  And this trial is going to be about the

13   defendant's confrontations with co-conspirators, Deryl Leon,

14   making sure he doesn't talk, his confrontations with Josh

15   Wallace trying to get Washakie Renewable Energy's money

16   back.  And this trial is going to be about the evidences of

17   Levon Termendzhyan, at the head of the table, with Jacob

18   Kingston, and Isaiah Kingston, and Deryl Leon, and Kat

19   Pattison, and Josh Wallace, and Brendan Morrissey while they

20   plot this fraud.

21           And so after you have had the opportunity through

22   this trial to hear all of the evidence that we are going to

23   present to you, the testimony of witnesses and the exhibits,

24   you will see that we have proven beyond a reasonable doubt

25   not only did Levon Termendzhyan know that this money was

```
 1   stolen when he was having Jacob Kingston send it all over
 2   creation to his friends, to his companies, to Turkey, to buy
 3   lavish gifts, not only did he know that that money was
 4   stolen, he helped steal it.  And that is why at the end of
 5   this trial, we are going to come back and we are going to
 6   ask you to find the defendant guilty of every charge in this
 7   indictment.
 8            Thank you for your time.
 9            THE COURT:  I think now would be a good time to
10   take our morning break.  Let's try and keep it to ten
11   minutes or so, and then we'll see you back in the courtroom.
12            (Jury excused)
13            (Recess)
14            THE COURT:  Are you ready to proceed, Mr. Geragos?
15            MR. GERAGOS:  Yes, Your Honor.
16            THE COURT:  All right.  Let's get the members of
17   the jury.
18            (Jury present)
19            THE COURT:  Welcome back, members of the jury.  We
20   are now ready to hear an opening statement from defense
21   counsel.
22            MR. GERAGOS:  Thank you, Your Honor.
23            Good morning, ladies and gentlemen.  Hopefully I
24   will finish this morning as opposed to this afternoon.
25            I think Ms. Goemaat had mentioned part of what an
```

```
 1    opening statement is.  I don't want to overload you.

 2              THE COURT:  Mr. Geragos, would you like this

 3    microphone?  I was having a bit of trouble hearing you.

 4    There is either this one or the other portable one.

 5              I'm sorry for the interruption.

 6              MR. GERAGOS:  I'd rather you hear me, Your Honor,

 7    than not hear me.

 8              Let me explain a couple of things that I think are

 9    helpful.  I talked to all of you during the jury selection

10    about, for whatever reason, we don't give you a manual on

11    how to deal with being a juror, and it's important that I

12    think that you understand certain things.

13              First of all, everything that you just heard is

14    not evidence.  Nothing that the lawyers say is evidence.

15    Nothing I say, nothing that anybody from the government

16    says, nothing that these agents say is evidence until they

17    get on the stand, they're under oath.  None of these

18    demonstrative exhibits, the ones where they put up a

19    picture, or they try to get you to hate my client because he

20    has wealth, you know, he's got a nice car, there's a nice

21    house, that isn't evidence of a crime.  So understand what

22    you're here and what we're here to do.

23              You're here to be judges of the facts, as I

24    explained when we were picking a jury.  And an opening

25    statement is not a closing argument.  I'm not here to wow
```

1    you into what appeared to me to be a closing argument just

2    now as opposed to an opening statement.

3            An opening statement is to try to give you context

4    for what you are going to hear.  I always say when you go to

5    the movies -- a lot of people don't go to the movies

6    anymore.  After reading your questionnaires, I don't even

7    know how many people watch cable.  It seems to be Netflix.

8    The part of what we used to say was that it's like a

9    trailer.  It's a coming attraction.  This is what you can

10   expect.  I'm trying to give you the names of the people, the

11   faces.  We want you to understand it.  And then I'm going to

12   tell you what I expect the evidence to show.

13           Now why do I say that?  Well, we're in federal

14   court, and unlike a lot of state courts, state courts you

15   get a freer flow of discovery from one, and you get,

16   generally, a preliminary hearing to hold somebody to answer

17   before you come here so that you can see the witnesses

18   before and you know what to expect.

19           Federal court is different.  Federal court,

20   generally what you get is you'll get -- you'll hear a

21   hundred times in this case are called MOIs, memorandums of

22   interviews.  You will get the statements -- the law

23   enforcement statements.  So when I tell you I expect

24   something or that this is what I expect, it's based on the

25   review of those things.

1            Now I will also tell you, having a couple of

2     trials under my belt, that whatever you expect in an MOI,

3     generally you will find other things that happened, on the

4     stand, and you will find that once there's a

5     cross-examination, once somebody questions somebody, it

6     takes on a whole different flavor, because understand what's

7     happening.

8            What they tell you, when they do these charts and

9     when they do these statements of what they expect to say,

10    all of those -- all of that testimony that leads up to the

11    trial is all based on what the prosecutors have gotten out

12    of the witness that fits their theory.  There's no -- I'm

13    not in there.  There's no defense counsel in there.  Whether

14    it's a grand jury, whether it's an interview, nobody else is

15    testing things.  And why is that important?

16           Well, you heard this opening statement this

17    morning.  You would hope -- you would hope -- I would have

18    hoped, that they would have talked a little bit about what

19    drove this investigation.  And why is that important?

20    Because why do we have what appears to be the entire IRS

21    sitting in the audience here and an enormous amount of

22    resources.  When you hear the number of search warrants that

23    were executed, when you hear the number of people that were

24    interviewed, when you see the amount of resources that went

25    into this case, you're going to say wait, did this happen

1   because it was fuel credits or was there something else

2   going on.  And what you'll hear -- and you're going to hear

3   it from Jacob Kingston, you're going to hear it from Isaiah

4   Kingston, if they tell the truth, this investigation started

5   not on the, originally, the bio tax fuel credits.  This

6   investigation started on what we asked you about in jury

7   selection, The Order, a/k the Davis County Cooperative, a

8   polygamist organization that has been operating for

9   generations committing fraud in Utah, and generational

10  fraud.  And the government knows that.

11          The government knows in their search warrant

12  affidavits, in their statements to the Court, in the things

13  that they've turned over to me, there is a wealth of

14  information when this case started about the fraud committed

15  by The Order.

16          Now for those of you who don't know -- this was

17  something foreign to me before this case -- but The Order

18  was founded sometime roughly 100 years ago, here in Utah,

19  and there is a hierarchal of male dominated organization.

20  The current head of The Order is a gentleman by the name of

21  Paul Kingston.  I think I've got a picture here.  I'm going

22  to put him up so at least you know the players to some

23  degree.  This would be Paul Kingston.  I can't keep track

24  of the -- you need a score card.  He's got 27 wives, 300

25  kids, or something like that.  The government talks about

 1   how he controls, with basically an iron fist, this

 2   organization.

 3          Also, you have his sister-in-law, who's Rachel,

 4   who is pretty much married to Paul's brother, who is the

 5   father of the two guys you are going to hear from here at

 6   trial.  This is Jacob Kingston and then here's Isaiah

 7   Kingston.

 8          Now Jacob's wife, who I do not believe you're

 9   going to hear from the stand, I don't believe they're

10   calling her, but you're going to hear a lot about her, and

11   her name is Sally Kingston.

12          Now apparently -- and I've taken this straight out

13   of the government's own filings, and this will be confirmed.

14   I will have the agents testify to it.  I assume Jacob will

15   admit it.  What they have done is because you have what's

16   called numbered men.  So the men at the top of the

17   organization have a hierarchy, and they're numbered.  And I

18   believe -- I can't keep track of them, but I believe that

19   Paul Kingston now is number seven or 13.  I don't know what

20   it is.  But basically it's like a giant Ponzi scheme, if you

21   know what that is.

22          The younger kids -- because they've got just so

23   many kids and so many children, and they're marrying each

24   other.  The interrelationships are astonishing here.

25   They're marrying half sisters.  They're marrying cousins.

1    There's a constant inter-incestuous, frankly, organization

2    going on with all these kids.  And what they do is is for

3    years, for generations, they've used these kids and the

4    public assistance to commit fraud and to go after public

5    benefits and to go after government benefits.

6         Now they even have a term for this.  The

7    government knows this.  You didn't hear it here.  But The

8    Order has a term that's called bleeding the beast.  Bleeding

9    the beast is defraud the government.  That is the model.

10   That's the ethos.  That's the mantra.  That's what The Order

11   does.  They bleed the beast.

12        Now there are various theories on this.  They tell

13   you, they've written this in court filings, one of the

14   reasons is that they need the money in order to run the

15   organization and take care of the kids.  Another is because

16   they feel that they're persecuted because it's a polygamist

17   organization, and because they are persecuted by the

18   government, that they get investigated by the government

19   because they're engaged in polygamy, that they feel like

20   this is the way they strike back, and they strike back by

21   bleeding the beast.

22        This is how Jacob Kingston was raised.  This is

23   how Isaiah was raised.  And you try to work yourself up if

24   you're male -- not if you're a female.  But if you're a

25   male, you try to work yourself up in the organization.  And

1    if you eventually get up to what's called a numbered man,

2    and you've got to wait until somebody either dies to inherit

3    that stance, or you've got to wait until you've brought

4    enough money into the organization, then you can live a very

5    nice lifestyle.

6            But the great majority of the members of The Order

7    do not live that kind of a lifestyle.  There are hundreds if

8    not thousands -- I mean, the estimates of the number of

9    people in Davis County, and in Utah, who belong to The Order

10   are astronomical.  I mean, it's an astronomical number of

11   people that claim to be or have been reputed by law

12   enforcement to be members of The Order.

13           What happens is is because it's so difficult for

14   them to support all of these people, The Order has created

15   all of these shadow accounts.  They have phantom accounts.

16   They have an underground banking system.  They've got all

17   kinds of false ledgers that they keep that try to tell

18   people -- basically to keep them happy.  You do have some

19   kind of -- you're working for something, that you can use --

20   for lack of a better term, I'd almost call it chits -- if

21   you know what that is -- a chit that you can then spend.

22   They operate businesses.  You go to The Order related

23   businesses.  That is where you spend your money.  You go

24   shopping.  You have to shop at an Order related business.

25           Well, why am I getting into all of this?  Because

1   you can't understand what happened here if you don't

2   understand The Order.  Because originally when this case

3   was -- the genesis of this case, the search warrants

4   executed in this case, and the generations of this happening

5   is the backdrop for Jacob Kingston, because all roads in

6   this trial are going to lead through Jacob Kingston.

7           Everything that Ms. Goemaat just told you about

8   the charts, the items that are going to be -- let me see

9   Jacob's picture one more time -- everything that you're

10  going to hear, and the only way they can put any of this

11  together is through Jacob Kingston.

12          What they haven't told you about Jacob Kingston is

13  that what was really going on here -- and we've pieced it

14  together after the fact.  We've been living this case for

15  almost 18 months on this side of the table, and we think

16  we've got a pretty good idea what the evidence is going to

17  show what's happened here.  Jacob Kingston decided that when

18  he figured out this new fraud, which was the tax credits --

19  and I've got that very interesting chart, the one that

20  Ms. Goemaat put up.  She puts up this chart.  It's very

21  interesting, to me at least.

22          If you see this, one of the things you need to see

23  is that specifically Levon Termendzhyan had never even met

24  Jacob until 2012.  See where I have that circle?  Now why is

25  that important?  Because just like generations before Jacob

1    Kingston, the Kingston family was committing fraud, bleeding

2    the beast, going after the government.  They were doing tens

3    of millions of dollars from 2010 to 2011.  That's all that

4    the government has shown you here, by the way.

5          What you should also know -- and I will give you

6    another piece of information.  Put it in the back of your

7    head.  You'll learn this later on.  The fuel tax credits,

8    biofuel tax credits, they aren't in existence in perpetuity.

9    In fact, you don't know if Congress is going to pass it

10   until after the fact.  Generally the program expires every

11   year, and then Congress has to reauthorize it, and then you

12   have to apply after the fact if Congress reauthorizes it.

13   I'll explain later why that's important.

14         But one of the things -- and I don't why the

15   government does this -- but one of the things they're trying

16   to do is, first of all, saying it was a billion dollars

17   here.  This is cumulative.  See where it says total

18   cumulative claims?  It's not 352 this year.  It's not 522

19   this year.  It's a billion.

20         But, interestingly, let me show you something.  In

21   2010, before they ever met Levon Termendzhyan -- who, by the

22   way, has been a very successful fuel and gas operator, and

23   trucking business for over 25 years in California.

24   Something else you're also going to hear about, in

25   California, where I come from -- we think of ourselves as

 1    very progressively green.  So we have even more tax credits.

 2    What we're talking about here is a federal tax program.

 3    That's why the IRS is involved.  That's why they've got what

 4    looks like half of Washington, D.C. here is for the federal

 5    program.  California has got its own program.

 6           Why is that important and why does that give you

 7    some import?  Well, one thing they never tell you about is

 8    that Levon Termendzhyan has been in business for 20 years

 9    before 2010 in California, and during this entire time, do

10    you know how much Levon Termendzhyan -- before he ever met,

11    before he ever laid eyes on Jacob Kingston, do you know how

12    much Levon Termendzhyan or his companies had ever applied

13    for in RINs, in tax credits, or the very lucrative

14    California ones?  Zero.  Not a dime.  He had never

15    applied -- this guy, who is supposedly the mastermind, who

16    is supposedly the one who started this and got this guy in,

17    Jacob, for 41 million, zero.  Zero.

18           Now you say to yourself, okay, he met Jacob

19    Kingston.  If Levon is such a fraudster, then as soon as he

20    learned from Jacob how to do this, how much did he apply for

21    in California?  If you've got these hundreds of millions of

22    dollars, how much do you apply for in California?  Well,

23    guess what?  Not only has -- to this day, his company never

24    applied for any federal -- zero -- every one of these years,

25    which they don't put on their chart, every single year.  And

1    guess what?  Not one dime ever in California.  Not one dime.

2    Could have, but doesn't.  And let me explain to you why.

3          This becomes important too to understand how Jacob

4    has now manipulated the government because he's now

5    cooperating to get out of this and trying to blame Levon.

6          What happens is -- Levon has never wanted to go

7    through the process.  One of the reasons is -- for that very

8    reason that I just told you.  With Congress, you never know.

9    So if you're relying on the tax credit, you're buying what

10   would normally be called -- I'm dating myself -- buying a

11   pig in a poke.  You don't know whether what you're going to

12   rely on is going to pay off because you don't know if

13   Congress is going to appropriate the money.  He doesn't want

14   to get into that.  He's never wanted to get into that.

15         He deals with fuel suppliers.  You've heard of

16   Shell gasoline.  You know, you'll see them occasionally.

17   You'll see -- I forget the name of the other one -- Valero.

18   And he tells them, you guys -- you guys, meaning Shell,

19   Valero, the other big one, you keep the credits.  I don't

20   care what you do with the credits.  You can have it.  I want

21   a lower price.  I'd rather take today what I know I've

22   got -- that's the kind of businessman he is.  I'd rather

23   take a lower price than what I'm buying and deal with it

24   now.  I'm not going to waste time or effort on the vagaries

25   of the federal tax system.  So that's what he's always done.

1    That's one of the reasons.

2           Now that is not and never has been a motivation by

3    the Kingstons because the Kingstons, they deal in fraud.

4    Fraud is game one.  That is all they know how to do, for

5    generations.  And the reason the government doesn't tell you

6    is that the reason that Jacob reached out to people in

7    California was he wanted to commit fraud in California.  He

8    wanted to get the tax credits from California.  He knew

9    that -- he had cold-called a number of people and a number

10   of entities, including Levon, and tried to start doing

11   business so that he could commit the fraud that he was doing

12   on a federal level, and now he wanted to commit it in

13   California.  That's how they first met.

14          Now you heard about that there's going to be

15   testimony from a number of people, and you heard about how

16   there's going to be testimony about kind of the fraud that

17   is committed here and how Levon did it.  You heard about

18   burner phones, you remember that.  That was before the

19   break.

20          Well, guess what?  Once they arrested Jacob, once

21   they arrested his wife, Sally, they arrested his brother

22   Isaiah, and they arrested his mother, Rachel, what he made a

23   decision to do at some point is in order to keep his mother

24   and his wife out of jail, he said I'll plead guilty, and

25   I'll plead guilty and I'll blame Levon, and I will say that

1   Levon is the one who was the mastermind of all this, even

2   though I was doing it before, I was doing it after, and his

3   name is not anywhere.

4            One of the fascinating things about this, you saw,

5   I think, on one of the charts -- do you have the SBK chart?

6            Now this was Exhibit 2.3.  Once again, I don't

7   quite understand why Ms. Goemaat led you down this -- what I

8   would call -- and excuse me for using these old-time

9   expressions, that's just who I am -- the primrose path.  You

10  see where it's got Washakie.  You see where it's got Komak.

11  In some of these others, you're going to see where there is

12  the term SBK.  And she keeps saying SBK is a Levon

13  controlled company.  Well, there are two SBKs.  SBK, by the

14  way, stands for -- and I always get this wrong.  I'll have

15  Ms. Qassim do it.  Give me the full name.

16           MS. QASSIM:  Sezgin Korkmaz.

17           MR. GERAGOS:  Korkmaz.

18           Now he is a Turkish businessman.  SBK are his

19  initials, SBK.

20           Now, interestingly, when Jacob was still fighting

21  this case, the government interviewed this gentleman whose

22  initials are SBK.  Where all of this money Jacob was

23  wiring -- all of this Washakie money that's on their

24  exhibits here, this money that they keep saying is going to

25  Levon is going to SBK, and they know that.

And how did they know that?  They interviewed this
gentleman, Baran -- we call him Baran Korkmaz, and I'll call
him, just for simplicity's sake, Baran.  They interviewed
Baran.  They gave him free passage to the U.S.  They told
him come to the U.S.  We want you only as a witness against
Jacob Kingston.  They interviewed him not once but twice, in
Washington, D.C.  Never told us.  Didn't tell the defense.
Didn't give us -- I was here.  I was around.  Didn't call up
and say, hey, you want to sit in on the interview?  Not a
peep.

And they then told Korkmaz's lawyers -- he has a
battalion of lawyers -- they said we want you as a witness
in this case.  We believe that you were a good guy who was
just duped by the Kingstons.  We know that the Kingstons --
you didn't know that the Kingstons had engaged in fraud.
You didn't know that the Kingstons were defrauding the U.S.
government and shipping this money to Turkey.  And you've
given us all of this information, and guess what?  All of
the information that Baran gave to these government lawyers
in Washington, D.C., in interviews that were attended by
many of these IRS agents, all of those interviews did one
thing and one thing only.  They exculpated, meaning they
said that Levon was not -- was not in control of these
companies.  He said these were investments by Jacob
Kingston.  This money was invested by Jacob Kingston with

1    Korkmaz in Turkey.  All of this nonsense has happened after

2    Jacob Kingston pled guilty because now they have to turn

3    themselves and their theory upside down.

4            How will we know that?  You will see this in the

5    evidence.  You will see, hopefully, testimony that will show

6    you that, in fact, Korkmaz had told them early on Lev Dermen

7    was not doing any fraud.  Lev Dermen, this wasn't the person

8    who had control over the money.  It was, in fact, Jacob

9    Kingston.

10           In fact, I believe, if she tells the truth or if

11   one of the other witnesses tells the truth, they'll tell you

12   that to this day, within the last ten days, Sally Kingston,

13   who also -- let me show you the -- the Kingstons have all

14   pled guilty in this case to many counts.  You can see all of

15   the guilty pleas.  There's 23 through 33, through 45,

16   tampering with a witness.  Guilty.  Guilty.  Guilty.  All of

17   that.

