FILED
2021 FEB 10
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br>v.<br><br>LEV ASLAN DERMEN, et al.,<br><br>　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGEMENT OF ACQUITTAL OR IN THE ALTERNATIVE FOR A NEW TRIAL AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR DISCOVERY**<br><br>Case No. 2:18-cr-00365-JNP-BCW<br><br>District Judge Jill N. Parrish |

On March 16, 2020, following a seven-week trial, Defendant Lev Dermen (a.k.a. "Levon Termendzhyan") was convicted of ten counts of various offenses arising out of his participation in a conspiracy to defraud the United States government of renewable tax credits and launder the proceeds of the fraud. On April 7, 2020,[1] Defendant moved for a judgement of acquittal or, in the alternative, for a new trial, based on the insufficiency of the evidence under Rules 29 and 33 of the Federal Rules of Criminal Procedure. Docket No. 949. On April 29, 2020, Defendant submitted a supplemental Rule 33 motion for a new trial based on newly discovered evidence and to reopen discovery. Docket No. 964. On May 21, 2020, Defendant filed a supplemental motion requesting Rule 33 relief and to reopen discovery. Docket No. 1014. On August 3, 2020, Defendant filed another supplemental motion for a new trial and to reopen discovery. Docket No. 1099. The Government opposes Defendant's motions. Docket Nos. 956, 972, 1024, and 1102. For the reasons

---

[1] The court partially granted Defendant's motion for extension to submit the post-verdict motions given the complexity of the case at hand. Docket No. 944.

1

stated below, Defendant's motions are DENIED. The court, however, grants Defendant's request to disclose several documents that the Government filed with the court ex parte and under seal.

## I.     BACKGROUND AND PROCEDURAL HISTORY

### A. Indictment

On January 17, 2019, a grand jury in the District of Utah returned a Second Superseding Indictment charging Defendant Dermen, along with Jacob Kingston ("Jacob"), Isaiah Kingston ("Isaiah"), Rachel Kingston ("Rachel"), and Sally Kingston ("Sally") with 46 offenses. Docket No. 135. Initially, all five defendants pled "not guilty" to the charged offenses. *See* Docket Nos. 10, 62, 173. On July 18, 2019, Jacob, Isaiah, Rachel, and Sally changed their pleas and entered into plea agreements with the Government.

After Defendant Dermen's co-defendants pled guilty, the ten counts that Defendant had originally been charged with in the original indictment were renumbered as Counts 1 through 10 in the stipulated Renumbered Indictment. Docket No. 489-3. The counts charged Defendant Dermen with the offenses summarized in the table below:

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to Commit Mail Fraud |
| 2 | Conspiracy to Commit Money Laundering |
| 3 | Concealment Money Laundering for Wire Transfers and Withdrawals Related to the Repayment of Kazi Loan |
| 4 | Concealment Money Laundering for Wire Transfers and Withdrawals Related to the Repayment of Kazi Loan |
| 5 | Concealment Money Laundering for Wire Transfers and Withdrawals Related to the Repayment of Kazi Loan |
| 6 | Concealment Money Laundering for Wire Transfers and Withdrawals Related to the Repayment of Kazi Loan |

| 7 | Concealment Money Laundering for Wire Transfers and Withdrawals Related to the Repayment of Kazi Loan |
| 8 | Concealment Money Laundering for Wire Transfer in Connection with Purchase of Sandy, Utah Residence |
| 9 | Expenditure Money Laundering for Wire Transfer to Defendant's Turkish Bank Account |
| 10 | Expenditure Money Laundering Relating to Purchase of Huntington Beach Residence |

*See* Docket No. 489-3.

### B. Trial Testimony

Defendant Dermen's trial began on January 27, 2020 and lasted for seven weeks. The Government called fourteen witnesses to testify and entered 306 exhibits. Defendant recalled the Government's summary witness as his first witness and called one additional witness. The Government did not call rebuttal witnesses or submit any rebuttal evidence. After deliberating for over eight hours over two days, the jury convicted Defendant on all ten counts.

At trial, the Government presented a case that Defendant Dermen conspired with other individuals, including Jacob, Isaiah, Rachel, and Sally, to defraud the United States Government out of $1.1 billion in renewable fuel tax credits and Renewable Identification Numbers ("RINs").[2] The Government also presented evidence that Defendant participated in laundering the proceeds of this fraud through complex financial transactions. Defendant attempted to rebut the Government's case by primarily alleging that the Kingstons were the main perpetrators of the fraud scheme and that Defendant was an honest entrepreneur who had unwittingly become business

---

[2] RINs are issued by the Environmental Protection Agency ("EPA") and are associated with each gallon of biofuel manufactured by producers. Producers of biofuel can apply to the EPA for RINs, and RINs may be bought and sold on the open market so that large oil producers can comply with regulatory targets set by Congress.

partners with various bad actors involved in the Kingstons' schemes. Defendant claimed that Jacob, the true leader of the fraud, was now cooperating with the Government and blaming the fraud on Defendant to receive a lighter prison sentence. Below, the court summarizes the testimony of key witnesses and evidence presented at trial.

        1)     Jacob Kingston

Jacob testified at trial for six days, the longest of any witness. He testified as a witness for the Government pursuant to a cooperation agreement. During his direct examination, Jacob testified that shortly after graduating from his doctoral program in 2006, he formed a biodiesel production company called Washakie Renewable Energy ("WRE") based in Plymouth, Utah. He hired his mother (Rachel), his brother (Isaiah), and his wife (Sally) to work at WRE. He testified that the Kingstons were members of the Davis County Cooperative Society ("the Order"), a religiously affiliated organization in which members provide their income to a central entity that distributes money back to members as needed. Jacob's uncle was the leader of the Order.

Beginning in 2010, Jacob began collaborating with Andre Bernard of Biofuels of Colorado ("BOC") to create false paperwork to fraudulently claim tax credits on biofuels. In 2011, Jacob and Bernard entered into an agreement with a grease processing facility, Grease Depot, to fraudulently claim the waste product from Grease Depot as biofuel in order to fraudulently file for renewable fuel tax credits on the waste material. Later in 2011, Jacob partnered with Joshua Wallace of Aspen Biofuels to fraudulently claim renewable tax credits. Rachel and Isaiah filed fraudulent paperwork relating to the Biofuels of Colorado and Grease Depot schemes, and Sally and Isaiah participated in the Aspen Biofuels scheme. During this time, Jacob testified that the vast majority of the fraudulent tax credits that he received from the U.S. Treasury were being paid to

his partners in these schemes. Through 2011, Jacob and his family continued to live in poor conditions despite the millions of dollars Jacob was claiming through fraudulent tax credits.[3]

In December of 2011, Jacob met Defendant Dermen at Defendant's offices in Commerce, California in connection with another potential biofuel fraud scheme. Jacob explained that at this meeting, he and Defendant agreed to fraudulently claim biodiesel credits, with Defendant serving as the buyer of the fuel that WRE purported to create. In exchange for a share of the proceeds of the fraud, Defendant also agreed to provide Jacob and the other co-conspirators with protection from prosecution through a network of corrupt law enforcement agents referred to as the "umbrella." Jacob and Defendant communicated through burner phones and often made references to Defendant's umbrella. Jacob testified that he did not question the existence of the umbrella and believed at the time that Defendant's corrupt law enforcement contacts kept the co-conspirators protected from legal consequences of their actions.

Jacob testified at length to many schemes in which he and Defendant were involved within the broader conspiracy. Jacob's testimony regarding these schemes is summarized below:

- **India Rotation**: Jacob testified that he conspired with Defendant in 2012 to create a trail of false paperwork and fraudulently claim tax credits on third-party biodiesel that was exported to India and imported back to Los Angeles. The co-conspirators then manufactured additional paperwork to show that the product, falsely labeled as unprocessed feedstock, was shipped to Utah to be processed and sent back to Los Angeles. In reality, the product was never shipped to Utah. Jacob testified that he agreed to participate in this scheme with Defendant when they met at his offices in Commerce, California.

- **Panama Rotation**: Jacob testified that he conspired with Defendant in 2012 to recreate the India rotation on third party biodiesel that was exported from the East Coast of the United States to Panama, trucked across Panama, and shipped to Los Angeles. As with the India rotation, the co-conspirators manufactured paperwork falsely showing that the product was shipped from Los Angeles to Utah to be processed, and then shipped back to Los Angeles.

---

[3] Jacob testified that even while pursuing these schemes, he and his family were "living in an old, old cabin that didn't – the heat didn't work, the water didn't work, and it had rats and snakes." Transcript of J. Kingston testimony (Feb 6, 2020) at 611.

- **CIMA Green**: Jacob testified that Defendant negotiated an arrangement with Joseph Furando and Katirina Pattison to use WRE to recertify third-party biodiesel from their company, CIMA Green. WRE would then sell the biodiesel to Defendant's company, Noil Energy, at a below-market price.

- **Singapore Project**: Jacob testified that he entered into an agreement with Defendant to form a company under Defendant's son's name and use a Singapore facility to import biodiesel that could be re-certified through WRE. As with the India and Panama rotations, Jacob testified that a paper trail would then be created to falsely show the product being shipped to Utah to be processed. Although Jacob testified that a company was purchased to carry out this plan, the Singapore facility was never used to recertify biodiesel.

- **Morrissey Oil**: Jacob testified that in 2012, he conspired with Defendant to use WRE to recertify B99[4] biodiesel purchased through Morrissey Oil, a company based in Ireland. Morrissey Oil would produce fraudulent invoices and contracts to create a false paper trail. The resulting fraudulent RINs and tax credits would then be split among the parties.

- **False Claims with No Documentation**: Jacob testified that beginning in 2013, he entered into an agreement with Defendant to file false claims for tax credits without any underlying product or false paperwork to confirm the transactions. Jacob later identified the false claims in Government's Exhibit 1-1.

- **Westway Rotation**: Jacob testified that in 2013, he entered into an agreement with Defendant to arrange for their logistics manager and co-conspirator, Deryl Leon, to purchase biodiesel and other products and rotate them between storage facilities (called Westway I and Westway II) in Louisiana and Texas. This rotation was organized to give the false appearance that B100 biodiesel was being purchased by WRE, processed into B99, and sold to Leon. The parties then filed false returns for these transactions.[5]

- **2014 Claims Fraudulently Filed in 2015**: Jacob testified that he entered into an agreement with Defendant to fraudulently claim tax credits for the 2014 year when they were filing returns in 2015, after the tax credit was re-instated. Jacob also testified about a text message exchange between Jacob and Defendant where they discussed what they would do with the 2014 tax credit funds.

- **2015 Claims Fraudulently Filed in 2016**: Jacob testified that, as with the 2014 claims filed in 2015, the false claims for 2015 would be filed in 2016.

---

[4] B99 biodiesel, also referred to as "B99.9," is a type of biodiesel that has been blended with at least 0.1% diesel. B100, by contrast, has not been blended with diesel. The federal government incentivizes biodiesel production by providing a tax credit for every gallon of B100 that has been blended to form B99.

[5] This project was sometimes referred to as "the Deryl project."

Jacob also testified at length about how the proceeds of the fraud were laundered. He testified that there were a number of mechanisms that he and Defendant agreed to set up to facilitate the laundering of the proceeds. The mechanisms, as described by Jacob, are summarized below:

- **Payments to Noil Energy**: Jacob testified that one of the mechanisms to launder the proceeds of the fraud was through checks made by Jacob and addressed to Noil Energy, Defendant, and Defendant's son for non-existent contracts and equipment.[6] Additionally, Jacob testified that WRE sold Noil fuel at below-market costs as a way to launder the fraud proceeds. Finally, Defendant charged Jacob an exorbitant "broker fee"[7] for RINs as a money laundering scheme.

- **Payments Made by Morrissey Oil and TCM Renewables**: WRE made prepayments to both Morrissey Oil and TCM Renewables, a company owned by co-conspirator Joshua Wallace. Although these payments were to be paid back to WRE, Jacob testified that Defendant collected and retained funds owed by these two entities.

