Mark J. Geragos
Setara Qassim
GERAGOS & GERAGOS
644 S. Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 625-3900
Facsimile: (213) 625-1600

Jon D. Williams (8318)
9 Exchange Place, Suite 600
Salt Lake City, UT 84111
Telephone: (801) 746-1460
Facsimile: (801) 998-8077

*Attorneys for Lev Aslan Dermen*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, <br><br>   Plaintiff, <br><br> v. <br><br> LEV ASLAN DERMEN <br><br>   Defendant. | **DEFENDANT LEV DERMEN'S SENTENCING MEMORANDUM** <br><br> Case No. 2:18-cr-00365-JNP-BCW <br><br> Honorable Jill N. Parrish |
|---|---|

# THE COURT SHOULD EXERCISE ITS DISCRETION AND IMPOSE A NON-GUIDELINES SENTENCE IN THIS CASE

The guideline calculations yield a life-sentence as to Mr. Dermen. This sentence is extremely severe and inconsistent with the crimes which Mr. Dermen was convicted for the fact that this was a victimless crime, did not involve any sort of violence or physical injury, and was exclusively financial and "white collar" in nature. In *United States v. Booker* 543 U.S. 220 (2005), the United States Supreme Court held the United States Sentencing Guidelines were advisory rather than mandatory. Therefore, the Court has the discretion to impose a Guidelines or a non-Guidelines sentence. Under 18 U.S.C. section 3553(a), the Sentencing Guidelines serve as

one factor among several that courts must consider in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); see 18 U.S.C. § 3553(a). The Guidelines are not the only consideration. *Gall v. United States*, 552 U.S. 38, 49 (2007). The district court judge must:

> [H]ear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, USSG § 5K2.0, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless.

*Rita v. United States*, 551 U.S. 338, 351 (2007). In fact, district courts may vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines. *Kimbrough*, supra, 552 U.S. at 101-102.

"[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate," the district court must select the appropriate and ultimate sentence in light of the purposes and factors set forth in section 3553(a). Id.; *Rita*, supra, 127 S.Ct. at 596-597. "In so doing, the court may not presume that the Guidelines range is reasonable." *Gall,* supra, 552 U.S. at 50.

18 U.S.C. Section 3553(a) calls upon sentencing judges to consider specific enumerated factors, including the Sentencing Guidelines range, to impose a sentence that is "sufficient but not greater than necessary" to comply with the goals of sentencing. See 18 U.S.C. § 3553(a). The following are the factors that Section 3553(a) requires the district court to consider in determining the sentence to be imposed:

- (1) offense and offender characteristics;
- (2) the need for the sentence imposed to reflect the basic aims of sentencing, namely "just punishment" (retribution), deterrence, incapacitation, and rehabilitation;
- (3) the kinds of sentences available;
- (4) the Sentencing Guidelines;
- (5) any pertinent policy statements by the Sentencing Commission;

>    (6) the need to avoid unwarranted sentence disparities; and
>
>    (7) the need to provide restitution to any victims of the offense.

*Rita*, supra, 551 U.S. at 347-48; see 18 U.S.C. § 3553(a).

Following a careful consideration of these factors, the Court must impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing: (1) reflection of the seriousness of the offense, respect for the law, and just punishment; (2) deterrence; (3) protection of the public; and (4) the rehabilitation of the defendant. 18 U.S.C. § 3553(a)(2).

### (A) The Guideline Range Should Unequivocally be Rejected in this Case Because it Yields a Sentence "Greater than Necessary" to Achieve Section 3553(a) Objectives

Mr. Dermen is a 56-year old male. He was born on August 13, 1966 in Yerevan, Armenia. He immigrated with his family to the United States in 1980 at the age of 14. He worked his first job at a gas station in Los Angeles. His education level is high school, needing to drop out of school to work longer hours so that he could help support his family.

