Mark J. Geragos  (SBN 108325)
Setara Qassim    (SBN 283552)
GERAGOS & GERAGOS
644 S. Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 625-3900
Facsimile: (213) 625-1600

Jon D. Williams (8318)
9 Exchange Place, Suite 600
Salt Lake City, UT 84111
Telephone: (801) 746-1460
Facsimile: (801) 998-8077

*Attorneys for Lev Aslan Dermen*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, Plaintiff, v. LEV ASLAN DERMEN Defendant. | **DEFENDANT LEV DERMEN'S MOTION TO CONTINUE SENTENCING HEARING AND MOTION TO COMPEL DISCOVERY** <br><br> Case No. 2:18-cr-00365-JNP-BCW <br> Honorable Jill N. Parrish |
|---|---|

Defendant Lev Dermen through counsel files this motion to continue the April 7, 2023 sentencing hearing and motion to compel discovery from the government regarding Isaiah Kingston and Jacob Kingston's memorandum of interviews.

During the April 6, 2023 sentencing hearing of Isaiah Kingston, the government made several statements as to the veracity and truthfulness of Isaiah Kingston's cooperation regarding the Order and his unwillingness to cooperate against the Order and members of the Kingston family.  Mr. Rolwing told the Court that while Isaiah was "up for testifying against Levon" he was not willing to cooperate against his family, and that

Isaiah *will readily testify against Mr. Korkmaz because it doesn't impact his family*. While the prosecution was comfortable with Isaiah agreeing to cooperate on matters that did not affect his family but withheld information on those that would, the government's failure to disclose to Mr. Dermen's counsel that Isaiah had willfully withheld information concerning the Order and was providing "unsatisfactory" responses to the government to protect his family, constitutes *Jencks and Brady/Giglio* discovery.

The Government has an independent affirmative obligation to disclose evidence favorable to the defendant. See *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). "This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 79 (1959)).

Under 18 U.S.C. § 3500 ("the Jencks Act"), the Government is required to disclose to criminal defendants any statement "in the possession of the United States" after the witness has testified. 18 U.S.C. § 3500(a). The *Jencks Act* defines a witness's "statement" as any of the following materials: (1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury. 18 U.S.C. § 3500(e).  The defendant has the burden to show that materials qualify as "statements," and that the statements in question relate to the subject matter of the witness's anticipated testimony. *United States v. Smaldone*, 544 F.2d 456, 460 (10th Cir.

1976).

  The topic of the Order benefitting from WRE's fraud, Jacob's frustration with having to share the fruits of his fraud with Uncle Paul and "Daddy" were at the core of Mr. Dermen's cross-examination of Isaiah Kingston. The defense case focused largely on Jacob Kingston's credibility and his motivation to lie about Dermen receiving a share of the fraud proceeds in exchange for "umbrella" protection for the Kingstons as a way of diverting his fraud proceeds from the Order and its numbered men. The evidence at trial demonstrated that The Order also operated several lending companies including Alliance Investments, Fidelity, and Equity. WRE wired substantial amounts of the fraudulent tax credit proceeds to Order related entities, a criminal conspiracy the Kingston defendants were separately charged in and plead guilty. Jacob and Isaiah's sister, Ruth Kingston managed these lending companies under the supervision of Paul Kingston, the leader of The Order. Paul Kingston is the uncle of Jacob and Isiaah, and also Isaiah's father-in-law. Jacob and Isaiah's cousin Grace, prepared the taxes for all of the entities It was evident that the high ranking members of the Order were kept informed about the status of the various entities, of their debts and liabilities, and most importantly, of their earnings and money in their bank accounts. Paul Kingston especially kept a close eye on WRE.

