Exhibit "G"

## TABLE OF CONTENTS (EXHIBIT G)

| **JACOB KINGSTON TRIAL TESTIMONY** | **PAGE(S)** |
|---|---|
| February 5, 2020 | 1 - 3 |
| February 6, 2020 | 4 - 8 |
| February 10, 2020; Morning Session | 9 - 17 |
| February 10, 2020; Afternoon Session | 18 - 27 |
| February 11, 2020; Morning Session | 28 - 33 |
| February 11, 2020; Afternoon Session | 34 - 38 |
| February 12, 2020 | 39 - 43 |
| February 13, 2020 | 44 - 50 |

1    be about 64, 65.

2    Q    Now other than the Kingston family and the group you

3    grew up associating with, did you come to learn that there

4    were other big -- other people like yourself who had

5    hundreds of half siblings?

6    A    Yeah.

7    Q    Where?

8    A    There are people all over Utah that have half siblings.

9    Q    Did you belong to a certain organization?

10   A    Yes.

11   Q    What was it called?

12   A    Davis County Cooperative.

13   Q    What is the Davis County Cooperative?

14        Is it still in existence?

15   A    Yes.

16   Q    What is it?

17   A    The Davis County Cooperative was formed in the 30's.

18   It's started off to be a communal living scenario where

19   everybody would contribute into the common, and it would be

20   a communal living and everyone would pull as their needs

21   were there.  And part of that is a church.  So now Davis

22   County Cooperative has -- is an organization that is the

23   same thing.  Your property is made available to the common

24   good.  Also it consists of the church and it's where you

25   learn the gospel.

1   Q      Did you grow up in a communal living situation?

2   A      I'm not sure exactly what you would call communal

3   living.

4   Q      What do you call communal living?

5   A      When the Davis County Cooperative was first started,

6   people actually lived in the same community, in the same

7   area, the same houses, that type of thing, but now it's not

8   that way at all.

9   Q      So how was it when you grew up?

10  A      Well, when I grew up, you kind of fend for yourself.

11  If you have needs, then those needs are met.  But there is a

12  record kept of your income and everything you draw.

13  Q      There is a record kept of your income and everything

14  you draw?

15  A      Yes.

16  Q      Who keeps that record?

17  A      The organization, Davis County Cooperative.

18  Q      How did they get that information?

19  A      It's submitted on a monthly basis.

20  Q      By whom?

21  A      By each individual.

22  Q      You submit your income and your draws to the

23  organization?

24  A      Yes.

25  Q      And are you asked to donate to this organization?

EX. G 2

```
 1    A      No, other than the tithing.  The tithing is for the

 2    church, but the donation is not.  It's not a donation.

 3    There's a record kept.  Everything that you turn in is

 4    yours.

 5    Q      This is the way you were raised?

 6    A      Yes.

 7    Q      You learned about it how young?

 8    A      Sunday school.

 9    Q      Sunday school, is that what you said?

10    A      Yeah, four years old.

11    Q      Since you were four?

12    A      Yeah.

13    Q      Did all your family members live with this

14    self-reporting of income and draws and someone was keeping

15    records on them?

16    A      Yes.

17    Q      Who leads the Davis County Cooperative Society?

18    A      Today?

19    Q      Yeah.

20    A      Today it's Paul Kingston.

21    Q      Since you were four years old, who's led the Davis

22    County Cooperative Society?

23    A      His father was alive back then.

24    Q      And whose Paul Kingston to you?

25    A      He's my uncle.
```

EX. G 3

```
        1   time we got an IDR or Information Document Request

        2   from the IRS, then I gave that information to Levon.

        3   Q.   Why?

        4   A.   He said he had his people take care of it.

02:47:20  5   Q.   But Mr. Termendzhyan, I thought you testified,

        6   had nothing to do with those 2011 claims when they

        7   were filed and all of the conduct that related to

        8   them?

        9   A.   That's right.

02:47:30 10   Q.   Why were you giving him anything in the audit

       11   that related to those claims?

       12   A.   To reduce our liability we had to.  We needed

       13   help getting through the audit and he offered to

       14   help.

02:47:41 15   Q.   How did he offer to help?

       16   A.   He said he had friends in the government that

       17   could take care of it.  He called him his boys or his

       18   umbrella.

       19   Q.   His boys or his what?

02:47:52 20   A.   Umbrella.

       21   Q.   Was that his term for this group?

       22   A.   Yes.

       23   Q.   Did you know him to associate with government

       24   officials?

02:48:00 25   A.   Yes.
```

EX. G 4

```
 1   Q.   Who?

 2   A.   On a regular basis.

 3   Q.   What do you mean?

 4   A.   We would have dinner with police officers,

 5   current officers.  We would have dinner repeatedly

 6   with homeland security agents, active agents, we had

 7   dinner with the sheriff of LA County.  We have had

 8   dinner with ministers, with mayors.  I have met the

 9   president of Turkey through Levon.

10   Q.   President Erdogan?

11   A.   Erdogan.

12   Q.   Erdogan?

13   A.   Yes.

14   Q.   And you said ministers.  What does that mean?

15   A.   We have had dinner and done business with

16   ministers in Belize.

17   Q.   Turkey and Belize?  And the others you mentioned,

18   were those U.S. government people?

19   A.   Yes, homeland security in the U.S., secret

20   service in the U.S., local police officers.

21   Q.   And when you say "you had dinner," what does that

22   mean?

23   A.   Um, we would meet for dinner at either

24   restaurants or at the beach house and that's when we

25   would meet.  I wasn't always there for the
```

02:48:09 (line 5)
02:48:34 (line 10)
02:48:41 (line 15)
02:48:57 (line 20)
02:49:12 (line 25)

713

EX. G 5

1    conversations.

2    Q.   So and -- and you pointed out in that picture,

3    Government Exhibit 4-2, that you thought that the two

4    bodyguards were off-duty policemen?

02:49:26    5    A.   Yes.

6    Q.   Did Mr. Termendzhyan employ off duty policemen in

7    Southern California?

8    A.   Yes.

9    Q.   How many?

02:49:33    10   A.   I don't know.

11   Q.   More than those two?

12   A.   Yes.

13   Q.   Did you -- did you have any interaction with --

14   you said homeland security agents?

02:49:48    15   A.   Yes.

16   Q.   Did you have any direct interaction with the

17   homeland security agent?

18   A.   Yes.

19   Q.   Who?

02:49:52    20   A.   Felix Cisneros.

21   Q.   And what kind of interaction?

22   A.   I had dinner with him.

23   Q.   Just once?

24   A.   No.

02:50:01    25   Q.   How did you meet him?

EX. G 6

1    A.   I met him at dinner with Levon.  I didn't know

2    who he was at first, but later on Levon told me who

3    he was.