18           They have pled guilty across the board, which

19   presented a problem.  They now have to figure out a way --

20   the government had to figure out a way to now prosecute Lev

21   Dermen, who has said from day one, I didn't do this.  I had

22   nothing to do with this.  You say, well, how can I prove

23   that?

24           I will tell you one thing.  The evidence is going

25   to show you -- all of this talk about burner phones, which

```
 1   had never been turned over, the burner phones -- the
 2   government had issued search warrants originally.  Mind
 3   you -- and I'll give you another piece of information I
 4   think will come out -- and I don't know why the government
 5   didn't tell you -- the Kingstons knew about the search
 6   warrants, apparently, because when law enforcement showed
 7   up -- and I'm telling you it was a large law enforcement
 8   presence at the execution of these search warrants --
 9   servers had been wiped clean at the Kingston place.  The
10   documents had been shredded.
11           There's witnesses -- they know about these
12   witnesses.  They just didn't think to tell you in the
13   opening.  But witnesses said they were there days and days
14   on end shredding documents.  They were there and knew and
15   had told everyone we've already been tipped off -- the
16   Kingstons have -- because we know search warrants are going
17   to be executed, and they started shredding everything.
18           Now they apparently kept from -- somewhere, in
19   some kind of a safe house, or a safe room, or something like
20   that, they kept burner phones -- or Jacob at least kept
21   burner phones.  I believe what really happened is Sally,
22   who's been out of custody the entire time, is the one who's
23   carrying out exactly -- and I think you'll see this -- she's
24   carrying out what Jacob wants her to do while she's out.
25           So Sally found the burner phones.  I assume Jacob
```

1    told her where.  So the government spent an inordinate

2    amount of money downloading the burner phones.

3          Guess what they found?  They show you these two

4    texts, which I will explain to you through the witness,

5    you'll see through Jacob what they really mean.  But the one

6    thing they didn't find is the burner phones that

7    supposedly -- the two that were just referred to by Ms.

8    Goemaat.  She says that Jacob Kingston was given two burner

9    phones by Lev Dermen.  Guess what?  Couldn't find those two

10   burner phones.  Didn't find them at all.

11         Guess what?  When they asked them how come there's

12   no texts on the -- why are we only finding two texts if he

13   was the mastermind of all of this.  And Jacob Kingston

14   actually says, in one of his memorandum of interviews, Lev

15   Dermen only whispered to me if he was going to commit fraud.

16   He only whispered to me.  So he didn't text.  He didn't have

17   the burner phone.  We don't have any records of that.  It's

18   all in Jacob Kingston's mind.

19         Now why is that a problem?  Well, Jacob Kingston

20   had decided that he was going to use Lev Dermen before he

21   got arrested.  Why was he going to use Lev Dermen?  Because

22   he didn't want this fraud money going to his Uncle Paul.  He

23   wanted to skirt around The Order.  That's the sole reason as

24   to why all of these surreptitious actions by Jacob is taking

25   place.

1              One of the reasons that you don't see Lev Dermen

2    on them is because this wasn't for Lev Dermen's benefit.

3    Everything that was done here financially was done for

4    Jacob's benefit so that he would not have to give the money

5    to the higher numbered men in The Order, period, end of

6    story.  This was all to avoid any kind of paying the tribute

7    or paying it up on the number scale in The Order.  He wanted

8    to avoid paying The Order.

9              How do we know that?  We know that he was deathly

10   afraid of the Bank of Utah.  The Bank of Utah is where The

11   Order does some of their financial transactions.  Apparently

12   Uncle Paul Kingston has a connection at the Bank of Utah.

13   And when they first saw what Jacob -- this scheme Jacob had

14   come up with, Bank of Utah had mentioned this to Paul, and

15   that was one of the things that got back to Jacob, that he

16   couldn't even trust the banking system, or this other system

17   that his Uncle Paul controlled, and he had to somehow do an

18   around or do an end run.  So his end run was this gentleman

19   named Baran, and he was introduced to Baran by Levon, who

20   knew him from Turkey.

21             Now they made a big deal about Levon's name.  Let

22   me explain to you what happened.  Levon was widowed in 2013,

23   and pretty much after that had moved his operation to -- it

24   was devastating to him, and he moved his operation to his

25   son and a guy named Dan McDyre, who you will hear from.  I

1    think the government is going to call him.  They are running

2    an operation.  He wanted to leave and go live in Turkey.  He

3    speaks Turkish but he's got an Armenian name.

4          Some of you might know that there is historic,

5    100-year hostilities between the Armenians and the Turks.

6    There was a genocide between 1915 and 1923.  The Turks to

7    this day reject the idea of a genocide, deny the genocide.

8    In fact, they had alluded to the fact that they can't get

9    records from Turkey.  If you're a political science nut or a

10   current events nut, you will know that there has been --

11   Congress just passed the recognition of the Armenian

12   genocide.  This year, for the first time, Congress passed

13   it.  But the administration did not acknowledge it, and the

14   administration has got a close relationship with the

15   president of Turkey.

16         One the things that appealed to Jacob was that

17   Baran has a close relationship with the president of Turkey.

18   That's why he thought this would be a great place for me to

19   plant my money that's away from my Uncle Paul and the rest

20   of The Order.  That is the genesis of this.  It has nothing

21   to do with the fact that Levon was there.  Levon changed his

22   name because he went there to live, to get away.  And as an

23   Armenian in Turkey, did not want to suffer the kind of ethic

24   strike that you normally would get with an i-a-n or a y-a-n

25   on the end of your name.  That's why he went to Lev Dermen,

1    as short for Levon Termendzhyan.

2            Coincidentally, that's why Geragos is not

3    Geragosian.  My grandfather came through Ellis Island.  He

4    did the same thing.  Although most people think I'm now

5    Greek with Geragos.  But there is an acculturation that

6    takes place.  So that gives you the explanation for why

7    these things were happening.

8            Now for each of these transactions, at the same

9    time when Lev went to Turkey, he also had a guy back then

10   who was named Edgar Sargsyan.  Edgar was an Armenian who

11   claimed to be a lawyer, and Edgar -- I'm putting up on the

12   screen the flow of funds that the government showed you --

13   Edgar was helping Dan McDyre run his operation while he was

14   out of here.

15           Now this flow of funds chart is not exactly

16   accurate.  You'll notice how they say -- and we'll get into

17   it -- the Kazi Foods.  You see that Kazi Foods there.

18   Actually the Kazi Foods payments didn't go in -- remember I

19   said SBK Holdings, which is Baran Korkmaz's -- what's the

20   first name?  Sezgin Baran Korkmaz, SBK Holdings.  It didn't

21   go into SBK Holdings.  They know that, because they traced

22   it.  It went into a thing called the Pillar Law Group.

23   Pillar Law Group was a trust account.  Lawyers have to have

24   trust accounts.  When you get money on behalf of a client,

25   the money comes into your trust account, and you pay it out.

1            Well, the monies that were coming in aren't going

2    to SBK Holdings.  They were going -- right here -- to

3    Pillar, which I think was spelled like this -- Law Group.

4            Now why do I bring that up?  Once again, much of

5    what they're going to show you is going to be -- they are

6    trying to give you snapshots that, I would contend, when you

7    hear the evidence and hear the cross-examination, you're

8    going to realize we didn't get the full picture.  That's one

9    of the reasons that I said, when we were selecting you, I

10   want you to keep an open mind, because you'll get somebody

11   who's up on direct and you'll say, hey, what about that.

12   Let me get up, and I promise you, even though I don't have

13   to, I will cross-examine and you'll get a fuller picture.

14           What happened is this Edgar Sargsyan, who claims

15   to be a lawyer, had started embezzling money.  This SBK

16   Turkey, which was a Jacob Kingston operation, along with

17   Korkmaz, they then decided, after Levon went to Turkey, I

18   don't want to invest here -- I'm an Armenian in Turkey --

19   but we can invest together in Los Angeles.  We'll call it

20   SBK Holdings.

21           Now let me belabor this so you understand.  I'm

22   just trying to give you a road map so you'll figure it out.

23   You guys are smarter than I am, so you'll figure it out

24   quicker than I did.

25           The SBK Holdings in LA is what's called a hard

money lender.  Now a hard money lender used to be -- it's
not as common now because money and interest rates are so
low -- but if you're somebody who needs money quick, and you
may not have great credit, and you want to buy something
quick, a lot of times you go to what's called a hard money
lender.  A hard money lender will charge eight percent, nine
percent, ten percent, 11 percent in this environment.  In
other economic environments, it can go much higher.  You can
pay as much as 20 percent.  And that is the business Baran
did in Turkey.  So he wanted to replicate that business in
the U.S., and he, Levon and Jacob, decided to do that, and
that was SBK Holdings.

Now, for instance -- do you have the one with the
house in Huntington Beach?

They make it seem, for instance, right here -- and
I don't know why, maybe they don't understand it on the
government's side of the table.  Now you take a look at this
and you would think, oh, he bought the house and the house
is -- they've taken the money.  No, they know better than
that.  The house went into title, went into escrow, and
there still is a trust deed on the house.  No different than
if I went to Wells Fargo, or you went to Chase, there's a
trust deed.  And all of this was done by lawyers, notarized,
with payment terms, and the borrower is obligated to pay the
money.

1                So what they've called money laundering, anybody

2      here who buys a house, if you don't know -- I mean,

3      basically what they're saying is if you're borrowing money

4      from somebody and you don't know how they made the money,

5      then therefore you're money laundering.  That's not the law

6      and that's not what happened here.  They borrowed the money

7      to buy a house with a trust deed that went through escrow.

8      They didn't steal the house.  The house isn't owned free and

9      clear.  There is a trust deed that was filed.  That's with

10     virtually every one of these transactions.  That's what's so

11     astonishing.

12                They talked about -- do you have the Luxembourg

13     documents?

14                Here's another one.  You know, they talked

15     about -- the government, when they issue a foreign subpoena,

16     it's called an MLAT, M-L-A-T.  But they get the documents

17     from the MLAT and it's delivered here to America.

18                Now they got all of the documents from Luxembourg,

19     and guess what?  All of the transactions that they say are

20     money laundering were all approved by numerous law firms,

21     big four accounting firms, and filed with the government.

22     Every transaction was legit.  There was nothing that was not

23     legit in any of these transactions, and they know that.

24     They know that why?  Because they talked to Korkmaz over two

25     days.  They know that because they also talked to the woman

1   who runs Korkmaz's businesses, who is a Turkish woman, who

2   we -- we, the defense, actually got her to go to Austria so

3   that she could be interviewed by them.  They had canceled

4   their interview with her on December 10th, just last month.

5   They didn't want to hear from her.  We got her to Austria.

6   We're going to get her to Austria again.

7          She's going to tell you that yes, she knows him,

8   that she was the one who runs Korkmaz's business, and she's

9   going to tell you that all of these transactions were on the

10  up-and-up by Korkmaz, that Lev Dermen was not the owner of

11  these things, as Jacob would have you know, but this was

12  Jacob's scam that he was running now on the government to

13  make the government believe that it was all Lev Dermen when,

14  in fact, it was just his way of hiding funds from The Order,

15  from his Uncle Paul, and from his father.  That's what this

16  case involves.

17         Now we've got a situation where they take out --

18  and there's things they know that I don't understand.

19         Where's the Doga Dogan whatever?

20         They put up another one where they say that he was

21  getting personal money overseas, and I think it was one of

22  these exhibits where it said 100 grand or something -- they

23  showed it to you -- for spending money.  Well, either they

24  missed it or they didn't flip through the pages.  You'd see

25  right before that hundred thousand -- remember it says send

1    it to me the next day -- they say this was for -- these are

2    for Levon's spending money, this hundred here, this hundred

3    here.

4            I'm going to guarantee you by the time this trial

5    is over -- I'll wait for closing because I don't want them

6    to change their story in the interim or have Jacob change

7    his story -- this wasn't for Levon's spending money.  In

8    fact, this was for -- directly for something that Jacob

9    wanted and that Levon purchased for him, and they should

10   know.  And if they don't know, it's shame on them because

11   they didn't turn the page on the text.  And I'll show you

12   that in closing.  I just don't want him to change his story.

13           Now the bottom line to most of this case is

14   that -- you know, I'll give you an example.  I think this

15   afternoon we're going to hear from Katirina Pattison.  Do

16   you remember she mentioned Katirina Pattison?  Katirina

17   Pattison is going to tell you -- she's in her twenties.  She

18   now lives with her parents.  Just had a kid.  Originally

19   they portray her as a goat farmer.  She was in a fraud

20   machine that had nothing to do with Levon Termendzhyan.

21           She was working for and having an affair with a

22   guy by the name of Joseph Furando.  Joseph Furando was her

23   boss.  So the two of them -- and I believe she will admit,

24   98 percent of their transactions, these two, were

25   fraudulent.  Everything they were doing was fraudulent.

1          Well, somebody figured it out.  A search warrant

2    gets executed.  She gets confronted by whatever agency, some

3    fed, and the feds start questioning her and tell her, by the

4    way, we've got pornographic videotapes of you.  And she

5    says, yeah, I know.  They're in my boss's, her fraud

6    partner's middle drawer of the cabinet.  She tells the FBI

7    where they are, and she doesn't want them to come out.  So

8    she starts cooperating.

9          She's got obviously an axe to grind.  But she

10   doesn't just start cooperating against her boss, who she's

11   having an affair with, she cooperates against the boss's

12   wife's father, so her crime partners.

13         So this woman -- who I assume is going to come in

14   here and portray that she's just doing this out of the good

15   of her own heart -- the goodness of her own heart -- she

16   actually has what I'd call a sordid past, but they want to

17   bring her in for one reason and one reason only.  She's met

18   with Levon Termendzhyan twice -- and I'll get to the third

19   in a second.

20         The first time she met with him, she was trying --

21   if she testifies the way she has before, she'll tell you

22   that she kept trying to get him to listen to her talk about

23   the fraud scheme.  Well, she'll admit, I believe, when I

24   question her -- maybe they'll be up front with you -- but

25   she'll admit that he kept saying I'm having dinner, I don't

 1   want to talk about this, and trying to shoo her away.

 2          They will make a big deal about the fact that he

 3   ordered, believe it or not, truffles on her pasta, and she

 4   thought this was a quote, unquote, power move.  Just like

 5   they show you the picture of the Bugatti, and they show you

 6   the picture of the chrome Lamborghini, or the house that's

 7   here.  And, by the way, the house that's here Jacob and

 8   Sally bought and had Levon help them buy because The Order

 9   wouldn't let him do that because he wasn't high numbered

10   enough.

11          Now they want to show that somehow, I guess, this

12   woman thought that was a power move.  The problem is

13   Katirina Pattison already told them, and they know, that he

14   didn't want to hear from her.

15          Then the second time she met, she basically said

16   that her boss, Furando, her lover, was bugging her.  He was

17   on the phone and he kept saying have you cut a deal?  Will

18   he do the fraud?  Will he do the fraud?  And he kept saying

19   no.  And finally she put him on the phone with Levon, who

20   still didn't want to deal with it.

21          Then you heard or you saw this little chart, this

22   thing, and, once again, this is how they hope to make this

23   relevant.  They want to say that the fraud, which takes

24   place here, that's what she's going to testify to, I assume.

25   Well, they're going to say that the cars that went here, the

1    six railcars, I believe, that was how he decided to do the

2    fraud.  That wasn't the case.

3           You will hear that he did, one time, take six of

4    these blended railcars, blended fuel railcars -- and one of

5    the reasons they showed you wait until Levon gets back -- do

6    you remember that text that says he'll deal with it because

7    there was a problem?  The problem was that Jacob Kingston's

8    fraud went to the point where he was just cooking up very

9    inferior fuel.  When he sent it to Levon, it clogged up and

10   ruined the trucks.  Literally where they put the fuel into

11   ruined the trucks, because it was all basically just

12   vegetable oil, and clogged the engines on it, and that was

13   what this had to do with.  It didn't have anything to do

14   with him wanting RINs, or tax credits, or anything else.

15   That's just another way that the government here has, I

16   believe, not told you the full story.

17          Now look, the full story of this case is very

18   simple when it comes down to it.  Jacob knows that he and

19   his -- he's got Sally, who's his one wife, he's got another

20   couple of spiritual wives, and there are other things that

21   they're trying to collapse together to get you to believe

22   Jacob Kingston.

23          One of the things that I think they're going to

24   show you and I had mentioned to you before was the Edgar

25   Sargsyan.  Edgar Sargsyan, this guy who was running his

1   company in Los Angeles when he went to Turkey, Edgar

2   Sargsyan ended up embezzling from Levon, and he embezzled to

3   the tune of 22 or 23 million bucks.

4           Levon, contrary to Jacob Kingston -- and you will

5   hear testimony also, Jacob Kingston, when he goes to court,

6   he lies.  He files perjured documents.  He was sanctioned in

7   the New York District Court.  Nothing to do with Levon

8   Termendzhyan but with another entity that he defrauded, and

9   the judge in the district court caught him, caught Jacob

10  Kingston lying in federal court in New York City, in the

11  Southern District of New York.  That's how he operates.  He

12  lies to everyone, including his wives, including his father,

13  including his uncle, and I would submit to you, including to

14  everyone in this jury box.  That's what they do.  They only

15  know how to lie.  And you'll hear that he did that in the

16  Southern District.

17          Levon Termendzhyan, he uses lawyers to fight the

18  battle, and that's what he did with the guy Edgar Sargsyan,

19  who embezzled from him.  He's in a video.  You're going to

20  see a video that is of his deposition.  When you do a

21  lawsuit, a lot of times you get to take a deposition of the

22  other side.

23          So what Edgar Sargsyan did in this deposition is

24  he brought along a federal law enforcement guy, who had gone

25  bad, by the name of John Balian.  He had John Balian trying

1   to bait Levon on the video, after they had stolen in a

2   scheme 20 some odd million, and he's angry.  So they are

3   going to show you the video and say, look, look how angry he

4   gets on the video.

5         If you watch the video in context -- and I would

6   invite you to, and I won't force you to watch all four

7   hours -- but I will try to show you some context to what

8   they show you.  You will see that he's consistent all the

9   way through.  He didn't do anything as muscle, or anything

10  else.  All Levon Termendzhyan did is he wanted his money

11  back from somebody he had trusted.

12        Now what they also don't tell you is that this

13  Edgar Sargsyan, who was operating the SBK here in the United

14  States, he's just entered into a plea agreement.  He's

15  entered into a plea agreement himself.  He's another one of

16  these so-called insiders.  Edgar Sargsyan, plea agreement.

17  All four Kingstons, plea agreement.  That means they're

18  felons.  When they say insiders, that means felon.  That

19  means somebody who pled guilty.  That means somebody who

20  stood in front of a court, in front of a judge wearing a

21  robe, and said I did this, stipulated to the factual basis,

22  and admitted it.