- **Loan Made to Zubair Kazi**: Jacob testified that $11.2 million of Defendant's share of the fraud proceeds were transferred by WRE to Defendant's friend and business associate, Zubair Kazi. These proceeds were used to pay Kazi's creditors.[8] Kazi then entered into a repayment plan to pay the loan back to accounts controlled by Defendant.

- **Mansion in Sandy, Utah**: Jacob testified that Defendant used his company, Noil Energy, to launder proceeds of the fraud and buy Jacob a mansion and conceal the proceeds from other members of the Kingston family.

- **Bugatti Purchase**: Jacob testified that Defendant explicitly told Jacob to purchase him a $1.8 million Bugatti Veyron, an Italian sports car. Jacob testified that he used the funds from the tax credit to purchase the vehicle.

- **Payments to Viscon and Komak**: Jacob testified that, under the guise of renewable fuel investments, he transferred $10 million to entities connected to Defendant. Jacob paid $1 million directly to Defendant's company Viscon International. Two other payments totaling $9 million were paid to Komak, a company based in Turkey. Jacob testified that the $9 million paid to Komak was almost immediately repatriated to Speedy Fuel

---

[6] In some cases, there was not even a pretextual business purpose for payments made by Jacob to Defendant. For example, Jacob testified that he gave Defendant a check for $1.3 million for no business purpose at all. Transcript of Jacob Kingston Testimony (Feb. 6, 2020) at 246; *see also* Ex. 6-30.

[7] Jacob testified that a "normal" broker fee was about 0.5 cents per RIN. Transcript of J. Kingston Testimony (Feb. 6, 2020) at 244-246. He testified that Defendant was paid a broker fee that totaled to 5 cents per RIN. Id.

[8] The repayment of this loan to Defendant's business entities are the subject of Counts 3 through 7.

Renewable Fuel Investments ("Speedy Fuels"), a company created by Defendant's brother, Grigor Termendzhyan.

- **SBK Holdings USA**: Jacob testified that in 2013, he agreed with Defendant to transfer a portion of the fraud proceeds to Defendant's California-based lending company, SBK Holdings USA ("SBK-USA"). According to Jacob's testimony, in January of 2014, he sent $10 million to SBK-USA.

- **Proceeds Sent to Turkey and Luxembourg**: Jacob testified that between 2013 and 2015, Jacob sent more than $134 million of fraud proceeds to accounts and entities in Turkey and Luxembourg. According to Jacob, these payments were made to compensate Defendant for his share of the fraud proceeds and for Defendant to pay members of the "umbrella." Some of the money sent to these foreign entities was in Jacob's name; however, he was unable to repatriate any of this money. Jacob also sent money to Defendant's personal bank account in Turkey.[9] Finally, Jacob testified that in 2018, Jacob began to pay Sezgin Baran Korkmaz ("Baran"), one of Defendant's business partners, for additional protection from prosecution and legal exposure.[10]

- **Casino in Belize**: Jacob testified that in 2012, he agreed with Defendant to use proceeds of the fraud to purchase land in Belize for the purpose of building a casino. Jacob testified that, at the direction of Defendant, he purchased a warehouse in Belize that was going to serve as the base of operations for the physical casino location as well as the online casino.

- **Viscon Contracts**: Jacob testified that between 2015 and 2016, he entered into an agreement with Defendant to create inflated invoices between WRE and Defendant's company, Viscon International. Viscon would sell fuel additives to WRE at highly inflated prices to legitimize the $250 million in tax credits they intended to fraudulently apply for in 2016.

- **Huntington Beach House**: Jacob testified to his agreement with Defendant in 2015 to transfer the fraud proceeds by making a down payment on a beach house for Defendant located in Huntington Beach, California.[11]

- **Viscon Lawsuit**: Jacob testified that he entered into an agreement with Defendant to participate in a fraudulent lawsuit and settlement between Jacob's entities and Viscon regarding the inflated invoices from the fuel additive purchase discussed above. According to Jacob's testimony, he agreed with Defendant that Viscon would sue United Fuel Supplies ("UFS"), one of the entities controlled by Jacob. The two entities later reached a prearranged settlement to transfer proceeds of the fraud from Jacob to Defendant. Jacob testified that Defendant explained to him that these legal actions would help create "legal

---

[9] This transfer was the subject of Count 9 in the Renumbered Indictment.

[10] This network of protection was functionally the same as the "umbrella" that Defendant had discussed with Jacob. However, Jacob testified that Baran referred to this protection as the "grandpa."

[11] The purchase of this residence using the proceeds of the mail fraud was charged as Count 10.

separation" between the two entities and evade scrutiny from law enforcement officials who were investigating them.

On cross-examination, Jacob testified about his multiple wives, the operations of the Order, and additional details regarding the fraud schemes that Jacob initiated prior to meeting Defendant. Defense counsel also inquired into Jacob's involvement with other Order-related businesses that received proceeds from the mail fraud scheme. At numerous points during his cross-examination, Jacob claimed he did not remember key details of the conduct to which he had pled guilty. Defense counsel pointed out that Jacob often professed to have no recollection of key events in the conspiracy, especially those related to Order-related entities and their potential involvement in Jacob's schemes. At one point, defense counsel asked if Jacob had memory issues:

Q: Do you have any memory issues?

A: Sometimes.

Q: Okay. Are you taking any drugs or anything for it, medication for it?

A: No. Do you recommend anything?

Q: What?

Q: The truth is always helpful. That would be my medication for you. So how long do you want to keep telling this jury, or misleading—will you concede with me that you haven't exactly been forthright today? Would you concede that?

A: No.

Q: So when you told them you've heard of Alliance Investments and you didn't know where your sister and your aunt worked, that was just part of your memory issue?

A: No. That's not a memory issue.

Q: What was that?

A: Which part?

Q: I got it. Cute.

Transcript of J. Kingston (Feb. 12, 2020), 1579-1580. However, when Jacob was later confronted again about his evasiveness on cross-examination, he stated that the Order was not involved in his conspiracy with Defendant.

> Q: Is part of the reason that you're being as truthful as possible the fact that you do not want to admit what the connection of your frauds—and we've only gotten through 2011 so far. But is one of the reasons that you're not being truthful, or as truthful as possible, is because you don't want to tag your uncle or your father?
>
> A: That's ridiculous.
>
> Q: What's ridiculous about it?
>
> A: Because the Order or anyone in the Order has nothing to do with this case.
>
> Q: What about the $100 million they wanted?
>
> A: This is a case between me and Levon Termendzhyan.

*Id*. at 1589.

On re-direct examination, Jacob testified that he had pled guilty to laundering proceeds of the fraud through Order-related entities before meeting Defendant.[12] However, he clarified that these money laundering charges had nothing to do with Defendant. Additionally, he testified that the scale of the fraud increased exponentially after Defendant joined the conspiracy in late 2011.

2)      Isaiah Kingston

Isaiah, Jacob's younger brother, testified at trial for four days. Like Jacob, Isaiah testified as a witness for the Government pursuant to a cooperation agreement. He testified that he began working at WRE in November of 2009, and eventually was promoted to the position of Chief Financial Officer ("CFO") at WRE. Isaiah also testified that he conspired with Jacob and Defendant to defraud the government by fraudulently claiming biodiesel tax credits and sending

---

[12] This violation was charged as Count 25 in the original indictment.

the proceeds of the fraud to Defendant's businesses, to SBK-USA, to a third party as a loan, to various international entities, and to purchase a Bugatti. He corroborated Jacob's account that Defendant was given a share of the proceeds to fund the operations of the "umbrella."[13]

Isaiah also provided additional details regarding the Morrissey Oil and Westway Rotation schemes within the conspiracy. He testified that Defendant oversaw the Morrissey Oil scheme and delegated roles for the participants in the scheme. Beginning in 2013, Isaiah entered the Westway Rotation scheme when he conspired with Deryl Leon to facilitate the circular rotation of fuel and money between WRE and Leon's company. Isaiah noted that Defendant had instructed Jacob on how to carry out the scheme. In 2015, Isaiah helped facilitate a similar scheme with Leon, and Defendant directed Jacob on how much money he should claim on the fraudulent tax credits.

Isaiah also testified about the mechanisms through which the proceeds of the mail fraud were laundered. He corroborated many key details that Jacob had testified to regarding the loan made to Zubair Kazi, the purchase of the Bugatti, the purchase of the mansion in Sandy, the proceeds sent by Jacob to Turkey, and proceeds transferred from WRE to SBK-USA. In addition to the mechanisms to which Jacob had testified, Isaiah testified that he was often asked by Jacob to withdraw large sums of cash to deliver to Defendant. Jacob had informed Isaiah that all the money that was being sent to Turkey was for Defendant.

Isaiah also addressed a $90 million contract he signed with Lifetree Trading ("Lifetree") to purchase biodiesel. He signed this contract at Jacob's direction. Isaiah testified that WRE did not have the funds to go through with the transaction. But Jacob believed that he could secure a letter of credit from Turkey to guarantee the funds based on the millions of dollars that WRE had

---

[13] Isaiah testified that his belief in the "umbrella" was reinforced when an IRS audit of WRE that had initially resulted in the assessment of approximately $90 million was reduced to $5 million. Jacob told Isaiah that Defendant was the reason for the reduction in assessment.

sent to various Turkish entities. Despite this belief, Jacob was never able to secure the letter of credit. WRE was forced to default on its contract, and Lifetree sued WRE in the U.S. District Court of the Southern District of New York ("SDNY").

Isaiah testified that he signed two affidavits in relation to the Lifetree lawsuit.[14] Isaiah testified that the first affidavit, in which he declared his belief that WRE had access to funds in Turkey, was not true. At the time he signed the first affidavit, Isaiah already suspected that the money was no longer going to be repatriated. When the SDNY court ordered WRE to provide discovery into those Turkish assets, Isaiah submitted a second affidavit recanting his previous claims that WRE had access to Turkish funds. Even after this litigation and Jacob's failure to secure a letter of credit from Turkey to guarantee funds in WRE's name, Isaiah testified that Jacob continued to direct him to send money to Turkey.

On cross-examination, Isaiah testified about the circumstances around his arrest and the forfeiture of property related to his charges. He agreed with defense counsel's assertions that the source of much of his information was Jacob, that Jacob was involved with the transfers made to international accounts, and that Jacob began submitting false tax claims for biofuel credits before he met Defendant. Defense counsel spent a significant portion of the cross-examination challenging the credibility of Jacob and the Government's theory that Jacob was simply a nominee owner of the assets in Turkey. Defense counsel also questioned Isaiah regarding the dynamics within the Kingston family and elicited testimony that Jacob became more estranged from the family and the Order as he began to work with Defendant and collect more income from the fraud. On re-direct, the Government questioned Isaiah about the funds in WRE's account that could have been used to settle the Lifetree litigation. Isaiah testified that although WRE did have the funds in

---

[14] Both affidavits were admitted at trial as Government's Exhibits 7-32 and 7-33.

its bank account to settle the Lifetree litigation, the money in the account was earmarked for Defendant.

3)      Zubair Kazi

Zubair Kazi, a friend and business associate of Defendant, testified for three days at trial. He testified about his involvement in the purchase of the Bugatti Veyron, Defendant and Jacob's plans to purchase a casino in Belize, and an $11.2 million loan made by Defendant. Kazi, who spent a significant amount of time socializing and traveling with Defendant in the past, also testified about his interactions with Defendant and Defendant's business partners during these visits.

Kazi met Jacob through Defendant in Los Angeles in 2012. Defendant introduced Jacob as a friend and a business partner. In August of 2013, Jacob arranged to have a $1.8 million Bugatti Veyron shipped to Kazi's home in Los Angeles as a gift for Defendant. Kazi testified that he had previously test-driven the vehicle with Defendant in Florida.