He married his late wife Arusyak Arabyan in 1989. Together Mr. Dermen and Arusyak had two children, Ani and George Termendzyan, ages 34 and 30. Ms. Arusyak suffered from mental health disease that had been left untreated leading to her suicide in 2011 at the age of 40. Mr. Dermen did not remarry or have any other children. Mr. Dermen took on full responsibility for his children, maintained an unbreakable bond with them, and provided for them. In a letter addressed to this Court dated March 21, 2023, his daughter Anne explains that her mother's passing had a profound effect on the family, in particular her father Mr. Dermen. She states that: "He suffered in deep sorrow and grief as he tried to raise us alone for the first time. My dad made every effort to attempt to normalize our new reality. It was a significantly dark period in our lives, but as a widower, my dad did his best to console and comfort us by spending quality time with us and reinforcing our faith. I personally observed the toll my mother's passing had on my dad's overall well-being. The trauma my dad endured when he lost the love of his life was painful and heartbreaking. As his daughter, I share the pain with him to this present day." Anne describes her father as a "kind, thoughtful, generous, compassionate, giving, honest, loving, and caring" and as a "man of faith" who has always "encouraged [Anne] mto adhere to [her] religious values and faith for strength and peace." Anne also states that Mr. Dermen was a

"tremendous proponent of education, and supported [her] while [she] earned [her] bachelor's and master's degrees.

Mr. Dermen was arrested approximately one month after his daughter Ani's July 2018 wedding in Los Angeles. During his incarceration, Ani has had two children, Nicholas Tigran Hekimyan November 27th, 2020 and Alice Susan Hekimyan born August 30th, 2022. Mr. Dermen met his grandson behind bars one time a year-and-a-half ago. He has yet to meet his granddaughter. In her letter addressed to the Court, Anne states that "it was very difficult for all of us to have him meet his first grandchild behind bars without having the ability to hold, hug, or kiss him."

Mr. Dermen's family reside in Los Angeles, California. If released, Mr. Dermen will return to and stay in Los Angeles, California where he will continue to reside with his children.

On July 1, 2022, Mr. Dermen's father tragically passed away in Los Angeles, California. His mother and father both suffered sudden declining health following his incarceration, caused by stress and sadness of their youngest son's ongoing detention. Mr. Dermen attempted to obtain a furlough to see his father before his death but the request was ultimately denied by the Court. Mr. Dermen has expressed that he does not believe his father's death to be true and that he cannot accept that reality. In her letter to the Court, Mr. Dermen's Anne explained that her grandfather "waited for my dad on his deathbed with his dying wish to see his son, and asked about my dad's whereabouts with his final breath." Meanwhile, his mother is on the same sad and unfortunate trajectory. She suffers from declining health with a combination of health issues, primarily blood clots that are becoming more aggressive due to her ongoing stress and sadness. In a letter addressed to the Court, his mother Astig Termendzyan wrote: "My son's incarceration has taken a substantial toll on my health. It has caused me major depression anxiety, and the stress has exacerbated my cardiac related issues. Levon's father, Gevork Teremdnzhyan, passed away on July 1, 2022. Levon's incarceration had a direct and grave impact on my husband's health. He too suffered from depression and anxiety, so much that his health took a turn for the worse, and he asked for Levon with his dying breath." His mother went on to state that "without Levon, my world is empty, and my heart is broken. I need him present in my life, and my grandchildren need their father back in their lives."

Mr. Dermen also has an older brother, a niece and nephew. All three have submitted letters attesting to Mr. Dermen's good character, requesting leniency from the Court. His

nephew Gevork Termendjian states that his uncle "has been an important figure my entire life" and "has always been a person of good character, who has helped everyone around him." Gevork also explains how his uncles detention for the last five years has impacted his family, causing his grandfather to become sick due to stress and pass away, and explained that his grandmother's health is equally impacted stating that "she has been hospitalized several times since my uncle was imprisoned due to stress," "all of us have suffered as a result and we have all been paying the price, but I don't want to lose another grandparent." His niece Asthik Termendjian wrote in a letter addressed to the Court: "His son, daughter, and grandchildren need him for guidance especially since they do not have their mother with them as she passed away. Please give him the opportunity to meet his grandchildren and for him to be able to walk them through life.  My uncle has always been a pillar of strength for his family, and I am certain that they will be devastated if he has to be incarcerated any longer than he already has been."