  Isaiah was cross-examined extensively about the Order and Jacob Kingston's collapsing relationship with the Order, his uncle Paul, and his father. Isaiah begrudgingly on cross-examination, after much probing by defense counsel, explained witnessing Jacob's growing frustration with the Order. Isaiah testified that employees of Bank of Utah would at times give information to Paul Kingston about WRE's accounts and income, which bothered Jacob. Jacob expressed his frustration with constant demands for money from WRE by Order members because they were withdrawing so much money from WRE that it was interfering with Jacob's plans to expand the plant. Feb 20 at P. 33. Jacob said Order members were trying to kill the goose that lays the golden eggs. Id. WRE/UFS was also "far and away" the most successful Order company. Feb 24 at 32. [Q. There is no company that has ever, at least while you have been alive, that

you have ever seen that is doing the kind of business that WRE and UFS is doing, right? A. Correct. Id. at 33.] Isaiah testified that Uncle Paul's decision to take the ownership of WRE away from Jacob in August of 2014 was a turning point for Jacob Kingston. *Feb 23, 2020* at Pg. 574. Isaiah agreed that Jacob began to distance himself from the Order leadership, including Uncle Paul and his father John Daniel Kingston. Feb 20 at Pg. 36. Isaiah admitted that he noticed part of the reason for this was Jacob's frustration with needing to give money to the Order. Id. Isaiah said that he began to see Jacob talk in ways about other Order members that he had not seen before including using derogatory terms towards close family members [i.e. "You should ask her who he thinks feeds his fat face, right?" regarding Hyrum Kingston, his daughter Rachel Kingston's father in law. Feb 20 at Pg. 52] Isaiah said Jacob began to hide money from The Order which was disturbing to Isaiah. Id. at 54. Isaiah's testimony was plagued by a series repetitive phrases along the lines of "because Jacob told me" "because Jacob asked me to send it" followed by a "for Levon's cut of his share of the fraud proceeds."

      Today we learned that Isaiah has not been cooperative as to the Order and bases the topics and people he is willing to cooperate against on whether it will protect his family. Consequently, Isaiah's cooperation has been "unsatisfactory" and untruthful as to the Order. This is problematic to Mr. Dermen and his defense, which relied strongly on the Order and their role in the tax credit fraud, and Jacob's growing frustration with the organization. There would have been much made of the fact that the Government did not believe Isaiah was being satisfactory and was willing to blame Levon when in reality it was the Order who was taking the proceeds. In the government's exhibits IEK 1 & 2, tens of millions of dollars was being paid by Jacob and Isaiah directly to their father John Daniel Kingston, to pay-off his debts to the Order. This arrangement was not only a vigorously avoided by the government in their direct examination of Isaiah, but Isaiah during his cross-examination feigned ignorance despite numerous opportunities to disclose it in that testimony. During today's sentencing of Isaiah the government provided an exhibit to this Court which purports to be text messages between Isaiah and Ruth Kingston (his sister), Isaiah and Ruth had equal access to Washakie's bank accounts

and at one point even withdrew $15,000,000 from the account. Apparently the government's purpose in presenting the exhibits today was to undermine Isaiah's credibility at his sentencing while taking the completely opposite position at Mr Derman's trial. That prosecutorial schizophrenia should not be countenanced.

Discovery regarding Isaiah's unwillingness to cooperate truthfully and candidly about the Order and his family members constitutes *Brady/Giglio* material that Mr. Dermen is entitled to. All post-trial statements provided by Isaiah Kingston to the government is Jencks material that Mr. Dermen is entitled to. The government is not relieved of its discovery obligations to Mr. Dermen and must continue to produce exculpatory, *Brady/Giglio* materials to him.

## CONCLUSION

Accordingly, defendant Lev Dermen, through undersigned counsel, respectfully requests that the sentencing hearing scheduled for April 7, 2023 is continued, and that the government be ordered to produce all Brady/Giglio materials, memorandum of interviews, and raw notes to the defendant.

Dated: April 6, 2023

/s/ Mark J. Geragos
MARK J. GERAGOS
GERAGOS & GERAGOS
644 Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 625-3900
Email: geragos@geragos.com
*Attorneys for Lev Aslan Dermen*

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed a true and correct copy of the foregoing, on the case styled *United States of America v. Lev Aslan Dermen*, this 6th day of April, 2023, with the Clerk of the Court using CM/ECF.

*/s/     Mark J. Geragos*