4    Q.   Was he an active federal agent?

02:50:11    5    A.   Yes.

6    Q.   Were there any other active onduty officers or

7    government officials that you interacted with?

8    A.   Yes.  There was John Balian.  Tony Choppa was

9    secret service.

02:50:26    10   Q.   And how did you meet all these individuals?

11   A.   Either at lunch or at dinner with Levon.

12   Q.   Were they your contacts or his?

13   A.   They were not mine.  They were Levon's.

14   Q.   Did you believe that he had this umbrella?

02:50:41    15   A.   Yes.

16   Q.   And approximately how many times did you discuss

17   this with him in 2012?

18   A.   Many times, many times.

19   Q.   We saw earlier that when Washakie and NOIL

02:51:08    20   entered into a contract on December 30th, 2011, that

21   there was paperwork from Titan Terminal associated

22   with the bills of lading and weigh tickets on the

23   B99.  Do you remember those?

24   A.   Yes.

02:51:21    25   Q.   Did the paperwork ever change when the Panama or

715

EX. G 7

```
 1   A.   Yes.

 2   Q.   Did you reach a plea agreement with the United

 3   States Government?

 4   A.   Yes.

 5   Q.   What is your understanding of the plea agreement

 6   you pled to these 41 felonies?   What did you agree to

 7   do?

 8   A.   I agreed to make it right, to be truthful, and to

 9   disclose all of the facts.

10   Q.   So you have a cooperation agreement as well?

11   A.   Yes.

12   Q.   Did you agree to forfeit any of the interest in

13   any of the proceeds and property that was purchased

14   with any of these proceeds that you took from the

15   United States government?

16   A.   Yes.

17   Q.   And what is the maximum sentence that as a result

18   of your plea agreement -- well, what was the maximum

19   sentence you were looking at as a result of these 41

20   felony counts you were charged with?

21   A.   400 years.

22   Q.   Is that life?

23   A.   That is life.

24   Q.   And what is the maximum sentence that is part of

25   your plea agreement that the government is going
```

04:39:57 (line 5)
04:40:18 (line 10)
04:40:31 (line 15)
04:40:45 (line 20)
04:40:57 (line 25)

EX. G 8

```
           1    him.

           2           Q.    And who were these guys?  What do you mean?

           3           A.    That's just what he told me.

           4           Q.    So the umbrella were the guys who prosecuted him?

09:57:46   5           A.    Yes.

           6           Q.    And so did you try and correct this $20 million

           7    claim with the IRS?

           8           A.    No.

           9           Q.    How much of the $20 million -- were you paid the

09:58:07  10    $20 million?

          11           A.    Yes.

          12           Q.    How much was due to Greece Depot, the people that

          13    sent you all this paperwork, and Andre Bernard?

          14           A.    I think 12 cents.  So roughly 20 percent.

09:58:23  15           Q.    And how about Andre Bernard?

          16           A.    His was like 30 percent.

          17           Q.    And did you pay 20 or 30 percent of this 20 million

          18    to Mr. Bernard or the Greece Depot people?

          19           A.    No.

09:58:37  20           Q.    Why not?

          21           A.    They came out to meet with me.

          22           Q.    Where did they come out to?

          23           A.    Levon had me come out to -- have them come out to

          24    California to meet with him in his office.

09:58:49  25           Q.    Where was his office?
```

300

EX. G 9

```
 1              A.    Yes.  There would have been.

 2                    MR. GERAGOS:  I'm sorry.  I couldn't hear the last

 3        part.

 4                    THE WITNESS:  Yes, there would have been.

10:04:34  5                   MR. GERAGOS:  There would have been, thank you.

 6              Q.    BY MR. ROLWING:  Did Levon Termendzhyan have any

 7        role in recruiting Borro into your schemes to falsely claim

 8        credits?

 9              A.    No.

10:04:51 10          Q.    Did he have any role in your agreeing with Andre

11        Bernard on Greece Depot and Adirondack?

12              A.    No.

13              Q.    Who was responsible for that, Mr. Kingston?

14              A.    I was.

10:05:03 15          Q.    Did you ever tell them about the Adirondack or

16        Borro schemes and claims?

17              A.    I don't think so.

18              Q.    Was the Adirondack claim large like the Greece

19        Depot $20 million claim or small like the Borro one?

10:05:28 20          A.    It was small.  About 160,000 gallons, I believe.

21              Q.    Okay.  Let's turn to your March 2013 trip to

22        Turkey.  When you arrived who did you meet?

23              A.    I met Baran, his family and Zubair Cosi and Levon.

24              Q.    Zubair Cosi was there, too?

10:06:11 25          A.    Yes.
```

306

EX. G 10

```
1      2014 building out the plant.

2            Q.   Where did all that money come from?

3            A.   From these claims.

4            Q.   And did your extended family's companies get

11:47:06  5  involved in doing some of that work?

6            A.   Yes.

7            Q.   Did anyone else in your extended family receive any

8      of this money?

9            A.   I don't understand your question.

11:47:18 10         Q.   Did you pay any of this money to Uncle Paul or your

11     dad?

12           A.   No.

13           Q.   Did they get any of this money?

14           A.   Not that I'm aware of.

11:47:29 15         Q.   Did any other related entity get any of this money

16     that wasn't doing the plant build out?

17           A.   Yes.

18           Q.   Who?

19           A.   A-Fab Engineering.

11:47:39 20         Q.   What are they?

21           A.   It's my brother's company.

22           Q.   Who's your brother?

23           A.   Joe Kingston.

24           Q.   And what was the purpose of paying his company

11:47:53 25     money?
```

365

```
 1        Ferrari that you were given?
 2            A.   It's about 2- or 300,000.
 3            Q.   All right.  You can take that down, Miss Bonney.
 4                 Let's move to September of 2013.  Where did you
 5        travel if anywhere with the defendant?
 6            A.   I went to Turkey.
 7            Q.   And who did you meet there?
 8            A.   I met Baran.
 9            Q.   And who was with you?
10            A.   I think it was just me and Levon that came, that
11        came together.
12            Q.   And was there -- what was the purpose of this trip
13        to Turkey?
14            A.   We was looking at projects to do in Turkey.
15            Q.   With what money?
16            A.   With some of the money that we had received.
17            Q.   From where?
18            A.   From the tax credits.
19            Q.   So did you talk with Baran on this trip?
20            A.   Not directly.  He didn't speak English.
21            Q.   Did you speak Turkish in September of 2013?
22            A.   No.
23            Q.   So how did these discussions take place?
24            A.   Everything was through Levon.
25            Q.   What does that mean?
```

11:55:07  5
11:55:29  10
11:55:41  15
11:55:56  20
11:56:07  25

371

1     A.   Levon would translate.   I was always on the

2     sideline during the meetings.