23        And they have -- and they all did it, including

24  Katirina Pattison, including Deryl Leon -- who, by the way,

25  you are also going to hear from and who will tell you he not

```
 1    only lies when he wakes up in the morning, he lies when he
 2    talks to federal prosecutors, and he pled guilty to lying.
 3    That's all this case is is nothing but people lying, getting
 4    caught, then lying again.
 5           They talked about -- I think the second person
 6    you're going to see, and maybe not today, but you might see
 7    it on Monday is a videotape of Brendan Morrissey, another
 8    guy who's a scam artist, you'll see.  You'll see his depo.
 9    I think she said he wouldn't come to the U.S. because he's
10    in Ireland.  That's nonsense.  You'll see the excuses he
11    gives.
12           He's got a company in Los Angeles.  He even calls
13    his company MobStar.  Believe it or not, MobStar.  That's
14    the name of his company.  He just gave the government a
15    hook, line, and sinker, what they wanted to hear, and
16    basically you'll hear his excuses for not coming here,
17    because he knew that if Levon Termendzhyan and Kingston get
18    convicted, then the government is not going to take his
19    money.  He's got an investment, supposedly, that Jacob
20    Kingston gave him and he doesn't want to lose that
21    investment.
22           Every single one of these witnesses has got an axe
23    to grind with the government.  The ones who don't have an
24    axe to grind, the ones who exculpate -- and that's a word
25    you're going to hear, which means prove that he's not
```

1    guilty -- they push aside and no longer want them.

2         This case has been a -- I think by the end of it,

3    I think you'll agree with me that for some reason, the

4    government just does not want you to know the truth here.

5    They are leaving out significant parts of the truth.

6    They're not calling witnesses who could tell you the truth.

7    They have access to all of these witnesses.  They've got the

8    MOIs, which are the memorandums of interviews, and they're

9    not calling the people.  And there's a reason for that,

10   because they've already got Jacob Kingston saying I'm

11   guilty, but keep my Mom out, keep my wife out -- or at least

12   one of my wives out, and I'll tell you where Lev Dermen's

13   money is.

14        Well, I'm going to predict now -- we'll see what

15   Jacob Kingston does when he talks.  They've been trying to

16   figure out where the money is.  They keep throwing -- you've

17   got all these circles, on their charts, of money.  But you

18   know one thing that's interesting about this one -- and they

19   keep saying a billion dollars.  There's no billion dollars.

20        In fact, I remember in one of the early hearings,

21   I had the case agent on, and the case agent said, well, I

22   don't know.  It could be 30, it could be a hundred, it could

23   be a half.  He had no idea, because when they say tracing,

24   you're going to find out.

25        I will cross-examine and -- I apologize in

1    advance -- I'm going to pin people down when they're on that

2    stand.  I'm going to ask them, you tell me where you did the

3    tracing.  You tell me -- for instance, on here -- where is

4    Noil?  Where is Noil on there?  By the way, that is Lev's

5    company.  Noil is nowhere on there.

6         By the way, when you see charts like this -- once

7    again, I'm going to date myself -- look at this.  This has

8    nothing to do with Levon Termendzhyan, but they put his name

9    here in a square.  It's the old expression you can't put a

10   square peg into a round hole.  It's almost like

11   unconsciously they've admitted they can't put Levon into

12   this.

13        So what do they do?  They just throw his name into

14   a square so that you won't ask the question, well, why is

15   the Morrissey Oil project -- which has everything to do with

16   Morrissey, Cahill, and these other clowns you're going to

17   hear from -- why is that?  Why are they just throwing Lev's

18   name there?  Because that's really the kind of bait and

19   switch the government is going to do in this case.

20        There isn't any tracing that is going to show any

21   money that was applied for from the federal government, the

22   state government, or anybody else, for RINs and tax credits.

23   He had every opportunity in the world to do it.  He

24   obviously, if you believe them, would have known about it

25   because he negotiated, and there's going to be zero evidence

1   that he ever did any of that fraud.

2          What there will be evidence of at the end of the

3   day, when I get back up here in the closing, what you're

4   going to see at the end of this case is that the government

5   has decided, for whatever reason -- I don't know if it was

6   because The Order is that connected.  I mean, obviously The

7   Order is connected because The Order is getting tipped off

8   by federal law enforcement out of Washington, D.C. when

9   search warrants are being executed.  Somebody is tipping

10  them off.  But you're going to find out that Jacob Kingston

11  is almost delusional.

12         Why do I say that?  I don't say that to be mean.

13  I'm going to tell you that when he gets up there, they're

14  even going to show you one of these schemes where he thinks

15  somebody who works for him, Santiago Garcia, is imitating a

16  Commissioner Gordon who's going to help him on his fraud.

17  He thinks that that's -- I mean, he's got some fanciful idea

18  that this imaginary figure is helping him, Commissioner

19  Gordon.  You'll hear about it.  I don't want to spoil the

20  fun because you're sitting here for six to eight weeks,

21  you're going to enjoy this Commissioner Gordon scam because

22  it gives you an insight into Jacob.

23         Jacob thinks -- the idea that he stripped down in

24  Vegas, well, who else knows about that?  How do we

25  corroborate that?  Nobody.  It's a figment of Jacob's

1    imagination.  You're going to hear about Jacob and all of

2    these other -- grandpa.  He's got another one.  Grandpa is

3    going to take care of everything, and he talks about

4    grandpa.

5         What they won't tell is that he was congratulating

6    Baran, or Baran was congratulating him on being a grandpa

7    because he's a young man and he's already got grandkids.  In

8    fact, he's got probably 22 kids and God knows how many

9    grandkids.  But he has -- there's a serious what I would

10   call -- it's either contrived or delusion.  He thinks these

11   things are happening that aren't really happening.  He

12   thinks everybody is out to get him.  So there could be

13   paranoia there.

14        But it's not our job, it's not your job to

15   psychoanalyze him.  But what I'll tell you is our job and

16   your job, mine is just to try and get the truth out to you.

17   Yours is to determine that you're not going to be

18   hoodwinked, like I think they have, into believing that this

19   guy is telling you the truth, because the truth -- you're

20   going to find, I believe -- I could be wrong, don't hold me

21   to it -- I think the government has interviewed this guy a

22   total of 300 hours over 20 different days, all because

23   supposedly he's going to get up here and tell the truth?

24   Who needs 20 days and 300 hours to learn how to tell the

25   truth?  Well, that's what they're going to do.

1              And, by the way, I'm not going to belabor it this

2    morning -- Ms. Qassim has done a wonderful job doing a time

3    line -- but I will belabor it with him.  You go through

4    those memorandums of interviews, and it's stunning.  There

5    are 16 different interviews so far that we've done on a time

6    line and I will show them to you when I get back up here.

7    He's changed his story over 16 interviews, 35 times in a

8    hundred different ways.  Reading between the lines, the

9    government is frustrated with him because he won't sing from

10   their script.  And I think he will admit that, because I

11   think he won't know what he's supposed to say and what he's

12   not supposed to say.

13             Because I'm telling you that this guy has lived --

14   and I don't blame -- I'm not here to blame -- he was raised

15   in an environment with this Order, where apparently you

16   subjugate women.  The government thought that he was a child

17   predator, and that's replete in their reports.  When they

18   stopped him at the border once, they even confiscated his

19   phone because he had pictures of child porn on there because

20   many of these women who he takes or beds down are underage,

21   and relatives on top of it.

22             I just think this was somebody who was raised in a

23   toxic environment.  I think this was somebody who really has

24   no idea whether he's coming or going.  I think he finally,

25   in his own mind, decided -- my guess is that the evidence

will show, at Sally's behest -- Sally is his first wife.
He's got other spiritual wives -- but I think at Sally's
behest, because he's got the 20 kids, that Sally talked him
into pleading guilty in this case so that she could remain
out, and for once in his life take responsibility for all of
the fraud, all of the lies, all of the things that he's
done.  I think that's at the end of the day what you're
going to hear from the witness stand in this case.

I could go on -- and I'm not going to -- for hours
on this case.  You guys have been more than patient to
listen to this.  I know this is almost a document dump or an
information overload.  I don't even know how you process
this stuff.  I hopefully will do everything in my power to
explain it and to break it down.  I know it's a lot of
information.  But I think at the end of the day, what you're
going to find is that all roads in this case lead to Jacob
Kingston.

I could go through and dissect every one of their
exhibits -- and I'll do it when they get up there, but you
don't need to see that yet.  You just need to ask this one
question at all times:  If we don't have Jacob, then who's
telling us the truth here?  If we don't have one of the scam
artists who's already pled guilty to some federal felony,
then who is telling us the truth?  Why aren't they calling
any of the witnesses who haven't pled guilty?  Why aren't

1    they calling any of the witnesses who aren't admitted liars?

2    What are they afraid of if they're after the truth?

3            I thank all of you.  I hope to get back up

4    hopefully in four weeks, not eight weeks.  I will apologize

5    in advance.  I guarantee you I will spend time with Jacob

6    Kingston, and he and I will have a long talk.  But the other

7    witnesses I think I can dispose of fairly quickly because

8    most of them have absolutely no relevance and it's just

9    trying to inflame your passion.  I'm hoping to get back up

10   here in four weeks.  I'm hoping to explain to you why this

11   has been a massive injustice, why they are trying to inflame

12   you with wealth and get you to convict on the basis of

13   wealth as opposed to acquit on the basis of no evidence.

14           Thank you.

15           THE COURT:  Thank you, Mr. Geragos.

16           It's now a couple minutes after 12:00.  It's time

17   for our lunch break.  So the lunch should be waiting for you

18   in the jury room.  I know it's very crowded in there.  There

19   is a conference room down the hall and we've propped the

20   door open to that.  You are free to spread out anywhere you

21   can find a chair and space on the table.

22           So we'll see you back here.  Let's try and

23   reconvene at one o'clock.

24           Is 45 minutes enough?

25           MS. GOEMAAT:  Yes, Your Honor.

```
 1              (Jury excused)

 2              MR. ROLWING:  It looks like a juror has left their

 3    notebook here.

 4              THE COURT:  I will ask Ms. Schaerrer to return it.

 5              Thank you.  We'll see you at one.

 6              (Recess)

 7              THE COURT:  Let me just raise a couple of items

 8    before we get the jury.

 9              First, just a general reminder that I do not allow

10    speaking objections.  If you choose to object, you can say

11    objection relevance, objection hearsay.  I don't want

12    argument.  I think I'm familiar with the issues and I can

13    rule based on the two words.

14              I have looked back over the issues in terms of the

15    evidentiary objections that were raised in Ms. Pattison's

16    deposition.  If this will help speed things up and minimize

17    objections, I can tell you that I do find the truffles

18    evidence relevant.  I find the existence of the tapes

19    relevant but not their content beyond just a general word

20    description.

21              So, Mr. Geragos, you need to limit it to the

22    existence of the tapes and whether that motivated her to

23    cooperate.  You are not going into the content of the tapes,

24    or that will be sustained.

25              MR. GERAGOS:  Okay.
```

1          THE COURT:  I suppose you can ask her about the

2    relationship with Mr. Furando.  He's a co-conspirator.

3          With respect to Amanda Brown, I guess to the

4    extent that a relationship with Ms. Brown was offered to

5    your client, Mr. Geragos, you can ask that.  I am not going

6    to allow any questioning into the relationship between this

7    witness and Amanda Brown.

8          General guidance, you can -- again, I understand

9    that there may be a flow here and there may be a need to

10   object if things get out of hand, but those are my general

11   thoughts at this point, if that helps to minimize

12   objections.

13         MR. GERAGOS:  Thank you.

14         THE COURT:  The last thing I would say is because

15   you both left the juror on the panel who has the obligation

16   on Thursdays, we're really pressed for time.  There's not

17   much more than an hour for each side.  So we can't waste a

18   lot of time with objections and bench conferences.  That's

19   why I hoped to give you that guidance.

20         Government, if you go much over an hour with her

21   and Mr. Geragos doesn't finish, you're going to have to

22   bring her back.  That's just it, plain and simple.

23         MS. GOEMAAT:  I understand, Your Honor.  And I

24   would only ask that you let us call her, then re-call her

25   slightly out of order to let her attend her grandmother's

1    funeral.

2            THE COURT:  I think that's reasonable.

3            MR. GERAGOS:  I don't remember -- I was just

4    looking through the Rule 15 -- and I'm sorry.  I don't mean

5    to talk while I'm sitting -- I don't remember how long it

6    took on direct last time.

7            THE COURT:  I don't know.  Clearly depositions

8    sometimes take longer than trials, even trial depositions.

9    But let's just get the jury in and get moving.

10           MR. GERAGOS:  What time do you normally take a

11   break?

12           THE COURT:  Let's just kind of see where we are.

13   Let's let the government go for an hour and take a break.  I

14   think we need to be out of here at around 3:45, 3:50,

15   because the witness said she needed an hour to get home.

16           MR. GERAGOS:  Correct.  I will try to speed it

17   along too.

18           THE COURT:  Okay.  All right.

19           You can get the jury, Ms. Schaerrer.

20           We may want to hold off on reading the name change

21   exhibit in light of the time.  You can do that the next time

22   we meet.

23           MS. GOEMAAT:  Yes.  Thank you, Your Honor.

24           (Jury present)

25           THE COURT:  Welcome back, members of the jury.

```
 1              Let me give you one quick schedule reminder, and
 2   that is that there's one of you jurors who had an obligation
 3   on Thursday evenings at five o'clock, and the parties were
 4   aware of that when they selected that juror to stay on the
 5   jury.  So what that means for all of you is that on
 6   Thursdays, we'll be recessing about an hour earlier than we
 7   will on the other days of the week.  So for planning
 8   purposes, that should be helpful.  So we will be breaking
 9   today about an hour early to allow that juror the time
10   necessary to make that obligation.
11              You may call your first witness.
12              MS. GOEMAAT:  Thank you, Your Honor.
13              The government calls Katirina Pattison.
14              THE COURT:  Ms. Pattison, come forward here and
15   we'll ask the clerk to swear you in.
16                    EVELYN KATIRINA PATTISON,
17                Having been duly sworn, was examined
18                     and testified as follows:
19              THE CLERK:  Have a seat right over here.  If you
20   can make sure and pull the microphone close to you, and
21   state your name and spell it for the record, please.
22              THE WITNESS:  My name is Evelyn, E-v-e-l-y-n,
23   Katirina, K-a-t-i-r-n-a, last name Pattison,
24   P-a-t-t-i-s-o-n.
25   //
```

```
 1                        DIRECT EXAMINATION

 2   BY MS. GOEMAAT:

 3   Q    Good afternoon, Ms. Pattison.

 4   A    Good afternoon.

 5   Q    Where do you currently live?

 6   A    I live in Missouri.

 7   Q    Where do you work?

 8   A    I work for my parents on our family ranch.

 9   Q    What do you do on the ranch?

10   A    I raise cattle and goats with my parents.

11   Q    Is this your first time testifying?

12   A    It is not.

13   Q    Have you testified in here previously?

14   A    I have.

15   Q    And what is your understanding of why you did that?

16   A    The reason why I testified previously is because at the

17   time I was 34 weeks --

18             MR. GERAGOS:  Objection, relevance.

19             MS. GOEMAAT:  Your Honor, I expect that the prior

20   deposition will be used.

21             THE COURT:  Overruled.

22             THE WITNESS:  At the time I was 34 weeks pregnant

23   and I was not able to fly after 36 weeks, and at the time we

24   believed the trial would begin in September.  So I was not

25   going to be able to be present at the trial.  So they
```

1  brought me in for a video deposition.

2  BY MS. GOEMAAT:

3  Q    And have you been involved in your own criminal case

4  separate from this?

5  A    Yes.

6  Q    What generally were you charged with in that case?

7  A    I was charged with one count of conspiracy and it was

8  related to biodiesel fraud.

9  Q    Were you charged with additional counts as well?

10 A    Yes, I was.

11 Q    Did you plead guilty?

12 A    I did.

13 Q    What did you plead to?

14 A    I pled guilty to one count of conspiracy to defraud the

15 United States government.

16 Q    And did you cooperate with the United States?

17 A    I did.

18 Q    What was your understanding of your plea agreement that

19 you entered into?

20 A    My plea agreement, I understood, to the best of my

21 knowledge, I had to cooperate with the United States

22 government and provide any knowledge that I had on not just

23 my case but any other cases that were presented to me at the

24 time.  I was also facing a possibility of five years in

25 prison, or three years probation was the best case scenario.

```
1    Q    Were you asked to meet with various federal agencies to

2    provide information?

3    A    Yes.

4    Q    And have you been sentenced?

5    A    I have.

6    Q    When you went into your sentencing, what did you expect

7    to happen?

8    A    I fully expected to walk out of that courtroom and

9    spend five years in prison and say goodbye to my friends and

10   family that day.

11   Q    What happened at your sentencing?

12   A    By the grace of God, I received three years probation

13   and 288 hours of community service.

14   Q    And when was that?

15   A    November 16th of 2016.

16   Q    Are you still on probation?

17   A    I am not.  I completed my sentence November 16th, 2019.

18   Q    And was this with a prosecution team out east?

19   A    Yes.

20   Q    So what promises were made for your testimony here

21   today?

22   A    None.

23   Q    What benefit do you hope to receive from your testimony

24   here today?

25   A    None.
```

```
1    Q    Why are you here?
2    A    Because I received a subpoena and it's the right thing
3    to do.
4    Q    Did you testify at the trial of a co-defendant?
5    A    I did.
6    Q    Did you also testify at the sentencing of your
7    co-defendant, Joseph Furando?
8    A    I did.
9    Q    I'd like you to briefly tell the jury about your case
10   that you pled guilty to and what the fraud was.
11   A    Okay.  I was the chief operating officer for two
12   organizations, Cima Green and Caravan Trading Company.  We
13   worked with a company called e-biofuels, which was located
14   in Middleton, Indiana.  They were a biodiesel facility
15   located in Indiana, and we bought B99 biodiesel and sold it
16   to them as feedstock, which is your raw material.  And they,
17   in turn, took it and recertified it and listed it as B100
18   with RINs and the dollar tax credit and sold it for a
19   profit.
20   Q    Did you and Joseph Furando have a word for this?
21   A    We did.  We called it both recertification and Alchemy.
22   Q    And you mentioned B99 biodiesel.  What is B99
23   biodiesel?
24   A    B99 biodiesel is 99 percent biodiesel with one percent
25   diesel added to it in order to be eligible for something
```

1    called the dollar tax credit.

2    Q    What is the dollar tax credit?

3    A    The dollar tax credit was a government incentive that

4    was provided by the United States so when you would blend

5    your biodiesel to a certain level with diesel fuel, you

6    would receive a dollar for that.

7    Q    And what is it that your company, Cima Green, was

8    having e-biofuels do with this B99 that you were selling to

9    them?

10   A    We were having e-biodiesel recertify the B99 biodiesel.

11   Essentially they would take that product, claim that they

12   had produced it as their own so that it would be eligible

13   for both the RINs and the dollar tax credit.

14   Q    And can you briefly explain what a RIN is?

15   A    A RIN is a renewable identification number.  I don't

16   recall if it's either 36 or 38 digits long.  Essentially it

17   is comprised of a series of numbers that indicate the date,

18   the producer that manufactured it, a batch code, and I'm

19   sure there's some other parts to it but I don't remember

20   them off the top of my head.  And this RIN is similar to

21   like a stock certificate, and it allows it to have a certain

22   market value, and there are one and a half RINs assigned to

23   each gallon of biodiesel.