The primary subject of Kazi's testimony was an $11.2 million loan that he received from Defendant in 2013.[15] In 2013, Kazi told Defendant that he was concerned about a debt that he owed to G.E. Capital, part of which was collateralized by an $11.2 million personal guarantee from Kazi. When it came time to pay G.E. Capital the $11 million, Kazi contacted Defendant asking him for help with the debt payment. Shortly thereafter, WRE wired G.E. Capital the $11.2 million Kazi owed the company.

Kazi testified at length about the discussions he had with Defendant regarding repayment of the loan. He noted that Defendant instructed Kazi to discuss repayment matters with him alone, not with Jacob. After many aborted discussions regarding repayment options, Defendant ultimately

---

[15] Kazi also testified about receiving $2.3 million from Defendant in 2012 and 2013 that he reported as income.

proposed that Kazi pay back the $11.2 million loan to SBK-USA in monthly payments of $70,000. Defendant proposed that under this repayment option, Defendant and Jacob would convey deeds of trust on Kazi's properties, which had been conveyed to them as collateral on the loan. Kazi agreed to this arrangement and testified that he made seventeen payments totaling $3.3 million on the $11.2 million loan between February of 2015 and July of 2016.

Kazi was also privy to Jacob and Defendant's plans to open a casino in Belize. He introduced Defendant to a number of high-ranking government officials in Belize, including the Attorney General, the National Security Minister, and a minister who had oversight over casino licenses. Kazi testified that in 2013, Defendant explained to him that Defendant and Jacob were working on a project to open a physical and online casino in the country. Kazi helped to facilitate the purchase of the property in Belize where the casino would be based, as well as the licensing of the casino, by introducing Defendant to the officials in the Belizean government who could help with such a project.

On cross-examination, defense counsel impeached Kazi's credibility by introducing evidence that a $135 million tax assessment against Kazi by the IRS had been reduced to $500,000 on the eve of trial, suggesting that Kazi was testifying on behalf of the Government as part of an undisclosed cooperation agreement. However, Kazi denied that he was testifying as part of any arrangement to reduce his obligations to the IRS. Kazi also testified that he stopped making payments on the $11.2 million loan in July of 2016 because Special Agent Louis Skenderis of the Department of Homeland Security ("DHS") had advised him to stop making payments because of a pending investigation involving Defendant. Defense counsel asked if Kazi was required to start paying the balance of the loan to the U.S. Treasury in lieu of Defendant. Kazi testified that he was

not asked to do so. Kazi also testified that Defendant called him demanding him to continue making the payments on the loan, but he did not comply with Defendant's demands.

    4)  Agent Stephen Washburn

   The Government called Special Agent Stephen Washburn of the Criminal Investigation unit of the IRS as a summary witness. He testified for approximately four days. Agent Washburn was asked to review the Government's financial summaries to determine whether they were true and accurate. Agent Washburn concluded that the Government's summaries were true and accurate summaries of the underlying records that he reviewed for the case.[16] Agent Washburn's testimony regarding each of the counts charged is summarized below:

- **Count 1**: Agent Washburn testified that he reviewed fifty-five different bank accounts to trace the proceeds of the mail fraud conspiracy charged in Count 1. After tracking the proceeds using a spreadsheet, he was able to trace the money to U.S. Treasury checks obtained from the IRS.

- **Count 2**: Agent Washburn was able to trace all but one of the international wire transfers reflected on Government's Exhibit 2-3 to U.S. Treasury checks obtained from the IRS. He testified that each of the following involved fraud proceeds: (1) a $15 million transfer from Luxembourg to SBK-USA that was initiated in July of 2015; (2) the funds used to purchase the $1.8 million Bugatti; and (3) the $18 million that WRE sent to Turkey during 2013, which was later sent to Speedy Lion Renewable Fuel Investments. Finally, Agent Washburn testified regarding many of the financial transactions reflected on Government's Exhibit 2-1 related to the Count 2 money laundering conspiracy charge, including a check payment traced to RIN proceeds, the $11.2 million Kazi loan, and a series of wire transfers.[17]

- **Counts 3-7**: Agent Washburn testified that Government's Exhibit 3-1 was a true and accurate summary of the underlying records relating to the $11.2 million loan to Zubair Kazi. According to Agent Washburn, Defendant exercised control over the many aspects of Kazi's loan repayment.

---

[16] Agent Washburn testified that there were small inaccuracies with Government's Exhibits 1-2 and 1-3, which did not properly reflect the numbers from Government's Exhibit 1-1. However, Agent Washburn made corrections to these documents on the witness stand, and the corrected exhibits were marked as Exhibits 1-2.1 and 1-3.1.

[17] These wire transfers included the $1.8 million Bugatti purchase, the $18 million sent from Turkey to Speedy Lion Renewable Fuel Investments, $483,000 sent to Defendant's personal bank account in Turkey, $25 million sent from WRE to SBK-USA, and $15 million sent from the Luxembourg-based Isanne-SARL to SBK-USA.

- **Count 8**: Agent Washburn testified that Government's Exhibit 8-1 accurately depicted the flow of funds related to the purchase of a mansion in Sandy, Utah. He also confirmed that Jacob had a loan management account at Merrill Lynch, account #1352, that was secured and collateralized by another Merrill Lynch account, account #4821. Agent Washburn was able to trace all deposits in account #4821 to U.S. Treasury checks obtained pursuant to the mail fraud conspiracy. On June 5, 2013, Jacob issued a $3 million check to Noil Energy, which was subsequently deposited into an account in the name of Noil Energy Group. Agent Washburn further testified that 99% of the funds used to purchase the Sandy house originated from Noil Energy.

- **Count 9**: Agent Washburn testified that Government's Exhibit 9-3 accurately depicted the flow of funds relating to a March 2014 wire transfer of $483,000 to Defendant's personal bank account in Turkey. He also testified that all funds involved in the wire transfer represented fraud proceeds traceable to U.S. Treasury checks obtained pursuant to the mail fraud scheme charged in Count 1.

- **Count 10**: Agent Washburn testified that Government's Exhibit 10-1 was an accurate summary of the flow of funds relating to the purchase of the Huntington Beach residence. He further testified that all funds listed on the exhibit, including the March 2015 wire transfer of $3.5 million to the title company, involved proceeds of the mail fraud scheme charged in Count 1.

Agent Washburn also testified to other key pieces of evidence relating to his investigation into Defendant. The most relevant of this evidence is summarized below:

- **American Express Account**: Agent Washburn testified about an American Express account statement, Government's Exhibit 2-6. The account was in the name of WRE, and listed credit cards issued in the names of Jacob, Isaiah, and Defendant. Based on Agent Washburn's review of the American Express records, it did not appear that Defendant used the credit card that was issued in his name.

- **Records Relating to the Bugatti**: Agent Washburn testified that on January 14, 2014, the Bugatti Veyron was registered in the state of Montana in the name of Noil, LLC.

- **Wire Transfers to Turkey**: On April 28, 2015, Isaiah initiated a wire transfer of $15 million from WRE to Turkey for "capital costs" relating to a Turkish company called Setapp Teknoloji Sistemleri.

- **Luxembourg Records**: Records obtained from Luxembourg showed that Sezgin Baran Korkmaz was the sole owner of SBK Holdings AS, which was the sole owner of Isanne SARL, which was the sole owner of Biofarma. Agent Washburn testified that these accounts were used as intermediaries between WRE and other Turkish entities.

- **Defendant's Personal Income Tax Forms**: Agent Washburn confirmed the accuracy of Government's Exhibit 15-6, which summarized Defendant's income tax returns between

2011 and 2015. These records confirmed Defendant's ownership interest in Speedy Lion Renewable Fuel Investments and showed discrepancies between what Defendant claimed to have earned through SBK-USA and the fraud proceeds placed in the name of the company.

- **Joint Bank Account**: Defendant and Sezgin Baran Korkmaz held a joint bank account in the United States where $10 million from Turkey was deposited in 2015. Agent Washburn testified that most of the funds were transferred through multiple bank accounts, including accounts held in the name of SBK-USA and Noil, and were transferred back to Turkey after search warrants were executed at WRE's offices.

- **Declaration Signed by Defendant**: Agent Washburn testified about Government's Exhibit 6-101, a declaration signed by Defendant on October 17, 2017 in Turkey and filed in a civil lawsuit.[18] The declaration stated that Defendant had been residing in Istanbul, Turkey since at least September of 2017 and would be residing there for the foreseeable future for business purposes.

- **Video Clips of Defendant's Deposition in Civil Lawsuit**: Portions of Defendant's deposition for a civil lawsuit were played during Agent Washburn's direct examination as Government's Exhibits 10-24, 10-25, and 10-26. During these clips, Defendant testified about his background, his businesses, how he met Jacob, his residence in Turkey, and how he had loaned $3.5 million from SBK-USA to his brother, Grigor Termendzhyan, to purchase the Huntington Beach residence.

- **Transcripts of Recorded Conversations Between Defendant and His Son**: During Agent Washburn's direct examination, the Government introduced transcripts between Defendant and his son that established ongoing communications between Sezgin Baran Korkmaz and Defendant's associates after Defendant's arrest.

On cross-examination, defense counsel elicited more details about the lawsuit from which Defendant's recorded deposition was taken, how SBK-USA operated, and how SBK-USA was paying Pillar Law Group millions of dollars. He also challenged the identity of who filed the fraudulent tax credits, noting that the U.S. Treasury checks made to WRE did not list the individual who filed for the tax credit. Defense counsel also inquired about a civil audit that the IRS had conducted of WRE, in which the IRS reduced its penalty assessment for WRE from $100 million to roughly $5 million. Defense counsel also questioned Agent Washburn about his conclusion that

---

[18] The lawsuit involved Defendant's company, SBK-USA, suing the law firm that represented it, Pillar Law Group, for embezzling money.

Defendant used fraud proceeds to purchase the Huntington Beach residence or fund the Kazi loan. When Agent Washburn was recalled as Defendant's second witness, Agent Washburn testified that Defendant was arrested after he voluntarily appeared at the IRS offices located in Los Angeles.

    5)  Other Witnesses

In addition to the witnesses discussed above, the Government called ten other witnesses and Defendant called one witness. Their testimony is summarized below:

- **<u>Katirina Pattison</u>**: Pattison, a co-conspirator who plead guilty[19] in a separate biodiesel tax credit scheme in the Southern District of Indiana, testified that she and her business partner, Joseph Furando, entered into an agreement with Defendant in 2012 to fraudulently re-certify B99 biodiesel through WRE. She testified about her interactions with Defendant and believed that he, not Jacob, was the leader of the conspiracy.

- **<u>Brendan Morrissey</u>**: Morrissey was the founder and CEO of Morrissey Oil, a company based in Ireland. Morrissey's testimony was taken via video feed in August of 2019 as part of a deposition pursuant to Rule 15 of the Federal Rules of Criminal Procedure. He testified that he had met with Defendant and Jacob about a business arrangement whereby Morrissey Oil would serve as a broker between WRE and Speedy Fuels, one of Defendant's companies. After an introductory meeting with Defendant and Jacob, Morrissey testified he did not wish to get involved in such a deal. However, the co-owner of Morrissey Oil, Philip Cahill, entered into an agreement with Defendant and Jacob and arranged a series of unauthorized trades on their behalf. Morrissey testified that in April of 2013, he received an email from Isaiah stating that Morrissey Oil owed WRE approximately $1.8 million for product sold by Morrissey Oil to WRE and UFS that had not been delivered. Morrissey, still unaware of Cahill's dealings with Jacob and Defendant, did not believe he owed WRE this money. Defendant called Morrissey about the money owed to WRE, and asked Morrissey to meet Defendant at his office in Los Angeles. Although Morrissey traveled to Los Angeles for the meeting, he did not attend the meeting after seeing Defendant's security detail and becoming fearful. Later, when Morrissey drove to the airport, Defendant and two other associates drove up next to Morrissey's vehicle while he was en route to the airport. Morrissey believed this was an intimidation tactic initiated by Defendant.