Mr. Dermen has strong community ties. He is a United States citizen and has resided in this country since immigrating from Armenia in 1980 at the age of 14. Mr. Dermen has ties to his community in the state of California. Importantly, Mr. Dermen's two children, two grandchildren, his elderly mother, and older brother reside in Los Angeles, California.

Approximately nine years ago he suffered a heart attack. His severe heart condition and coronary heart disease resulted in coronary stent needing to be placed in Mr. Dermen's arteries. In addition to requiring the stent, Mr. Dermen is also required to take a combination of prescription medications daily to stabilize his heart function.  Anne Termendzyahn expressed this in her letter to this Court that she is "concerned about my dad's health as he has suffered several health setbacks, including a heart attack and painful kidney stones."  Mr. Dermen remains on medication to address his hypertension and cardiac issues.

Mr. Dermen maintains support from his community.  Eddie Loussararian, Professor of Finance at UCLA and Director of  Learning & Development, at A.P. Moller-Maersk, who has known Mr. Dermen for 35-years wrote in a letter to the Court "I know Levon to be an industrious, hardworking, family man who is a community-minded thought leader.  Levon has donated his time and resources to building and restoring several churches and has sponsored many immigrants to come to the United States to live the American dream."  Mark Lill, a business colleague and friend of 35 years wrote in a letter addressed to the Court "I have been a part of many family related events to include graduations of children, marriages of family

members, funerals, and many other events.  I have observed Levon as an individual who has always been a very giving person, whether it was a homeless person on a corner or an employee going through hard trying times.  Levon and his family have always been very supportive of their communities." Mitch Lewis, former Vice President of IPC USA, Inc., wrote in a letter to the Court that he has known Mr. Dermen for over 20 years from the petroleum industry, and stated "Levon holds family and community in very high regard.  I have come to know of his community involvement and his generous work with charitable organizations throughout this time.  I have seen Levon help struggling individuals with their business or personal development." Murph Jones wrote in a letter to the Court that Mr. Dermen "was well known in the petroleum industry as someone that was good to do business with.  The company I worked for did business for many years with his company and never had any issues to my knowledge with his credibility.  Levon was always straightforward and was a man of his word in all of our business dealing." Steve Bailey who has known Mr. Dermen professionally for twenty years, stated in his letter to the Court that "Levon has always gone above and beyond to make sure, as a friend you have what you need to succeed in business, whether it is with contacts or education.  At no time have I seen or heard anyone that does not have respect for him.  He treats everyone the same, as a friend!"

   Many have attested to Mr. Dermen's commitment to charity and giving back in their letters of support for a lenient sentence on behalf of Mr. Dermen to the Court.  Mr. Dermen has been recognized by many as an avid supporter of the Fuel Relief Fund.  The Fuel Relief Fund provides fuel during natural disasters as they occur around the world.  The Fuel Relief Fund works directly with the American Red Cross and the United Nations World Food Program.  He has also been widely recognized for guiding and aiding Armenians who have immigrated to the United States.  In a letter of support to the Court, Randy Jones, former Senior Vice President of IPC USA, Inc., wrote that Mr. Dermen was so generous that he "often helped those in his community get started with a gas station business" and "would guarantee their receivable (payment) to IPC so credit could be extended."  Mr. Dermen instilled these same values and principles to give back to the community into his children and niece and nephew.  His daughter Anne stated in her letter addressed to the Court that "for many years, my dad has contributed to the Fuel Relief Fund, the world's only charitable organization focused exclusively on fuel provision in natural disasters and complex emergencies.  In addition to funding crisis-related

challenges, my father has organized toy drives for the past decade to donate gifts to thousands of underprivileged children in the greater Los Angeles area. The annual toy drive is a charitable event my dad designed in honor of my mother's memory. To this date, my brother and I continue to fund and host the annual toy drive in honor of both my mother's and grandfather's memories." His nephew Gevork wrote "he would regularly take us to church and explain the importance of giving back to the community. As a young boy, I didn't want to give up any of the money I had worked so hard to earn. But he showed me that giving to the community would in turn allow more abundance into my life. And this is how he lived his life. Always working hard but giving back to those in need."