3          Q.   Was any business concluded in this trip?

4          A.   Yes.

11:56:18  5     Q.   What business was concluded or resolved?

6          A.   We went and looked at a warehouse.  Baran is in the

7     business of buying distressed assets, either companies or

8     physical assets and either selling them or turning them

9     around.  He went -- we went and looked at a warehouse, and the

11:56:41 10   project was that Levon and I and Baran would split the

11    investment in this warehouse and it would get flipped within

12    90 days.

13         Q.   So were you told to do anything?

14         A.   Yes.

11:56:56 15    Q.   What were you told?

16         A.   That it was a $5 million investment each, and so I

17    instructed Isaiah to send $10 million to Turkey.

18         Q.   Why 10 million?

19         A.   Because 5 million for me and 5 million for Levon.

11:57:12 20    Q.   And where was the money coming from Isaiah would

21    send?

22         A.   It was coming from these tax credits.

23         Q.   Did Isaiah send the $10 million?

24         A.   He sent 1 million to a company of Levon's in

11:57:31 25   California, and then he sent $9 million to Turkey.

EX. G 13

```
            1    Baran?

            2         A.   I don't remember any at this time.

            3         Q.   Was there -- did you ever send more money to

            4    Turkey?

12:13:30    5         A.   Yes.

            6         Q.   Why?

            7         A.   I was told to.

            8         Q.   By whom?

            9         A.   By Levon.

12:13:37   10         Q.   What is -- do you remember the purposes for which

           11    you sent money to Turkey in 2013?

           12         A.   I remember the purpose was that it was to pay

           13    Levon's boys.  That was the only thing that mattered to me is

           14    I make those payments.

12:14:00   15         Q.   And why did that matter to you?

           16         A.   Because that was our agreement.

           17         Q.   Do you remember specifically how much more you sent

           18    in 2013?

           19         A.   $23 million.

12:14:20   20         Q.   Who did you send it to?

           21         A.   I sent it to Turkey.  I don't know if it was Komak

           22    or not.

           23         Q.   Would you take a look just for the witness

           24    Government's Exhibit 6-23?  I'm sorry.  That is not the

12:14:43   25    right -- that's not the right one.
```

EX. G 14

```
 1          A.   SBK Holding is a company of Baran.  It does hard
 2   money lending.
 3          Q.   Is SBK, are those Baran's initials?
 4          A.   Yes.
 5          Q.   Do you know -- do you remember how much this
 6   payment was in November of 2013?
 7          A.   I know -- yes.  This was a $10 million payment.
 8          Q.   Did you make any plans to go back to Turkey?
 9               MR. GERAGOS:  Objection; vague as to time.
10               THE COURT:  Sustained.
11          Q.   BY MR. ROLWING:  In 2013, did you make any plans to
12   go back to Turkey?
13          A.   Yes.
14          Q.   With whom?
15          A.   I was going to go back with Levon.
16          Q.   Would you look at Government's Exhibit 6-41 just
17   for the witness?
18               MR. GERAGOS:  This is provisional.
19               THE COURT:  Right.  So I believe it may be shown to
20   the jury and subject to a motion to strike.
21               MR. GERAGOS:  Correct.
22          Q.   BY MR. ROLWING:  Do you recognize this as an e-mail
23   you got upon December 5th, 2013, from Petro to Jacob Kingston?
24          A.   Yes.
25          Q.   Regarding what?
```

Timestamps: 12:16:39 (line 5), 12:17:08 (line 10), 12:17:20 (line 15), 12:17:37 (line 20), 12:17:55 (line 25)

EX. G 15

```
            1              A.   Levon booked me First Class tickets to Turkey.

            2              Q.   Who is Petro?

            3              A.   I don't know.

            4              Q.   Do you see that this is an e-mail that Petro

12:18:17    5    forwards you that was received by Petronovel@yahoo.com from

            6    GT Energy?

            7              A.   Yes.

            8              Q.   Who is Petro Novel?

            9              A.   It's one of Levon's companies.

12:18:32   10              Q.   Is Novel spelled backwards Levon?

           11              A.   Yes.

           12              Q.   And this is $7,425.80 purchase for tickets for whom

           13    to travel from LA to Istanbul?

           14              A.   For me.  For me to travel.

12:18:50   15              Q.   Let's go back to Page 2.

           16                   Who else is listed as passengers?

           17              A.   Levon.

           18              Q.   Did you travel with him on these flights?

           19              A.   Yes, I did.

12:19:04   20              Q.   And what's the date of this planned trip?  Let's go

           21    back to Page 1.  Down here.

           22              A.   The 16th of January I was going to arrive.

           23              Q.   You're going to arrive in Istanbul in January?

           24              A.   Yes.

12:19:26   25              Q.   What was the purpose of this trip that was planned
```

EX. G 16

1      back in December of 2013?

2           A.   This trip, he wanted me to be the owner of a

3      company over there.

4           Q.   What kind of company?

12:19:49   5           A.   Of a bank.

6           Q.   Who wanted you to be an owner?

7           A.   Levon did.

8           Q.   Why?

9           A.   In Baran's business, for him to get access to

12:20:05  10      distressed assets it was easier for him to have a bank.

11           Q.   It was easier for who to have a bank?

12           A.   For Baran.  So I was instructed to be the white

13      face of an owner of this bank.

14           Q.   Did you send any money between the time of this

12:20:31  15      ticket purchased on December 5th and the trip to Los Angeles

16      from there to Turkey in January of 2014?

17           A.   I don't remember the dates that I sent all of that

18      money, but I know I sent a lot in '14.  If you could remind me

19      with some documents.

12:21:06  20           Q.   Did you ever send any more money to Komak?

21           A.   Yes.

22           Q.   How much approximately?

23           A.   I don't know.

24           Q.   What was the purpose?

12:21:18  25           A.   I don't know.

1   A      It was the banking regulation authority to get set up

2   to have a bank.

3   Q      What did you do there?   Who took you there?

4   A      I think it was Chilar.   HELP

5   Q      And who is Chilar?

6   A      One of the people that work for Baran.

7   Q      What did you do there with Chilar?

8   A      I sat and answered questions.   They already had the

9   agenda mapped out.

10  Q      Who's they?

11  A      Or Chilar did.

12  Q      And why did you do this?

13  A      Because I was going to be the owner of the bank.

14  Q      Why were you going to be the owner?

15  A      Because they needed a -- I was told they needed a white

16  boy face to be the owner as a foreign investor.

17          MR. GERAGOS:   Objection, vague as to who told him

18  that.

19          THE COURT:   Let's lay some foundation.

20  BY MR. ROLWING:

21  Q      Who told you that, sir?

22  A      Levon told me that.   We talked about this previous.

23  Levon told me that I was going to be the white boy face of

24  the bank over there.

25  Q      Did you learn anything about the -- did you ever visit

EX. G 18

1    the technology company?