24   Q    So the fraud that you pleaded guilty to, did that

25   include tax credits and RINs?

```
 1   A      Yes.

 2   Q      How big was the fraud that you pleaded guilty to?

 3   A      The case that I was involved in was approximately

 4   $55 million.

 5   Q      And was that the e-biofuels case?

 6   A      Yes.

 7   Q      And when you were at Cima Green, did you do this kind

 8   of a thing with any other companies?

 9   A      We did.

10   Q      With who?

11   A      Washakie Renewable Energy.

12   Q      I want to ask you a few questions about your

13   co-defendant, Joseph Furando.

14   A      Okay.

15   Q      Were you in a relationship with him?

16   A      I was.

17   Q      When did it start?

18   A      I was 16 years old and he was 36 at the time.

19   Q      Was he married?

20   A      He was.

21   Q      What was going on at home when that happened?

22   A      I was not in a very good home situation.

23          MR. GERAGOS:  Objection, relevance.

24          THE COURT:  Overruled.

25          THE WITNESS:  My home situation was not ideal.
```

1    The woman who was raising me had mental health disorders,

2    and I was not very happy at home, and so I was looking for

3    any form of an escape.

4    BY MS. GOEMAAT:

5    Q    And was it a good relationship that you had with Joseph

6    Furando?

7    A    No.  Mr. Furando was sexually, mentally, and physically

8    abusive in more ways than you can even imagine.

9    Q    Did the abusive nature of your relationship have an

10   impact on the fraud you committed with Mr. Furando?

11            MR. GERAGOS:  Objection, relevance.

12            THE COURT:  It's also leading.

13            MS. GOEMAAT:  Yes, Your Honor.

14   BY MS. GOEMAAT:

15   Q    Did this have any impact on anything?

16   A    It did.  The result of my relationship with

17   Mr. Furando, he was very controlling, and I was -- I was not

18   able to live my life the way that a normal young woman

19   should.  I was involved in multiple things that were not

20   very fun.  He forced me into prostitution.  He forced me to

21   sell my eggs at one point to make money.  He pretty much

22   controlled every single aspect of my life from how I

23   dressed, to how I interacted with people, to how I spoke,

24   groomed me to be his perfect employee.

25   Q    Were there videotapes?

1    A    Yes, there were.

2    Q    What were the videotapes?

3    A    When Mr. Furando had forced me into prostitution, he

4    videotaped some of the encounters and, in turn, would take

5    those tapes and use them to blackmail other clients out of

6    money when he needed it.

7    Q    Are you aware that when search warrants -- are you now

8    aware that when search warrants were executed, that these

9    tapes were seized?

10   A    Yes.

11   Q    Did these tapes play any role in why you cooperated

12   with the government?

13   A    No.

14   Q    Why did you cooperate with the government in your case?

15   A    Because I had to.  I couldn't stay in the relationship

16   with Mr. Furando.  He had attempted multiple times to take

17   my life.  And if I didn't cooperate with the United States

18   government, I would be dead, in my mind.

19   Q    And if you can explain why do you think that you would

20   have been dead.

21   A    Because he tried to kill me on more than one occasion.

22   Q    Are you in a relationship with him now?

23   A    No.

24   Q    When did he stop making you engage in prostitution?

25   A    It was late 2008, I believe.

```
 1   Q     I'm going to switch topics.
 2         Do you know Jacob Kingston?
 3   A     I do.
 4   Q     When did you first meet him?
 5   A     I met Jacob Kingston at the National Biodiesel Board
 6   Convention in February of 2012.
 7   Q     Who was there?
 8   A     It was myself, Mr. Furando, Jacob Kingston, Justin
 9   Divis, and a third individual who I cannot recall off the
10   top of my head what his name was.
11   Q     Did you talk to Jacob Kingston?
12   A     We did.
13   Q     Why?
14   A     At the time our fraud that we were involved in with
15   ebiofuels was essentially coming to an end.  They were on
16   the verge of filing for bankruptcy.  And we were sitting on
17   several million gallons worth of biodiesel and had nowhere
18   to go with it.  This was a fairly large financial
19   predicament for us.  And so we were looking essentially for
20   another partner to commit fraud with.  And we heard some
21   rumors in the industry that Washakie was engaging in some of
22   this fraud, and so we approached them, and essentially this
23   was a, hey, how are you conversation, what can we do for
24   you, can we supply things for you, how can we help.
25   Q     And what did Jacob Kingston tell you?
```

```
 1   A    At this point he had not given us any specific details
 2   on customers.  It was more of a let's continue to explore
 3   this relationship and we'll see what we can do.
 4   Q    And how were you going to explore the relationship with
 5   Jacob Kingston?
 6   A    We essentially wound up having to have a meeting with
 7   somebody by the name of Levon Termendzhyan.
 8   Q    And how did that come about?
 9   A    We were told that if we wanted to continue to work with
10   Washakie --
11            MR. GERAGOS:  Objection, hearsay as to what they
12   were told.
13            THE COURT:  Well, you ought to lay some foundation
14   as to who told her.
15            MS. GOEMAAT:  Thank you.  I'll do that,
16   Your Honor.
17   BY MS. GOEMAAT:
18   Q    Did somebody else tell you something about the Levon
19   Termendzhyan?
20   A    Yes, we were --
21            THE COURT:  Yes or no.
22   BY MS. GOEMAAT:
23   Q    And who was that person?
24   A    Jacob Kingston.
25            THE COURT:  Overruled.  You can go ahead.
```

1  BY MS. GOEMAAT:

2  Q     What did Jacob Kingston tell you about Levon

3  Termendzhyan?

4  A     If we wanted to work with Washakie Renewable Energy, we

5  had to meet with Levon.

6  Q     Did you do that?

7  A     Yes.

8  Q     Can you describe your first meeting with Levon

9  Termendzhyan?

10 A     We met with Levon in March of 2012.  I believe the date

11 was March 24th.

12 Q     Where was the meeting?

13 A     It was in Miami.

14 Q     Can you describe it for the jury?

15 A     Yes.  We flew into Miami.  I believe it was in the

16 morning we landed.  It was myself and Mr. Furando.  We

17 stayed at the hotel called the Eden Roc.  And at some point

18 during the day, I don't recall specifically who told us to

19 go to the Fontainebleau, which is the hotel next door.  We

20 were told to go next door to the hotel.

21        MR. GERAGOS:  Objection, hearsay.

22        THE COURT:  Sustained.

23 BY MS. GOEMAAT:

24 Q     Did you go to the hotel?

25 A     Yes.  We went next door to the hotel to meet Levon, and

1    we essentially wound up --

2              MR. GERAGOS:  Objection, nonresponsive.

3              THE COURT:  Let's not have a narrative.

4    Sustained.

5    BY MS. GOEMAAT:

6    Q    Please describe the very first meeting you had at the

7    hotel with Levon Termendzhyan.

8    A    We met with Levon outside of the hotel in the area

9    where they dropped the guests off.  It's where the cars all

10   pull in.  That's where we first met him.

11   Q    And what's the first thing that you did with Levon

12   Termendzhyan?

13   A    We went up to him and shook his hand and introduced

14   ourselves, and then proceeded inside the hotel to the bar.

15   Q    What did you do at the bar?

16   A    We went to the bar and we ordered some drinks.

17   Mr. Furando ordered a scotch.  And at that point

18   Mr. Termendzhyan said that that wasn't good enough, and he

19   wound up ordering -- I think it was a 50-year-old glass of

20   scotch.

21   Q    Who was present for this?

22   A    Myself, Mr. Furando, Levon, I believe a few of his

23   family members, and some bodyguards as well.

24   Q    Who paid for this $1500 scotch?

25   A    Levon did.

1    Q    And how did he pay for it?

2    A    The waitress was not being attentive enough, so Levon,

3    after we finished our drink, he took several hundred dollar

4    bills and called the waitress over and threw them down on

5    the table and said next time you will remember me.

6    Q    How did that feel to you?

7    A    I was --

8              MR. GERAGOS:  Objection, relevance.

9              THE COURT:  Overruled.

10             THE WITNESS:  I was thoroughly impressed, shocked.

11   At this point I didn't know what was happening.  It was a

12   very powerful move.

13   BY MS. GOEMAAT:

14   Q    What did you do after the meeting at the bar?

15   A    We left and proceeded to a -- I believe it was an

16   Italian restaurant somewhere in Miami.  I don't remember if

17   we walked or drove there.

18   Q    And who was present for the dinner?

19   A    It was myself, Mr. Furando, Levon, a few of his family

20   members, and some bodyguards.

21   Q    And did you and Mr. Furando have a discussion with

22   Mr. Termendzhyan?

23   A    We did.

24   Q    Can you please describe that discussion for the jury?

25   A    Mr. Furando was very insistent about discussing

1  business with Levon.  He wanted to get the fuel moving, he

2  wanted to get product to him, and he wanted to do it now.

3  And so he had a very insistent conversation, and Levon kept

4  pushing back saying I don't want to talk.  I just want to

5  enjoy my dinner and get to know you.  And Mr. Furando

6  continued to --

7            MR. GERAGOS:  Objection, narrative.

8            THE COURT:  Sustained.

9  BY MS. GOEMAAT:

10  Q    Eventually did you and Mr. Furando and Mr. Termendzhyan

11  talk, as you called it, business?

12  A    Yes.

13  Q    Please describe that conversation.

14  A    We ultimately wound up discussing that Levon would be

15  interested in getting material from us.  However, it needed

16  to be delivered into California at HO minus 60.

17  Q    What does HO minus 60 mean?

18  A    HO stands for heating oil, and minus 60 would be minus

19  60 cents.

20  Q    Was that a price you were able to sell biodiesel to

21  Mr. Termendzhyan for?

22  A    No.

23  Q    Why not?

24  A    In my experience as the chief operating officer for

25  Cima Green, I did not see that as feasible.  There was no

1    way we could deliver it at that price to California.

2    Q    Was there any more discussion about how

3    Mr. Termendzhyan could get your biodiesel at that price?

4    A    Yes.

5    Q    What was that discussion?

6    A    We explained to Mr. Termendzhyan that we could use

7    Washakie to recertify the fuel and, in turn, be able to

8    deliver it into California at his price.

9    Q    Now was it you or Mr. Furando who explained it?

10   A    It was both of us.

11   Q    And can you explain to the jury what you mean when you

12   say that you explained you could use Washakie to recertify

13   the fuel?

14   A    We specifically stated that we would take the B99

15   biodiesel and send it to Washakie, label it as your raw

16   material, which would be either soy blend or animal fat, or

17   something along those lines.  And then Washakie would, in

18   turn, say that they had produced that material, and it would

19   be produced as B100, and therefore be eligible for the tax

20   credit and the RINs.

21   Q    What did Levon Termendzhyan say about this?

22   A    Nothing.

23   Q    Did he object to the fraud?

24   A    No.

25   Q    Where was Jacob Kingston in this conversation about

1   recertifying through Washakie?

2   A    He was not there.

3   Q    How could you make a plan to recertify your B99 through

4   Washakie without Jacob Kingston?

5   A    In my opinion, in my mind --

6           MR. GERAGOS:  Objection as to her opinion.

7           THE COURT:  Sustained.

8           MS. GOEMAAT:  I'll lay a foundation, Your Honor.

9   BY MS. GOEMAAT:

10  Q    Were you and Joseph Furando in charge of executing your

11  side of the fraud?

12  A    Yes.

13  Q    And did you need to secure certain agreements from

14  certain people?

15  A    Yes.

16  Q    And whose agreement did you need to secure in order to

17  recertify your fuel through Washakie?

18  A    We needed to secure Levon Termendzhyan's agreement.

19  Q    What is the basis for your understanding that you

20  needed to secure Levon Termendzhyan's agreement?

21  A    Because Levon controlled the partnership between

22  Washakie and himself.

23  Q    What is your basis for saying that Levon controlled the

24  partnership between himself and Jacob Kingston?

25  A    Because unless we had Levon's signature of approval, we

1    would not be able to do business with Washakie.  That is

2    what we were -- that was our understanding.

3    Q    What did you do after that dinner?

4    A    After that dinner, I returned back to New Jersey, and a

5    few days later I was on a plane to Calgary, Canada.

6    Q    Did you do anything else in Miami before you went to

7    Calgary?

8    A    Yes.  Sorry I got ahead.  Yes, we celebrated the next

9    day at a place called Nikki's Beach.

10    Q    What is that?

11    A    It's a beachside resort that is located in South Beach,

12    sand, lounges, deejays, music, food.

13    Q    I'd like you to take a look at what's been

14    provisionally admitted as Government's Exhibit 4-1.

15         It's also tab one in your binder if you prefer to look

16    at it there.

17         Can you explain to the jury what this picture is?

18    A    Yes.  This is a picture that I took at Nikki's Beach

19    the day we were there.

20    Q    And who are the people in this photo?

21    A    The gentleman in the red and white shirt with the

22    Ferrari logo, that is Mr. Furando.  The female next to him

23    is the waitress.  The gentleman in the shorts and no shirt,

24    that is Levon.  And the other gentleman, I don't recall

25    specifically who he is.

1   Q    What was the purpose of going to Nikki's Beach?

2   A    We were there to have a celebration.

3   Q    What were you celebrating?

4   A    The start of our business.

5   Q    With who?

6   A    With Levon and Washakie.

7   Q    Who paid for this party?

8   A    Levon did.

9   Q    Now you said previously that you went pretty much

10  straight to Calgary, Canada?

11  A    Yes.

12  Q    Why did you do that?

13  A    I had to go to Canada.  That is where our supplier was,

14  Astra Oil.  So I went up there to reassure them face to face

15  that we were back in business, that we had a deal, and we

16  were going to start moving our material that we had

17  purchased from them.

18  Q    What did you do after the Canada trip?

19  A    I flew from Canada to LA to meet with Levon again.

20  Q    Why?

21  A    Because we were told to go.

22  Q    Who told you?

23  A    Levon.

24  Q    And describe your trip to Los Angeles, if you would.

25  A    We landed in LA -- I believe it was about nine o'clock

```
 1    in the morning -- and we were picked up at the airport by --

 2    I believe it was his son, George, and also his nephew whose

 3    name is George.

 4    Q    Where did you go?

 5    A    We went to Levon's offices.  I don't remember if they

 6    were in LA or just outside of LA.

 7    Q    Can you briefly describe the office?

 8    A    It was a yellow building similar to like a mobile home,

 9    or a trailer of some sort.  It had a wooden ramp leading up

10    to it.  There was some fuel trucks in the parking lot, and

11    that was about it.

12    Q    Did you go inside?

13    A    I did.

14    Q    Did you have a meeting?

15    A    I did.

16    Q    What did you find when you went inside?

17    A    I went inside and there was a small reception area, and

18    I was at this point unimpressed.  I expected something

19    different.  And then we turned and went into Levon's

20    offices, and then that's where I saw Levon's personality

21    come alive.

22    Q    How so?

23    A    In his office he had Lamborghini furniture.  There was

24    a huge spread of food on the table.  There was a bottle of

25    tequila, and I believe also his desk.
```

1   Q     Who did you have with you on this trip?

2   A     It was myself and three of my business colleagues.

3   Q     Did they know about the fraud?

4   A     No.

5   Q     Okay.  So there was a spread of food?

6   A     Yes.

7   Q     Good host?

8   A     Yes.

9   Q     What happened after the -- sounds like a breakfast

10  meeting.  What did you do?

11  A     We wound up taking a tour of what we were told was

12  Levon's business holdings.  He took us to a nonoperational

13  biodiesel plant as well as a truck stop fuel terminal, and

14  we got out there and he said -- at the fuel pump, he said

15  this is where your fuel will be delivered to my customers.

16  Q     What did you do after the tour of the gas stations?

17  A     We went back to Levon's offices.  The breakfast type

18  food had been taken away and was replaced with a lunch style

19  meal.  And myself and my three colleagues, we sat down with

20  somebody -- I believe his name was Dan McDyre.  We were just

21  talking some legitimate business and ways we could diversify

22  and help Levon.

23  Q     What was the legitimate business you were trying to

24  talk about?

25  A     We wanted to try and supply anything that we possibly

 1   could.  Mr. Furando was the type of person where he didn't

 2   want all of his eggs in one basket.  So if Levon needed

 3   toys, we would try and sell him toys.  That's what we would

 4   do.

 5   Q    In that meeting, were you able to cement any legitimate

 6   deals?

 7   A    No.

 8   Q    Now you haven't mentioned Jacob Kingston.  Was he

 9   there?

10   A    At the time I did not recall him being there at all.

11   Q    At some point did you recall him being there?

12   A    It wasn't until I started to look for photos and

13   e-mails related to this case at the government's request did

14   I find a picture showing that Jacob Kingston was there.

15            MS. GOEMAAT:  I'd like to show the witness

16   provisionally admitted Government's Exhibit 4-2.

17   BY MS. GOEMAAT:

18   Q    Is this the photo?

19   A    Yes.

20   Q    Can you describe who is in this photo?

21   A    In this photo the two gentlemen who are facing the

22   camera in the black suits are bodyguards.  The gentleman in

23   the blue shirt who is looking away is Jacob Kingston.  And

24   the other gentleman with his back --

25   Q    Excuse me.  I'm so sorry.

```
 1              MS. GOEMAAT:  I think we're having some technical
 2   problems.
 3              Thank you for bringing that to our attention.
 4   BY MS. GOEMAAT:
 5   Q    Let's dial back 30 seconds.  Is this the photo that
 6   reminded you that Jacob Kingston was present?
 7   A    Yes.
 8   Q    Please tell the members of the jury who's in this
 9   photo.
10   A    So the gentlemen in the black suits that are facing the
11   camera, those are the bodyguards.  The gentleman in the blue
12   shirt who is looking away is Jacob Kingston.  And the other
13   gentleman in the black with his back to us I believe to be
14   Levon.
15   Q    And how do you know that this is the same meeting, this
16   photo that it sounds like you found kind of recently?
17   A    There are tire tracks in the back, and that was from
18   Levon doing doughnuts in the parking lot in one of his
19   vehicles.
20   Q    Is that during the course of this Los Angeles meeting
21   that he did that?
22   A    Yes.
23   Q    Now at this point of the day have you discussed any
24   fraud?
25   A    No.
```

1   Q    And where is Joseph Furando in this?

2   A    Mr. Furando was not able to attend this trip.  He had

3   a -- I believe it was a medical procedure of some sort, so

4   he was not able to go.  So he was texting and calling me

5   throughout this trip.

6   Q    What was he saying?

7   A    He was asking do we have a date, do we have a quantity,

8   do we have a price, do we have -- do we have, do we have, do

9   we have.

10  Q    The specifics of --

11  A    The deal.

12  Q    Was he asking for specifics?

13  A    Yes.

14  Q    So what did you do in response to Furando's many

15  inquiries?

16  A    At this point it was getting later in the day, and I

17  was extremely tired, and I very -- well, not so politely

18  told him F you.  Talk to Levon yourself.

19  Q    So what happened?

20  A    I went inside and I asked Levon if he would speak with

21  Mr. Furando, and he agreed.  And so we went outside and we

22  had a phone call.