- **<u>Greg Perrin</u>**: Perrin was an associate of Philip Cahill who brokered various fuel deals. He testified that he became involved with Morrissey Oil's deal to sell biodiesel to WRE. He could not explain many discrepancies within the paperwork regarding the sales—including why the B99 biodiesel being sold to WRE was listed as "feedstock" in the paperwork or why Deryl Leon and his company, Skinny Crow Music, were listed as the buyers on a

---

[19] Although Pattison had entered a cooperation agreement with the Government in her own case in the Southern District of Indiana, she testified that her probation was completed, and she had not entered into any sort of cooperation agreement with the Government to testify against Defendant in this trial.

contract when in reality, the fuel was being sold to WRE. Perrin testified that Jacob was paying for the B99 biodiesel that Morrissey Oil was purchasing from other entities; however, part of the product being purchased was being delivered by Morrissey Oil to Defendant.

- **Joshua Wallace**: Wallace testified that he owned and operated a biodiesel company based in Oregon called Aspen Biofuels. He met Jacob in 2011 and started a joint venture that ultimately was not successful. To recoup their losses, Jacob and Wallace agreed to file false claims for biodiesel tax credits. In 2012, Wallace shut down Aspen Biofuels and started TCM Renewables ("TCM'), a company established to broker and trade fuel deals. After Wallace started TCM, one of Jacob's associates contacted Wallace about potentially sourcing large quantities of biodiesel. It was in connection to this venture that Wallace met Defendant. Wallace believed that Defendant oversaw the fraudulent tax credit scheme based on his interactions with Defendant. Wallace also testified about his involvement in the Morrissey Oil scheme. On cross-examination, Wallace was questioned at length about his credibility given his numerous convictions and false statements that he previously made under oath. He testified that he often had difficulty telling the truth.

- **Deryl Leon**: Leon was a co-conspirator in the biodiesel recertification fraud. He testified pursuant to a cooperation agreement with the Government. Leon explained that he coordinated with the Kingstons to create fake and fraudulent invoices, transport product between fuel terminals in a circular manner, and cycle funds to create the false appearance that the Kingston-owned companies and his own companies, Skinny Crow Music ("SCM") and Catan Trading, were involved in legitimate biodiesel transactions. He explained his involvement in the India and Panama rotations and detailed other fraud schemes that he perpetrated with the Kingstons and Defendant until 2016. He also discussed his interactions with Defendant, and how Defendant constantly questioned his "loyalty." Finally, Leon testified about his belief in the "umbrella," about which Jacob had informed him.

- **Shimon Katz**: Katz was a principal of Lifetree Trading. He testified that he entered into a contract to sell 90,000 metric tons of biodiesel to WRE, and then WRE failed to fulfill the contract after failing to secure a letter of credit from Turkey. Katz also testified about an interaction he had with Defendant where Defendant stated that WRE was one of "his companies." Defendant also told Katz that Jacob was Defendant's partner and often sat in his offices in Los Angeles. WRE never performed on the contract, and ultimately Lifetree sued WRE and obtained a $32 million judgment.

- **Anna Avagyan**: Avagyan was responsible for billing at Noil Energy. She worked for Defendant for twelve years until she was fired in 2018 by Defendant when he began suspecting that she was cooperating with federal agents. Avagyan testified that, at Defendant's direction, she created false invoices and paperwork to substantiate the biodiesel rotations and Viscon frauds.

- **Nicolas Steele**: Steele is a private pilot who testified that he flew Defendant on hundreds of flights. Steele testified that Defendant often flew with law enforcement officers. He also testified that approximately 50-70% of Defendant's payments were made in cash wrapped

in rubber bands. Steele also testified to eating lunch with Defendant's friend Baran Korkmaz, and that Defendant served as an interpreter between the two since Baran spoke only Turkish.

- **Mike Porter**: Porter is the owner and manager of Las Palmas Oil Dehydration, Viscon USA, and Viscon California, all based in Bakersfield, California. He testified that Viscon USA owns the intellectual property for a fuel additive called Viscon, which is marketed by Viscon California. Porter testified that the average market price of Viscon fuel additive was $60 per gallon, and the price of $625 per gallon that Defendant and Jacob had negotiated amongst themselves seemed unreasonable. He was also not aware of any significant sales or demand for Viscon in Utah. Defendant owned 10% of Viscon California but was not involved in company management. Porter also testified that between March and May 2012, he bought biodiesel from Defendant, which Defendant re-sold to a third party. He testified that he did not know why Defendant's paperwork for the loads of biodiesel he purchased from Defendant referred to the product as vegetable oil.

- **Dan McDyre**: Defendant appointed McDyre to be Chief Executive Officer of both Noil and Viscon International.[20] McDyre testified that during his time as CEO, he had reviewed a $6 million biodiesel processor invoice and became concerned at the cost inflation of the equipment. He discussed the matter with Defendant and the invoice was reduced to $600,000, which he testified was the market value of the equipment. McDyre testified that he was not involved in the 2015 sale of Viscon additive to WRE. He testified that he did, however, successfully lobby Defendant to lower the rate of the Viscon additive in the deal from $625 a gallon to $62 a gallon. McDyre attempted to collect payment from WRE on the product but was unsuccessful. This led Defendant to sue Jacob. Although McDyre helped prepare for trial, he was not informed when Jacob and Defendant settled the lawsuit. McDyre also testified about his travels to Turkey with Defendant, and how he helped Defendant prepare his resumes, which indicated that Defendant formed SBK Holdings in Turkey in 2013 and invested over $500 million in a company called Biofarma.

- **Isaac Chan**: Chan was the only witness to testify solely for the defense.[21] He testified that in 2013, he was the financial advisor for various accounts Jacob held at Merrill Lynch. Specifically, Chan testified about a brokerage account ending in 4805 that was created by Jacob and Edwin Tanglao. Chan testified that he assisted Jacob with the creation of standby letters of credit for that bank account that were never used. Chan did not know who Defendant was. He did not know that the money coming into any of the accounts owned by Jacob was from tax fraud proceeds.

---

[20] McDyre testified that Defendant was the "owner" and decisionmaker at both companies.

[21] Agent Washburn was called by both the Government and Defendant.

*C. Events Outside Trial and Post-Trial Developments*

1) Edgar Sargsyan Plea Deal and Complaint Against Agent Broumand

On January 29, 2020, the Government notified Defendant that it had received a copy of a plea agreement that Edgar Sargsyan had entered with the United States Attorney's Office for the Central District of California ("USAO-CDCA"). Docket No. 798.[22] The Government informed Defendant that the Government had reviewed the document and determined that it did not contain any discoverable information. *Id*. Accordingly, the Government explained that it would not produce the plea agreement to Defendant as part of discovery absent an order from the court. *Id*. Upon receiving this information, Defendant moved to compel disclosure of the plea agreement. The court invited the parties to submit memoranda on an *ex parte* basis to brief the issues.[23]

After the court reviewed the *ex parte* briefing, it made a preliminary determination that the plea agreement was potentially discoverable and issued an *ex parte* order to the Government to submit a summary of the relevant facts of the plea agreement to be released to the defense team on March 2, 2020. Docket No. 840 at 2. Because Sargsyan was not on the Government's witness list and the Government's case was expected to last more than one month, the court allowed the Government until February 26, 2020 to file the summary. *Id*. at 1. The Government complied with the court's order and submitted a summary of the relevant facts to the court for review. Additionally, the Government filed two *ex parte* memoranda reiterating the sensitive and

---

[22] All documents that were filed in relation to Sargsyan's plea agreement were filed under seal because the agreement had not been made public at that time. However, because the agreement has now been made public, the court intends to unseal all documents related to this matter, and therefore discusses these issues without redaction in this unsealed order.

[23] The court ordered this briefing to be submitted *ex parte* so the Government could address why the factual details included in the sealed plea agreement were not discoverable and Defendant could explain the exculpatory value of the agreement without divulging its trial strategy to the Government.

confidential nature of the plea agreement and requesting that the disclosure of the agreement be delayed until Defendant called Sargsyan as a witness. *See* Docket Nos. 849 and 870.

Thereafter, the court again reviewed the plea agreement and the factual basis that had been submitted by the Government in light of the evidence that had been presented to the jury subsequent to the initial *ex parte* filings. Following this review, the court determined that the plea agreement and the facts contained therein were simply not relevant to this case. On March 9, 2020, shortly before the Government rested, and after over five weeks of trial testimony had been heard, the court orally denied Defendant's motion to compel. On March 13, 2020, the court issued a written order to memorialize and explain the basis for its oral ruling. Docket No. 898.

On April 25, 2020, over a month after the jury returned its verdict in this case, the USAO-CDCA filed a criminal complaint in the United States District Court for the Central District of California against former FBI Special Agent Babak Broumand. Docket No. 964-3. The complaint charges Broumand with one count of conspiracy to commit bribery of a public official. *Id*. The complaint, which relies on the probable cause affidavit of FBI Special Agent Michael Torbic, alleges that Agent Broumand took bribe payments from an individual referred to in the complaint as Cooperating Witness 1 ("CW1") to perform or omit certain actions in relation to Agent Broumand's official duties. *Id*. Agent Broumand also allegedly provided non-public information to CW1, such as law enforcement information regarding Defendant. According to information contained within Agent Torbic's affidavit, Agent Broumand and CW1 also interfered in the federal investigation of Homeland Security Investigations ("HSI") Special Agent Felix Cisneros. *Id*. Based on biographical information included in the complaint, Defendant asserts that CW1 is Edgar Sargsyan.[24]

---

[24] The court has no information as to whether this is true, and as such, takes no position as to the identity of CW1.

On April 28, 2020, the plea agreement of Edgar Sargsyan was unsealed. The plea agreement details the factual bases for the charges to which Sargsyan pled guilty. The charges pertain to Sargsyan's role in a conspiracy to commit bank fraud in violation of 18 U.S.C § 1349 by (1) obtaining lines of credit in the names of third parties between 2014 and 2016; (2) bribing a former San Francisco-based FBI special agent and former Special Agent Cisneros in violation of 18 U.S.C § 201(b)(1)(C);[25] and (3) lying to law enforcement officers about payments he made to the former San Francisco-based FBI special agent in violation of 18 U.S.C § 1001(a)(2).

2)   Zubair Kazi Lawsuit against Santiago Garcia

On March 13, 2020, after jurors had begun deliberating in this case, Zubair Kazi and Kazi Management Saint Croix, LLC ("Kazi Management"), an entity owned and controlled by Kazi, initiated a civil action against Santiago Garcia,[26] Universal Investments and Trading, LLC ("UIT"), United Fuel Supply SA, LLC ("UFS-SA"), and an unnamed individual ("John Doe") who the complaint avers "is, or pretended to be, [a] federal law enforcement officer in the Los Angeles, California area." Docket No. 964-1 at 2.  The lawsuit was filed in the United States District Court for the Southern District of Texas.

The complaint alleges that Garcia and his companies UIT and UFS-SA, along with John Doe, orchestrated a scheme to defraud Kazi and Kazi Management of $3.1 million. *Id*. at 3. Specifically, the complaint states:

> GARCIA and DOE devised a scheme wherein they used telephone, text, and WhatsApp communications to convince the CEO of Kazi Management [Zubair Kazi] that he would be able to purchase cars and aircraft seized by the U.S.

---

[25] The Government has represented to the court that the charges relating to Mr. Sargsyan's bribery of Special Agent Cisneros do not pertain to Cisneros's efforts to assist Santiago Garcia in unlawfully re-entering the country, which was the basis of Cisneros's subsequent conviction in the United States District Court for the Central District of California. Docket No. 859 at 3.

[26] Santiago Garcia was involved in two counts of obstruction of justice (Counts 44 and 46) with which the Kingston defendants had been charged. Defendant was not charged with these counts. Although Garcia's involvement was briefly mentioned in Jacob's testimony, it merely served as background information. Garcia did not testify at trial.

Government due to GARCIA's cooperation with government officials on multiple criminal cases.

*Id.* The complaint alleges that the scheme began on or about March 21, 2018 and lasted through May 31, 2019. Additionally, the complaint states that at the direction of Garcia, Kazi sent several bank wires to accounts he believed belonged to law enforcement entities. Garcia also told Kazi that agents of the government informed Garcia that Kazi's continued cooperation[27] "in a criminal matter in Utah" was necessary if they approved the sale of the vehicles and airplanes. *Id.* at 8.