Mr. Dermen has close ties and commitment to his church, the Armenian Apostolic Church of Glendale. In a March 21, 2023 letter to Judge J. Parrish, Archpriest Fr. Manoug Markarian wrote that he has known Mr. Dermen's family for thirty years, that Mr. Dermen's parents have been "God-honoring and church-loving people and they have instilled their values of discipline, honor, humility, and respect in their children.," and that Mr. Dermen "has been a sincere and kind individual, whose love for family and community have been appreciated and highly commendable. He has left an impact on me as a caring and loving father, who lost his wife eleven years ago and ensured that his presence in the life of his children would be of utmost importance."

True and correct copies of the character letters excerpted and referenced here are attached for your review and consideration.

**Mr. Dermen's Role in the Offense**

The PSI reports includes an adjustment for Role in the Offense pursuant to USSG §3B1.1(a), stating that the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; adding four levels because "the defendant directed the efforts of some of the coconspirators."

Mr. Dermen allegedly being a "leader" of the conspiracy, was a narrative pushed by the government for the first time after Mr. Dermen moved for the second time to sever his case from the Kingston defendants in May of 2019 [DOC 289]. For the first time since charges were brought in August of 2018, in a May 2019 filing the government propose a new theory that Mr. Dermen "masterminded" the Washakie conspiracy and even wanted the Court to believe that Mr. Dermen was the mastermind and leader of the entire operation including being behind the

Order-led conspiracies. [DOC 314]. Their claim did not add up. Mr. Dermen was an outsider to the Kingston clan. Until the filing of the Second Superseding Indictment, the charges against Mr. Dermen were limited to four separate money laundering offenses. On August 01, 2018, the grand jury returned a fifteen-count Indictment against Jacob and Isaiah Kingston and Mr. Dermen. In that Indictment, Counts 1 through 9 charged the $500,000,000.00 plus tax fraud scheme and at the time only named Jacob Kingston. Those Counts specifically accused Jacob Kingston of willfully aiding and assisting in, and procure, counsel, and advise the presentation to the IRS of Forms 8849, claims for refund excise taxes, for and on behalf of his company Washakie, while Jacob Kingston then knew that Washakie was not in fact entitled to the credits. Mr. Dermen was not charged in the 500 million renewable fuel tax credit scheme nor was he implicated in a conspiracy at the time. Instead, Mr. Dermen was charged in four separate money laundering counts where it is alleged that he aided in the transfer of illegally obtained funds on behalf of Jacob Kingston. Suddenly, the government's theory turned to Mr. Dermen led the entire conspiracy and masterminded the underlying tax fraud scheme. Meanwhile, Mr. Dermen has no interest, ownership, or control of Washakie or UFS, both of which are Salt Lake City-based companies. In fact, at times the Kingston controlled companies worked against Mr. Dermen's interests. Similarly, nor was he part of the family-based, patriarchal Order which was at the center of this case. There are four Kingston defendants, and then there is Mr. Dermen. Notably, of the 46 counts in the Second Superseding Indictment (the "Indictment"), the substantive charges related to Mr. Dermen are limited to money laundering. Mr. Dermen is not accused of filing false tax credit claims with the government, conspiracy to commit obstruction of justice, destroying and concealing records, and attempted force or threat. Most importantly, the government did not include Mr. Dermen in charges related to the crux of the case – the alleged renewable fuel tax credit scheme and 305 related financial transactions in and out of Washakie- and Order-related businesses totaling $3.26 billion dollars. Mr. Dermen could not control or lead such an enterprise as an outsider of the Order.

        The government alleged without any proof or evidence at trial, that Mr. Dermen recruited new co-conspirators into the alleged scheme. Mr. Dermen introduced Sezgin Baran Korkmaz to Jacob Kingston, and Korkmaz and Kingston entered into their independent business arrangements for the most part cutting out Mr. Dermen of those agreements and financial transactions.