2    A     Yes.

3    Q     What was that?

4    A     They changed the name to SetApp.  HELP so I walked

5    through and toured the facility and met the people that

6    worked there.

7    Q     Were you given a business card?

8    A     Yeah.

9    Q     What did the business card say?

10   A     That I was a chairman.

11   Q     Did you ever conduct yourself as the chairman of this

12   technology company in Turkey?

13   A     No.

14   Q     How did your chairman's duties get accomplished?

15   A     I had no chairman duties.

16   Q     When did you leave Turkey, sir, in January of '14, on

17   this trip?

18   A     The 25th.  It looks like I came back a couple days

19   later.

20   Q     Why did you come back?

21   A     I went to Kuala Lumpur, and then I came back.

22   Q     Why did you go Kuala Lumpur?

23   A     Because I had an office there.  I had a real office in

24   Kuala Lumpur.

25   Q     For what purpose?

EX. G 19

1   A      For bottling vegetable oil.   So I went there to meet

2   with my managers there, and then I came back to Turkey.

3   Q      And what did you do when you came back to Turkey?

4   A      I set up a personal bank account when I was there.

5   Q      How did you go about doing that?

6   A      Umut took me to Garanti Bank.   Her husband worked there

7   as a manager, and I set up a personal bank account there.

8   Q      Why?

9   A      To be an owner of a bank, you had to have a certain

10  amount of capital invested into the country for a period of

11  time before they would give you that ownership.

12  Q      Did you fund that personal bank account any money?

13  A      Yes.

14  Q      How much?

15  A      $10 million.

16  Q      Where did that $10 million come from?

17  A      From the tax credits from the previous year.

18  Q      Did you have control over that personal bank account in

19  Turkey.

20  A      I gave all control to Chilar.

21  Q      How did you do that?

22  A      I signed everything to him.

23  Q      So did you play any role in how that ten million that

24  you sent to that account got disbursed?

25  A      No.

EX. G 20

1   Q    So you had video communication with whose office in

2   Turkey?

3   A    With Baran's office.

4   Q    And whose office in Long Beach?

5   A    I had one in the Pillar Law Group and in Levon's

6   office.

7   Q    Where was Levon's office?

8   A    In Commerce.

9   Q    And why this video link?

10   A    It's easier to talk.

11   Q    Did you do any further business with Baran Korkmaz

12   after this trip to Turkey?

13   A    No.

14   Q    Did Baran Korkmaz ever come to the United States?

15   A    Yes.

16   Q    Why?

17   A    You mean the next time?

18   Q    When was the first time?

19          MR. GERAGOS:  Objection, vague.  No foundation.

20          THE COURT:  Let's lay some foundation, please.

21   Set a time frame.

22   BY MR. ROLWING:

23   Q    Did Baran Korkmaz ever visit you?

24   A    Yes.

25   Q    When and where?

1    Q      Did you this around this time?

2    A      Yes.

3    Q      Is Levon Termendzhyan on this e-mail?

4    A      No.

5    Q      Did you ever discuss the Mega asset -- the asset

6    management bank or company with Levon Termendzhyan?

7    A      Yes.

8    Q      Why did you agree to do this?

9    A      I was told to do it.   I didn't see any harm in doing

10   it.

11   Q      What did you -- what was in it for you?

12   A      This bank?   Nothing.

13   Q      Nothing?

14   A      I didn't benefit at all from this bank.

15   Q      Did you ever try and do other business with Baran

16   Korkmaz over in Turkey through your company or any other?

17   A      Yeah, we did.

18   Q      What did you try?

19   A      We tried -- well, he tried to source a extruder, a

20   plastic extruder from us.

21   Q      What is an extruder?

22   A      It's just a machine that presses plastic out.

23          And we looked for one and it didn't work.   On his trip

24   to when he was hunting, then we looked into seeing if he was

25   interested in purchasing guns from the U.S.   My cousin has a

1    gun company that he makes his own guns.  We looked into

2    that.  That never worked.

3    Q     Did the extruder ever pan out?

4    A     No.

5    Q     What other business did you look into with Baran

6    Korkmaz?

7    A     I don't remember.

8    Q     Did you end up doing any other business with him with

9    any of the other companies that were here in Utah?

10   A     No.

11   Q     Okay.  Let's look at 662.8.  Do you recognize these

12   text messages, Mr. Kingston?

13   A     Yes, I do.

14   Q     What are they?

15   A     Text messages from me and Levon.

16   Q     From your phone that was imaged n 2015?

17   A     Yes.

18   Q     And these are dated in the month of March 2014?

19   A     Yes.

20   Q     And what is the picture of Mr. Termendzhyan texting you

21   on the left on March 12th, 2014?

22   A     It's a picture of him and Hawk HELP and this gentleman

23   mur at bill can.  HELP HELP

24   Q     Can we go to the next page and look at that picture

25   blown up.

```
 1              MR. GERAGOS:  Thank you.

 2              (Recess)

 3              MR. ROLWING:  Before we call for the jury,

 4    Your Honor -- I didn't get to talk with Mark about this on

 5    the break.  I should have.  We saw the video, 6-169, which

 6    was provisionally admitted.  We have a certified translation

 7    of the Turkish that was mentioned in -- or used in that

 8    video.  It's 6-169-2.  We'd offer into evidence.

 9              THE COURT:  And is that something that's on the

10    chart?

11              MR. ROLWING:  It is.  It's provisionally admitted.

12              THE COURT:  Are you going to ask this witness

13    about it?  He doesn't speak Turkish as he's repeatedly

14    testified.  So I'm not sure that he's the guy to indicate --

15              MR. ROLWING:  I agree.  I'm not going to ask him

16    about it, but I want to offer it into evidence because I

17    believe it's a necessary corollary to the video, and I

18    believe -- I haven't heard that there's an objection about

19    the translation in any manner.

20              MR. GERAGOS:  Can we wait until -- since we're not

21    going to ask him about it, can we wait until we're done with

22    cross?

23              THE COURT:  Let's do that.  It's in evidence.  So

24    we can point it out to them after that, I suppose.

25              And let's plan on going until 4:45 so we don't
```

1    Q     And was the plan going to be more or less than what you

2    claimed in 2013?

3    A     It was going to be more.

4    Q     Did you buy this product from LifeTree?

5    A     We went into contract, but we never purchased or

6    received it.

7    Q     Why not?

8    A     Because we defaulted on the contract.

9    Q     Why?

10   A     Because we didn't have the money.

11   Q     Why not?  You had been paid over $300 million in 2013.

12   A     By this time in 2014, I have spent between 30 or $50

13   million in upgrading our facility in Utah.  I had sent

14   almost $100 million to Levon in either cash payments or

15   product, and I had spent the remaining balance in the

16   infrastructure setup with Deryl for the 2013 Gulf project.