23  Q    Where did you go to have the phone call?

24  A    There was an outbuilding, almost like a shed that was

25  either attached or just off of Levon's offices.  It had a

1    wooden bench inside and I can't remember if there was a door

2    or not.

3    Q    Why did you have to go to the shed to have a

4    conversation?

5    A    Because the three colleagues who were with me on this

6    trip were not aware of the fraud.

7    Q    Did Jacob Kingston come to the shed?

8    A    No.

9    Q    Can you describe this phone call -- was it on

10   speakerphone?

11   A    Yes.

12   Q    Can you describe this phone call that you and Joseph

13   Furando and Levon Termendzhyan had?

14   A    Yes.  We were in the middle of trying to sort all of

15   this out.  We needed to know how many gallons.  We needed to

16   know when they would start to move railcars.  We needed to

17   know how Washakie was going to get the railcars out to

18   Illinois, which is where our fuel was located, and all of

19   this took place during this conversation.

20   Q    And did you make any kind of agreement with Levon

21   Termendzhyan during this call?

22   A    We did.  We agreed to have a short test run of six

23   railcars that would go to Illinois, pick up the material,

24   and bring it back to Washakie in Utah, and eventually wind

25   up in California for Levon.

1    Q    What was the material that was going to be picked up in

2    Illinois?

3    A    B99 RINless biodiesel.

4    Q    And where was it going to go?

5    A    To Washakie in Utah.

6    Q    And what did you discuss with Levon Termendzhyan?  What

7    happened to it in Utah at Washakie?

8    A    We explained to Levon that Washakie would claim that it

9    was raw material, that we would provide documents that would

10   say that it was their raw material, such as soybean oil, and

11   Washakie would, in turn, say that they produced it as B100,

12   which is 100 percent biodiesel, and be able to claim RINs

13   and the dollar tax credit.

14   Q    And then what was the plan for this material?

15   A    Then Washakie would take that material and sell it to

16   Levon and be able to get it into California at the price

17   that he wanted of HO minus 60.

18   Q    Was Mr. Furando trying to obtain somebody's agreement

19   in this phone call?

20              MR. GERAGOS:  Objection, calls for speculation.

21              MS. GOEMAAT:  I will rephrase.

22   BY MS. GOEMAAT:

23   Q    Were you part of the entire phone call?

24   A    Yes.

25   Q    Were you and Mr. Furando speaking to Levon

1    Termendzhyan?

2    A     Yes.

3    Q     What were you trying to do?

4    A     We were trying to get Levon to agree to participate in

5    fraud with us.

6    Q     Where was Jacob Kingston during this phone call in the

7    shed?

8    A     He was not there.

9    Q     How can you make this plan with Levon Termendzhyan to

10   recertify your B99 through Washakie without Jacob Kingston?

11   A     Because I believe that Levon was in control and it did

12   not matter what Jacob wanted to do.  If Levon wanted it

13   done, it was done.

14   Q     And what is your basis for that belief?

15   A     My basis is that it was the same relationship that I

16   had with Mr. Furando.  Mr. Furando controlled everything

17   that I did, and it was the same behavior.  It didn't matter

18   what was said.  If Levon wanted it --

19             MR. GERAGOS:  Objection, speculation.  Motion to

20   strike.

21             THE COURT:  Sustained.

22             MR. GERAGOS:  Motion to strike.

23             THE COURT:  I'll ask the jury to disregard that

24   last statement.

25   //

```
1   BY MS. GOEMAAT:

2   Q    Did you get an agreement on that phone call?

3   A    We did.

4   Q    What was the agreement?

5   A    The agreement was to do a test run of six railcars.

6   Q    Did you have any final details to hammer out?

7   A    Yes.  We still needed to hammer out a date and we

8   needed to hammer out a price.

9   Q    What did you do after the shed phone call?

10  A    Myself and our three colleagues, we returned back -- or

11  I returned back into the offices, and it was myself and a

12  female colleague got dressed and we went to go to dinner.

13  Q    Where did you go to dinner?

14  A    We went down to a -- it was like a sushi Italian style

15  type restaurant just off Rodeo Drive in LA.

16  Q    How did you get there?

17  A    I rode in Levon's Maybach, and everyone else followed

18  in two other vehicles.

19  Q    I'm sorry.  Who was driving?

20  A    A bodyguard.

21  Q    Did you make a special request of them on the way to

22  the dinner?

23  A    I did.  I was 26, I believe, at the time and I had

24  never been down Rodeo Drive and I wanted to go down Rodeo

25  Drive.  So Levon requested that his driver take me and we
```

1   got to drive down Rodeo Drive.

2   Q     Did you like that?

3   A     Yes.

4   Q     Do you remember anything that happened at the dinner?

5   A     There were a couple of events that happened at the

6   dinner.  The first one was a very large boat of sushi was

7   brought out, and we were also given menus.  And there was a

8   truffle risotto on the menu -- and I really like risotto --

9   and so I ordered that.  And it came out and Levon said that

10  there was not enough truffle on this dish.  And so he called

11  the waiter over and asked the waiter to bring out the

12  truffle, which for those of you who don't know what a

13  truffle is, it's a very expensive mushroom.  And he had the

14  waiter shave this entire mushroom onto the dish.

15  Q     What did you think about that?

16              MR. GERAGOS:  Objection, relevance.

17              THE COURT:  Overruled.

18              THE WITNESS:  I was stunned, impressed, shocked.

19  I, again, had never seen this type of behavior before.  I

20  felt like a celebrity.

21  BY MS. GOEMAAT:

22  Q     Did anything else happen at the dinner?

23  A     At one point I needed to use the restroom, and I was

24  told that I could not go by myself and a bodyguard had to

25  escort me to the restroom.

```
 1   Q    Was that kind of exciting?

 2   A    Yes.

 3   Q    Anything else happen in this trip to Los Angeles?

 4   A    Not that I can recall.

 5   Q    So what was the point of this trip to Los Angeles?

 6   A    It was, in my mind --

 7              MR. GERAGOS:  Objection, relevance.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  In my mind it was a trip for how far

10   will you go, what will you do in order to make this deal

11   happen.

12   BY MS. GOEMAAT:

13   Q    What was your next encounter with Levon Termendzhyan?

14   A    The next time I met with Levon was in -- I want to say

15   late April of 2012, and that was in Las Vegas.

16   Q    Can you briefly describe that meeting?

17   A    It was a five-minute meeting in an RV in the parking

18   lot of the hotel.

19   Q    Why did you go there?

20   A    Because we were told to be there.

21   Q    Who told you?

22   A    Levon.

23   Q    Did you discuss anything, that you can remember?

24   A    No.

25   Q    So at this point did you get going with these six
```

1    railcars?

2    A      Yes.

3    Q      And where were you sending the fuel from?

4    A      The fuel was coming from two terminals in Illinois.

5    One is Kinder Morgan and the other one was Incobrasa.

6    Q      And where were they going?

7    A      They were going to Utah.

8    Q      And where were they supposed to go after that?

9    A      To California.

10   Q      And one more time, what was the purpose of this sojourn

11   in Utah on the way to California?

12   A      The material needed to go to a biodiesel facility in

13   order to be recertified.

14   Q      I'd like to briefly look at a couple of the contracts

15   that you had.  I'd ask you to look at Exhibit 4-3.

16          MS. GOEMAAT:  If we can put that to the screen,

17   and turn to page two.  This is pre-admitted 4-3.

18   BY MS. GOEMAAT:

19   Q      What is this?

20   A      This is a contract between our organization, Caravan

21   Trading, and Astra Oil, which was our supplier, and it is

22   for B99 SME, which stands for soy methyl ester, which is soy

23   biodiesel.  And down towards the bottom under RIN terms

24   you'll see no RINs transferred.

25   Q      And what does that mean?

1    A    It means that this material has already had the dollar

2    tax credit and the RINs taken off of it.

3    Q    I'd like you to turn to previously admitted 4-4, page

4    two.  Can you tell me what this contract is for?

5    A    This is also another contract for B99, soy methyl

6    ester, or soy biodiesel, also with no RINs transferred.

7    Q    Did you ever send these contracts to Jacob Kingston or

8    Levon Termendzhyan?

9    A    No.

10   Q    Did you tell them?

11        MR. GERAGOS:  I'm sorry.  I missed the last

12   question.

13        THE COURT:  She said did you ever send these

14   contracts to Levon Termendzhyan.  The answer was no.

15        If you could both speak up a little bit.

16        MS. GOEMAAT:  Yes, Your Honor.

17   BY MS. GOEMAAT:

18   Q    Did you tell Jacob Kingston or Levon Termendzhyan that

19   you were sending them feedstock?

20   A    No.

21   Q    What did you tell them you were sending?

22   A    We told them that we were sending them B99 biodiesel.

23   Q    How did you bill them?  How did you bill Jacob

24   Kingston?

25   A    We sent an invoice to Jacob Kingston that was billed to

1    them as feedstock.

2    Q    I'd like you to look at previously admitted 4-5.

3         MS. GOEMAAT:  If we can put that on the screen.

4    BY MS. GOEMAAT:

5    Q    What is this document, Ms. Pattison?

6    A    So this is an invoice from Sunbelt Ag Supply to

7    Washakie Renewable Energy dated May 17th of 2012.  And it is

8    labeled as soy blend is the material we are billing them

9    for, with payment terms of net 20 days.

10   Q    What is soy blend?

11   A    Soy blend is a code word for soy biodiesel.  It can

12   either be seen as fuel or it can be seen as raw material.

13   Q    What was the point of billing them for soy blend

14   instead of B-99?

15   A    So they could take this invoice and use it as

16   documentation to back up their ability to recertify this

17   material.

18   Q    And we haven't talked about Sunbelt AG Supply.  What is

19   that?

20   A    Sunbelt Ag Supply is a shell company that Mr. Furando

21   created specifically for the Washakie Cima Green business.

22   Q    And this is billed in pounds.  Does that have any

23   significance to you?

24   A    Yes.  Feedstock is billed in pounds, so your raw

25   material is always billed in pounds, whereas your biodiesel

1  would be billed in gallons.

2  Q    But this was biodiesel, right?

3  A    Yes.

4  Q    So is the pounds false?

5  A    Yes.

6  Q    And you mentioned net 20 days.  What's the significance

7  of that?

8  A    So that is their credit terms.  Previously we had

9  always requested customers to pay for their material up

10  front, but because we were in a very difficult situation, we

11  agreed to give Washakie credit terms.

12  Q    Now this invoice is dated May 17th, 2012?

13  A    Yes.

14  Q    To be clear, is that one of the invoices for those

15  railcars of B99 that you sent to Washakie?

16  A    Yes.

17  Q    Did anything happen around May 17th, 2012?

18  A    May 24th, 2012, the FBI, the EPA, and a whole host of

19  other three-letter agencies that I can't even begin to tell

20  you, raided our offices.

21  Q    Was it public?

22  A    Yes.

23  Q    Did you and Jacob Kingston change invoices after the

24  FBI, EPA raids?

25  A    Yes.

```
1   Q    What's the purpose of that?

2   A    We were caught.  There was no way we could continue in

3   any form of fraud.  So we needed to back out of this deal.

4   Q    So changing these voices, was it like a cover-up?

5   A    Essentially, yes.

6   Q    I'd like you to turn to pre-admitted Government's

7   Exhibit 4-9.  This is an e-mail that was sent on June 20th

8   at 7:16.  And if we can go to page 10, this is attached to

9   that e-mail that you sent.  What is this?

10  A    This is the new invoice that is dated June 20th of 2012

11  that shows the railcars that were sent to Washakie and

12  requests payment for the B99 biodiesel.

13  Q    Why did you change it from soy blend to identifying a

14  specific railcar?

15  A    Because the FBI was investigating our organization and

16  we could not be involved in any further fraud.

17  Q    I'd like to turn your attention to pre-admitted

18  Government's Exhibit 4-7.  This is an e-mail on the same day

19  from Jacob Kingston.  What does he tell you?

20  A    Invoice revision coming.

21  Q    And he attaches something.  Can you read the name of

22  the attachment?

23  A    Cost calculation cima.xlsx.

24  Q    If we can turn to the attachment, page three of the

25  exhibit.  Can you explain this attachment to the jury, you
```

```
 1    received from Jacob Kingston?
 2    A     Yes.  So at the top, the product, they list it as
 3    costing $2.25.  The RINs below it, that column is blank.
 4    Q     What does that mean, that RINs is zero?
 5    A     That there were no RINs attached to this material.
 6    Q     Weren't you previously planning for Washakie to claim
 7    RINs on the material?
 8    A     Yes.
 9    Q     So now there's no RINs?
10    A     Yes.
11    Q     What else?
12    A     Then below that are the expenses, the freight from
13    Argo, which is Argo, Illinois, which is where the fuel
14    originated from.  Then there is a charge for freight to
15    California.
16    Q     Why is there freight to California?
17    A     Because the material was being shipped to Levon.
18    Q     And what's below freight to California?
19    A     It states a processing fee to WRE, which is Washakie
20    Renewable Energy.
21    Q     Why do you need a processing fee?
22    A     We were told that there was possibly issues with the
23    biodiesel.  I believe it was a moisture issue.
24              MR. GERAGOS:  Objection, hearsay.
25              THE COURT:  We need a foundation.  We just can't
```

1  have her say we were told.  We need to know who said what to

2  whom.

3  BY MS. GOEMAAT:

4  Q    Did you talk to Jacob Kingston about the processing

5  fee?

6  A    Yes.

7  Q    What did he say?

8  A    That there were moisture issues with the material.

9  Q    Did you think there were moisture issues?

10  A    No.

11  Q    What did you think this was?

12  A    A way for them to get more money.

13  Q    Was it to pay you less for the biodiesel?

14  A    Yes.

15  Q    I'd like to turn to Government's Exhibit pre-admitted

16  4-8.  This is an e-mail that is also sent on June 20th, just

17  moments later, and if we can turn to the second page, what

18  has Jacob Kingston attached to this e-mail that he sent you?

19  A    So this is his revisions that were sent to us.  He has

20  crossed out Washakie Renewable Energy and written in United

21  Fuel Supply.

22  Q    What's the significance of United Fuel Supply versus

23  Washakie Renewable Energy?

24  A    United Fuel Supply was the trading organization that

25  was owned I believe by Jacob Kingston, and there was no

1    issue with a trading company purchasing biodiesel.

2    Q    What were the other changes that he made?

3    A    He also added that it was B99 SME biodiesel.  I'm not

4    sure what that is written below, the NPMVDF515.  I don't

5    know what that means.  And then below that is no assigned

6    RINs transferred.

7    Q    Okay.  So all of these new invoices that you and Jacob

8    Kingston sent back and forth, was this basically a cover-up

9    since you'd been caught?

10   A    Yes.

11   Q    Would you say that the six railcar test was a

12   successful one?

13   A    No.

14   Q    Why not?

15   A    Because we did not succeed in recertifying the fuel

16   with Washakie, and we did not get the profit that we thought

17   we would.

18   Q    Why was that?

19   A    Because the FBI had put us under investigation at that

20   point.

21   Q    Now did you have any difficulties getting paid for the

22   six railcars of B99 that you did send out?

23   A    Yes.

24   Q    And did you talk to Jacob Kingston about that?

25   A    Yes.

1    Q    And did he tell you why he wasn't paying you?

2    A    We were told that there were moisture issues with the

3    fuel and that customers were not pulling.  So we needed to

4    wait until the customers started to buy the fuel in order to

5    be paid.

6    Q    And let me move ahead.  Did you eventually get some

7    money?

8    A    Yes.

9    Q    How did you ask Jacob Kingston to pay you?

10   A    We asked him to send us a certified check.

11   Q    And why did you ask to be paid that way?

12   A    Because several of our bank accounts had been frozen by

13   the United States government and we did not want these ones

14   to be seized.

15   Q    Were you trying to hide the money?

16   A    Yes.

17   Q    I'd like to slow you pre-admitted Government's Exhibit

18   4-10.  Now at the bottom of this e-mail you say this issue

19   needs to be resolved immediately.  What issue?

20   A    The fact that we had not been paid.

21   Q    And Jacob Kingston, at the top, he tells you that the

22   lab is rerunning the specs because they were outside

23   California standard.  Why did they need to be California

24   standard?

25   A    Because --

```
1              MR. GERAGOS:  Objection, no foundation.

2              THE COURT:  Sustained.

3   BY MS. GOEMAAT:

4   Q    Did you know where this fuel was going?

5   A    I believed it to be going to California.

6   Q    Were you in ongoing conversations with Jacob Kingston?

7         Will you turn to the one in your book 4-10, thank you

8   very much, and we were just saying you had written to Jacob

9   Kingston saying that issue needs to be resolved immediately.

10  And for the record, I am going to pass this exhibit around

11  to the jury, like the way we used to do it.  And Jacob

12  Kingston responds to you.

13        Now had you been talking to Jacob Kingston about this

14  issue of the quality?

15  A    Yes.

16  Q    Where did you think the fuel was going?

17  A    I believed it to be going to California.

18  Q    And do you see here where Jacob Kingston says to you

19  they need to redo it because of the specs for California

20  standard?

21  A    Yes.

22  Q    Now can you read the third sentence in Jacob Kingston's

23  e-mail?

24  A    It states this will be resolved when Levon gets back to

25  the country next week.
```

```
 1   Q     Is Levon Termendzhyan on this e-mail?

 2   A     No.

 3   Q     Did you bill Levon Termendzhyan for these six railcars

 4   of B99?

 5   A     No.

 6   Q     Did you e-mail with Levon Termendzhyan and mark up

 7   invoices, and do all that after the FBI raid?

 8   A     No.

 9   Q     Well, giving your conversations with Jacob Kingston

10   about this issue, why did this have to wait for Levon to get

11   back into the country for it to be resolved?

12   A     Because unless Levon agreed to pay us, we would not

13   receive the money.

14   Q     Why was that?

15   A     Because Levon controlled what Washakie Renewable Energy

16   was doing.

17              MS. GOEMAAT:  I have no further questions of this

18   witness.

19              THE COURT:  All right.  It looks like we have

20   someone from our IT department.  Let's just take a very

21   short five- to ten-minute stretch break.  You can hit the

22   restroom, or whatever.  Hopefully we'll get the system back

23   up before you come back.

24              (Jury excused)

25              (Recess)
```

```
 1              MS. GOEMAAT:  Your Honor, apparently my paper
 2     exhibit didn't make it all the way around.  So I'd like to
 3     just show the exhibit.  And while we're discussing, I'd like
 4     the Court's permission to ask just one more question.
 5              THE COURT:  Okay.
 6              MS. GOEMAAT:  Thank you.
 7              THE COURT:  I guess the system went down in every
 8     courtroom in the building.
 9              (Jury present)
10              THE COURT:  Are all the screens back up?  I should
11     ask you that question.  Are we doing okay?
12              It appears that there must have been a power surge
13     or something because the system went down in every courtroom
14     in the building.  But we're now back up.
15              And I don't believe that the exhibit that we had
16     in paper form made it all the way around, so I'm going to
17     turn the time back over to Ms. Goemaat to give you a chance
18     to look at this exhibit and finish up any additional
19     questioning she may have.
20              MS. GOEMAAT:  Thank you, Your Honor.
21     BY MS. GOEMAAT:
22     Q    All right.  Turning back to Exhibit 4-10, for the
23     record, this is the paper exhibit that made its way
24     partially around the jury box.  Can you please read the line
25     that I have now accidentally drawn a line through.  Can you
```

1    please read that line, Ms. Pattison?