3)      Nicolas Steele Investigation

By the summer of 2019, the United States Department of Transportation, Office of Inspector General (DOT-OIG) had begun to investigate Steele for possible Federal Aviation Administration (FAA) violations. The prosecution team in this case avers that it was unaware of the DOT-OIG investigation.

On November 22, 2019, the Government produced Volume 40 of its discovery to Defendant. This discovery contained several emails from 2016 that had been provided to the prosecution team in this case by the Los Angeles Border Enforcement Security Task Force (LA BEST),[28] which had independently opened its own investigation into Defendant and his associates. The emails indicate that Steele was cooperating with the LA BEST investigation and that Steele had told the officers that he was having problems with the FAA. The emails also show that one of the LA BEST officers contacted FAA officials in an attempt to resolve Steele's issues with the agency, presumably to secure Steele's cooperation with the investigation.

---

[27] The Government suggests that "[i]t is not clear from the syntax of this allegation whether the 'he' refers to Garcia or Kazi." Docket No. 972 at 10. However, the court finds that reading paragraphs 46 and 47 of the complaint in context makes clear that the pronoun used in paragraph 47 refers to Kazi, not Garcia.

[28] LA BEST was formed by Homeland Security Investigations (HSI), an arm of the Department of Homeland Security. LA BEST includes both HSI agents and state and local law enforcement officers.

On February 4, 2020, twenty days before Steele testified in this case, a DOT-OIG agent obtained a warrant to place a tracking device on Steele's vehicle. The Warrant was extended on March 25, 2020 and again on May 8, 2020. On June 22, 2020 Assistant United States Attorney (AUSA) Dubois from the United States Attorney's Office for the Central District of California contacted the prosecution team in this case and told them about the criminal investigation of Steele. The Government attests that this was the first communication with AUSA Dubois and the first time that the prosecution team had been made aware of the criminal investigation of Steele. AUSA Dubois told the prosecution team that the Steele investigation was covert.

On July 14, 2020, the prosecution team was informed that search warrants had been executed on Steele's residence and that the investigation against him had become overt. On July 15, 2020, the prosecution team informed Defendant of the Steele investigation and produced the documents it had in its possession, including the warrants and extensions. The application for the search warrant indicates that the DOT-OIG is investigating Steele for potential charges for wire fraud, making false statements, identification fraud, perjury, and flying without a certificate.

## II.    RELEVANT LAW

### A.  Rule 29

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "the court on the defendant's motion must enter a judgement of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). In making such a determination, the court must decide whether "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001) (quoting *United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000)). Thus, the court "will not overturn a jury's finding

unless no reasonable juror could have reached the disputed verdict." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997).

When evaluating the evidence, the court must not weigh conflicting evidence or consider the credibility of witnesses. *United States v. Evans*, 42 F.3d 586, 589 (10th Cir. 1994) (citing *United States v. White*, 673 F.2d 299, 301-02 (10th Cir. 1982)). "The evidence necessary to support a verdict 'need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.'" *Wood*, 207 F.3d at 1228 (quoting *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999)). "Instead, [the court] must simply determine 'whether the evidence, if believed, would establish each element of the crime.'" *United States v. Delgado Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004) (quoting *Vallo*, 238 F.3d at 1247) (alteration omitted). Although a court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason," *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citation omitted), a court may not uphold a conviction "obtained by piling inference upon inference." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998) (citing *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)).

B. *Rule 33*

Rule 33 of the Federal Rules of Criminal Procedure states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). Rule 33(b) sets forth the timing requirements of such a motion:

(b) Time to File.

> (1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

(2) Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

FED. R. CRIM. P. 33(b).

"A motion for a new trial based on newly discovered evidence is not favorably regarded and 'should be granted only with great caution.' " *United States v. Combs*, 267 F.3d 1167, 1176 (10th Cir. 2001) (citation omitted). In *United States v. Stevens*, the Tenth Circuit articulated the requirements for granting a new trial based on newly discovered evidence. 978 F.2d 565, 570 (10th Cir. 1992). To prevail on such a motion, a defendant must show:

(1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id*. (citation omitted). "[T]he district court is to serve as a gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered 'new evidence' is credible." *United States v. McCullough*, 457 F.3d 1150, 1167 (10th Cir. 2006). When a court is considering whether to grant a new trial on the basis of newly discovered evidence, "the [] evidence must be more than impeaching or cumulative, must be material to the issues involved, and must be such as would probably produce an acquittal." *United States v. Gleeson*, 411 F.2d 1091, 1094 (10th Cir. 1969).

The Tenth Circuit has noted that a

defendant may move under Fed. R. Crim. P. 33(a) for a new trial under the catch-all 'interest of justice' rubric on the ground that a conviction, though supported with legally sufficient evidence, is nevertheless against the weight of the evidence. That, however, is a matter that involves assessing credibility and weighing evidence and is, accordingly, committed to the trial court's discretion.

*United States v. Fields*, 516 F.3d 923, 949 n.14 (10th Cir. 2008) (citing *United States v. Gabaldon*, 91 F.3d 91, 93–94 (10th Cir. 1996)). As Defendant notes, unlike a Rule 29 motion, the court need not view all the evidence in the light most favorable to the Government when evaluating a Rule

33 motion. Instead, the Supreme Court has articulated that "[t]he 'weight of the evidence' refers to a determination by the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other." *Tibbs v. Florida*, 475 U.S. 31, 37–38 (1982). Nonetheless, the Tenth Circuit has cautioned courts to grant motions of this nature only under the most extraordinary circumstances, noting "[m]otions for new trial are disfavored, however, and granted only with great caution." *United States v. Mounkes*, 204 F.3d 1024, 1027 (10th Cir. 2000) (citing *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir.1999)).

### C. Discovery Violations

The Government has an obligation to disclose evidence favorable to the defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). "This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence effecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (citation omitted).

A defendant seeking a new trial for an alleged *Brady* violation must show that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *Quintanilla*, 193 F.3d at 1149 (citing *Brady*, 373 U.S. at 87). Suppressed evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Cooper*, 654 F.3d 1104, 1119 (10th Cir. 2011) (citation omitted). The five-part *Stevens* test is not applicable to the court's analysis if a *Brady* violation has occurred.

## III.   DISCUSSION

### A.  Request to Hold Defendant's Motions in Abeyance

In his first supplemental motion, Defendant requests the court to "hold defendant's pending Rule 29/Rule 33 motion in abeyance . . . and permit supplemental briefing on the issues and evidence outlined here." Docket No. 964 at 1–2. Defendant subsequently filed three additional supplemental motions requesting Rule 33 relief, a new trial for discovery violations, and to reopen discovery. These additional supplemental motions have been fully briefed and are resolved through this Order.

### B.  Sufficiency of the Evidence

Defendant argues that that the court should enter a judgement of acquittal on Counts 1 through 10 due to insufficiency of evidence. The court now examines the evidence presented at trial as to each of these counts to determine whether "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *Vallo*, 238 F.3d at 1247.

#### 1)  Count 1: Conspiracy to Commit Mail Fraud

Count 1 of the indictment charged Defendant with conspiring with Jacob, Isaiah, Rachel, and Sally to commit mail fraud in violation of 18 U.S.C. § 1349. As the court instructed the jury, to establish a violation of 18 U.S.C. § 1349, the Government must prove:

**First**: two or more persons agreed to commit mail fraud in violation of 18 U.S.C. § 1341. . . ; and

**Second**: the defendant knew the essential objective of the conspiracy; and

**Third**: the defendant knowingly and voluntarily participated in the conspiracy; and

> **Fourth**: there was interdependence among the members of the conspiracy, that is,
> the members, in some way or manner, intended to act together for their shared
> mutual benefit within the scope of the conspiracy charged.

Docket No. 897 at 76.[29] Defendant argues that the Government failed to prove the second, third, and fourth elements of this count.

The court finds that, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found Defendant guilty of Count 1 beyond a reasonable doubt. First, the Government presented extensive evidence showing that Defendant collaborated with Jacob to devise a scheme to defraud the federal government of $1.1 billion by filing fraudulent tax returns. Jacob and Isaiah's direct examinations detailed the various schemes that were a part of this agreement, and the Government introduced voluminous records of emails and text messages that corroborated the agreement. Second, the Government established Defendant's knowledge of the essential object of the conspiracy through the testimony of Jacob, Katirina Pattison, and Josh Wallace, who all testified that Defendant had engaged in overt discussions about the fraud with them. Anna Avagyan's testimony regarding Defendant's instructions to her to create false paperwork, Agent Washburn's testimony regarding Defendant's receipt of proceeds from the fraud through complex financial mechanisms, Deryl Leon's testimony regarding Defendant's constant interrogations of Leon's "loyalty," and Defendant's use of burner phones with other co-conspirators all establish Defendant's knowledge of the essential, unlawful object of the conspiracy. Third, the Government established Defendant's knowing and voluntary participation in the conspiracy by presenting emails and text messages between Defendant and Jacob, testimony showing his recruitment of other members of the conspiracy such as Katirina Pattison and Josh

---

[29] This instruction is adapted from Tenth Circuit Pattern Jury Instruction 2.19 (18 U.S.C. 371).

Wallace, and documentation of his receipt of payments from the conspiracy through complex financial transactions. Finally, the Government established interdependence among members by presenting emails and text messages among members of the conspiracy, most notably between Defendant and Jacob, that showed their collaboration in committing the fraud. The Government also showed how Defendant and Jacob shared the proceeds of the fraud and derived mutual benefits from the various schemes within the conspiracy.

2)      Count 2: Conspiracy to Commit Money Laundering

Count 2 charged Defendant with conspiracy to commit international, concealment, and expenditure money laundering in violation of 18 U.S.C. § 1956(h). At trial, the court instructed the jury that to establish a violation of 18 U.S.C. § 1956(h), the Government must prove:

**First:** two or more persons agreed to accomplish one of the three illegal objectives of the conspiracy charged in Count 2; and

**Second:** the defendant knew the essential objective of the conspiracy; and

**Third:** the defendant knowingly and voluntarily participated in the conspiracy; and

**Fourth:** there was interdependence among the members of the conspiracy, that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

Docket No. 897 at 79.[30] The jury was further instructed that in order to find a defendant guilty of Count 2, jurors needed to find unanimously that the conspirators agreed to at least one of the three illegal objectives charged in the indictment: (1) to commit international money laundering; (2) to commit concealment money laundering; or (3) to commit expenditure money laundering. *Id*. at 79–80. The jury indicated on the special verdict form that the Government proved all three

---

[30] This instruction is adapted from Tenth Circuit Pattern Jury Instruction 2.19 (18 U.S.C. § 371).

31

objectives of the conspiracy. Docket No. 934. Defendant argues that the Government failed to prove any of the elements of this count.

The court finds that, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found Defendant guilty of Count 2 beyond a reasonable doubt. First, the Government established through the testimony of Jacob and Isaiah that they formed an agreement with Defendant to commit expenditure money laundering,[31] concealment money laundering,[32] and international money laundering.[33] Jacob and Isaiah's testimony was corroborated by Agent Washburn's testimony regarding Defendant's receipt of funds. Second, the Government established that Defendant knew the essential objective of the conspiracy through Jacob's testimony. Jacob testified that he agreed to share proceeds with Defendant through payments made to Defendant and his company, Noil Energy, through direct transfers as well as through below-market fuel transactions. Third, the Government proved Defendant's knowing and voluntary participation in the conspiracy by presenting testimony and documents that showed Defendant directed Jacob where to send the proceeds of the fraud. The Government presented evidence, for example, that showed that the proceeds went to (1) the purchase of the Bugatti; (2) Defendant's own personal bank account in Turkey; and (3) companies he held in other people's names in Turkey, to his companies, and to his friend Zubair Kazi. Fourth, the Government established interdependence among the members of the conspiracy by showing how Jacob and

---

[31] The purchase of the $1.8 million Bugatti Veyron, sending money to Defendant's personal bank account in Turkey, and transferring proceeds of the fraud directly to Defendant's companies were all evidence of expenditure money laundering.