The government cited to Mr. Dermen's California based companies, including NOIL Energy Group ("NEG"), claimed that he used these entities to "create fake, false, and fraudulent invoices to support Washakie's claims for fraudulent renewable fuel credits." However, as the limited documents that actually relate to Mr. Dermen and the entities controlled by him within the multiple terabytes of discovery produced in this case revealed, NEG did not invoice Washakie or UFS for purchase of B99 or B100. NEG was on the receiving end of the product from Washakie/UFS and received and approved invoices following receipt of the product. In fact, oftentimes NEG disputed the invoices with respect to both quantity and quality of product NEG was charged for by Washakie/UFS, as a result of short loading and/or poor quality product (see Anna Agavyan and Dan McDyre testimonies). NEG was one of many Washakie/UFS customers, and like a typical customer expected competitive pricing and quality product from Washakie. The evidence showed that when Washakie fell short of these expectations, Mr. Dermen would stop purchasing product from Washakie [i.e. October 26, 2013, email from Dan McDyre to Parker Smith Re: Bio COLOR,"Our local biofuels sourcing is clear, lower in price than your offer, requires no storage and has [] good volume allocation. Levon is committed to quality. Don't waste his time."]

Moreover, the Kingstons were not scared of Mr. Dermen, as the government wanted the jury to believe. Jacob Kingston was not "concerned about what might happen to him if he crossed Dermen." In a November 28, 2012, email, Jacob and Rachel Kingston discuss starting a business relationship with a separate California biodiesel buyer "instead of Levon," and Jacob Kingston describes this new potential buyer as Mr. Dermen's "mortal enemy.". Jacob Kingston's tone only changed after he agreed to testify for the government and respond to every single inquiry with some variation of "Levon told me to."

Mr. Dermen's role in the offense as a leader is belied by details of this report. For instance, at paragraph 20 the report states "Jacob Kingston, Isaiah Kingston, Rachel Kingston, and Sally Kingston conspired with each other, and many others, starting in or about 2010, to create fake paperwork, engage in illusory financial transactions, and procure and transport falsely labeled product, in order to fraudulently obtain renewable fuel tax credits.." Mr. Dermen did not enter the picture until mid 2012. Paragraph 22 elaborates: "Between 2010 and January 2012, Jacob Kingston, his brother Isaiah, his mother Rachel, and his first wife Sally, on behalf of Washakie Renewable Energy, participated in a scheme to file 20 separate false claims for tax

credits with the IRS. While Jacob would generally meet with and enter into the agreements with co-conspirators to do fraud, Rachel Kingston, Sally Kingston, and Isaiah Kingston each would participate in creating the false or often simply fake records to support the fraudulent filings that they agreed with Jacob to file on behalf of Washakie. Rachel kept what some of the co-conspirators referred to as a binder of fraud, laying out the steps necessary to create the fake and false records to support their fraudulent claims for tax credits." Mr. Dermen had no role in creating false paperwork or devising the scheme.  In paragraph 37, the report states: "Rachel Kingston was responsible in part for cycling funds between WRE, Yknott, and Montgomery Recycling, to create a patina of legitimacy."  In paragraph 39, the report states: "Andre Bernard also testified before the grand jury that Adirondack was another fraud with WRE and its principals. Rachel and Sally Kingston played key roles in obtaining and coordinating the necessary false paperwork. For example, Andre Bernard testified about a document entitled "Biodiesel Processing Procedures," provided by Sally and Rachel Kingston, which described in detail precisely what paperwork needed to be generated and maintained."  Mr. Dermen had no role or say in this.  Paragraph 43 states: "This fraud was hatched between Jacob Kingston and Andre Bernard, and executed by Rachel Kingston, Isaiah Kingston, Sally Kingston, and the Grease Depot operators. The Grease Depot co-conspirators additionally agreed with Jacob Kingston to obtain the trash receipts of nearby companies, which disposed of wood chips in order to use these receipts to support larger volumes of false tax claims."  Mr. Dermen had no role or involvement in this.  The report is replete with anecdotal evidence demonstrating that Mr. Dermen had no role or participation in the crux of the conspiracies charged in the Indictment.