17   Q     How much had you provided to your extended the family,

18   The Order, Davis County Cooperative Society?

19   A     Almost $10 million extra.

20   Q     And how much had you spent on other expenses of

21   Washakie Renewable Energy?

22   A     Like I said, we upgraded the plant, roughly 30 to $50

23   million, during that year.

24   Q     So who did you ask for money, if anyone?

25   A     I told Levon that we went into contract and I needed to

```
 1   get a letter of credit for this product.
 2   Q     And did he give you any money?
 3   A     No.
 4   Q     Did he give you a letter of credit?
 5   A     No.
 6   Q     What did he respond?
 7   A     He said to go to Turkey and to get a letter of credit
 8   based on the assets that we had there.
 9   Q     Did you do that?
10   A     I attempted to, yes.
11   Q     Let's look at 16-4.
12             MR. ROLWING:  I believe it's admitted, Your Honor.
13             THE COURT:  It is.
14   BY MR. ROLWING:
15   Q     Do you recognize this as an e-mail from Jordan Sebitain
16   HELP to Umut cc'ing Baran Korkmaz, you and Isaiah?
17   A     Yes.
18   Q     In what month.
19   A     May of 2014.
20   Q     Does this have anything to do with the LifeTree trading
21   contract?
22   A     Yes.
23   Q     What were you asking of Umut in Turkey?
24         Whose Jordan Sebitain?
25   A     Jordan Sebitani was my executive secretary.
```

EX. G 26

1    Q      Did you go to your bank and request money out?

2    A      No.

3    Q      Why not?

4    A      It wasn't my money.

5    Q      Let's look at -- well, who did you meet with when you

6    were in Turkey in April of 2014?

7    A      I met with Baran and Umut, and Fereba.   HELP

8    Q      Can you look at -- do you remember where you went with

9    Baran?

10   A      No, not necessarily.

11   Q      Did you have a habit of taking pictures when you were

12   in Turkey?

13   A      Yeah.

14   Q      Can you look at the picture marked Government's Exhibit

15   6-203?

16          THE COURT:   It's admitted.

17   BY MR. ROLWING:

18   Q      Do you recognize this picture?

19   A      Yes.

20   Q      A picture on your phone?

21   A      Yes, it is.

22   Q      And who is in the picture?

23   A      I saw from Baran.

24   Q      Where are you?

25   A      This is a SetApp office.

1    Q.   You also mentioned that the defendant had told

2    you about his prior arrest and acquittal from the

3    1990s that was somehow related to his umbrella.   Do

4    you remember that?

-01:-28:-39   5    A.   Yes.

6    Q.   Did he ever tell you how he acquired this

7    umbrella?

8    A.   No, he didn't.

9    Q.   Did he ever tell you what relationship he had

-01:-28:-30   10   with the umbrella?

11   A.   No, he didn't.

12   Q.   Did you ever see him with the umbrella?

13   A.   I knew of -- some of the agents that we had

14   dinner with, I understood them to be part of that,

-01:-28:-14   15   yes.

16   Q.   So you did see him talk to people you believe

17   were part of the umbrella?

18   A.   Yes.

19   Q.   Who were some of those people?

-01:-28:-05   20   A.   Felix Cisneros.

21   Q.   Who was he?

22   A.   He was a homeland security agent.

23   Q.   Did the defendant ever mention to you anything

24   Felix Cisneros had ever done for him?

-01:-27:-52   25   A.   Yes.

EX. G 28

A. Yes.
Q. What about November 15th?
A. I asked -- I told him that he needed to pay now.
Q. And did he pay?
00:-24:-42 A. No.
Q. All right. Let's go to 6-54.7. What did he tell you in December 2014? Who are these texts with?
A. These again are with Baran and myself.
Q. And what does he represent to you in December
00:-24:-14 of 2014?
A. He says, "soon, I will pay back more than all your money."
Q. 6-54.8. Can you go to that? A few days later who are you texting with?
00:-23:-51 A. With Baran and myself.
Q. And what did he tell you on December 10, 2014?
A. He says the money you sent is $643,000,000.00.
Q. What do you respond to him down below? So --
A. I asked him if this is Turkish lira.
00:-23:-26 Q. What did he say?
A. He says it was US dollars.
Q. How much had you sent to Turkey by December of 2014?
A. Over $50,000,000.00.
00:-23:-13 Q. And did you believe him when he told you it was

```
 1   now worth 643,000,000 US dollars?
 2   A.   No, I didn't.
 3   Q.   Did you ever get any of it back?
 4   A.   No.
 5   Q.   Who is Brad Dennis?
 6            We can take that down, Ms. Bonney.  Thank
 7   you.
 8   A.   Brad Dennis started out to be my Turkish
 9   instructor.
10   Q.   You were learning to speak Turkish?
11   A.   Yes.
12   Q.   Why?
13   A.   So that I could do business and communicate with
14   Baran.
15   Q.   And how far along did you get with Mr. Dennis?
16   A.   Not very far.
17   Q.   Did you hire him?
18   A.   Yes, I did.
19   Q.   Not just to be an instructor but in any other
20   capacity?
21   A.   Yes.
22   Q.   What?
23   A.   He was -- he was hired on as a project manager.
24   Q.   What was -- what project was he managing?
25   A.   He really didn't have an assignment.  Can I
```

00:-22:-57    5
00:-22:-47   10
00:-22:-41   15
00:-22:-28   20
00:-22:-17   25

EX. G 30

```
 1    A.   Yes, he accepted it.

 2    Q.   Accepted what?

 3    A.   The help.

 4    Q.   And then what?

 5    A.   He is going to kill the goose that lays the eggs.

 6    Q.   Who is the he you're referring to?

 7    A.   Um, I was referring to my family.

 8    Q.   And who is the goose?

 9    A.   Me.

10    Q.   Next page.  What does Mr. Termendzhyan then tell

11    you?

12    A.   He says, tell him me and you very big project, we

13    need all of the money we can.

14    Q.   And what did you respond?

15    A.   I says he doesn't know anything on amounts but he

16    thinks anything we get is ours and it's profit.  I

17    told him it's very small part is ours, and we already

18    spent it on the crush plant and it may not even come

19    until August.

20    Q.   And then what?

21    A.   And he needs to cover what he owes.

22    Q.   Did you tell your uncle a very small part of the

23    tax credit was yours?

24    A.   I never had a conversation with my uncle about

25    the tax credit.
```

00:27:50 (line 5)
00:28:01 (line 10)
00:28:20 (line 15)
00:28:41 (line 20)
00:28:56 (line 25)