2    A    It says this will be resolved when Levon gets back into

3    the country next week.

4    Q    Why does this need to wait for Levon to get back into

5    the country to be resolved?

6               MR. GERAGOS:   Objection, speculation.

7               THE COURT:   Sustained.

8               MS. GOEMAAT:   Thank you.

9    BY MS. GOEMAAT:

10   Q    Based on your conversations with Jacob Kingston about

11   this processing, and payment issue, and these e-mails that

12   you were having with him, and your understanding of the

13   agreement, why did this have to wait for Levon to get back

14   into the country until it could be resolved?

15              MR. GERAGOS:   Same objection, speculation.

16              THE COURT:   Sustained.

17   BY MS. GOEMAAT:

18   Q    Ms. Pattison, who did you enter into an agreement with

19   regarding these six railcars?

20   A    Washakie Renewable Energy.

21   Q    And who did you actually talk to to enter into the

22   agreement?

23   A    Levon Termendzhyan.

24   Q    Now on July 11, 2012 when you guys are e-mailing back

25   and forth, had you been paid?

```
 1    A     No.

 2    Q     And whose agreement did you need, based on your

 3    understanding of the agreement that you were in with these

 4    parties, in order to get paid?

 5              MR. GERAGOS:  Objection, leading, asked and

 6    answered.

 7              THE COURT:  Sustained.

 8    BY MS. GOEMAAT:

 9    Q     Ms. Pattison, I apologize.  I didn't ask you this

10    previously.  Do you see Mr. Termendzhyan in the courtroom?

11    A     I do.

12    Q     Can you identify him by an article of clothing he's

13    wearing?

14    A     He's wearing a blue tie with some sort of design on it,

15    and glasses.

16              MS. GOEMAAT:  Can the record please reflect the

17    witness has identified Mr. Termendzhyan.

18              THE COURT:  It may.

19              MS. GOEMAAT:  Thank you, Your Honor.

20    BY MS. GOEMAAT:

21    Q     Ms. Pattison, did you enter into an agreement to do

22    fraud regarding these six railcars?

23    A     Yes.

24    Q     Who did you enter into this agreement with?

25    A     Levon Termendzhyan.
```

```
 1    Q    Did you have a number of conversations with different
 2    people about this agreement that you had entered into?
 3    A    Yes.
 4    Q    And were you a participant in this agreement?
 5    A    Yes.
 6    Q    Who gave you directions as to how to accomplish this
 7    agreement?
 8    A    Levon Termendzhyan.
 9    Q    Thank you.
10             MS. GOEMAAT:  Your Honor, no further questions.
11             THE COURT:  You may cross-examine, Mr. Geragos.
12             MR. GERAGOS:  Thank you, Your Honor.
13                         CROSS-EXAMINATION
14    BY MR. GERAGOS:
15    Q    Good afternoon.  You testified here in this courtroom
16    before, correct?
17    A    Yes.
18    Q    And when you testified here before, you were also under
19    oath, correct?
20    A    Yes.
21    Q    And you were trying to tell the truth then, correct?
22    A    Yes.
23    Q    You specifically testified that you never got to an
24    agreement with Levon Termendzhyan.  Isn't that what you
25    testified to last time?
```

1    A    Yes.

2    Q    Okay.  You just testified with Ms. Goemaat that you did

3    reach an agreement, correct?

4    A    We had an agreement without specific details, such as

5    price and date.

6    Q    I specifically asked you last time you testified, in at

7    least three different ways, whether you ever reached an

8    agreement with Levon Termendzhyan.  Do you remember that?

9    A    We did not have a full agreement that included price,

10   date, and location.

11   Q    So you didn't have price, correct?

12   A    Yes.

13   Q    You didn't have date, correct?

14   A    Yes.

15   Q    You didn't have location, correct?

16   A    Yes.

17   Q    Last time I asked you that, I walked you through

18   specifics, and I said did you ever reach an agreement, and I

19   asked you three different times, and each time you said no.

20   Isn't that right?

21            MS. GOEMAAT:  Objection, Your Honor, can I see

22   the --

23            THE COURT:  He's just asked her a question at this

24   point.

25            THE WITNESS:  May I see the statement?

BY MR. GERAGOS:

Q    No.  I'm asking you for your memory.  You're testifying to this jury.  You just told them that you reached an agreement with Levon Termendzhyan, and the last time you testified you said you didn't.

A    I would like to see the statement, please.

Q    Does that mean you can't remember what you testified to last time?

Do you need your recollection refreshed because you don't remember what you testified to under oath last time in this same courtroom?  Is that a fair statement?

A    I would like to see the statement, please.

Q    You're not going to answer --

MR. GERAGOS:  Objection, nonresponsive.  I'd ask the Court to direct her to answer my question.

THE COURT:  You need to answer the question to the best of your recollection.

THE WITNESS:  To the best of my recollection, you had asked me whether or not we had had a complete deal.  We did not have a complete deal.  There were still specifics that needed to be identified.

BY MR. GERAGOS:

Q    I didn't ask about a complete deal last time, did I?  I asked you if you ever reached an agreement.  Do you remember that?

```
 1   A     Yes.  However --
 2   Q     I didn't ask you.  That's all I asked you.
 3         Now last time when I went through it with you, I asked
 4   you three different ways, and you said no, we never reached
 5   an agreement.  Is that a fair statement?
 6   A     We did not reach a complete deal.
 7   Q     Okay.  Now how many hours did you spend with the
 8   prosecutors before you testified last time?
 9   A     I believe it was somewhere between five and six hours.
10   It started in the morning and we ended in the afternoon.
11   Q     Okay.  And that was before the last time you testified,
12   and was it this prosecutor, Ms. Goemaat, that you spent five
13   or six hours with?
14   A     It was with Ms. Goemaat and several other attorneys,
15   yes.
16   Q     Were there also agents present?
17   A     Yes.
18   Q     How many people were prepping you for the last
19   testimony?
20   A     I cannot recall a specific number.  There were several
21   people in the room.
22   Q     Okay.  Now you also just testified, I believe, if I've
23   got it right, that you had -- as soon as you got busted, you
24   knew you couldn't do fraud any more; is that correct?
25   Meaning when the search warrants were executed.
```

1  A     Yes.

2  Q     But then you proceeded to do fraud; is that right?

3  A     We proceeded to unwind the fraudulent deal with

4  Washakie.

5  Q     Okay.  When you say unwind the fraudulent deal, you

6  asked for a certified check so that you could evade the

7  taxes, right?  Wasn't that part of the fraud?

8  A     It wasn't so that we could evade taxes.  It was so we

9  could avoid having the funds seized.

10  Q     Funds were seized because you were engaged in fraud,

11  correct?

12  A     Yes.

13  Q     You were the chief operating officer.  You've got a

14  bank account, correct?

15  A     The companies did, yes.

16  Q     The company did.  Were you a signatory on it?

17  A     No.

18  Q     So you knew that there were bank accounts.  You knew

19  the federal government froze the bank accounts, right?

20  A     Yes.

21  Q     You knew that they froze the bank accounts because you

22  were engaged in fraud, correct?

23  A     Yes.

24  Q     So your way of unwinding the fraud was to ask for a

25  certified check that would go into another account; is that

 1   right?  Do I have it correct?

 2   A    Yes.

 3   Q    Last time you were here, we also testified -- or you

 4   also testified when I asked you about Mr. -- how do you

 5   pronounce it, Furando?

 6   A    Furando.

 7   Q    Furando.  Now when you went to work for the Furandos,

 8   as I understand it, according to your memorandum of

 9   interview, you were interviewed by agents.  Not the ones

10   sitting in the courtroom or these U.S. attorneys, correct?

11   A    Yes.

12   Q    You were interviewed by a different set of U.S.

13   attorneys and a different set of agents, correct?

14   A    Yes.

15   Q    You told them that you had gone to work as a babysitter

16   for the Furandos; is that right?

17   A    Yes.

18   Q    So when you were 16, you were living in the house.  And

19   was Mr. Furando's wife's name Christine?

20   A    Yes.

21   Q    And then you started having an affair with Mr. Furando

22   after you moved into the house; is that right?

23   A    I did not move into his house until I was 20.

24   Q    Well, did you start babysitting when you were 16?

25   A    Yes.

1    Q    And then you started doing these extortion style,

2    having sex to get what you needed, correct -- or to get him

3    what he needed; is that right?

4    A    I'm not understanding what you're trying to say.

5    Q    Well, you said, I believe in regards or in response to

6    Ms. Goemaat, that you would get people in compromising

7    positions with pictures; is that right?

8    A    That was not my decision.  That was Mr. Furando's

9    decision.

10   Q    Correct, but you participated?

11   A    Because I had to.

12   Q    Correct.  While you were babysitting the kids?

13   A    Yes.

14   Q    Now at some point after all of this unraveled, did you

15   start taking screen shots and sending them to Mrs. Furando,

16   Christine?

17   A    I don't recall if I did.

18   Q    Do you recall an interview that you gave on July 31st,

19   2014, with a Will Stanley, a special agent for the IRS?

20   A    I believe there was an interview, yes.

21   Q    Did you send his wife -- didn't you tell the officer,

22   Pattison sent Furando's wife screen captures of text

23   messages involving Furando and a Saddle River prostitute

24   named Alyssa?  Did you tell him that?

25   A    I would need to see the statement.

1          MR. GERAGOS:  May I approach, Your Honor?

2          THE COURT:  You may.

3          MR. GERAGOS:  Paragraph 13 on memorandum, page

4   three of six.

5          MS. GOEMAAT:  What's the date of the memorandum?

6          MR. GERAGOS:  July 31st, 2014.

7   BY MR. GERAGOS:

8   Q    Can you read paragraph 13 silently to yourself, and

9   then I'll ask you some questions.

10  A    Okay.

11  Q    Does that refresh your recollection?

12  A    Yes.

13  Q    You specifically -- after you sent Furando's wife,

14  Christine, screen captures -- meaning like you take a screen

15  shot on the phone?

16  A    Yes.

17  Q    Now when you do that, I assume you've got text messages

18  of some kind, you press on the button to capture the text?

19  A    Yes.

20  Q    You sent text messages involving Furando, who was your

21  crime partner, and a prostitute named Alyssa, correct?

22  A    Uh-huh.  (Affirmative)

23  Q    Is that a yes?

24  A    Yes.

25  Q    Did you also send Christine, Mr. Furando's wife, whose

```
 1   kids you were babysitting, the account for Mr. Furando's
 2   sugarsugar.com?
 3   A    Yes.
 4   Q    What is sugarsugar.com?
 5   A    It's a website that is used for older men to solicit
 6   younger women and provide them with gifts in exchange for
 7   sexual services.
 8   Q    This is after -- obviously, you're telling this to the
 9   agents -- this is after the search warrants have been
10   executed, correct?
11   A    Yes.
12   Q    And then the next thing you did is you called
13   Christine, Mr. Furando's wife; is that right?
14   A    Yes.
15   Q    And told her about Furando's affairs, including your
16   affair with him, correct?
17   A    Yes.
18   Q    She said she didn't have -- you told them she didn't
19   have much of a response; is that right?
20   A    Yes.
21   Q    And then you didn't have any contact after that for
22   approximately three weeks; is that right?
23   A    Yes.
24   Q    Then did you sometime in June -- by the way, the search
25   warrant was when?
```

```
 1   A     The search warrant was May 24th of 2012.

 2   Q     Of 2012, what date?

 3   A     May 24th.

 4   Q     Over a year later, this is what you're doing, correct?

 5   A     I don't know.

 6           MR. GERAGOS:  May I approach again, Your Honor?

 7           THE COURT:  You may.

 8           MR. GERAGOS:  Take a look at paragraph 14.  Read

 9   the first sentence silently to yourself, and tell me when

10   you're done with that.

11           Tell me or the jury whether that refreshes your

12   recollection.

13           THE WITNESS:  Do you want me to read the entire

14   paragraph?

15   BY MR. GERAGOS:

16   Q     Just the first.  I'm just trying to get the dates for

17   you.

18   A     Okay.

19   Q     You've read it silently to yourself?

20   A     Yes.

21   Q     So is it a fair statement that basically the search

22   warrant is issued, still a year later -- it's not only

23   issued, it's executed -- you knew that the government was

24   coming after you, correct?

25   A     Yes.
```

1  Q    And still a year later, you were sending these messages

2  and screen shots to Mrs. Furando, correct?

3  A    Yes.

4  Q    And you were also sent the alleged affair e-mails to an

5  Assistant United States Attorney named Steve DeBrota; is

6  that right?

7  A    Yes.

8  Q    And you explained to the two IRS agents that Furando --

9  meaning Mr. Furando or Mrs. Furando -- who set you off?

10  A    Mr. Furando.

11  Q    -- had set you off alleging the Voils affair and

12  another series of e-mails, correct?

13  A    Yes.

14  Q    And that you had been drinking and you were stressed,

15  and that's why you left voice mails at eleven o'clock at

16  night at the Assistant United States Attorney's home; is

17  that right?

18  A    It wasn't his home.  It was his office.

19  Q    But was it after eleven o'clock at night?

20  A    When I left the voice mail, yes.

21  Q    And then you also -- in the interim of this time, you

22  didn't cooperate with the United States Attorney up until

23  this time that you started sending screen shots and things

24  to Mr. Furando's wife, did you?

25  A    No.

```
 1   Q    So you didn't immediately say, okay, I realized what
 2   was wrong -- or what I did was wrong.  You fought this, you
 3   were fighting this case -- your case for well over a year,
 4   correct?
 5   A    No.
 6   Q    So you weren't fighting your case?
 7   A    I told the truth to the FBI agents that interviewed me
 8   in the second half of my interview.
 9   Q    Well, when you told the truth to the FBI, they asked
10   you about Levon, and you told them you didn't even know his
11   last name; isn't that correct?
12   A    In the original interview?
13   Q    Correct.
14   A    I don't recall.  I would need to see the statement.
15   Q    Do you remember, as you sit here, whether the very
16   first time you talked to the FBI you even knew his last
17   name?
18   A    I would need to see the statement.
19   Q    Does that mean you don't remember?
20   A    I don't remember.
21   Q    Now when you -- by the way, you practiced five or six
22   hours last time with the United States Attorney and the
23   others before you testified.  How long have you been in Utah
24   this time?
25   A    I have been here since Tuesday.
```

```
 1   Q     Have you met with the United States Attorney since
 2   you've been here?
 3   A     Yes.
 4   Q     How long?
 5   A     I met with them yesterday evening for approximately an
 6   hour and a half.
 7   Q     Did you go over your testimony?
 8   A     Briefly.
 9   Q     Well, I noticed today when you testified -- about going
10   to Canada -- you got ahead of yourself.  What does that
11   mean?
12   A     I had gotten ahead of myself.
13   Q     Did you have a script?
14   A     No.
15   Q     Well, you also said that the first time you talked to
16   the agent in this case -- you talked to Special Agent
17   Hatcher; isn't that correct?
18         Do you remember talking to Special Agent Hatcher?
19   A     Yes.
20   Q     Now the first set of IRS agents you talked to was in
21   regards to your case, right?
22   A     I believe so.
23   Q     And the first U.S. Attorney that you talked to was the
24   guy that you were harassing and leaving the voice mails
25   with, right, because you were stressed out?
```

1   A    I was not harassing the U.S. Attorney.  I was leaving

2   him a voice mail regarding Mr. Furando's behavior.

3   Q    Didn't you excuse your behavior by telling the agents

4   that the reason you were harassing him was because you had

5   been drinking and stressed?

6   A    Again, I was not harassing the U.S. Attorney.  I had

7   left him a voice mail and I was upset at the situation that

8   was happening with Mr. Furando at the time.

9   Q    Okay.  That had set you off, correct?

10   A    Yes.

11   Q    Quote, unquote.

12       Now didn't you tell them you had been drinking with

13   lowered inhibitions?  Is that quote, unquote, what you told

14   them?

15   A    I don't recall.

16   Q    Then at some time later, you're interviewed by Special

17   Agent Hatcher; is that right?

18       Have you seen Special Agent Hatcher on either of your

19   trips to Utah, last time you testified or this time?

20   A    I saw him briefly yesterday.

21   Q    When you say briefly, he was in a meeting, correct?

22   A    No.

23   Q    Well, where did you see him?

24   A    He came into the meeting, shook my hand, said hello,

25   and left.

1    Q    So you had talked to him before sometime in 2018?

2    A    Yes.

3    Q    And when you talked to him in May of 2018, you told him

4    that you didn't do any deals with Kingston or Termendzhyan

5    after the six railcars because you couldn't come to any

6    agreement on the fuel prices; isn't that correct?

7    A    I don't recall specifically.

8    Q    You stated -- and I'll ask one more question and then I

9    will let you refresh your recollection.  Didn't you tell

10   Hatcher that you couldn't come to an agreement and no one

11   would do business with CG?  Who's CG, Cima Green?

12   A    Cima Green.

13   Q    That's your company?

14   A    It was Mr. Furando's company.

15   Q    Right.  They wouldn't do business, and it wasn't

16   because you didn't want to, it was because nobody would do

17   business with you?

18   A    Yes, because we were under investigation for fraud.

19   Q    Correct.  But the reason that you -- you told them that

20   the reason that you didn't do any more deals is because you

21   couldn't come to an agreement on the fuel prices, right?

22   A    Yes.

23   Q    Now today you said -- or let me ask you again.  You

24   didn't know, when I asked you, not only -- well, let's just

25   go back to the last time you testified.

1       You didn't know anything as to whether six railcars got

2   there, correct -- went to California, you have no idea,

3   right?

4   A    I know that the railcars went to Utah, and then from

5   the documentation that was sent to us, I believe they went

6   to California.

7   Q    The last time you testified, you said you had no idea

8   what happened to the six railcars after they went to Utah.

9   Do you remember that?

10  A    I believe that the six railcars --

11  Q    I didn't ask that.

12          MR. GERAGOS:  Motion to strike, nonresponse.

13          THE COURT:  Sustained.

14  BY MR. GERAGOS:

15  Q    I'm going to ask you the question, and it will make it

16  a lot quicker if you just -- and if you don't understand,

17  just ask me.

18       Last time you testified you had no knowledge of where

19  the six cars went after they went to Washakie, correct?

20  A    May I see the statement?

21  Q    No.  I'm asking you a question.

22          THE COURT:  Just give your best recollection.

23          THE WITNESS:  To the best of my knowledge, I do

24  not know where the railcars went after they left Utah.

25  //

```
 1   BY MR. GERAGOS:

 2   Q    Correct.  And that's what you testified to last time

 3   you were under oath, correct?

 4   A    Yes.

 5   Q    Now the first time you went to Miami and you went to

 6   Fontainebleau, was Mr. Furando with you when you met with

 7   Mr. Termendzhyan?

 8   A    Yes.

 9   Q    Now when the two of you are together, didn't

10   Mr. Termendzhyan repeatedly say stop talking about this

11   fraud or stop talking about this business?

12   A    He did not want to talk about business.

13   Q    How many times did he tell you stop talking about this

14   business?

15   A    I don't recall the specific number.

16   Q    It was a number of times, correct?

17   A    Yes.

18   Q    In fact, last time you testified you said he

19   repeatedly -- you used the term -- I think you said he was

20   almost persistent in telling you not to talk about business,

21   correct?

22   A    I believe so.

23   Q    Isn't that what you testified to?

24   A    I cannot recall specifically what I testified to that

25   date.
```

1   Q    Okay.  Is your memory better today than it was last

2   time?