[32] The transfer of money to Defendant by way of a loan to Kazi and the purchase of the house in Sandy, Utah are both examples of concealment money laundering.

[33] The transfer of more than $134 million in proceeds internationally to companies and accounts under the control of Sezgin Baran Korkmaz to conceal the location of the funds, the source of the funds, and the Defendant's ownership and control of the funds is an example of international money laundering that was presented at trial.

Isaiah carried out financial transfers that Defendant directed. These interactions, to which Jacob and Isaiah testified, were corroborated by text messages sent between Defendant and Jacob as well as financial records.

> 3)  Counts 3 through 7: Concealment Money Laundering for Wire Transfers and Withdrawals Related to the Repayment of the Kazi Loan

Counts 3 through 7 charged Defendant with concealment money laundering for wire transfers and withdrawals related to the repayment of the $11.2 million Kazi loan in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The court instructed the jury that to establish a violation of 18 U.S.C. § 1956(a)(1)(B)(i), the Government must prove:

**First:** the defendant conducted or attempted to conduct a financial transaction; and

**Second:** the financial transaction involved the proceeds of the mail fraud scheme alleged in Count 1 of the indictment; and

**Third:** the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

**Fourth:** the defendant conducted or attempted to conduct the financial transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity.

Docket No. 897 at 82.[34] Defendant argues that the Government failed to prove any of the elements of this count.

The court finds that, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found Defendant guilty of Counts 3 through 7 beyond a reasonable doubt. First, the Government established that Defendant conducted or attempted to

---

[34] This instruction is adapted from Tenth Circuit Pattern Jury Instruction 2.73.

conduct a financial transaction. The testimony of Jacob, Isaiah, and Kazi illustrated how Defendant directed the transfer of approximately $11.2 million from WRE in fraud proceeds to pay off Kazi's debt to G.E. Capital, and how Defendant directed Kazi to make repayments *to Defendant* on this loan. Second, the Government illustrated that the financial transaction involved the proceeds of the mail fraud scheme alleged in Count 1 through the testimony of Agent Washburn, who testified that he traced the source of the Kazi loan to proceeds of the mail fraud scheme. Third, the Government presented evidence, both testimony and documentary, that Defendant's involvement in the Count 1 mail fraud scheme proved his knowledge that the $11.2 million deposited by WRE to repay Kazi's debts were the proceeds of the biodiesel tax fraud. Fourth, the Government presented evidence that the structure of the Kazi loan and repayment shows that it was designed to conceal the location, source, ownership, and control of the proceeds of unlawful activity. The Government argued that Defendant organized the loan through WRE "only to have Kazi make payments back to [Defendant] through a series of byzantine mechanisms including the Pillar Trust Group and via a withdrawal from a joint bank account styled to appear like a joint venture." Docket No. 956 at 147. The evidence presented at trial supports this theory.

        4)        Count 8: Concealment Money Laundering for Wire Transfer in Connection with Purchase of Sandy, Utah Residence

Count 8 charged Defendant with concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) for a $3,160,000 wire transfer on or about August 5, 2013, from Noil Energy Group to a title company in connection with the purchase of a residence in Sandy, Utah for Jacob. The court provided the jury with the same instructions regarding the elements for Count 8 as it did for Counts 3 through 7 above. Defendant argues that the Government failed to prove any of the elements of this count.

The court finds that, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found Defendant guilty of Count 8 beyond a reasonable doubt. First, the Government presented evidence that Defendant caused a $3,160,000 wire transfer from Noil Energy to the title company. Jacob testified that this was part of a plan that he and Defendant had devised to purchase a house for Jacob using fraud proceeds while concealing it from the other members of the Kingston family. Second, Agent Washburn testified that he traced the source of the funds used to purchase the Sandy house to U.S. Treasury checks obtained pursuant to the mail fraud conspiracy. Third, as with Counts 3 through 7, the Government presented testimony and documentary evidence that Defendant's involvement in the Count 1 mail fraud scheme proved his knowledge that the $3 million used to purchase the Sandy house were proceeds of the biodiesel tax fraud. Fourth, the Government presented evidence, through the testimony of Jacob and Isaiah, that Defendant and Jacob agreed to launder the proceeds of the fraud through Noil in order to conceal the source of the money in WRE's accounts and prevent other members of the Kingston family from locating it.

     5)     Count 9: Expenditure Money Laundering for Wire Transfer to Defendant's Turkish Bank Account

Count 9 charged Defendant with expenditure money laundering in violation of 18 U.S.C. § 1957 for a wire transfer on March 5, 2014 of $483,000 to an account in his own name in Turkey. The court instructed the jury that in order to establish a violation under 18 U.S.C. § 1956(a)(1)(B)(i), the Government must prove:

**First:** The defendant engaged or attempted to engage in a monetary transaction; and

**Second:** That defendant knew the transaction involved criminally derived property; and

> **Third:** The property had a value greater than $10,000; and
>
> **Fourth:** The property was derived from the mail fraud scheme alleged in Count 1
> of the indictment; and
>
> **Fifth:** The transaction occurred in the United States.

Docket No. 897 at 85.[35] Defendant argues that the Government failed to prove any of the elements of this count.

The court finds that, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found Defendant guilty of Count 9 beyond a reasonable doubt. First, the Government presented evidence that Defendant texted Jacob with wiring instructions to make the payment in question as well as the note to include with the payment.[36] Second, the Government presented testimony and evidence that established that Defendant knew the transaction involved proceeds of the fraud scheme. Third, the Government presented evidence that showed that the wire amount was $483,000, and thus greater than $10,000. Fourth, Agent Washburn testified that he traced all of the funds involved in the wire transfer to U.S. Treasury checks obtained pursuant to the mail fraud scheme charged in Count 1. Fifth, the Government presented evidence that the outgoing wire originated from the Washakie Bank of Utah account 4874, based in the United States.

---

[35] The instruction is adapted from Seventh Circuit Pattern Jury Instruction regarding violations of 18 U.S.C. § 1957 and Tenth Circuit precedent as articulated in *United States v. Dazey*, 403 F.3d 1147, 1163 (10th Cir. 2005) and *United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992).

[36] The Government notes that even though the wire was actually sent by Isaiah, "Defendant is criminally responsible under 18 U.S.C. § 2(A), because he aided, abeted [*sic*], commanded, and induced this monetary transaction." Docket No. 956 at 152 (citation omitted). This interpretation is in line with the court's final jury instructions and applicable law.

6)   Count 10: Expenditure Money Laundering Relating to Purchase of Huntington Beach Residence

Count 10 charged Defendant with expenditure money laundering in violation of 18 U.S.C. § 1957 for a March 26, 2015 wire transfer of $3,520,085 from SBK-USA to a title company for the purchase of a residence in Huntington Beach, California. The court provided the jury with the same instructions regarding the elements for Count 10 as it did for Count 9 above. Defendant argues that the Government failed to prove any of the elements of this count.

The court finds that, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found Defendant guilty of Count 10 beyond a reasonable doubt. First, the Government presented evidence that Defendant wired $3,520,859 from a bank account in the name of SBK Holdings USA for the purchase of a house to be held in the name of Gilbert Island Property. Agent Washburn testified that Defendant and his brother, Grigor Termendzhyan, each own 50% of Gilbert Island Property. Defendant had previously testified in a December 2017 civil deposition that he was the only person who had the authority to wire funds from SBK Holdings USA. Second, the Government presented evidence that Defendant's participation in the fraud scheme proved his knowledge that this transfer, comprised of funds received from WRE, constituted criminally derived property. Third, the Government presented records showing that the wire amount was $3,520,085 and thus higher than $10,000. Fourth, Agent Washburn testified that all transfers of funds related to this purchase involved proceeds of the mail fraud scheme. Fifth, the Government presented evidence that the charged wire transfer was between two accounts based in the United States.

C.  Weight of the Evidence

Defendant argues that even if he is not entitled to a judgment of acquittal under Rule 29, the court should grant a new trial under Rule 33(a) because the jury verdict was against the weight

of the evidence presented at trial. In assessing this argument, the court weighs the trial evidence and the credibility of the witnesses and determines whether "a greater amount of credible evidence supports one side of an issue or cause than the other." *Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982) (citation omitted). Evaluating the evidence presented at trial, the court determines that the great weight of the evidence supported the jury's guilty verdict on all charges.

Above, the court has summarized the testimony that Government witnesses offered at trial. Defense counsel's cross-examination of these witnesses consisted largely of questions designed to establish bias or impeach their credibility on tangentially relevant matters. But if you follow the money, the defense comes up short. Defendant had no believable explanation for the Government's extensive documentation of financial transactions showing that fraudulently obtained funds were transferred from WRE bank accounts to accounts controlled by Defendant, his family members, or his close associates for no legitimate business purpose. For example, there was no credible explanation for why Kazi was instructed to make payments to a company controlled by Defendant, SBK-USA, for the $11.2 million that WRE had loaned to Kazi. The Government also produced unrefuted evidence of $10 million in direct payments to SBK-USA, as well as evidence of a $15 million transfer to Luxemburg that was then wired to SBK-USA. The Government also showed that WRE transferred tens of millions of dollars to entities in Turkey controlled by Korkmaz, a close associate of Defendant, and that the Kingstons were later unable to repatriate those funds. Additionally, the Government presented credible evidence of payments to Defendant's companies for nonexistent services and equipment, Defendant's attempts to launder the proceeds by selling fuel additives to WRE at ten times the market rate, and their payments of exorbitant broker fees to Defendant. Similarly, the Government presented credible evidence of Defendant's attempt to

launder fraud proceeds through a gifted $1.8 million sports car and through the transfer of funds for the purchase of Defendant's Huntington beach house.

These, and many other, financial transactions supported the testimony of numerous witnesses that Defendant threatened individuals involved with the scheme to intimidate them into silence, that Defendant insisted on the use of burner phones to evade wire taps, and that Defendant assumed a controlling role in the scheme to defraud the United States. These transactions also supported Jacob's direct testimony that he conspired with Defendant to perpetuate the scheme and that these payments were made to Defendant for his share of the proceeds and to buy protection from detection and prosecution for their crimes.

In sum, having presided over the trial and observed the witnesses, the court finds that the vast majority of the testimony presented by the Government's witnesses was credible. This testimony and the documentary evidence proved Defendant's guilt on all charges beyond a reasonable doubt. Because the court concludes that the overwhelming weight of the credible evidence supports the jury's verdict, it denies Defendant's motion for a new trial.

### D. Newly Discovered Evidence

Defendant has submitted supplemental motions for a new trial pursuant to Rule 33(a) based on newly discovered evidence. The court now evaluates each of these categories of new evidence using the five-part *Stevens* test articulated by the Tenth Circuit. To satisfy the *Stevens* test, Defendant must show (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by his own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

1) Zubair Kazi Lawsuit Against Santiago Garcia

Defendant argues that Zubair Kazi's lawsuit against Santiago Garcia and others is "directly relevant to Zubair Kazi's credibility, bias, and motive which if the information within the lawsuit had been disclosed would have dramatically altered defense counsel's cross-examination of Kazi, but the information would have also substantially altered defense counsel's approach of Santiago Garcia and the impact of the 'Commissioner Gordon Scheme' on Jacob Kingston and this entire prosecution." Docket No. 964 at 3. The Government responds that by May 2019, Kazi had stopped wiring funds to Garcia for the cars and airplanes that had not been delivered, and on March 13, 2020, he sued Garcia, indicating that he believed that he had been defrauded *before* the events at trial.

The Government has stipulated to the first two elements of the *Stevens* test, acknowledging that the evidence in question was discovered after trial and that the failure to learn about the evidence was not caused by Defendant's own lack of diligence. But Defendant has not satisfied the three remaining elements of the test.