      Even pivotal characters in the scheme such as Deryl Leon hardly engaged or interacted with Mr. Dermen.  In his February 18, 2020 trial testimony Mr. Leon testified that the last time he had seen Mr. Dermen was in 2014.  He testified that during the 2016 raid for Washakie, it was Jacob Kingston that called him a week before the search warrant was executed to tip him off about the raid.  In fact it was Jacob that took Mr. Leon into a hotel room in Miami and made him undress so he could check him for wires when Jacob believed that Mr. Leon was cooperating with law enforcement.   Regarding "burner phones" Mr. Leon testified that Mr. Dermen never called him on the phone that George Termendzyan gave to him, and stated to the jury  " I don't recall any phone conversation with Levon." Tellingly, Mr. Leon, an intricate player in the entire organization testified that he did not even know if Mr. Dermen had anything to do with the fraud

he was committing with the Kingstons:

> Q You entered into a plea agreement, what, two years ago -- a little more than two years ago, in which you had a factual basis that identified them as your fraudster co-conspirators; is that right?
> A Yes.
> Q Now you also had told the government and the grand jury numerous times that you didn't know if Levon was involved, correct?
> A I believe that's accurate.

February 18, 2020, Deryl Leon trial testimony at Pg 125.

> Q Okay. Now when you went to Houston, you had mentioned that there was this gentleman Wang Zi Min? Am I pronouncing that right?
> A His name is Wang Zi Min.
> Q Okay. Who is that?
> A He is an Asian customer of Washakie.
> Q Okay. And not of Levon, correct, as far as you knew?
> A Correct.
> Q And as far as you knew, he couldn't understand English, correct?
> A Correct. He had a translator present.
> Q And so there wasn't a whole lot that was going on and being talked about with him, correct?
> A I don't recall anything in particular being discussed with him.
> Q And you didn't see him and Levon talking, did you, of any great moment, anything that you remember?
> A I did not see that, sir.

February 18, 2020, Deryl Leon trial testimony at Pg 126-27.

> Q Now the government seems to want to focus on who ordered food, who did this or that. Did you understand that it is an Armenian custom, at some point when you go there, that a lot of food is laid out family style?
> A I did understand that when we went to Los Angeles.
> Q And you also testified to that in front of the grand jury, right?
> A It's possible.

February 18, 2020, Deryl Leon trial testimony at Pg 127.

Mr. Leon also changed his testimony quite dramatically as to feeling "intimidated" by Mr. Dermen. For instance, in his grand jury testimony, he testified describing the "intimidation" as follows: " I don't know if it was to intimidate. I was intimidated. I don't know if that was his aim or his intent. I was certainly intimidated, but I can't point to anything he specifically said or did. It could have been in my head or it could have not. He's an intimidating character to begin with." During his trial testimony on direct, he said he felt like Mr. Dermen would "blow his brains out."

Finally Paragraphs 121 through 124 discuss Mr. Dermen's role in the scheme from the perspective of Jacob Kingston. Specifically, paragraph 121, states that "shortly after meeting Dermen in late 2011, Kingston began scheming with Dermen to fraudulently claim RINs and biodiesel credits. In exchange for a share of the proceeds of their planned fraud, Dermen told Kingston that Dermen would provide 'protection' from prosecution through his 'umbrella' of corrupt law enforcement." Paragraph 121 goes on to state that Mr. Kingston "observed" Dermen associating with people that Jacob "believed" to be part of the so-called "umbrella." Paragraph 122 describes text messages that Jacob Kingston exchanged with third-parties about his observations of Mr. Dermen with these purported "members of the 'umbrella.'" Paragraph 124 claims that after Dermen "joined" the conspiracy, the amount of the false claims "dramatically" increased because Dermen "promised to provide protection to Kingston." This theory pushed by the government that Mr. Dermen promised "umbrella protection" to Kingston is not supported by any actual evidence of affirmative conduct on Mr. Dermen's part. Instead this is also based on figments of Jacob Kingston's imagination and what he "believed" was happening, despite Dermen not ever telling that any of these things were in fact happening. It was Jacob's own fantastical mind in which he believed that there were poisonous rings, law enforcement umbrellas, Commissioner Gordons, grandpa and grandmas that motivated him to brazenly continue to commit the fraudulent scheme he himself led and masterminded.