EX. G 31

```
 1              MR. GERAGOS:  I'm sorry, turn in --

 2              THE COURT:  To turn in our increases.

 3   Q.   (By Mr. Rolwing)  What does that mean?

 4   A.   That means make available any increases.

 5   Q.   Make available what?

 6   A.   Any of our increases.

 7   Q.   What are increases?

 8   A.   Any money that is available.

 9   Q.   And how much of your increases are you supposed

10   to make available?

11   A.   However much we saw fit that was available.

12   Q.   Did your Uncle Paul know about the scheme with

13   Levon Termendzhyan and Deryl Leon?

14   A.   No.

15   Q.   Did your Uncle Paul's legal troubles have

16   anything to do with the scheme with the defendant and

17   Deryl Leon?

18   A.   No.

19   Q.   So on February 11th, what do you text Levon?

20   A.   I ask him for his new number.

21   Q.   What does that mean?  You're texting his phone?

22   A.   Yes, I'm texting for the number for his new

23   burner phone.

24   Q.   Did he give it to you?

25   A.   Yes.
```

Timestamps:
00:35:23 (line 5)
00:35:33 (line 10)
00:35:49 (line 15)
00:36:12 (line 20)
00:36:21 (line 25)

EX. G 32

| | | |
|---|---|---|
| | 1 | investing up to 350,000,000 more.  Where did that |
| | 2 | figure come from? |
| | 3 | A.   I don't know. |
| | 4 | Q.   Why did you send this e-mail? |
| 01:34:18 | 5 | A.   I was told to. |
| | 6 | Q.   Do you know if these funds that you sent to, as |
| | 7 | you call it, Isanne were used to buy BioPharma? |
| | 8 | A.   I don't know. |
| | 9 | Q.   Did you ever discuss BioPharma with Levon |
| 01:34:40 | 10 | Termendzhyan after this? |
| | 11 | A.   Yes. |
| | 12 | Q.   What did you discuss? |
| | 13 | A.   That there was a pharmaceutical company that |
| | 14 | Baran was looking at in buying.  And later on I went |
| 01:34:55 | 15 | and toured the facility. |
| | 16 | Q.   With who? |
| | 17 | A.   With Baran and Levon, and Umut I think was there. |
| | 18 | Q.   And so was BioPharma purchased? |
| | 19 | A.   Yes. |
| 01:35:10 | 20 | Q.   And did you discuss that with the defendant? |
| | 21 | A.   Yes. |
| | 22 | Q.   After you left Turkey on June 1st of 2015, where |
| | 23 | did you go? |
| | 24 | A.   I went to Kuala Lumpur. |
| 01:35:30 | 25 | Q.   And then where did you go? |

```
          1            A.   That's false.

          2            Q.   Why did you sign this document?

          3            A.   This document was sent to me, and I was instructed

          4     to sign it.

13:35:33  5            Q.   Who instructed you?

          6            A.   I believe Umut instructed me to sign this.

          7                 MR. GERAGOS:  I'm sorry, who?

          8                 THE COURT:  Umut.

          9                 MR. GERAGOS:  Umut.  Thank you.

13:35:46 10            Q.   BY MR. ROLWING:  And this document appointed

         11     someone named who as the CEO of Mega Varlik?

         12            A.   Caglar Sendil.

         13            Q.   Who is Caglar Sendil?

         14            A.   He's a person that worked for Baran.

13:36:11 15            Q.   Did you have anything to do with the financial

         16     transactions that occurred on June 16, 2015, in Turkey?

         17            A.   No, I did not.

         18            Q.   This is the month after you sent money to Isanne?

         19            A.   Yes.

13:36:47 20            Q.   Did you know in 2015 whether any of the 56 million

         21     you sent to the Isanne account came back to the United States?

         22            A.   No, I did not.

         23            Q.   Did any of it come back to you?

         24            A.   No.

13:37:11 25            Q.   Did you and the defendant discuss any plans for the
```

648

EX. G 34

1    going to solve it.

2         Q.   What did he say?

3         A.   He said that he was going to be returned home as

4    soon as his case was resolved.

15:30:52 5         Q.   And did he say anything about who was involved in

6    this case?

7         A.   No, he didn't.

8         Q.   How was it going to be resolved?  Did he have any

9    plan or did he share anything with you?

15:31:06 10        A.   No.

11        Q.   Did you ever learn whether anything got resolved

12   about a search warrant executed on Levon Termendzhyan in his

13   residence and businesses?

14        A.   Yes.

15:31:17 15        Q.   What did you learn from whom?

16        A.   Levon told me that his property was returned to him

17   and there was no more charges on him.

18        Q.   And did he return to the country?

19        A.   Yes.

15:31:30 20        Q.   What effect did this have on your belief that there

21   was an umbrella providing him protection?

22        A.   This reinforced it.

23        Q.   Did you ever seek protection from anyone else other

24   than Levon Termendzhyan and Commissioner Gordon?

15:31:55 25        A.   No.

712

EX. G 35

```
 1              Q.   Did you ever discuss this protection you were

 2      seeking with anyone other than Levon and Santiago Garcia and

 3      Commissioner Gordon?

 4              A.   No.  Other than Isaiah.

15:32:13  5     Q.   Did you ever discuss getting protection from Baran?

 6              A.   No.  Not from Baran.

 7              Q.   Did you ever discuss getting protection with Baran?

 8              A.   I discussed payments that I made with -- that I was

 9      obligated to pay Levon for protection with Baran and Umut.

15:32:36 10     Q.   Where did this discussion with Baran and Umut lead?

11              A.   We did this in Turkey in February.

12              Q.   Of what year?

13              A.   2018.

14              Q.   And what was the discussion with Baran and Umut

15:32:49 15     about protection?

16              A.   Baran told me that Levon was stepping away from me,

17      that because of my legal issues and his legal issues, Baran

18      told me that Levon was stepping away from me and that I would

19      have to send payments directly to Baran and his companies.

15:33:17 20     Q.   For what purpose?

21              A.   For what Levon had told me was protection.

22              Q.   And what terms did you and Baran use regarding this

23      protection?

24              A.   Because he didn't speak English he referred it to

15:33:36 25     his grandpa.
```

EX. G 36

1    Q.   And who did you understand him to mean by grandpa?

2    A.   Levon's people.

3    Q.   And did you pay Baran directly any money in 2018

4  for the protection of Levon's people known as the grandpa?

15:33:54  5    A.   Yes.

6    Q.   How much?

7    A.   $6 million.

8    Q.   Where did you get this money?

9    A.   I sold everything I had.

15:34:00  10    Q.   What did you sell?

11    A.   I sold jewelry.  I sold cars.  I sold a truck stop.

12  I was selling as many properties as I could sell.

13    Q.   To come up with this money?

14    A.   Yes.

15:34:15  15    Q.   Was the criminal investigation proceeding during

16  2018?

17    A.   Yes.

18    Q.   Did one of the mother's of your children get

19  subpoenaed to the grand jury?