3        In fact, let me show you page 94 of your testimony last

4   time, which would have been August 23rd.  Read lines 12

5   through 19 silently to yourself.

6   A    Okay.

7   Q    Okay.  That was you testifying under oath, correct?

8   A    Yes.

9   Q    I asked, do you know what was done in this case with

10  the six railcars.  You said, I do not have any knowledge as

11  to what happened after -- to six railcars after they left

12  the Utah facility.  Isn't that what you testified to last

13  time?

14  A    Yes.

15  Q    Didn't you say -- I asked you, you don't know if they

16  ever got to California, do you?  Your answer?

17  A    No.

18  Q    No, I do not, correct?

19  A    Yes.

20  Q    Did you go and did you meet with the government

21  yesterday and did they tell you look at these documents and

22  just speculate that they went to California?  Is that what

23  they told you?

24  A    No.

25  Q    Did you just come up with that on your own?

1    A    I reviewed the documents, and I saw that there was

2    freight charges to California and, in my opinion, that means

3    that the material went to California.

4    Q    But when you testified last time, you had spent five to

5    six hours preparing and had no knowledge as to where they

6    went.  Is that a fair statement?

7    A    I do not have concrete proof that they went to

8    California.  It is my belief that they did.

9    Q    In fact, the place in Miami was an Italian restaurant,

10   correct?

11   A    Yes.

12   Q    And in that Italian restaurant -- I asked you, do you

13   remember at that Italian restaurant specifically Furando

14   wanted to talk business and Termendzhyan did not.  Do you

15   remember me asking you that?

16   A    Yes.

17   Q    And you said yes?

18          MS. GOEMAAT:  Your Honor, could I have a page

19   number?

20          MR. GERAGOS:  Sure.  Page 124.

21          MS. GOEMAAT:  Thank you.

22   BY MR. GERAGOS:

23   Q    Then I asked, in fact, Mr. Furando kept bugging

24   Mr. Termendzhyan to talk about this scheme, correct?  And

25   you answered, yes.  Right?

```
 1   A     Yes.
 2   Q     I said, Mr. Termendzhyan kept saying no, I don't want
 3   to deal with that.  We're here, we're at a social gathering,
 4   I don't want to talk to you about whatever this is, correct?
 5   And you said?
 6   A     Yes.
 7   Q     I then said, in fact, it was not Mr. Termendzhyan
 8   saying I want to talk, I want to buy, I want you to
 9   recertify it.  It certainly was not that, it was the
10   opposite, correct?  And you answered?
11   A     Yes.
12   Q     And Mr. Furando was, would you say -- this is my
13   question -- relentless?  Do you know what that word means?
14   You said, I do.  And I said -- when I asked if he was
15   relentless, you said, I wouldn't say he was being
16   relentless.  I would say he was insistent on talking to
17   Mr. Termendzhyan about doing business.  Correct?
18   A     Yes.
19   Q     Now the document that they put up on the screen --
20   remember being shown this picture?
21   A     Yes.
22   Q     Now do you remember --
23             THE COURT:  We should probably identify it for the
24   record.
25             MR. GERAGOS:  I will.  Thank you.  It's 4-2.
```

1    BY MR. GERAGOS:

2    Q    That's the picture that you said -- you identified

3    Jacob Kingston, right?

4    A    Yes.

5    Q    And then you identified what you said are two

6    bodyguards, correct?

7    A    Yes.

8    Q    If I heard you correctly this morning, you said this

9    gentleman is who you believe to be Mr. Termendzhyan,

10   correct?

11   A    Yes.

12   Q    Now you said who you believed because you've

13   subsequently learned that's not Mr. Termendzhyan; isn't that

14   right?

15   A    No.

16   Q    Didn't the agents tell you that they know that that's

17   not Mr. Termendzhyan?  You had mentioned his nephew, George?

18            MS. GOEMAAT:  Objection, Your Honor, facts not in

19   evidence, misstates the record.

20            THE COURT:  Well, let her answer.

21   BY MR. GERAGOS:

22   Q    Weren't you told that this was his nephew, the one who

23   I've circled in green?  Can you take a look at the picture.

24   You are maintaining still that this is Mr. Termendzhyan

25   circled in green?

```
 1   A     I believe that that is Levon, yes.
 2   Q     And weren't you told that other witnesses had said it's
 3   not?
 4   A     No.
 5   Q     But you said today the one I believe is.  Where did
 6   that come from?  Why did all of a sudden you become
 7   equivocal on that?
 8   A     Because it's my belief that that is Levon Termendzhyan.
 9   Q     Did you get challenged on that yesterday when you were
10   being questioned?
11   A     No.
12   Q     They didn't mention that to you, that another witness
13   had notified them after you had identified the person as
14   being Levon?  They didn't tell you another witness contacted
15   them?
16   A     No.
17   Q     They didn't tell you that, in fact, this wasn't Levon?
18   A     No.
19   Q     Now you have been given a number of documents, for
20   instance, the Caravan contract, which is Government 4.3.
21   What is biodiesel@astraoil.com?  That has nothing to do with
22   Levon Termendzhyan, correct?
23   A     That is correct.
24   Q     The Astra Oil is somebody by the name of Reed Miller,
25   correct?
```

```
 1   A     Yes.

 2   Q     Now the second page of this, this would be a signature

 3   by Reed Miller at Astra, correct?

 4   A     Yes.

 5   Q     That doesn't have anything to do with Levon

 6   Termendzhyan, correct?

 7   A     That is correct.

 8   Q     You didn't ever show this to Levon Termendzhyan, right?

 9   A     No.

10   Q     4-4, same thing, another document.  4-4, does this

11   have -- on June 8th of 2012, Caravan contract, that doesn't

12   have anything to do with Levon Termendzhyan, does it?

13   A     No.

14   Q     Second page, also with Reed Miller's signature, nothing

15   to do with Levon Termendzhyan, correct?

16   A     That is correct.

17   Q     And 4-5, SAS, there's nothing to do with Levon

18   Termendzhyan, Noil Energy, or him on any of this, correct?

19   A     That is correct.

20   Q     This is dated May 17th of 2012, correct?

21   A     Yes.

22   Q     And you've got soy blend on there.  You don't know --

23   by the way, did you test it?

24   A     The material?

25   Q     Yeah.
```

```
 1   A     Yes, we had it tested.

 2   Q     And what was it?

 3   A     It was soy biodiesel.

 4   Q     Soy blend, correct?

 5   A     Soy biodiesel.

 6   Q     Right.  And this wasn't shown to anybody, was it?

 7   A     It was sent to Jacob Kingston at Washakie.

 8   Q     Was it sent for -- do you have any proof that it was

 9   ever sent to Levon Termendzhyan?

10   A     I do not know what Jacob did with that information.

11   Q     Then you say -- by the way, what was the date of the

12   raid again, May of 2012?

13   A     May 24th.

14   Q     May 24th.  This is May 17th, correct?

15   A     Yes.

16   Q     This is before the raid?

17   A     Yes.

18   Q     And then June 20th on 4-7, Jacob Kingston, is there

19   anywhere there that Levon Termendzhyan is copied?

20   A     No.

21   Q     In fact, the only people who are on here are you,

22   Katirina -- that's you right there, right?

23   A     Katirina, yes.

24   Q     Katirina.  I'm sorry.

25         Jacob, correct?
```

1    A    Yes.

2    Q    Joseph Furando, correct?

3    A    Furando, yes.

4    Q    And this says attached are -- and you're sending this,

5    right?

6    A    Yes.

7    Q    Attached are our invoices delivered to you, right?

8    A    Yes.

9    Q    Also the freight charges shipped to you, right?

10   A    Yes.

11   Q    And the original invoices, the ones I just showed you

12   and the jury, correct?

13   A    No.

14   Q    Were those original invoices from Astra?

15   A    It states on there that they are the original invoice

16   from Astra for the freight charges.  It was not the

17   contracts that you showed.

18   Q    Nowhere in any of these documents is Levon Termendzhyan

19   in the mix, correct?

20   A    No, he is not on any of these documents.

21   Q    I'm going to show you the next page of this.  Anything

22   here that's got Levon Termendzhyan or Noil on it?

23   A    The freight to California charge indicates to me that

24   the product was sent to Levon.

25   Q    But we already know that last time you testified, under

1   oath, you said you had absolutely no knowledge, correct?

2   A    I do not have direct knowledge of where the product

3   went.

4   Q    In fact, you don't even know if Jacob Kingston just

5   said that they went, do you?

6   A    I'm not sure what you're trying to ask me.

7   Q    I'm asking you, you don't have any knowledge.  For all

8   you know -- by the way, do you know what the specs are in

9   California?

10  A    No.

11  Q    Do you know what's legal to be sold in California?

12  A    No.

13  Q    Do you know what B75 is?

14  A    I know that is 75 percent biodiesel and 25 diesel.

15  Q    Do you know if B75 is legal in California?

16  A    I do not.

17  Q    Do you know if B50 is legal in California?

18  A    I do not.

19  Q    Do you have any idea what you can do with

20  recertification in California?  You have no knowledge of

21  that, correct?

22  A    Recertification in and of itself is illegal.

23  Q    Now when you say recertification is illegal, do you

24  have any familiarity with California -- do you know what

25  CARB is?

```
 1    A    I don't know what CARB is.  However, I do know --
 2              MR. GERAGOS:  There's an objection.  Motion to
 3    strike, nonresponsive.
 4              THE COURT:  You just need to answer the question
 5    that he asks.  So when he asks do you know what CARB is, you
 6    need to answer no, but you can't go on.
 7              The jury can disregard anything past the no.
 8    BY MR. GERAGOS:
 9    Q    Can you tell me, do you know if Jacob Kingston had any
10    other customers in California?
11    A    I do not.
12    Q    Do you know if he could have shipped the railcars to
13    any other customer?
14    A    I don't.
15    Q    In fact, you just completely speculated these cars went
16    to Levon Termendzhyan; isn't that correct?
17    A    I did not speculate.  In my mind, as per the other
18    e-mail --
19              MR. GERAGOS:  Motion to strike, nonresponsive
20    after I did not speculate.
21              THE COURT:  You just again need to listen to the
22    question.  So the jury can disregard anything that was said
23    after I did not speculate.
24    BY MR. GERAGOS:
25    Q    United Fuel Supply is another entity of Jacob Kingston;
```

```
 1  isn't that correct?
 2  A     Yes.
 3  Q     Do you know why United Fuel Supply was put into
 4  existence?
 5  A     No.
 6  Q     Do you know why you were delivering to United Fuel
 7  Supply?
 8  A     We originally were sending to Washakie Renewable
 9  Energy.  I don't know why it was changed to United Fuel
10  Supply.
11  Q     Okay.  Would you say that your operation with
12  Mr. Furando was in excess of 95 percent fraudulent the
13  entire time?
14  A     Yes.
15  Q     Would you say that you earned -- before you had ever
16  met, or laid eyes on, or had truffles shaved on your pasta,
17  you earned $500,000 in the year 2011; is that correct?
18  A     I don't recall the specific dollar amount.
19  Q     You don't recall how much you made?
20  A     I don't know off the top of my head, no.
21  Q     Do you remember talking to the agents and telling them
22  how much you made each year?
23  A     I believe so, yes.
24  Q     Did you tell them the first year you started
25  babysitting that you made $3,000?
```

```
 1   A    I don't know if that was the specific number.

 2   Q    Do you remember saying the second year that you made

 3   $500,000, in 2011?

 4   A    I don't recall specifically if that was the number.

 5   Q    Do you remember saying --

 6             MR. GERAGOS:  May I approach, Your Honor?

 7             THE COURT:  You may.

 8   BY MR. GERAGOS:

 9   Q    There's a yellow highlighted version.  Please read that

10   silently to yourself.

11             MS. GOEMAAT:  Excuse me.  Can you identify the

12   document?

13             MR. GERAGOS:  Sure.  It's a United States EPA

14   Protection Agency, Criminal Investigation Division,

15   Investigative Activity Report, page 14.

16             MS. GOEMAAT:  Just the date, please.

17   BY MR. GERAGOS:

18   Q    Read the yellow highlighted portion to yourself,

19   please.

20        Tell me when you're done.

21   A    Okay.

22   Q    Does that refresh your recollection?

23   A    Yes.

24   Q    How much did you make the first year you started as a

25   babysitter?
```

1   A    I wasn't a babysitter in 2009.  I was working for the

2   companies at that point.

3   Q    You made a couple of grand, about 3,000, in '09?

4   A    Yes.

5   Q    Had you already moved out of Furnando's house?

6   A    I was still living with them.

7   Q    And then you made how much in 2010?

8   A    In 2010, I made $500,000 that I split with a colleague.

9   Q    In 2011, you made how much?

10  A    I believe it says 110,000.

11  Q    In 2010, you were a 1099 employee, correct?

12  A    Yes.

13  Q    So that means on that $500,000, you had no tax

14  withheld, correct?

15  A    That is correct.

16  Q    Did you pay those taxes on that 500,000?

17  A    I did not earn the 500,000.  I split that with a

18  colleague.

19  Q    Did you pay taxes on the 500,000 that you got a 1099

20  on?

21  A    I believe I did.

22  Q    What do you mean you believe you did?

23  A    I had an accountant file the paperwork for me, and the

24  taxes were taken out of that.

25  Q    Did you ever ask the IRS if you owe any money?

1    A    I have never received anything from the IRS regarding

2    my taxes.

3    Q    Do you know if for a fact, as you sit here today,

4    whether or not you filed and paid taxes on your 1099 income

5    of over $610,000?

6    A    I did not receive a 1099 for the $110,000.  I was a W-2

7    employee at that point and taxes were being taken out.

8    Q    Actually that's not what you said.  Do you want to

9    reread this and refresh your recollection?

10   A    It says right here, in 2011 and 2012, I received a W-2.

11   I was a W-2 employee at that point in 2011 when I earned

12   $110,000.

13   Q    What were you in 2010 when you earned $500,000?

14   A    I did not earn $500,000 in 2010.  I split that with a

15   colleague.  We both earned approximately $250,000.

16   Q    Did you file taxes that said that you split the

17   500,000?

18   A    To the best of my recollection, I did file taxes and I

19   did pay them.

20   Q    Did you list the colleague that you split it with,

21   Pollack --

22   A    Yes.

23   Q    -- on your tax return?

24   A    I don't know if I listed him on my tax return.  That

25   was all handled by an accountant.

```
 1   Q    Who's your accountant?

 2   A    I don't recall his name.

 3   Q    So you don't recall the name of the accountant, you

 4   don't recall if you actually paid the taxes, but you assume

 5   it was done?

 6   A    Mr. Furando handled all of our accountant's business.

 7   I provided the documents.  I filed my taxes.  I signed them.

 8   I have never been questioned by the IRS as to whether or not

 9   I owe them money regarding my employment.

10   Q    How many times would you say you've met with IRS agents

11   over the course of your career in this biofuel fraud

12   industry?

13   A    I could not give you a specific number.  It's been

14   multiple times.

15   Q    I asked you before, and I think we had estimated

16   somewhere in the neighborhood of ten to 12 times; is that

17   right?

18   A    I believe so.

19   Q    Out of that ten to 12 times, no IRS agent ever said

20   what kind of taxes did you pay?

21   A    I have had to produce my financial records for

22   probation reasons and for court documents.  Nobody has ever

23   come to me and said that I owe money regarding my taxes.

24   Q    Did you supply your tax records to pretrial when you

25   pled guilty in your case?
```

1    A    I had to supply all financial documentation.

2    Q    So it would be in your file, correct?

3    A    I believe so.

4    Q    And specifically you said the rough estimate, if I

5    understand it, the entire time you were doing this fraud,

6    was somewhere in the neighborhood of between 95 and

7    100 percent fraud, correct?

8    A    Yes.

9    Q    And you don't even know whether or not the fuel ever

10   got to Mr. Termendzhyan or to California.  We just don't

11   know, do we?

12   A    I don't have concrete proof.

13   Q    Last time you testified I do not know.  Do you remember

14   that?

15   A    Yes.

16   Q    And specifically do you know how much Washakie applied

17   for in terms of the RINs credits on those six railcars you

18   shipped?

19   A    I don't know what they applied for.

20   Q    Do you know if Mr. Termendzhyan ever applied for RINs

21   credits?

22   A    I don't know.

23   Q    Now you said 60 -- you said something about 60 below

24   heating oil, or HO; is that correct?

25   A    Yes.

1    Q    That's all Mr. Termendzhyan cared about was a price;

2    isn't that correct?

3    A    Yes.

4    Q    And price was, he wanted 60 below, correct?  Meaning 60

5    cents below heating oil, right?

6    A    Yes.

7    Q    Heating oil is a separate benchmark from the biodiesel,

8    correct?

9    A    No.  Heating oil is used to price biodiesel.  At least

10   it was at that time.

11   Q    When you were saying -- this location that is on 4-2,

12   is this where this spread of food was?

13   A    Yes.

14   Q    And was there also tequila there?

15   A    Yes.

16   Q    And were you drinking tequila?

17   A    I was.

18   Q    Wasn't Mr. Furando driving you crazy when you were

19   there?

20   A    He was making me upset.

21   Q    And who were the two business colleagues you had with

22   you?

23   A    There were three.

24   Q    Who were they?

25   A    It was, I believe, Grace Conti, Casey Houser, and I

```
 1    can't recall if it was Ryan Davis or Lou Deary.

 2    Q    Two females and a male?

 3    A    No.  Casey is a male.

 4    Q    And have they been interviewed, do you know?

 5    A    I don't know if they were interviewed.

 6    Q    And is the location of the food and the tequila you

 7    were drinking, is it on this property that I'm pointing to?

 8    A    Yes.

 9    Q    This is the area or the building that you were very

10    impressed with?

11    A    I was not impressed with it.

12    Q    You were not impressed, correct?

13    A    Correct.

14    Q    Mr. Furando, he was blowing up your phone when you were

15    at this location, correct.

16    A    Yes.

17    Q    He sent you multiple messages, multiple phone calls,

18    and all he wanted to know if you had agreed on a price,

19    gallons, and ship date; isn't that right?

20    A    He was very insistent on nailing down the details.

21    Q    Now the last time that you saw Mr. Termendzhyan you say

22    was in Las Vegas, correct?

23    A    There were two meetings in Las Vegas.

24    Q    You testified to a five-minute meeting when Ms. Goemaat

25    asked you a question, correct?
```

```
 1   A     Yes.

 2   Q     Now that five-minute meeting you said was in an RV in a

 3   parking lot?

 4   A     Yes.

 5   Q     Were you with an Amanda Brown?

 6   A     I was.

 7   Q     And the two of you were in the parking lot?

 8   A     We were in the RV.

 9   Q     Mr. Termendzhyan was in the parking lot?

10   A     He was in the RV.

11   Q     He was in the RV?

12   A     Yes.

13   Q     And it lasted -- this total encounter lasted five

14   minutes?

15   A     I believe so.

16   Q     And did you offer him something?

17   A     No.

18   Q     So you were there for five minutes, and then he left;

19   is that right?

20   A     Yes.

21   Q     And Amanda Brown, did she work for you or Mr. Furando?

22   A     She did not work for our companies.

23   Q     Why was she at the Vegas location?

24   A     She was there to be a partner for Mr. Furando and

25   myself.
```

```
 1   Q     A partner?

 2   A     A sexual partner.

 3   Q     Now when you had that Vegas encounter for five minutes

 4   with Amanda Brown, nothing materialized there.  There was no

 5   deal made obviously, correct?

 6   A     We did not talk business, no.

 7   Q     Going back to the location here where you were talking

 8   about business, who was present when you say you had the

 9   phone on speaker and Mr. Furando was talking with

10   Mr. Termendzhyan?

11   A     It was myself, Mr. Termendzhyan, and Mr. Furando.

12   Q     That was it?

13   A     Yes.

14   Q     And after you pled guilty and started cooperating, did

15   you cooperate against Mr. Furando?

16   A     Yes.

17   Q     Did you also cooperate against Mr. Furando's wife's

18   father?

19   A     No.

20   Q     Father-in-law?  You didn't cooperate against Christine

21   Furando's dad?

22   A     He wasn't charged in the case.

23   Q     Did you cooperate against him?

24   A     I'm not sure what you're trying --

25   Q     Did you give information to the feds about Christine's
```

 1    father?