To prove the third element, Defendant must show that the evidence was "not merely impeaching." Defendant concedes in his motion that the newly discovered evidence would have been used in defense counsel's cross-examination to question Zubair Kazi's "credibility, bias, and motive." Docket No. 964 at 3. Defendant argues that Kazi's potential belief that he "had $3 million on the line" for his cooperation with the Government influenced his testimony. As the Government notes, Defendant has not identified any evidentiary basis for admitting text messages or recordings between Kazi and Garcia at trial. Thus, court finds that this evidence would have been used merely to impeach the credibility of Kazi.

Next, Defendant has not shown that the new evidence is material to the principal issues involved. The lawsuit between Kazi and Garcia does not involve any of the issues material to

Defendant's convictions. The alleged deal between Kazi and Garcia was not at issue in this trial. References at trial to Garcia, who did not testify, were limited to his involvement in the "Commissioner Gordon" scheme, which only involved the obstruction of justice charges to which the Kingston defendants pled guilty. Defendant Dermen was not charged on any counts related to the "Commissioner Gordon" scheme, and details regarding the scheme were only mentioned in passing during Jacob and Isaiah's testimony to establish background.

Finally, Defendant has not established that the new evidence is of such a nature that in a new trial it would probably produce an acquittal. As the court has noted above, the Government provided extensive evidence to establish beyond a reasonable doubt that Defendant engaged in concealment money laundering for wire transfers and withdrawals related to the repayment of the $11.2 million Kazi loan in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (charged as Counts 3 through 7). The Government presented testimony from Jacob, Isaiah, and Kazi that detailed Defendant's involvement in the money laundering. Agent Washburn testified that Government's Exhibit 3-1 accurately depicted the flow of funds between accounts that showed that Defendant engaged in money laundering. The Government offered numerous documents that corroborated Counts 3 through 7. Even if defense counsel had cross-examined Kazi regarding the newly discovered issues, the court finds no basis for believing that it would have produced an acquittal. By defense counsel's own admission, he had devoted a considerable portion of the cross-examination of Kazi impeaching Kazi's credibility with respect to a recent reduction of a tax penalty by the IRS as well as his recantation of certain statements that Kazi had made during his grand jury testimony regarding prior loans he had received from Defendant. The jury was not persuaded by this impeachment evidence which was stronger than the *new* impeachment evidence at issue here. The court finds it highly unlikely that the newly discovered impeachment evidence would have

changed the outcome of the trial. In short, in light of the events at trial and the nature of the newly

discovered evidence at issue, the court finds that a new trial would likely not result in acquittals

on any of the counts on which Defendant was convicted.

        2)      Edgar Sargsyan Plea Agreement and Complaint Against Agent Broumand

Defendant argues that two newly discovered pieces of evidence warrant a new trial: (1) the

unsealed April 21, 2020 plea agreement between Edgar Sargsyan and the USAO-CDCA and (2)

an affidavit filed by Special Agent Michael Torbic of the FBI in support of a complaint filed by

USAO-CDCA against former Special Agent Babak Broumand, also of the FBI. Defendant alleges

that these documents "revealed Edgar Sargsyan's ongoing criminal conduct with a corrupt law

enforcement official during the relevant time period charged in this case" and "additional criminal

conduct including bribing yet another corrupt federal agent, this time an unidentified Homeland

Security officer, and it revealed Edgar Sargsyan's participation in an elaborate conspiracy to

commit bank fraud." Docket No. 964 at 3.

As with the newly discovered evidence relating to the Kazi lawsuit, the Government has

stipulated to the first two elements of the *Stevens* analysis, acknowledging that the evidence in

question was discovered after trial and that the failure to learn about the evidence was not caused

by Defendant's own lack of diligence. The court agrees with the parties as to these two elements.

Although Defendant learned of the existence of the plea agreement during the trial and moved to

compel the discovery of the agreement, this court denied Defendant's motion because the facts

contained in the agreement were not relevant to this case. Docket No. 898.

But unlike the newly discovered evidence of the Kazi lawsuit, newly discovered evidence

relating to Sargsyan is entirely irrelevant to the issues presented at trial; it does not even qualify as

evidence that would "merely impeach" as articulated under the third element of the analysis. The

court has previously noted that the plea agreement at issue would likely have been inadmissible

pursuant to Rule 403 of the Federal Rules of Evidence "inasmuch as it would create confusion and waste time by requiring the jury to resolve the claims presented in the civil lawsuit, none of which are relevant to the criminal charges against [Defendant]." Docket No. 898 at 5. The same analysis applies to the affidavit filed by Special Agent Torbic. Even if Defendant could establish that the evidence could have been used for impeachment purposes, he points to "no authority suggesting that he is entitled to compel production of possible impeachment evidence for the sole purpose of impeaching his own defense witness." *Id*. at 6.

Defendant has also failed to establish that "the new evidence is material to the principal issues involved." Sargsyan's bribery and employment of corrupt law enforcement officials were not at issue in this trial. Instead, it was the *belief* that Defendant's co-conspirators had regarding Defendant's network of corrupt law enforcement officials—the so-called "umbrella"—that was of relevance in this trial. Thus, the issue of whether it was actually Sargsyan who used an "umbrella" to protect his co-conspirators against prosecution, and not Defendant, is simply not relevant.

Finally, Defendant has not established that the new evidence is of such a nature that in a new trial it would probably produce an acquittal. In his second supplemental motion, Defendant argues that evidence that he knew that Sargsyan had corrupted FBI Special Agent Broumand would show that Defendant was intimidated by Sargsyan and his law enforcement connections. Defendant contends that his fear of Sargsyan explains why he signed a declaration stating that he was residing in Turkey. He now argues that he signed the declaration in order to avoid a live deposition in his civil lawsuit against Sargsyan. He also asserts that his fear explains why he became agitated during a deposition in the civil lawsuit. But neither Defendant's assertion that he resided in Turkey nor his agitation during a deposition were central to the Government's case. As the court has summarized above, the Government presented numerous witnesses and documents

regarding Defendant's participation with the Kingstons in a scheme to defraud the United States. The Government also presented evidence of financial transactions designed to transfer the proceeds of the fraud to Defendant and his associates. At best, the new arguments based upon evidence of Sargsyan's and Broumand's crimes are tangential to the Government's evidence presented at trial and would not have changed the jury's verdict.

3)   Mega Varlik Accounting Report

At trial, Jacob testified that he transferred fraud proceeds to Turkey to establish a bank there called Mega Varlik. He stated that he submitted personal documents and letters of reference to establish the bank and that he told Isaiah that he was going to own Mega Varlik. Jacob testified, however, that he did not exercise control over the bank but merely signed documents that were given to him. He asserted that he approved minutes of board meetings he had not attended and signed a document appointing a CEO of the bank. About two months after the jury rendered its verdict, the Government received a valuation report for Mega Varlik prepared by an accounting firm. The report stated that Jacob owned 99.9% of Mega Varlik. The Government forwarded the report to Defendant.

Defendant argues that the valuation report constitutes new evidence that would justify a new trial under Rule 33. He asserts that the evidence that Jacob owns 99.9% of the bank "entirely undercuts Jacob Kingston's testimony regarding his interest in Mega Varlik." Docket No. 1065 at 6. But Jacob did not testify that he did not own the bank. He testified that he passively allowed others to operate Mega Varlik and that he rubber-stamped management decisions. Because the valuation report does not contradict the testimony at trial, the court finds that this evidence would not likely lead to an acquittal if presented in a new trial. *See United States v. Stevens*, 978 F.2d 565, 570 (10th Cir. 1992).

In summary, the court concludes that none of the new evidence proffered by Defendant satisfies the requirements for granting a new trial under Rule 33.

### E.  Alleged Discovery Violations

#### 1)  Kazi's Cell Phone

Kazi's attorney gave the Government screen shots of messages found on Kazi's cell phone. The Government forwarded the screen shots to Defendant. Defense counsel then asked whether the Government had imaged Kazi's phone. The Government responded that it had not. Defendant now argues that the Government committed a discovery violation by not imaging Kazi's cell phone and providing the data to Defendant because the phone was in the Government's "constructive control."

The court finds no discovery violation because the Government did not suppress evidence. The Government does not have an obligation to obtain evidence from third parties. *See United States v. Combs,* 267 F.3d 1167, 1173 (10th Cir. 2001); *United States v. Flynn*, 411 F. Supp. 3d 15, 32 (D.D.C. 2019) ("*Brady* does not extend to information that is not within the government's possession . . . ."); *United States v. Tierney*, 947 F.2d 854, 864 (8th Cir. 1991) ("It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.' " (citation omitted)). Kazi is not an employee of any arm of the United States. Because Kazi was an independent third party, the Government did not have access to or constructive control over his cell phone. And the Government did not have an obligation to obtain the cell phone evidence in Kazi's possession.

#### 2)  The Alleged Garcia Fraud

In his recently filed civil complaint, Kazi alleges that Garcia perpetrated a fraud against him. Kazi claims that Garcia told him that Garcia had the ability to purchase items seized by the United States, including luxury automobiles, airplanes, and oil refineries. Garcia claimed that he

was working with a federal agent named Ben McArthur and multiple other law enforcement agents to gain access to these items. Kazi further alleges that an unknown individual claiming to be "Ben" forwarded screen shots of documents purportedly from high level officials in the Department of Justice and the Department of Homeland Security in order to make the offers seem legitimate. Kazi asserts in his lawsuit that Garcia and the unknown individual purporting to be Ben lied about having the ability to broker the sale of these items in order to cheat Kazi out of millions of dollars that he wired to accounts controlled by Garcia as down payments for the items.

Defendant argues that the Government violated its discovery duties by failing to notify him of the alleged scheme perpetrated against Kazi by Garcia and the unknown individual. Defendant asserts that the prosecution team for the Government knew about the scheme because Ben McArthur is the name of a federal agent who worked for LA BEST. Defendant implies that LA BEST is part of the prosecution team in this case and, therefore, agent McArthur's knowledge is imputed to the Government.

Setting aside the question of whether Garcia was telling the truth about Agent McArthur's involvement in the fraudulent scheme, the court finds that the Government did not violate its discovery obligations because LA BEST is not part of the Government's prosecution team. In its January 9, 2020 Order on Defendant's motion to compel discovery, the court examined this issue in detail and determined that members of LA BEST are not part of the prosecution team in this case. Docket No. 757. In his most recent supplemental motion, Defendant argued in passing that this determination was in error. Docket No. 1014 at 23. But he does not cite evidence regarding the scope of the prosecution team or engage in an analysis of this issue. Thus, the court sees no reason to reconsider its ruling on the scope of the prosecution team. Because Agent McArthur is not a member of the prosecution team, any knowledge that he may have had regarding Garcia's

alleged scheme cannot be attributed to the Government in this case. Accordingly, the Government did not suppress evidence.

But even if the Government had suppressed evidence of the alleged Garcia scheme, the court finds that this evidence was not material. For the same reasons articulated above in Part III.D.1, the court finds that there is not a reasonable probability that the result of the trial would have been different had Defendant introduced evidence of the Garcia scheme at trial. *See United States v. Cooper*, 654 F.3d 1104, 1119 (10th Cir. 2011).

3)     Sargsyan Plea Agreement

Defendant argues that "not having access to the plea agreement and the information contained within the agreement regarding Sargsyan's criminal conduct not only impacted defense counsel's decision to call Sargsyan; but even if he were called in defendant's case-in-chief, the testimony would have been drastically different without the information contained in the recently unsealed plea agreement." Docket No. 964 at 15.

The court has addressed the much-litigated issue of the discoverability of the Sargsyan plea agreement in a sealed order denying Defendant's original motion to compel the production of the plea agreement published on March 13, 2020.[37] In that order, the court noted the following:

> The court carefully reviewed the factual basis for Mr. Sargsyan's plea in light of the evidence presented by the prosecution. The court finds that Mr. Sargsyan's plea agreement is simply not relevant to the case on trial. Nothing in the factual basis for the plea relates in any way to charges against the Defendant or to the payments from "Borrower X" that were deposited into the client trust account of the Pillar Law Group for the benefit of Defendant Dermen. Rather, they relate to completely independent schemes in which Mr. Sargsyan was involved; schemes that are wholly unrelated to Defendant Dermen or to the money laundering counts asserted against him here.