Significantly, in a post-trial interview with the prosecution team on April 9, 2021, Jacob Kington changed courses from blaming Levon and the "umbrella" to instead claiming that it was Sezgin Baran Korkmaz that offered him "umbrella services" by introducing him to former Central Intelligence Agency (CIA) director James Woosely, his wife Nancye Woosely, and Graham Fuller a CIA agent. Kingston also understood that Mr. Korkmaz is a CIA agent. Kingston explained that Mr. Dermen had "distanced" himself from Kingston and that Kingston

was depending on Korkmaz and the CIA.  Meanwhile, Kingston continued to associate with Turkish president, Recep Erdogon, Turkish Ambassadors in the United States, and other dignitories.  According to Kingston's April 2021 interview, Mr. Dermen "waited in the car" while Kingston sat with and rubbed elbows witj  these world leaders and ambassadors.  In this April 2021 interview, Kingston also stated that he believed he was sending funds to Syria on behalf of the CIA to help Syrian efforts.

Mr. Dermen did not direct the efforts of Jacob Kingston, the other defendants, and/or co-conspirators in this case.  The Kingstons were intent on committing their fraud right under the nose of the IRS whether or not Mr. Dermen was in the picture.

**Loss Amount**

Paragraph 250 of the PSI Report adds 30 levels for an intended loss calculation of more than $1 billion dollars.  We dispute this loss amount as to Mr. Dermen.  The Kingston defendants masterminded and participated in the fraudulent filing of biofuel U.S. Department of Treasury tax credits years before Jacob Kingston soliciting his business to Mr. Dermen in 2012.   There is no evidence whatsoever to corroborate the government's theory and Jacob Kingston's testimony that Mr. Dermen ever instructed the Kingstons how much tax credits to apply for at any given time nor that Mr. Dermen was ever aware of how many fraudulent tax credits the Kingston defendants applied for.   Neither Isaiah Kingston, Rachel Kingston, or Sally Kingston ever took any sort of direction or instruction from Mr. Dermen on applying for the tax credits.  A loss amount amounting to more than  $1 billion overstates Mr. Dermen's role in any aspect of the crimes committed by the Kingstons.

 Mr. Dermen further objects to the government's calculation of his "share of the proceeds," and Agent Stephen Washburn's speculative and faulty investigative methods.

**Criminal History**

The PSI report overstates Mr. Dermen's criminal history, recommending an unwarranted upward departure to his sentencing range of 2 points.  The Sentencing Guidelines provide that a court may depart downward if the applicable criminal history category "substantially over-represents the seriousness of a defendant's criminal history."  U.S.S.G. §4A1.3.  Mr. Dermen's criminal history consists of minor offenses, are over a decade old, and are wholly

unrelated to the conduct at issue in this proceeding. In determining whether criminal history is over-represented, some factors that a court may consider include: (1) the age of the prior convictions; (2) the defendant's age at the time of the prior convictions; (2) whether drug and alcohol use was involved in the priors; (4) the circumstances of the prior offenses; (5) the length of the prior sentences; (6) the circumstances of the defendant's life at the time of the prior offenses; and (7) the proximity of the prior offenses. See *United States v. Hammond*, 240 F.Supp.2d 872, 877-880 (E.D. Wisc. 2003).

U.S.S.G. 4A1.3 subsection (b) states the following regarding criminal history downward departures:

> (1) Standard for Downward Departure.--If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

U.S.S.G. 4A1.3 Guideline Commentary notes state the following regarding downward departures based on over representation of criminal history:

> Downward Departures.--A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.