15:34:31  20    A.   Yes.

21    Q.   Was that a concern for you?

22    A.   Yes.

23    Q.   Do you remember what date it was?

24    A.   I don't remember what date it was.

15:34:39  25    Q.   I'm going to hand you what's been marked 6-65.1 in

714

EX. G 37

1      Q.   Were you planning to get onto this yacht while you

2  were in Turkey?

3      A.   No.

4      Q.   Did you ever make it onto this yacht?

15:45:34  5      A.   No.

6      Q.   Did you make it to Turkey in August of 2018?

7      A.   No.

8      Q.   What happened to you?

9      A.   I was arrested.

15:45:43  10      Q.   Was your arrest consistent or inconsistent with the

11  protection that Levon Termendzhyan had been offering you and

12  your family for so long?

13      A.   Very inconsistent.

14      Q.   Was the protection -- was the arrest consistent or

15:46:06  15  inconsistent with the protection you thought you were getting

16  from Commissioner Gordon?

17      A.   Inconsistent.

18      Q.   Was the arrest consistent or inconsistent with the

19  protection you thought you were getting from grandpa?

15:46:20  20      A.   Inconsistent.

21      Q.   Was there a grandpa?

22      A.   I knew grandpa as Levon's guys.  Obviously there

23  was no one there.

24      Q.   Was there an umbrella?

15:46:32  25      A.   No.

722

```
1   we were turning in 100 million in less than a month?
2   A    Yes.
3   Q    You said it?
4   A    Yeah.
5   Q    That makes sense because Amy was your wife, and also
6   working in the accounting?
7   A    Yes.
8   Q    Also the daughter of the person who's saying, you know,
9   my brother wants this hundred million, right?
10  A    Of the rumor, yes.
11  Q    The rumor.  You're getting texted and you've been told
12  this by Amy, correct?
13  A    Yes.
14  Q    Amy didn't tell you it was a rumor.  She told you what
15  David said, her dad said, right?
16  A    Yes.
17  Q    So you didn't have a -- and maybe what you're trying to
18  say, tell me if I'm jumping to a conclusion, what you're
19  trying to convey to the jury is you didn't talk directly to
20  Paul about the hundred million?
21  A    No, I didn't.
22  Q    You heard it through your wife?
23  A    Yes.
24  Q    And this is February of 2015, correct?
25  A    Yes.
```

1    schedules of $100 million to your Uncle Paul?

2    A    I never had that conversation with $100 million to

3    Uncle Paul.

4    Q    You never talked about 100 million to Uncle Paul?

5    A    I never had a schedule about $100 million to my Uncle

6    Paul.

7    Q    How much money would you say to your Uncle Paul during

8    the eight years that you and Isaiah were there?

9    A    I don't know how much money actually went to him

10    personally.

11    Q    When you say personally, how much went to The Order?

12    A    Just over 30 million.

13    Q    How do you come up with 30?

14    A    Because that's what Isaiah and I allocated.

15    Q    When you say allocated, what do you mean by that?

16    A    When Isaiah and I would do our budgets for the projects

17    for the year, then we would decide what was extra and that's

18    what was allocated to go.

19    Q    Then why did your Uncle Paul -- do you know why your

20    Uncle Paul expected $100 million?

21    A    I don't think he did.  I think that was a rumor.

22    Q    You think that was a rumor and that's why you texted

23    it?  Amy said David said he's expecting 100 million.

24    A    Yeah.

25    Q    What is the rumor?  Who was the rumor?  The rumor was

1   you're wife, Amy?

2   A    Possibly.

3   Q    Was the rumor Amy's dad?

4   A    I don't know.

5   Q    Okay.  But he just came up with $100 million at the

6   same time you're applying for 170; is that right?  Is that a

7   coincidence?

8   A    I don't know.

9   Q    Did you know also that when you -- by the way, who

10  called you from the IRS?

11  A    Nobody talked to me.  They talked to my IT manager.

12  Q    And what did they tell your IT manager?

13  A    Like I said, that five of our facilities were going to

14  be raided.

15  Q    And how soon after that were the facilities raided?

16  A    They told me they would be raided the following

17  Wednesday, and they were.

18  Q    And did the IRS also go to many Order members' homes on

19  the day of the arrest?

20  A    Yes, they did.

21  Q    And did the person identify himself as Mr. Green?

22  A    Yes, he did.

23  Q    Was that part of your umbrella, or your protection?

24  Remember all those questions yesterday about consistent or

25  inconsistent?  That would seem to be consistent with an

EX. G 41

```
 1    think that you were being forthcoming at that point?  When I

 2    asked you about that in front of the jury, do you think you

 3    were being forthcoming?

 4    A    Yes.

 5    Q    You do?

 6    A    Yes.

 7    Q    So you think you were being completely truthful when I

 8    asked you those questions?

 9    A    As much as possible.

10    Q    As much as possible, right?

11    A    Yes.

12    Q    You have a limitation on that; isn't that correct?

13    A    I don't understand.

14    Q    Well, you've got sitting in this courtroom Order

15    related people, correct?

16    A    Yes.

17    Q    I know you said your eyesight was bad.  Do you want to

18    step forward and tell me.  Haven't there been Order related

19    people monitoring your testimony at all times?

20    A    I don't think anyone is monitoring my testimony except

21    the --

22    Q    Court reporter.  So are there Order related people in

23    this courtroom right now?

24    A    I think so, yes.

25    Q    Is part of the reason that you're being as truthful as
```

1    possible the fact that you do not want to admit what the

2    connection of your frauds -- and we've only gotten through

3    2011 so far.  But is one of the reasons that you're not

4    being truthful, or as truthful as possible, is because you

5    don't want to tag your uncle or your father?

6    A    That's ridiculous.

7    Q    What's ridiculous about it?

8    A    Because The Order or anyone in The Order has nothing to

9    do with this case.

10   Q    What about that $100 million they wanted?

11   A    This is a case between me and Levon Termendzhyan.

12   Q    I understand that.  I understand that.

13        What about the three million to Alliance Investments,

14   when did you get that back?

15   A    Whatever investments made into my company, we paid that

16   back.

17   Q    Who paid that back?

18   A    WRE did.

19   Q    What do you mean you paid it back?  You gave them three

20   million.

21   A    No.  That was for a loan.

22   Q    You loaned it to Alliance?

23   A    No.  They loaned me the money.

24   Q    Didn't we just establish that you gave the three

25   million to Alliance?

EX. G 43

1   recollection as to what the time period was?

2   A    I don't know.  I don't know.

3   Q    Who actually did it?

4   A    I think Isaiah did it.

5   Q    And who would have told Isaiah to do it?

6   A    I would have.

7   Q    Even though Isaiah was part owner?

8   A    Yes.

9   Q    And was the decision made to spread out, quote,

10  unquote, the liability?