 2    A     They asked specific questions regarding him, yes.

 3    Q     And did you tell them, did you cooperate, meaning give

 4    information on Christine's father?

 5    A     They asked me questions regarding him.  I answered them

 6    truthfully.

 7    Q     Well, when you say answered them truthfully, meaning

 8    did you testify against Mr. Furando?

 9    A     I testified at his sentencing.

10    Q     And did you testify ever against Mr. Furando's

11    father-in-law?

12    A     No.

13    Q     Now the last document I'm going to show you is -- do

14    you know if the Cima Green sent three railcars of soy blend

15    from Argo to Plymouth, Utah?

16    A     Cima Green sent railcars of material to Utah, yes.

17    Q     How many?

18    A     I believe it was six.

19    Q     Did they send it from Argo?

20    A     Yes, it's Argo, Illinois.

21    Q     How about Gilman, Illinois.

22    A     That would be where Incobrasa is located.

23    Q     Did you send three cars or six?

24    A     We sent three from Argo and three from Incobrasa.

25

1    Q     Thank you.

2              MR. GERAGOS:  I have no further questions.

3              THE COURT:  You may redirect.

4              MS. GOEMAAT:  Thank you.  Very briefly,

5    Your Honor.

6                        REDIRECT EXAMINATION

7    BY MS. GOEMAAT:

8    Q     Ms. Pattison, when you first approached Jacob Kingston

9    looking for another plant, who did he tell you to talk to?

10   A     Levon Termendzhyan.

11   Q     And when you and Joseph Furando first pitched this

12   recertification fraud at that restaurant in Florida, who

13   were you pitching it to?

14   A     Levon.

15   Q     And when you agreed -- when you came to the agreement

16   to do this test run of six railcars that you would recertify

17   fraudulently through Washakie --

18             MR. GERAGOS:  Objection, leading.

19             MS. GOEMAAT:  I will rephrase.

20   BY MS. GOEMAAT:

21   Q     When you agreed to recertify the six cars, who did you

22   make the agreement with?

23   A     Levon.

24             MS. GOEMAAT:  If I could see 4-10, please.

25   //

1    BY MS. GOEMAAT:

2    Q    In July of 2012, after you had been raided, when you

3    were trying to get paid, who did Jacob Kingston tell you

4    would resolve the issue?

5    A    Levon.

6            MS. GOEMAAT:  I have no further questions.

7            May we please release this witness?

8            THE COURT:  Let me see if Mr. Geragos has any

9    recross.

10           MR. GERAGOS:  I do have recross.

11                        RECROSS-EXAMINATION

12   BY MR. GERAGOS:

13   Q    I don't want to belabor it.  You've already testified

14   in the prior proceeding and admitted today there was no

15   agreement, correct?

16   A    We did not have a specific agreement.

17   Q    And specifically the reason you didn't have a deal is

18   because Termendzhyan only cared about price.  He didn't care

19   about this scheme you were talking about; isn't that

20   correct?

21   A    I'm not sure what you're trying to ask me.

22   Q    I just asked you, and you understood it last time I

23   asked you at the last proceeding, right?  I asked you, and

24   the reason they didn't have a deal is because Termendzhyan

25   only cared about price, he didn't care about --

```
 1                MS. GOEMAAT:  Could I have a page number, please.
 2                MR. GERAGOS:  Page number 143.
 3                THE COURT:  You'll also have to slow down a little
 4   bit.
 5                MR. GERAGOS:  I've already gotten in trouble with
 6   Patti today once.
 7   BY MR. GERAGOS:
 8   Q    And the reason they didn't have a deal is because
 9   Termendzhyan only compared price.  He didn't care
10   about Furando's fraud, right?  Answer, correct.
11   A    Again, I'm not sure what you're trying to get at.
12   Q    I understand that doesn't fit with what they prepped
13   you on, does it?
14   A    No, that's not correct.
15                MR. GERAGOS:  Thank you.  I have no further
16   questions.
17                THE COURT:  Do you have any additional questions.?
18                MS. GOEMAAT:  I will ask one final question.
19                     FURTHER REDIRECT EXAMINATION
20   BY MS. GOEMAAT:
21   Q    In your mind, do you have any doubt that you were doing
22   fraud?
23                MR. GERAGOS:  There's an objection.  That exceeds
24   the scope of recross.
25                MS. GOEMAAT:  Mr. Geragos was asking her
```

 1   repeatedly about whether she was sure about her testimony
 2   about this particular agreement.
 3              THE COURT:  Overruled.
 4   BY MS. GOEMAAT:
 5   Q    Do you have any doubt in your mind that you were
 6   entering into a fraudulent agreement?
 7   A    We were entering into a fraudulent agreement with Levon
 8   Termendzhyan and Jacob Kingston.
 9   Q    Thank you, Ms. Pattison.
10                    FURTHER RECROSS-EXAMINATION
11   BY MR. GERAGOS:
12   Q    Page 137.  It was the end of March.  I don't recall a
13   specific date.  And you testified it was a 30- to 40-minute
14   call between Furando and Mr. Termendzhyan, correct?
15   A    Yes.
16   Q    I specifically asked you, during this 30 or 40 minutes,
17   they never cut a deal, did they?  Answer -- do you remember
18   what you said?  Not specifically.  In fact, you specifically
19   told the agents they didn't come to a conclusion, right?
20   And then I asked, no, they didn't?  No, they did not come to
21   a conclusion.  Wasn't that your testimony?
22   A    It was.  They did not have price or a date.
23   Q    Thank you.
24              MS. GOEMAAT:  I have no further questions,
25   Your Honor.

1          THE COURT:  All right.  May this witness be

2    excused?

3          MR. GERAGOS:  Yes.

4          THE COURT:  All right.  Thank you, ma'am.  You may

5    step down and you may be excused.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  The government may call its next

8    witness.

9          MR. ROWLING:  Your Honor, the next witness is

10   Mr. Morrissey.

11         THE COURT:  Is this a videotaped deposition?

12         MR. ROLWING:  It is a videotape, Your Honor.

13         THE COURT:  Let me just explain to the members of

14   the jury that a while back I gave the parties permission to

15   travel overseas to take this witness's deposition testimony

16   because he is not subject to the subpoena power of the Court

17   because he's in a foreign country.  So the testimony was

18   taken and it was put on videotape, and that is what they are

19   going to play for you now.  The witness was under oath so it

20   would be the same as if he were here in the courtroom.

21         MR. ROLWING:  Your Honor, I know we're on a

22   schedule, so if you can just give us the signal when you

23   want us to stop.

24         THE COURT:  Let's break by a quarter to the hour,

25   which gives you about 30 minutes.

 1              MR. ROLWING:  Thank you, Your Honor.

 2              THE COURT:  Let me ask counsel, does Ms. Walker

 3    need to transcribe this, or since we have a videotape, are

 4    we okay with her not doing so?

 5              MR. GERAGOS:  I would stipulate we can use the

 6    transcript we already have.

 7              MR. ROLWING:  Same, Your Honor.

 8              THE COURT:  So, Ms. Walker, you don't need to take

 9    this down.

10              MR. ROLWING:  Your Honor, can we have a side-bar?

11              THE COURT:  Yes.

12              (Side-bar conference)

13              MR. ROLWING:  The video starts by introducing all

14    these other lawyers for the other defendants so I don't know

15    if the Court wants to take the opportunity to educate the

16    jury why other attorneys are there.

17              THE COURT:  I think I probably do need to indicate

18    that.  Do you have an objection, either of you, to that?

19              MR. GERAGOS:  No.  I think we just saw

20    Mr. Williams -- the other Williams.

21              (Side-bar concluded)

22              THE COURT:  Members of the jury, the lawyers have

23    suggested, and I think it's a very good idea, that I just

24    take a moment and explain to you that back at the time that

25    this deposition was taken, out of the country, this

1    particular case had five defendants in it at the time.  At

2    the time Jacob Kingston, Isaiah Kingston, Rachel Kingston,

3    and Sally Kingston had been indicted and they had entered

4    pleas of not guilty.  And so when this deposition was

5    convened, we had lawyers for all four of them, in addition

6    to Mr. Geragos, present at the deposition.  And you will

7    note, when you see the deposition played, that these other

8    lawyers are also asking questions that the witness is

9    answering.

10            So I just wanted to explain why there would be a

11   number of lawyers in the deposition that you don't see in

12   the courtroom today, because in light of the guilty pleas,

13   those lawyers were no longer participating in the case, but

14   they were participants at the time of the deposition.

15            MR. ROLWING:  Sorry, Your Honor.  It appears that

16   the connection is on Sanctions rather than TrialDirector.

17            MR. GERAGOS:  Can I have one minute and see if we

18   can expedite this?

19            (Side-bar conference)

20            MR. GERAGOS:  I suspect it's all this work they're

21   doing in the hallway.  But the problem is I don't know that

22   we want to show the transcript.  You want to show the video.

23   Is there a way to get it somewhere else if it's not hooking

24   up.

25            THE COURT:  Is there a way to try and hook it in

```
 1    at the podium?  I don't know if that would work.
 2              MR. GERAGOS:  That might work.
 3              (Side-bar concluded)
 4              THE COURT:  Ms. Schaerrer is calling our IT
 5    department again.  I think maybe when the power surge took
 6    everything down, it's caused some technical difficulties.
 7    And that's the problem with technology, right?  You rely on
 8    it and then it doesn't work.
 9              MR. GERAGOS:  Could we approach one more time?
10              THE COURT:  You may.
11              (Side-bar conference)
12              MR. GERAGOS:  You know, we did finish ahead of
13    time with Katirina.  Do you want to just let them go?
14              THE COURT:  If you want to let them go, I'm fine
15    with that.
16              MR. ROLWING:  Okay.
17              MR. GERAGOS:  Then we can work out the kinks.
18              I don't think any of us thought we would be done
19    with the first witness.
20              (Side-bar concluded)
21              THE COURT:  Members of the jury, the lawyers have
22    informed me that they had planned on taking the whole day
23    today with Ms. Pattison, and so they are actually ahead of
24    schedule.  And so we don't want to keep you waiting while we
25    try and resolve these technical problems.  So we are going
```

```
 1    to let you go for the day.  We're not behind schedule.  And

 2    then when we come back on Monday, we will have this

 3    resolved.  We will test it out and we won't waste your time

 4    to do that.

 5           So if you're all okay with that -- I'm assuming

 6    that you're all okay with that.  Are you?  Okay.

 7           The last thing -- well, just a couple of things

 8    before you leave, and that would be that we will start here

 9    in the courtroom at 9:00 a.m. on Monday morning.

10           And let me just remind you of the admonition I

11    gave you yesterday.  We are going to be apart now for

12    Friday, Saturday, and Sunday, and so it's really important

13    to remember that until the trial is over, you should not

14    read or listen to any news reports about this case, do not

15    do any research or visit any locations related to this case.

16    If you inadvertently hear or see news stories, or if someone

17    says something to you about the case, or you observe

18    anything that violates this instruction, report it

19    immediately to a clerk or bailiff.

20           Also remember my admonition about electronic

21    devices.  Remember that you violate your oath as a juror if

22    you conduct your own investigations or communicate with the

23    trial about others.  Do not post anything on social media.

24    Do not try to locate anything on your computer or the

25    Internet that would have anything to do with this trial.
```

1    And remember that the entire fairness of the system depends

2    upon you being true to that oath that you have taken.

3            As I'm sure you can tell by just the little time

4    that you've had today, there have been -- there's been much

5    preparation and planning put into this, and if you were to

6    violate that oath, you would jeopardize the fairness of

7    Mr. Dermen's trial and we would have to have a complete

8    do-over.

9            So I trust that you will follow that instruction.

10   I hope that you have a good weekend.  We will see you back

11   here on Monday morning at 9:00 a.m.

12           (Jury excused)

13           THE COURT:  Did we lose our IT folks?  I thought I

14   saw them come in.

15           We need to make sure that they know we need to get

16   this resolved.

17           What is everyone's preference?  Do you want to

18   take a quick break and then come back and address whatever

19   issue it was that was raised this morning?

20           MR. GERAGOS:  I think I can summarize it in 15

21   seconds.

22           THE COURT:  Okay.  Why don't you come to the

23   podium, then.

24           MR. GERAGOS:  Sure.

25           MR. ROLWING:  Actually I would like to do it in a

```
 1   side-bar.
 2             (Side-bar conference)
 3             THE COURT:  I suppose that we could recess or we
 4   could go to the conference room.  This is a very awkward
 5   situation.
 6             MR. GERAGOS:  This will just take 15 seconds and
 7   you can think about it, and I don't need a decision tonight.
 8   They've informed me that they've got the plea agreement for
 9   Edgar Sargsyan.  I asked for it.  They said we've reviewed
10   it.  I want it, and if you want the reason, I can file
11   something, two pages, to tell you why.  I don't need it
12   today, but I'd like to have it by next week.
13             THE COURT:  Let's do this.  Why don't you each --
14   now I take it you have an objection to letting them know why
15   you need it?
16             MR. GERAGOS:  Correct.
17             THE COURT:  Okay.  You think it would reveal your
18   trial strategy?
19             MR. GERAGOS:  Correct.  It's not like it's a state
20   secret.  They can, I'm sure, figure it out.  But I believe,
21   without getting into all of it, they've already turned over
22   things that reflect that he entered into the plea agreement,
23   meaning grand jury and stuff like that.  I want to see the
24   agreement itself, and I can let you know, in one page, as to
25   why it's relevant.
```

```
1                   THE COURT:  All right.  So why don't we have the
2      government file with me, under seal and ex parte, the plea
3      agreement, and a short statement as to why you believe it
4      should not be turned over, and then you can each give me
5      your independent submissions.  I will then review it in
6      camera and make a ruling.  Is that acceptable?
7                   MR. GERAGOS:  Yes.
8                   THE COURT:  Okay.  And if you could get it to me
9      by, say, two o'clock tomorrow, then that will give me time
10     to review it tomorrow afternoon.
11                  MR. GERAGOS:  Thank you.
12                  (Side-bar concluded)
13                  THE COURT:  All right.  Let me ask if there is
14     anything else we need to address before we recess for the
15     weekend?
16                  MR. GERAGOS:  Not on behalf of the defense,
17     Your Honor.
18                  MR. ROLWING:  I don't think so, Your Honor.  We'll
19     address this.  My apologies on this.
20                  THE COURT:  Well, that happens.  I think when the
21     system went down, I don't know what all happened, but that
22     would be great.
23                  Have you communicated who the witnesses are for
24     next week?
25                  MR. ROLWING:  Yes.
```

1          THE COURT:  And can you share that information

2     with me?

3          MR. ROLWING:  Yes.  So after the video, we'll be

4     calling Greg Perrin and Josh Wallace, and then moving into

5     Jacob Kingston.

6          THE COURT:  All right.  Then do you expect that to

7     consume most of the week?

8          MR. ROLWING:  I would be surprised if it doesn't.

9          MR. GERAGOS:  I couldn't agree more.

10         THE COURT:  All right.  Well, that sounds like a

11    fine plan.

12         There is one important piece of information that I

13    need to give you, and that is that tomorrow -- at what time?

14         At noon tomorrow, the federal courts are upgrading

15    the CM/ECF system to the Next Generation system.  I don't

16    know what kind of a mess that will cause.  I've been told

17    that there are instructions on line and warnings, and that

18    if you file something, that it can be then dated once they

19    get this whole thing done, which is apparently going to take

20    the entire weekend.

21         So my suggestion would be that if you have filings

22    that you want to make in this case, you e-mail them to my

23    chambers, you e-mail them to each other.  I will make sure

24    that anything that is e-mailed to my chambers is docketed

25    with an appropriate date when the CM/ECF system comes back

1   up.  But you need to be aware that if you plan on pulling

2   down items from the docket, that might not be possible after

3   noon tomorrow.

4            Do we know when it's supposed to be up?

5            By Monday.  So I don't know what that means.  This

6   is all above my paygrade.

7            MR. EWENCZYK:  Your Honor, I just wanted to

8   clarify, when Your Honor says to e-mail chambers, is

9   e-mailing Ms. Schaerrer what Your Honor has in mind?

10           THE COURT:  Well, we have a chambers e-mail

11  address that comes to Ms. Schaerrer.

12           What's that e-mail address, Ms. Schaerrer?

13           MR. GERAGOS:  We have it.

14           THE COURT:  Let her get it, and let's make sure we

15  are all on the same page.

16           Again, I'm sure that we can make manual

17  adjustments afterwards with respect to filings.  I think

18  that the concern is that it might not be available if you

19  needed to pull down something from the docket.

20           And Ms. Schaerrer is getting that e-mail address.

21           I know that you've contacted our chambers before,

22  both sides, with respect to scheduling matters and other

23  things.  And certainly we'll be in the office tomorrow until

24  five o'clock.  So if you need to call or e-mail

25  Ms. Schaerrer, you can do that.

1          What's the address?

2          It's utdecf_parrish@utd.uscourts.gov.

3          And I suppose you can also just send it to

4   whatever e-mail address you sent things when you talked to

5   Ms. Schaerrer, right?  Either one of those, we will make

6   sure that your materials get on the docket.

7          MR. EWENCZYK:  Will do.  Thank you, Your Honor.

8          THE COURT:  Is there anything else we need to

9   address?

10          MR. ROLWING:  Nothing.

11          THE COURT:  Okay.  Have a good weekend.

12          (Whereupon, the trial was continued to Monday,

13   February 3, 2020 at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3

4              I hereby certify that the foregoing matter is

5     transcribed from the stenographic notes taken by me and is a

6     true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16    PATTI WALKER, CSR-RPR-CP      DATED: 4-24-2020
      Official Court Reporter
17    351 South West Temple, #8.431
      Salt Lake City, Utah  84101
18    801-364-5440

19

20

21

22

23

24

25