---

[37] The order was sealed at the time in order to ensure that any details regarding plea agreement of Sargsyan, which was sealed at the time, were not divulged to the public.

Docket No. 898 at 4. Additionally, the court addressed Sargsyan's role in a separate lawsuit filed by Defendant's company, SBK Holdings USA:

> In its *ex parte* briefing on the discoverability of the plea agreement, the defense asserted that the civil lawsuit filed against Sargsyan by Defendant's company SBK Holdings USA, Inc. was relevant to this case because it provides context for Defendant Dermen's civil deposition testimony and declaration in that case, both of which have [ ] been admitted as exhibits in this case. The court was also initially persuaded by this argument. While it remains the case that the existence of the civil lawsuit is tangentially relevant because it provides some factual context for those exhibits, a careful review of the plea agreement establishes that there is nothing in the plea agreement that relates at all to that civil lawsuit. Moreover, Defendant Dermen has already successfully elicited evidence for the jury as to the existence of that civil lawsuit, the embezzlement allegations against Mr. Sargsyan, and the reasons that Mr. Dermen may have been agitated at the time of his deposition. Any additional evidence relating to that lawsuit would be subject to exclusion under Rule 403 because any slight probative value it may have is substantially outweighed by the danger of confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence. FED. R. EVID. 403.

*Id*. at 4-5 (footnotes omitted). Nothing that Defendant has presented in supplemental briefing warrants reconsideration of this ruling. As the court noted in its prior ruling, much of the evidence that Defendant seeks to introduce would be inadmissible pursuant to Rules 402 and 403 of the Federal Rules of Evidence. The court sees no reason to reconsider its prior ruling.[38] In short, the Sargsyan plea agreement evidence was not material because there is not a reasonable probability that the result of the trial would have been different if the evidence had been disclosed to Defendant.

### 4)   Steele Investigation

Steele is a pilot who flew Defendant on a private jet once or twice a month. Defendant argues that Steele offered two relevant areas of testimony at trial. First, Steele testified that

---

[38] In his second supplemental Rule 33 motion, Defendant also argues that Sargsyan's admission in his plea agreement that he bribed an HSI Special Agent to further schemes to bring a German citizen and an Armenian relative into the United States is relevant, exculpatory evidence that the Government should have produced. The court disagrees. The fact that Sargsyan bribed an official to circumvent immigration laws is not relevant to the Government's assertion at trial that Defendant wanted Jacob Kingston to believe that he had the ability to bribe U.S. officials.

Defendant would sometimes fly with law enforcement officers, including local police officers, a Homeland Security officer, an FBI agent, and a retired Secret Service agent. Second, Steele testified that Defendant paid for about 70 percent of the flights with cash.

Defendant contends that if the Government had disclosed the discovery material regarding the DOT-OIG investigation of Steele prior to the trial, he could have more effectively impeached Steele's testimony. For example, the recently disclosed affidavit attached to the search warrant asserted that Steele was an informant for HSI and that this agency had granted Steele, who was not a U.S. citizen, a work visa and a permit to travel. Presumably, Defendant could have used this information to argue that Steele had a motive to please the Government by giving it favorable testimony at trial. The affidavit also stated that Steele would request cash payments for flights on his private jet in order to hide the fact that he was providing for-hire passenger flights without the proper FAA certification. Defendant contends that he could have used this information to argue that it was Steele who required cash payments for the flights and that Defendant was not using the cash payments to launder illegal fraud proceeds.

Defendant argues that the Government's failure to disclose the information contained in the affidavits submitted by the DOT-OIG agent to a magistrate judge in the Central District of California constitutes a discovery violation that justifies a new trial. But neither the DOT-OIG agent nor the California AUSA were members of this prosecution team. Even if they were, the failure to disclose the allegedly suppressed information was not material.

Having presided over the seven-week trial in this case, the court determines that Steele was one of the Government's least consequential witnesses. During the short amount of time that he was on the witness stand, Steele did not provide any testimony that directly implicated Defendant for the crimes charged by the Government. His only relevant testimony was that Defendant

sometimes traveled with individuals associated with law enforcement and that Defendant often paid for the flights with cash. Other witnesses testified that Defendant projected an image of having connections to law enforcement agents. And the issue at trial was not whether Defendant actually had government officials on the take. Instead, the issue was whether Jacob Kingston believed that Defendant had the power to protect him from government scrutiny of their fraud. Moreover, the money laundering charges brought by the Government were not based upon the cash payments for the flights. Accordingly, the cash-payments testimony was only minimally probative of the issues in the trial.

The court determines that there is not a reasonable probability that the result of the trial would have been different if the DOT-OIG investigation information had been disclosed to Defendant. *See Cooper*, 654 F.3d at 1119. Notably, even though the Government had disclosed emails showing that Steele was cooperating with the LA BEST investigation, defense counsel did not attempt to impeach Steele with this information. Instead, defense counsel downplayed the significance of Steele's testimony during his brief cross-examination: "And the government flew you up today to ask you about rubber bands and money? Is that to the best of your knowledge as to why you're here?" For these reasons, the nondisclosure of additional impeachment evidence does not undermine the court's confidence in the verdict.

### F. Discovery Requests

Defendant requests that the court "reopen discovery" and order the Government to produce additional documents. But there is no need to "reopen discovery" because the Government's obligation to turn over exculpatory evidence continues even after the jury renders its verdict.[39] *See*

---

[39] The Government argues that *Browning v. Trammell*, 717 F.3d 1092, 1104 (10th Cir. 2013), limits its production responsibilities to documents in its possession prior to the verdict. But, at most, *Browning* suggests that the Government's discovery obligations do not extend to "evidence developed post-verdict." *Id.* It is not when the evidence came into the Government's possession that is determinative; it is when the evidence came into existence.

*Smith v. Roberts*, 115 F.3d 818, 819–20 (10th Cir. 1997). The court will now turn to each of Defendant's requests for additional discovery.

        1)  LA BEST Investigation

Defendant requests that the Government turn over all materials related to the LA BEST investigation conducted in Los Angeles. He also requests any memoranda of interviews for a particular individual, including any memoranda of interviews conducted by LA BEST member Ben McArthur. The prosecution team for the Government asserts that it has not interviewed the individual. Indeed, he did not testify at trial. Accordingly, this is functionally a request to procure and produce memoranda of interviews conducted by McArthur and other members of LA BEST.

These requests are duplicative of Defendant's pretrial motion for discovery of documents related to the LA BEST investigation. Docket No. 707. The court denied the motion to compel discovery of evidence held by members of LA BEST because they are not members of the prosecution team in this case. Docket No. 757. For the same reason, the court denies Defendant's request for discovery of any documents that may be held by the LA BEST investigation team.

        2)      Rough Notes

Defendant previously requested an order requiring the Government to produce rough notes of interviews conducted in this case. In its January 9, 2020 Order, the court noted that rough interview notes are generally not discoverable unless "the defendant shows that the notes are exculpatory and material." Docket No. 757. The court denied discovery of the rough notes but ruled that Defendant could renew his request for discovery if he could show that a particular set of rough notes was exculpatory and material—e.g., that the precise words used by a witness were significant or if a witness disputed the agent's account of the interview.

---

Because all of Defendant's discovery requests relate to evidence that existed when the jury rendered its verdict, the court need not decide whether *Browning* limits the Government's *Brady* obligations.

In his supplemental motions for a new trial, Defendant requests discovery of the rough notes of the interviews of Kazi and Sargsyan. But he has not explained why he believes that the notes may be exculpatory and material. Defendant notes that four Kazi interviews were conducted after he became a victim of the alleged Garcia scheme, but he does not argue why the rough notes would contain any reference to the Garcia scheme. Absent a showing of materiality, the court denies the request for discovery of the rough notes.

### 3) Settlement of Kazi's Tax Debt

Defendant moves for discovery of information in the possession of the prosecution team and the IRS regarding the settlement of Kazi's tax debt. The prosecution team represents that it has already produced all material in its possession. The court has no reason to doubt this representation. Moreover, Defendant does not argue that the branch of the IRS responsible for negotiating a settlement to Kazi's tax dispute is part of the prosecution team in this case. Thus, Defendant has not shown that the prosecution team must procure documents from the IRS in order to provide them to him. The court denies Defendant's request for discovery of the tax debt materials.

### 4) Non-Prosecution Deals

Defendant requests discovery "regarding any deal, benefit, [or] promise not to prosecute" Kazi and Garcia. The prosecution team represents that it has already provided all material in its possession responsive to this request. The court has no reason to doubt this representation. Thus, the court denies Defendant's request for such discovery.

### 5) Communications with Legal Counsel

Defendant moves for discovery of all communications between the prosecution team and counsel for Kazi and counsel for Baran Korkmaz. But Defendant does not explain the justification for his request or provide any supporting authority. The court denies this request.

6)      Ex Parte Filings

Finally, Defendant requests the disclosure of all ex parte Government communications with the court regarding Sargsyan. Because the final version of Sargsyan's plea agreement has now been disclosed to Defendant, the reason for permitting ex parte filings by the Government has dissipated. Accordingly, the court grants Defendant's request. The clerk of court shall email copies of Docket Numbers 794, 797, 840, 849, 852, 859, and 870 to all defendants. These documents shall remain sealed.

## IV.     CONCLUSION

After having witnessed over seven weeks of trial testimony, the court finds that, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found Defendant guilty of all ten counts of the Renumbered Indictment beyond a reasonable doubt. The Government presented a case-in-chief that lasted nearly five weeks and included the testimony of fourteen witnesses. The Government introduced hundreds of exhibits—including financial records, contemporaneous text messages and emails, and business records— to corroborate the testimony of its witnesses and prove the elements of all ten counts of the indictment. Although Defendant successfully challenged the credibility of some of these witnesses as to minor matters, he did not refute the most incriminating pieces of evidence against him. Moreover, the court notes that in Defendant's motion for acquittal, he advances no argument and presents no facts to support his conclusory declarations that the evidence presented by the Government was insufficient to prove each of the elements of the ten counts.[40] Additionally, the court finds that the jury's verdict was not against the weight of the evidence under Rule 33.

---

[40] The court notes that the length and detail of the memoranda submitted to the court illustrate the strength of the Government's evidence in this matter. Defendant's original motion and supplemental memorandum total 29 pages. The Government's responses total 183 pages. While the length of legal memoranda is not necessarily representative

The court also finds that the newly discovered evidence that Defendant has presented has little relevance to the counts for which he has been convicted. Moreover, the court concludes that the Government did not commit any discovery violations that would warrant a new trial. Finally, the court denies Defendant's additional discovery requests. The court, however, grants Defendant's request that the court disclose several ex parte filings submitted by the Government.

For the aforementioned reasons, Defendant's motion for a judgement of acquittal or, in the alternative, for a new trial, based on insufficiency of the evidence under Rules 29 and 33 of the Federal Rules of Criminal Procedure is DENIED. Docket No. 949. Defendant's supplemental motion requesting the court to reserve ruling on the Rule 33 motion based on newly discovered evidence, hold the motion in abeyance, reopen discovery, and permit Defendant to provide supplemental briefing on this issue is also DENIED. Docket No. 964. Defendant's second supplemental motion for a new trial and motion to reopen discovery is DENIED IN PART and GRANTED IN PART. Docket No. 1014. The court denies the requests for a new trial and to reopen discovery. The court grants the request to disclose certain ex parte filings. Finally, Defendant's third supplemental motion for a new trial and to reopen discovery is DENIED. Docket No. 1099.

SIGNED February 10, 2021.

BY THE COURT

_Jill N. Parrish_
Jill N. Parrish
United States District Court Judge

---

of the strength of arguments made by counsel, here it illustrates the weight of evidence in support of Defendant's conviction.