U.S.S.G. 4A1.3

The Guideline Commentary notes further state:

> "This policy statement authorizes the consideration of a departure from the guidelines in the limited circumstances where reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's criminal history or likelihood of recidivism, and provides guidance for the consideration of such departures."

U.S.S.G. 4A1.3

Mr. Dermen is currently 56-years old, a widower, father, and grandfather to two. Mr. Dermen has no serious or violent criminal convictions. Mr. Dermen has no felony convictions, and has never been convicted of any serious or violent offenses. Mr. Dermen's criminal history consists of three misdemeanor convictions. All of these offenses are minor in nature with the

latest of the three misdemeanor convictions occurring over 11 years ago. Undersigned counsel represented Mr. Dermen in the third matter involving the West Hollywood Sheriff's Department. Mr. Dermen maintained his innocence and elected to proceed with a bench trial. Los Angeles Superior Court Judge Kathleen Mader presided and acquitted Mr. Dermen of the misdemeanor criminal threat (Cal Pen. Code 422), Mr. Dermen was convicted for a simple battery. He has remained in custody without incident since 2018. Mr. Dermen has no federal convictions and has never been in BOP custody.

**Detention**

      Mr. Dermen has remained detained since his arrest on August 23, 2018. In July of 2019, Mr. Dermen was transferred from Davis County Jail to Salt Lake City County Jail instead. There, he was placed in the "supermax" security level of the jail for several weeks before being transferred to a lesser security level of the jail. From this time, his visitation privileges were severely restricted, where until recently he was not permitted to meet or speak with anyone other than his defense counsel. Mr. Dermen has survived on sub-par nutrition, sticking to a diet of canned tuna wrapped in tortilla bread. His ability to exercise has been severely limited given that he is restricted to his jail cell for the most part of the day and the jail does not provide any exercise facility to the inmates. The jail also does not provide any sort of programming or educational courses. Mr. Dermen's time has made productive use of his time by teaching himself to read in the English language having read over one-hundred books since his detention. Since it is a county facility as opposed to a federal detention center, there is a revolving door of new county inmates that Mr. Dermen must share his cell with. County jails are not facilities for long term inmates, as they lack proper nutrition, commissery, healthcare, space, exercise facilities, etc. Mr. Dermen's experience in the county jail for the last five years and its conditions are much worse than what his experience would have been in a federal detention facility.

      Despite enduring tragedy with the unexpected and traumatizing death of his wife, Mr. Dermen has remained a positive and pivotal member of his community, father, son, and now grandfather. Mr. Dermen does not have any serious criminal convictions, maintains his innocence in this case, and lives to regret ever doing business or befriending Jacob Kingston. While he got sucked into Jacob Kingston's fraud, a web of corrupt law enforcement agents, and individuals like Edgar Sargsyan and Zubair Kazi, any chance of recidivism upon his release from

five years of custody in a county jail is extremely unlikely. Mr. Dermen and his family have already been stripped of their livelihoods, hard-work, and importantly, of the patriarch of their family, Mr. Dermen's father who died on July 1, 2022 from stress and heartbreak struggling with his son's absence. After five years of ongoing detention, Mr. Dermen intends on returning home and resuming his life as a father and welcoming his new role as a grandfather.

**CONCLUSION**

In light of the foregoing, we respectfully request that Mr. Dermen is sentenced to a term of time-served with supervised release for a term that the Court deems appropriate under the circumstances.

Dated: April 23, 2023                                                                 Respectfully Submitted,

/s/ Mark J. Geragos
MARK J. GERAGOS
GERAGOS & GERAGOS
644 Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 625-3900
Email: geragos@geragos.com
*Attorneys for Lev Aslan Dermen*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed a true and correct copy of the foregoing, on the case styled *United States of America v. Lev Aslan Dermen*, this 3rd day of April, 2023, with the Clerk of the Court using CM/ECF, which sent notification of the filing to all parties registered to receive such notice in the case.

/s/   Mark J. Geragos