11  A    Yes, that was the reason.

12  Q    What liability was Paul Kingston worried about?  Do you

13  know?

14  A    No, I don't.

15  Q    What liability were you worried about?

16  A    It was his recommendation, so I took it.

17  Q    Well, it's true that Ms. Avery, Ginger, as you call

18  her, never had any real control or ownership in either WRE,

19  which is Washakie, or UFS, correct?

20  A    That's true.

21  Q    Did you describe her or would you describe her as a

22  placeholder?

23  A    Or a nominee, yes.

24  Q    Or a nominee.  Okay.  So basically kind of a front?

25  A    Yes.

```
 1    Q     And it was Paul Kingston's suggestion, it wasn't your
 2    decision, to put her as the nominee, so to speak, for UFS,
 3    correct?
 4    A     No, it was my decision.   It was his recommendation.
 5    Q     And was that done because he and Rachel moved owners in
 6    the companies around from year to year for tax reasons?
 7    A     No.
 8    Q     Did you tell the government that Paul Kingston and
 9    Rachel Young used to move around the owners of the companies
10    for tax reasons?
11    A     I don't remember saying that.
12              MR. GERAGOS:   May I approach?
13              THE COURT:   You may.
14    BY MR. GERAGOS:
15    Q     Paragraph 102.
16    A     Okay.
17    Q     Does that refresh your recollection?
18    A     Yes.
19    Q     Is it a fair statement that at one point, at least, you
20    understood that the reason that Ginger became the owner of
21    United Fuel Supply -- you're with me so far, correct?
22    A     Yes.
23    Q     UFS is the acronym for United Fuel Supply, right?
24    A     Right.
25    Q     And the reason that you thought that they were making
```

EX. G 45

1   Ginger the nominee, if you will, of United Fuel Supply

2   sometime in 2012 or 2013 was for tax reasons?

3   A    No, it was for liability.

4   Q    Did you tell the government that you changed -- or that

5   Rachel and Paul moved the owners of the companies around for

6   tax reasons?

7   A    I don't think I said that.

8   Q    Okay.  When you say liability, was that for legal

9   liability?

10  A    Yes.

11  Q    What kind of legal liability were they worried about?

12  A    I don't know what was going through their mind at the

13  time when they recommended it.

14  Q    Right.  I'm not asking you -- I don't want you to

15  speculate -- I'm sorry.  I didn't mean to step on you.

16       Were you done?

17  A    I'm done.  On a sidenote, I think we've been provided

18  these specifically for us.  So, go ahead.

19  Q    Are you done?

20  A    I'm done.

21  Q    Did you know what kind of legal liability -- what were

22  you thinking?  If it wasn't for tax, what was it?

23  A    People sue people all the time.

24  Q    Do you know the term bleeding the beast?

25  A    I've heard that term, yes.

EX. G 46

1    each other, was that a concern of members of The Order, you

2    specifically?

3    A    No.  That's good business sense, to protect yourself

4    and your business from lawsuit and to spread liability.

5    Q    So you thought it was a good idea when Paul Kingston

6    and Rachel Young would move around owners of the companies

7    that belonged to The Order?

8    A    I never said that, and I never gave a thought on that.

9    Q    Did you tell the government on July 15th, and

10   specifically the prosecutors, that Paul and Rachel Young

11   moved owners in companies around from year to year for tax

12   reasons?

13   A    No.  I don't think I said that.

14   Q    Were you always the owner of WRE?

15   A    I was always a part owner, yes.

16   Q    Who else owned it besides Isaiah?

17   A    I think my brother owned it for a time.

18   Q    Which brother?

19   A    Daniel.

20   Q    Did The Order or Paul Kingston have a financial

21   interest in WRE?

22   A    No.

23   Q    How about UFS?

24   A    No.

25   Q    But you would take the advice of Paul Kingston or

EX. G 47

```
 1    Q     Did this have to do with money that was going to

 2    Turkey?

 3    A     No.

 4    Q     Are you sure?

 5    A     Pretty sure.

 6    Q     Wasn't there wires going out to Turkey into a Garanti

 7    Bank and that's why he was asking you about it?

 8    A     No.

 9    Q     Didn't he ask you why you were sending money to Turkey?

10    A     No.

11    Q     He never asked you that?

12    A     No, I don't think he did.

13    Q     Do you remember a conversation with your Uncle Paul

14    when he confronted you with where the wire transfers out of

15    the Washakie account were going?

16    A     I don't remember that conversation.

17    Q     What was the conversation you just referenced, the one

18    where you said he confronted you and you thought it was

19    related to Bank of Utah?

20    A     That was several years earlier.

21    Q     When?  What are we talking about?

22    A     2011.

23    Q     And what was the subject matter of that conversation?

24    A     Just -- I mean, it was almost ten years ago.  I don't

25    remember the details.
```

EX. G 48

1   them that.

2   Q   From Mr. Korkmaz?

3   A   Korkmaz, yes.

4   Q   Korkmaz, in Turkey, right?

5   A   Yes.

6   Q   By the way, you never told them in August that the name

7   Anne, spelled A-n-n-e, was the way that Levon spelled -- his

8   daughter spelled her name, did you?

9   A   I don't think I told them that.

10  Q   You didn't, right?

11  A   No.

12  Q   By the way, the one thing that you weren't asked about

13  by the prosecution on redirect was about that $150 million

14  secret account, right?

15  A   Which one?

16  Q   Exactly.

17          MR. GERAGOS:  No further questions.

18                 FURTHER RECROSS-EXAMINATION

19  BY MR. ROLWING:

20  Q   Do you remember Mr. Geragos asking you about that text

21  you sent your brother on the $150 million secret account?

22  A   Yes.

23  Q   Were you serious?

24  A   That account that I sent that text message referred to

25  the account that I put that $160 million that I received

EX. G 49

1    from the IRS.

2    Q    Did you have a secret account with 150 million in it?

3    A    No.

4    Q    Would you look at -- you said Mr. Korkmaz is the source

5    of your information for the Queen Anne, right?

6    A    Yes.

7    Q    Is that the same person who you were paying money to in

8    2018 for protection?

9    A    Yes.

10   Q    Did you get protection?

11   A    No.

12   Q    And who did you believe he was in --

13        MR. GERAGOS:  Objection, exceeds the scope of

14   recross.

15        THE COURT:  Sustained.

16   BY MR. ROLWING:

17   Q    Did Mr. Korkmaz ever send you anything informing you --

18        MR. GERAGOS:  Objection, exceeds the scope.

19        MR. ROLWING:  I haven't finished the question

20   regarding Queen Anne.

21   BY MR. ROLWING:

22   Q    Did Mr. Korkmaz ever send you anything informing or

23   relating to who owned the Queen Anne?

24   A    Yes.

25   Q    What did he send you?